## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

CERTAIN UNDERWRITERS AT LLOYD'S LONDON,

*Plaintiff-Appellee,*

v.

ANCHOR INSURANCE HOLDINGS, INC., et. al.,

*Defendants-Appellants*

On appeal from the United States District Court for the
Middle District of Florida
No. 8:21-cv-370-TPB
Honorable Tom Barber

## APPELLEE'S JURISDICTIONAL BRIEF, ALTERNATIVELY,
## MOTION TO AMEND COMPLAINT

SINA BAHADORAN
Florida Bar No. 523364
Sina.Bahadoran@Clydeco.us
MICHELE A. VARGAS
Florida Bar No. 686395
Michele.Vargas@Clydeco.us

CLYDE & CO US LLP
1221 Brickell Avenue
Suite 1600
Miami, Florida 33131
T: 305.446.2646

March 10, 2023

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1, Certain

Underwriters at Lloyd's London provide this certificate of interested persons and

corporate disclosure statement:

The following district court judge, attorneys, persons, associations of persons, firms, partnerships, or corporations have an interest in the outcome of this appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party.

Anchor Insurance Holdings, Inc., Appellant

Anchor Property & Casualty Insurance Company, Appellant

Bahadoran, Sina, counsel for Appellee

Barber, Tom, District Judge

Bickford & Chidnese, LLP, law firm for Appellant

Certain Underwriters at Lloyd's London ("Underwriters"), Appellant; Underwriters are comprised of these Syndicates:

    a. Syndicate 4020[1]

    b. Syndicate 1458

    c. Syndicate 2001

    d. Syndicate 1084

---

[1] The sole member (corporation) of each Syndicate is incorporated in the United Kingdom. Each Syndicate is accordingly a citizen of the U.K., which also renders Underwriters citizens of the U.K.

e. Syndicate 435

f. Syndicate 5678, and

g. Syndicate 3000

Chidnese, Patrick M., counsel for Appellant

Clyde & Co US LLP, law firm for Appellee

Lindroth, Freida C., counsel for Appellant

Parrish Law, P.A., law firm for Appellants

Parrish, Paul, counsel for Appellants

Vargas, Michele A., counsel for Appellee

Pursuant to the Court's Order dated 02/24/2023, requiring jurisdictional briefing on the issue of whether the district court has diversity jurisdiction, Appellee, Certain Underwriters at Lloyd's London ("Underwriters"), provide this jurisdictional brief. In the alternative, Underwriters move for leave to file a second amended complaint more completely describing the basis for diversity jurisdiction, and in support state:

## Introductory statement

Underwriters are a self-regulating entity that operate and control an insurance market for buying and selling of insurance risk among its members. The members act through "Syndicates." *See Green Coast Enter. v. Certain Underwriters at Lloyd's London*, No. 22-973, 2022 WL 2208206, at *3 (E.D. La. June 21, 2022). "A Syndicate is a creature of administrative convenience through which individual investors [or members] can subscribe to a Lloyd's policy." *Louisiana Rest. Ass'n. v. Certain Underwriters at Lloyd's London*, 573 F. Supp. 3d 1054, 1059 (E.D. La. 2021). "A typical Lloyd's policy has multiple Syndicates which collectively are responsible for 100 percent of the coverage provided by a policy." *Id.*

The members subscribing to a particular insurance policy are jointly and severally obligated to the insured for the percentage of the risk each has agreed to assume. *Green*, 2022 WL 2208206, at *3. The majority of courts agree, that in

order to establish the citizenship of Underwriters, each member must be identified along with its citizenship. *Id.*

Historically, Syndicates were comprised of thousands of individual investors or "Names" because the Syndicates were not incorporated. *See PHL Variable Ins. Co. v. Cont'l Cas. Co.*, No. 19-cv-06799, 2020 WL 1288454, at *4 (N.D. Cal. Mar. 18, 2020). In recent times, that changed. Since 2003, many Names have converted to limited liability entities. *See Lloyd's Manual, Published 04/10/2016*, available at: https://www.gov.uk/hmrc-internal-manuals//lloyds-manual/llm1080 (last visited March 3, 2023). In fact, "[i]ndividuals who wish to enter the [Lloyd's] market must now do so via one of the limited liability vehicles introduced to allow Names to convert." *Id.* As a result of this change, **"[s]ome syndicates comprise only a single corporate member**." *Id.* (emphasis added).

Each Syndicate that subscribed to the Policy at issue in this appeal is comprised of single corporate member, which is a private limited company incorporated in the United Kingdom. For purposes of diversity jurisdiction, single member U.K. limited companies are treated similar to American corporations. *See PHLl Variable Ins.*, 2020 WL 1288454, at *4 (holding underwriters sufficiently established diversity jurisdiction through a declaration confirming each syndicate's member was incorporated in the U.K., making each syndicate a citizen of the U.K., and Underwriters citizens of the U.K.); *Green Coast Enter. v. Certain Underwriters*

*at Lloyd's London*, No. 22-973, 2022 WL 2208206,at *4 (E.D. La. June 21, 2022)

("[A] United Kingdom limited company is a juridical person and a foreign citizen. For purposes of diversity jurisdiction, U.K. limited companies are treated as American corporations) (citing *Brink's Co. v. Chubb European Grp. Ltd.*, No. 20-520, 2020 WL 6829870, at *6 (E.D. Va. Nov. 20, 2020) ("A private limited company [under United Kingdom law] has all of [the hallmarks of an American corporation]: a separate legal identity with separate liability; at least one director and one secretary; marketable stocks, though they cannot be sold on the public exchange; required annual reports to the Companies House, the United Kingdom's equivalent of a State Corporation Commission; and no pass-through taxation).

Underwriters respond to each question in the Court's Order.

**1. Do the pleadings sufficiently allege the citizenship of the parties in order to invoke the district court's diversity jurisdiction under 28 U.S.C. § 1332(a)(1)?**

Underwriters' amended complaint for rescission, monetary damages, and declaratory relief under 28 U.S.C. § 2201 against Anchor Insurance Holdings, Inc. ("Anchor"), Anchor Property & Casualty Insurance Company ("Anchor P&C"), Nick W. Griffin, Daniel S. Bowman, and Christopher Moench (collectively, the "Dismissed Individuals"), alleges diversity of citizenship. (*See* App. Vol. I, D.E. 20; D.E.92, D.E. 100, D.E. 101.) Specifically, at the time of the amended complaint, Anchor was a Florida corporation with its principal place of business in

Florida. At the time of the amended complaint, Anchor P&C was a Florida corporation with its principal place of business in Florida. The Dismissed Individuals were citizens of Florida.

At the time of the amended complaint, Underwriters were citizens of the United Kingdom. Underwriters are an unincorporated association comprised of seven Syndicates, although the amended complaint only identified three Syndicates. (App. Vol. I, D.E. 20, ¶ 6.) The amended complaint identified these Syndicates: Syndicate 4020; Syndicate 1458; and Syndicate 2001. (App. Vol. 1, D.E. 20, ¶6.) Each of these Syndicates is a citizen of the U.K. because the sole member (a corporation) of each Syndicate is a citizen of the U.K. Accordingly, Paragraph 6 of the amended complaint alleges Underwriters are citizens of the U.K., which satisfied diversity jurisdiction under Section 1332. Admittedly, however, Paragraph 6 inadvertently failed to disclose four additional syndicates subscribing to the Policy. Those four additional Syndicates are also all citizens of the U.K.

**2. Whether the allegations should be amended on appeal, pursuant to 28 U.S.C. § 1653, to cure any jurisdictional deficiencies in the current pleadings.**

After this Court issued the Order requiring jurisdictional briefing, counsel for Underwriters learned from Verve Risk Partners, LLP ("Verve"), which has 100% underwriting authority on behalf of the Syndicates subscribing to the Policy,

of four additional Syndicates and the percentage of the risk held by each Syndicate. (App. Vol. I, *Complete Policy*, Ex. A; *Decl.*, Ex. B.) The four additional syndicates are: Syndicate 1084, Syndicate 435, Syndicate 5678, and Syndicate 3000. These Syndicates are citizens of the U.K., because at the time of the amended complaint their sole members (corporations) were incorporated in and are citizens of the U.K.

Accordingly, Underwriters respectfully request the Court allow them to file a second amended complaint pursuant to 28 U.S.C. § 1653 to cure any procedural defect and comprehensively allege the citizenship of Underwriters in Paragraph 6 of the amended complaint.[2] *See Corp. Mgmt. Advisors, Inc. v. Artejen Complexus, Inc.*, 561 F.3d 1294, 1297 (11th Cir. 2009) ("Allstate's failure to allege, in its notice of removal, the plaintiff's citizenship at the time the original petition was filed constitutes a procedural… defect…."); *see also Dye v. Sexton*, 695 Fed. Appx. 482, 485 (11th Cir. 2017) ("Defective allegations of jurisdiction may be amended upon terms, in the trial or appellate courts."); *Green Coast*, 2022 WL 2208206, at *3 (Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts.").

Section 1653 is liberally construed to avoid dismissal on technical grounds. *See Artjen*, 561 F.3d at 1297 ("Where subject matter jurisdiction exists and any

---

[2] To be clear, Underwriters do not ask to reopen the pleadings. Underwriters only wish to amend Paragraph 6 of the amended complaint to be complete and dispense with any questions regarding diversity.

procedural shortcomings may be cured by resort to § 1653, we can surmise no

valid reason for the court to decline the exercise of jurisdiction."). Leave to amend

under Section 1653 is appropriate here because it is based on additional facts

confirming Underwriters have diverse citizenship from Appellants. *See 15 oz Fresh*

*& Healthy Foods v. Underwriters at Lloyd's London*, No. 21-10949, 2022 WL

6595768 (11th Cir. 2022) (granting appellant's motion to amend complaint to

include additional allegations of the parties' citizenship for purposes of diversity

jurisdiction) (citing *Mallory & Evans Contractors & Eng'rs, LLC v. Tuskegee*

*Univ.*, 663 F.3d 1304, 1305 (11th Cir. 2011) ("Because we suspect there may be

diversity of citizenship, [appellant] is invited to file in this court ... a motion for

leave to amend the complaint to correct the deficient allegations of citizenship.")).

### 3. Whether current record evidence adequately establishes the parties' citizenship?

The record evidence regarding the citizenship of Underwriters is incomplete.

The amended complaint and corporate disclosures of Underwriters only partially

alleged the basis for Underwriters's citizenship. (App. Vol. I, D.E. 20; D.E. 3.)

Anchor and Anchor P&C <u>admitted</u> diversity jurisdiction in their answer. (App. Vol.

I, D.E. 37, ¶ 5.) Moreover, Appellants never moved to remand. As detailed below,

there is evidence albeit outside the record, irrefutably establishing diversity

jurisdiction between the parties which ought to be considered. *See Dynasty Mgmt,*

*LLC v. UMG Recordings, Inc.*, 759 Fed. Appx. 784 (11th Cir. 2018) (noting the

district court considered "extensive evidence from a variety of sources, including business records, addresses listed in court filings, and sworn statements" to verify it had diversity jurisdiction).

### 4. Whether the record should be supplemented with additional evidence to demonstrate the parties' citizenship?

Underwriters believe the record should be supplemented with additional evidence. The declaration of Scott Simmons, a Partner of Verve, which is the managing general agent for Syndicate 4020, the lead Syndicate subscribing to the Policy, identifies: (a) the additional four Syndicates of the Policy; (b) the <u>sole</u> member of each Syndicate; (c) the corporate form of each sole member; (d) the citizenship of the sole member of each Syndicate based on the location of incorporation; (e) the citizenship of each Syndicate; (f) the percentage of interest in the $3,000,000 limit of insurance of the D&O Coverage section of the Policy held by each Syndicate; and (g) the citizenship of Underwriters. (App. Vol. I, *Decl.*, Ex. B.) The declaration of Mr. Simmons establishes Underwriters are citizens of the U.K., based on the following:

- o <u>Syndicate 4020</u>. Ark Corporate Member Limited ("Ark Corp.") is the sole member of Syndicate 4020. (*See Articles of Incorporation for Ark Corp.*, online records of Companies House, the United Kingdom's registrar of Companies, Ex. 1.) Ark Corp. is a private limited company incorporated in and is a citizen of the United Kingdom. Ark Corp. has

22.5% interest in the $3,000,000 limit of insurance of the D&O Coverage section of the Policy, *i.e.*, $675,000.

o <u>Syndicate 2001</u>. MS Amlin Corporate Member Limited ("MS Amlin Corp.") is the sole member of Syndicate 2001. (*See Articles of Incorporation for MS Amlin Corp.*, online records of Companies House, the United Kingdom's registrar of Companies, Ex. 2.) MS Amlin Corp. is a private limited company incorporated in and is a citizen of the United Kingdom. MS Amlin Corp. has 22.5% interest in the $3,000,000 limit of insurance of the D&O Coverage section of the Policy, *i.e.*, $675,000.

o <u>Syndicate 1458</u>. RenaissanceRe Corporate Capital (UK) Limited ("RenaissanceRe Corp.") is the sole member of Syndicate 1458. (*See Articles of Incorporation for RenaissanceRe Corp.*, online records of Companies House, the United Kingdom's registrar of Companies, Ex. 3.) RenaissanceRe Corp. is a private limited company incorporated in and is a citizen of the United Kingdom. Renaissance Re Corp has 20% interest in the $3,000,000 limit of insurance of the D&O Coverage section of the Policy, *i.e.*, $600,000.

o <u>Syndicate 1084</u>. Chaucer Corporate Capital No. 3 ("Chaucer Corp.") is the sole member of Syndicate 1084. (*See Articles of Incorporation for Chaucer Corp.*, online records of Companies House, the United

Kingdom's registrar of Companies, Ex. 4.) Chaucer Corp. is a private limited company incorporated in and is a citizen of the United Kingdom. Chaucer Corp. has 20% interest in the $3,000,000 limit of insurance of the D&O Coverage section of the Policy, *i.e.*, $600,000.

o Syndicate 435. Faraday Capital Limited ("Faraday Ltd.") is the sole member of Syndicate 435. (*See Articles of Incorporation for Faraday Ltd.*, online records of Companies House, the United Kingdom's registrar of Companies, Ex. 5.) Faraday Ltd. is a private limited company incorporated in and is a citizen of the United Kingdom. Faraday Ltd. has 5% interest in the $3,000,000 limit of insurance of the D&O Coverage section of the Policy, *i.e.*, $150,000.

o Syndicate 5678. VIBE Corporate Member Limited ("VIBE Corp.") is the sole member of Syndicate 5678. (*See Articles of Incorporation for VIBE Corp.*, online records of Companies House, the United Kingdom's registrar of Companies, Ex. 6.) VIBE Corp. is a private limited company incorporated in and is a citizen of the United Kingdom. VIBE Corp. has 5% interest in the $3,000,000 limit of insurance of the D&O Coverage section of the Policy, *i.e.*, $150,000.

o Syndicate 3000. Markel Capital Limited ("Markel Ltd.") is the sole member of Syndicate 3000. (*See Articles of Incorporation for Markel*

*Ltd.*, online records of Companies House, the United Kingdom's registrar

of Companies, Ex. 7.) Markel Ltd. is a private limited company

incorporated in and is a citizen of the United Kingdom. Markel Ltd. has

5% interest in the $3,000,000 limit of insurance of the D&O Coverage

section of the Policy, *i.e.*, $150,000.

(App. Vol. I, *Decl.*, Ex. B; *Complete Policy*, Ex. A, Pg. 104.) The declaration of Mr.

Simmons is proper supplemental evidence regarding diversity jurisdiction between

the parties. *See Alliant Tax Credit v. Thomasville Cmty. Housing*, 713 Fed. Appx. 821

(11th Cir. 2017) (noting Magistrate Judge considered joint statement of citizenship

supported by affidavits in finding diversity of citizenship existed).

Moreover, Pursuant to Fed. R. Evi. 201(b)(2), the Court may take judicial

notice of the corporate filings of the sole member of each Syndicate subscribing to

the Policy, filed with Companies House, the United Kingdom's registrar of

companies. *See also Lustig v. Stone*, 813 Fed. Appx. 461, 462 (11th Cir. 2020)

("[w]e take notice under Federal Rule of Evidence 201(b)(2) of Stone's brief in her

2019 appeal as a public record."); *Progressive Mountains Ins. Co. v.*

*Middlebrooks*, 805 Fed. Appx. 731, 733 (11th Cir. 2020) (After appeal was filed,

this Court learned that a lawsuit was filed against Progressive's insureds and noted

it could "reasonably take judicial notice of these state court filings as public

records.").

### 5. In the alternative, Underwriters request leave to file a second amended complaint to completely describe citizenship.

Underwriters respectfully request leave to file a second amended complaint to cure the allegations in paragraph 6. *See e.g.*, *Sanders v. Pierson*, No. 19cv60607, 2020 WL 3895131, at *1 (S.D. Fla. July 10, 2020) (noting a court has discretion to allow an amendment by interlineation); *Freedom Scientific, Inc. v. Enhanced Vision Sys.*, No. 8:14cv1229, 2014 WL 12617967 (M.D. Fla. Dec. 16, 2014) (granting motion to amend complaint by interlineation to clarify the scope of patent infringement claim). The proposed amendment would specify the basis for Underwriters's citizenship in the U.K., as detailed in Mr. Simmons's declaration. The minor edits to Paragraph 6 are meant to establish complete diversity between the parties at the time the amended complaint was filed and avoid dismissal of this appeal based on a procedural defect. The proposed second amended complaint will not prejudice Appellants in any way.

Counsel for Underwriters conferred with counsel for Appellants about the proposed amendment to Paragraph 6 of the amended complaint, but no agreement was reached.

## CERTIFICATE OF COMPLIANCE

### Fed. R. App. P. 32(g)(1)

This jurisdictional briefing complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 2,426 words, excluding the exempt parts. Further, this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).

## CERTIFICATE OF SERVICE

I CERTIFY that on March 10, 2023, this document was filed via the CM/ECF system. I further certify that I am unaware of any non-CM/ECF participants.

/s/MICHELE A. VARGAS
MICHELE A. VARGAS

# EXHIBIT "A"

**621**
**MIL**

**3Risk Details**

| | |
|---|---|
| **Type:** | Insurance Company Modular Policy |
| **Insured:** | Anchor Insurance Holdings, Inc. and as per Named Insured Schedule. |
| **Address:** | 5959 Central Avenue, Suite 200, St. Petersburg, Florida 33710 |
| **Policy Period:** | From:   30th November 2018<br>To:       30th November 2019<br>Both days at 12.01 am local standard time at the above address. |
| **Interest:** | Insurance Company Professional Liability *and Management liability Insurance* |

**Limit of Liability
And Deductible:**

| Liability Coverage Section | | Separate Limit of Liability | Shared Limit of Liability | Retention | Dates |
|---|---|---|---|---|---|
| **D&O-PRIV** | **D&O and Private Company** | N/A | USD 3,000,000 | Nil for Insuring Agreement A(1) USD 250,000 for Insuring Agreements A(2) and A (3) | As per schedule of Named Insureds Endorsement |
| **D&O-PUB** | **D&O and Public Company** | N/A | N/A | N/A | N/A |
| **EPL** | **Employment Practices** | N/A | USD 3,000,000 | USD 250,000 | As per schedule of Named Insureds Endorsement |
| **FLI** | **Fiduciary** | N/A | USD 3,000,000 | USD 50,000 | As per schedule of Named Insureds Endorsement |
| **BPL** | **Bankers Professional** | N/A | N/A | N/A | N/A |

**MR CONTRACT**
ENQ/QUO :



L/UWR

| ICL | Insurance Company | N/A | USD 3,000,000 but USD 500,000 in respect to Extra Contractual Claims in Florida | USD 350,000 but USD 700,000 for Extra Contractual Claim; and USD1,000,000 for Extra Contractual Claim arising in Florda | As per schedule of Named Insureds Endorsement |
|---|---|---|---|---|---|
| NAS | NetAdvantage Security & Privacy | N/A | N/A | N/A | N/A |
| ELAW | Employed Lawyers | N/A | USD 1,000,000 | USD 10,000 | 6th November 2017 |

**Territorial Limits:**   Worldwide.

**Conditions:**   As per Insurance Company Modular Liability Policy wording and endorsements attached.

**Notices:**   As per Florida Surplus Lines Notice (Guaranty Act) LMA9037 and Florida Surplus Lines Notice (Rates and Forms) LMA9038 attached.

**Choice of Law
& Jurisdiction:**   Choice of Law: Florida.

This Insurance shall be governed by and construed in accordance with the laws of Florida, each party agrees to submit to the exclusive jurisdiction of any competent court within the United States of America.

NMA1998 Service of Suit Clause – naming

Mendes & Mount LLP
750 Seventh Avenue, New York, NY 10019

**Premium:**   USD 79,098

**Payment Terms:**   Premium Payment Condition LSW 3001 – 60 days

**MR CONTRACT**
ENQ/QUO :



**Taxes Payable**
**by Insured and**
**administered by**
**Insurer(s):**          None

**Recording,**
**Transmitting and**
**Storing Information:**   Miller Insurance Services LLP will maintain risk and claim data, information and
documents which may be held on paper or electronically.

**Insurer Contract**
**Documentation:**      This document details the contract terms entered into by the insurer(s) and
constitutes the contract document.

Any further documentation changing this contract agreed in accordance with the
contract change provisions set out in this contract, shall form the evidence of such
change.

**Surplus Lines Notice:**
This contract is subject to US state surplus lines requirements. It is the responsibility
of the surplus lines broker to affix a surplus lines notice to the contract document
before it is provided to the insured. In the event that the surplus lines notice is not
affixed to the contract document the insured should contact the surplus lines broker.

**Notice of Cancellation**
**Provisions (Authority**
**Provisions):**        Where (re)insurers have the right to give notice of cancellation, in accordance with
the provisions of the contract, then

*To the extent provided by the contract, the Slip Leader is authorised to issue such*
*notice on behalf of all participating (re)insurers; and (optionally)*

*Any (re)insurer may issue such notice in respect of its own participation.*

**MR CONTRACT**
ENQ/QUO :



## NOTICES

### FLORIDA SURPLUS LINES NOTICE (GUARANTY ACT)

THIS INSURANCE IS ISSUED PURSUANT TO THE FLORIDA SURPLUS LINES LAW.  PERSONS INSURED BY SURPLUS LINES CARRIERS DO NOT HAVE THE PROTECTION OF THE FLORIDA INSURANCE GUARANTY ACT TO THE EXTENT OF ANY RIGHT OF RECOVERY FOR THE OBLIGATION OF AN INSOLVENT UNLICENSED INSURER.

LMA9037
01 September 2013

### FLORIDA SURPLUS LINES NOTICE (RATES AND FORMS)

**SURPLUS LINES INSURERS' POLICY RATES AND FORMS ARE NOT APPROVED BY ANY FLORIDA REGULATORY AGENCY.**

LMA9038
01 September 2013

**MR CONTRACT**
ENQ/QUO :



---

**NOTICES**

COVERAGE WITHIN THIS POLICY IS GENERALLY LIMITED TO LOSS FROM CLAIMS FIRST MADE AGAINST INSUREDS DURING THE POLICY PERIOD AND REPORTED TO THE INSURER AS THE POLICY REQUIRES. DEFENSE COSTS REDUCE THE LIMITS OF LIABILITY (AND, THEREFORE AMOUNTS AVAILABLE TO RESPOND TO SETTLEMENTS AND JUDGMENTS) AND ARE APPLIED AGAINST APPLICABLE RETENTIONS.

THE INSURER DOES NOT ASSUME ANY DUTY TO DEFEND UNLESS SUCH COVERAGE IS EXPRESSLY PROVIDED WITHIN A COVERAGE SECTION. WHERE THE INSURER HAS NO DUTY TO DEFEND, IT WILL ADVANCE DEFENSE COSTS, EXCESS OF THE APPLICABLE RETENTION, PURSUANT TO THE TERMS OF THIS POLICY PRIOR TO THE FINAL DISPOSITION OF A CLAIM. PLEASE REFER TO THE COVERAGE SECTIONS PURCHASED FOR DEFENSE RELATED DETAILS.

PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE HEREUNDER WITH YOUR INSURANCE AGENT OR BROKER TO DETERMINE WHAT IS AND WHAT IS NOT COVERED.

---

**Declarations**

ITEM 1.  **NAMED ENTITY:**  Anchor Insurance Holdings, Inc.

       (a) **MAILING ADDRESS:**  5959 Central Avenue, Suite 200, St. Petersburg, Florida 33710

ITEM 2.  **POLICY PERIOD:**  FROM: 30th November 2018    TO: 30th November 2019
                       12:01 A.M. Local Time at the address shown in ITEM 1.

ITEM 3.  **COVERAGE SUMMARY:**

| Liability Coverage Section | | Separate Limit of Liability | Shared Limit of Liability | Retention | Dates |
|---|---|---|---|---|---|
| **D&O-PRIV** | **D&O and Private Company** | N/A | USD 3,000,000 | Nil for Insuring Agreement A(1) USD 250,000 for Insuring Agreements A(2) and A (3) | As per schedule of Named Insureds Endorsement |
| **D&O-PUB** | **D&O and Public Company** | N/A | N/A | N/A | N/A |

---

**MR CONTRACT**
ENQ/QUO :



| EPL | Employment Practices | N/A | USD 3,000,000 | USD 250,000 | As per schedule of Named Insureds Endorsement |
|---|---|---|---|---|---|
| FLI | Fiduciary | N/A | USD 3,000,000 | USD 50,000 | As per schedule of Named Insureds Endorsement |
| BPL | Bankers Professional | N/A | N/A | N/A | N/A |
| ICL | Insurance Company | N/A | USD 3,000,000 but USD 500,000 in respect to Extra Contractual Claims in Florida | USD 350,000 but USD 700,000 for Extra Contractual Claim; and USD1,000,000 for Extra Contractual Claim arising in Florda | As per schedule of Named Insureds Endorsement |
| NAS | NetAdvantage Security & Privacy | N/A | N/A | N/A | N/A |
| ELAW | Employed Lawyers | N/A | USD 1,000,000 | USD 10,000 | 6th November 2017 |

With respect to the D&O-PRIV, D&O-PUB, EPL, FLI and ELAW Coverage Sections only, no Retention amount is applicable to Non-Indemnifiable Loss.

No Retention amount is applicable to Costs of Investigation for Derivative Claims, CrisisFund, Employment Crisis Management Fund, Voluntary Compliance Loss and HIPAA Penalties.

With respect to the NAS Coverage Section only, a separate Retention amount is applicable to Class Action Claims as set forth in Clause 6 of the NAS Coverage Section

With respect to Outside Entity Executive coverage under any D&O Coverage Section, the **Continuity Date** shall be the date on which the Individual Insured first served as an Outside Entity Executive of such Outside Entity.

**MR CONTRACT**
ENQ/QUO :



| ITEM 4. | **PREMIUM:** | USD 79,098 | |
|---|---|---|---|
| | **MINIMUM EARNED PREMIUM:** | 25% | |

| ITEM 5. | **OTHER LIMITS OF LIABILITY** | |
|---|---|---|
| | (a) **POLICY AGGREGATE LIMIT OF LIABILITY:** | USD 3,000,000 |
| | (b) **Derivative Investigation Sublimit of Liability for D&O-PRIV or D&O-PUB, if purchased:** | N/A |
| | (c) **CrisisFund for Crisis Loss of D&O-PUB, if purchased:** | N/A |
| | (d) **Additional CrisisFund for Delisting Crisis Loss for D&O-PUB, if purchased:** | N/A |
| | (e) **Employment Crisis Management Fund for EPL, if purchased:** | N/A |
| | (f) **Voluntary Compliance Loss Sublimit of Liability for FLI, if purchased:** | N/A |
| | (g) **HIPAA Penalties Sublimit of Liability for FLI, if purchased:** | N/A |
| | (h) **Regulatory Action Sublimit of Liability for NAS, if purchased:** | N/A |

ITEM 6.    **INSURER:**

Verve Risk Partners – On behalf of 100% Certain Underwriters at Lloyd's, London

ITEM 7.    **NOTICE TO THE INSURER:**
**Claims**
Attn: Marilyn Bonetati
Premier Claims Management
2020B North Tustin Avenue
Santa Ana, CA 92705
Email: mbonetati@premierclaimsllc.com

ITEM 8.    **FORMS ATTACHED AT ISSUE:**

| | | |
|---|---|---|
| ▪ | NMA 1256 | Nuclear Incident Exclusion Clause |
| ▪ | NMA1477 | Radioactive Contamination Exclusion Clause |
| ▪ | NMA464 | War & Civil War Exclusion Clause |
| ▪ | LSW3001 | Premium Payment Clause |

**MR CONTRACT**
ENQ/QUO :



- NMA1998 — Service of Suit Clause
- Short Rate Cancellation Table
- NMA2840 — Retroactive Exclusion Clause
- Prior and Pending Litigation Clause
- LSW4037 — Liberalization Clause
- Plan Definition Endorsement
- General Terms and Conditions Endorsement
- Named Insured Schedule
- Choice of Law and Jurisdiction
- Additional Insured / Co-Defendant
- Third Party EPL Coverage
- Agency Services Endorsement
- Manuscript Endorsement (Amend Insuring Agreements)
- Manuscript Endorsement (Amend Regulatory Exclusions – Insurance Company Liability)

PRODUCER:    ECC Insurance Brokers, Inc.
One Tower Lane, Suite 2850, Oakbrook Terrace, IL 60181

**THESE DECLARATIONS, THE POLICY FORM, ANY ENDORSEMENTS AND THE APPLICATION CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE COMPANY AND THE INSURED RELATING TO THIS INSURANCE.**

**MR CONTRACT**
ENQ/QUO :



### Financial Institutions Risk Protector

#### GENERAL TERMS AND CONDITIONS

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by application, including its attachments and the material incorporated therein, which form a part of this policy, the **Insurer** agrees as follows:

1. **TERMS AND CONDITIONS**

   These General Terms and Conditions shall be applicable to all **Coverage Sections**, unless otherwise explicitly stated to the contrary in either these General Terms and Conditions or the relevant **Coverage Section**. The terms and conditions set forth in each **Coverage Section** shall only apply to that particular **Coverage Section** and shall in no way be construed to apply to any other **Coverage Section** of this policy.

2. **DEFINITIONS**

   (a)   "**Affiliate**" means: (i) any person or entity that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is in common control with, the **Company**; or (ii) any person or entity that directly, or indirectly through one or more intermediaries, is a successor in interest to the **Company**.

   (b)   "**Bodily Injury**" means physical injury, sickness, disease (other than emotional distress or mental anguish), including death resulting therefrom.

   (c)   "**Claim**" means **Claim**, as that term is defined within each **Coverage Section**.

   (d)   "**Cleanup Costs**" means expenses (including but not limited to legal and professional fees) incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying or assessing the effects of **Pollutants**.

   (e)   "**Company**" means (i) the **Named Entity**, (ii) any **Subsidiary** thereof, and, (iii) in the event a bankruptcy proceeding shall be instituted by or against the foregoing entities, the resulting debtor-in-possession (or equivalent status outside the United States), if any.

   (f)   "**Company Shareholder Derivative Investigation**" means an investigation by the **Company** (including its board of directors (or equivalent management body) or any committee of the board of directors of the **Company**) as to whether or not the **Company** should commence a civil proceeding in a court of law against one or more **Director(s) or Officer(s)** of such **Company** in

**MR CONTRACT**
ENQ/QUO :



direct response to a written demand by one or more shareholders of a **Company**, other than shareholders who are **Insureds** ("**Complaining Shareholders**"), upon the board of directors (or equivalent management body) of such **Company** to bring, on behalf of the **Company**, a civil proceeding in a court of law against a **Director or Officer** of the **Company** for a **Wrongful Act** of such **Director or Officer** of the **Company**.

(g)      "**Complaining Shareholder**" means any shareholder or shareholders, other than any **Insured**, that makes a **Derivative Demand**.

(h)      "**Continuity Date**" means the date set forth in Item 3 of the Declarations with respect to each **Coverage Section**.

(i)      "**Coverage Section(s)**" means each **Coverage Section** that is purchased by the **Insured** as indicated in Item 3 of the Declarations.

(j)      "**Defense Costs**" means reasonable and necessary fees, costs and expenses consented to by the **Insurer** (including premiums for any appeal bond, attachment bond, or similar bond arising out of a covered judgment, but without any obligation to apply for or furnish any such bond), resulting solely from the investigation, adjustment, defense and appeal of a **Claim** against the **Insureds**, but excluding any compensation of any **Individual Insured** of the **Company**. **Defense Costs** shall not include any fees, costs or expenses incurred prior to the time that a **Claim** is first made against an **Insured**.

(k)      "**Derivative Demand**" means a written demand by shareholders upon the board of directors (or equivalent management body) of a **Company** asking it to bring, on behalf of the **Company**, a civil proceeding in a court of law against any **Director or Officer** of the **Company** for a **Wrongful Act** of such **Director or Officer** in order to obtain relief from damages arising out of such **Wrongful Acts**.

(l)      "**Director(s) or Officer(s)**" means any:

        (1) past, present and future duly elected or appointed director or officer of a corporation and member of the management board of a limited liability company (or equivalent positions);

        (2) with respect to operations of the **Company** in a **Foreign Jurisdiction**, such past, present and future persons in duly elected or appointed positions of the **Company** that are equivalent to an executive position listed in paragraph (1) of this definition; and

        (3) past, present and future general counsel and risk manager (or equivalent position) of the **Named Entity**.

**MR CONTRACT**
ENQ/QUO :



(m)     "**Discovery Period**" means **Discovery Period**, as that term is defined in Clause 8 of the General Terms and Conditions.

(n)     "**Domestic Partner**" means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law or under the provisions of any formal program established by the **Named Entity** or any **Subsidiary**.

(o)     "**Employee(s)**" means any past, present or future employee, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any part-time, seasonal and temporary employee in his or her capacity as such. An individual who is leased to the **Company**, who is contracted to perform work for the **Company**, or who is an independent contractor for the **Company** shall also be an **Employee**, but only if the **Company** provides indemnification to such individual in the same manner as is provided to the **Company's** employees.

(p)     "**Financial Insolvency**" means the: (i) appointment by any state or federal official, agency or court of a receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate a **Company**; or (ii) the **Company** becoming a debtor-in-possession pursuant to the United States bankruptcy law; or (iii) a bankruptcy petition is filed by or against the **Company**, and as to (i), (ii) and (iii), the equivalent status outside the United States of America.

(q)     "**Foreign Jurisdiction**" means any jurisdiction, other than the United States or any of its territories or possessions.

(r)     "**Indemnifiable Loss**" means **Loss** for which the **Company** has indemnified or is permitted or required to indemnify an **Individual Insured** pursuant to law or contract or the charter, bylaws, operating agreement or similar documents of a **Company**.

(s)     "**Individual Insured(s)**" means an **Individual Insured**, as that term is defined within each **Coverage Section**.

(t)     "**Insured(s)**" means an **Insured**, as that term is defined within each **Coverage Section**.

(u)     "**Insurer**" means the entity listed in Item 6 of the Declarations.

(v)     "**Investigation**" means the investigation by the **Company** or, on behalf of the **Company** by its board of directors (or the equivalent management body) or any committee of the board of directors (or the equivalent management body), as to whether or not the **Company** should bring the civil proceeding demanded in the **Derivative Demand**.

(w)     "**Investigation Costs**" means reasonable and necessary costs, charges, fees and expenses (including but not limited to attorney's fees and expert's fees but not including any settlement, judgment or damages and not including any regular or overtime wages, salaries or fees of any **Director or Officer** or **Employee** of the **Company**) incurred by the **Company** or its board of directors (or the equivalent management body) or any committee of the board of directors (or the equivalent management body), and incurred solely in connection with an **Investigation**.

**MR CONTRACT**
ENQ/QUO :



(x)   "**Loss**" means **Loss**, as that term is defined within each **Coverage Section**.

(y)   "**Management Control**" means: (1) owning interests representing more than 50% of the voting, appointment or designation power for the selection of a majority of: the board of directors of a corporation; the management committee members of a joint venture; or the members of the management board of a limited liability company; or (2) having the right, pursuant to written contract or the by-laws, charter, operating agreement or similar documents of a **Company**, to elect, appoint or designate a majority of: the board of directors of a corporation; the management committee of a joint venture; or the management board of a limited liability company.

(z)   "**Named Entity**" means the entity listed in Item 1 of the Declarations.

(aa)  "**Non-Indemnifiable Loss**" means **Loss** for which a **Company** has neither indemnified nor is permitted or required to indemnify an **Individual Insured** pursuant to law or contract or the charter, bylaws, operating agreement or similar documents of a **Company**.

(bb)  "**Outside Entity**" means any: (1) not-for-profit organization; or (2) other entity listed as an "**Outside Entity**" in an endorsement attached to this policy.

(cc)  "**Outside Entity Executive**" means any: (1) **Director(s) or Officer(s)** of the **Company** who is or was acting at the specific written request or direction of the **Company** as a **Director(s) or Officer(s)** of an **Outside Entity**; or (2) any other person listed as an **Outside Entity Executive** in an endorsement attached to this policy.

(dd)  "**Policy Aggregate Limit of Liability**" means the **Policy Aggregate Limit of Liability** stated in Item 5(a) of the Declarations.

(ee)  "**Policy Period**" means the period of time from the inception date shown in Item 2 of the Declarations to the earlier of the expiration date shown in Item 2 of the Declarations or the effective date of cancellation of this policy.

(ff)  "**Pollutants**" means, but is not limited to, any solid, liquid, gaseous, biological, radiological or thermal irritant or contaminant, including smoke, vapor, dust, fibers, mold, spores, fungi, germs, soot, fumes, acids, alkalis, chemicals and **Waste**. "**Waste**" includes, but is not limited to, materials to be recycled, reconditioned or reclaimed and nuclear materials.

(gg)  "**Property Damage**" means damage to, or destruction of tangible or intangible property, including the loss of use thereof, or the loss of use of tangible or intangible property which has not been damaged or destroyed.

(hh)  "**Related Wrongful Act**" means a **Wrongful Act**, which is the same, related or continuous, or a **Wrongful Act** which arises from a common nucleus of facts. **Claims** can allege **Related Wrongful Acts** regardless of whether such **Claims** involve the same or different claimants, **Insureds** or legal causes of action.



(ii)    **"Retaliation"** means a retaliatory act of an **Insured** alleged to be in response to any of the following activities: (1) the disclosure or threat of disclosure by an **Employee** of the **Company** or an **Outside Entity** to a superior or to any governmental agency of any act by an **Insured** which act is alleged to be a violation of any federal, state, local or foreign law, common or statutory, or any rule or regulation promulgated thereunder; (2) the actual or attempted exercise by an **Employee** of the **Company** or an **Outside Entity** of any right that such **Employee** has under law, including rights under worker's compensation laws, the Family and Medical Leave Act, the Americans with Disabilities Act or any other law relating to employee rights; (3) the filing of any claim under the Federal False Claims Act or any other federal, state, local or foreign "whistle-blower" law; or (4) strikes of an **Employee** of the **Company** or an **Outside Entity**.

(jj)    **"Separate Limit of Liability"** means each **Separate Limit of Liability**, if any, stated in Item 3 of the Declarations.

(kk)    **"Shared Limit of Liability"** means each **Shared Limit of Liability**, if any, stated in Item 3 of the Declarations, which limit of liability shall be shared between all of the **Coverage Sections** which are listed below such **Shared Limit of Liability** in the Declarations.

(ll)    "**Subsidiary**" means:

        (1) If the equity securities of the **Named Entity** are not publicly traded at the inception date of the policy:

        (i)     any for-profit organization that is not formed as a partnership or joint venture, whose equity securities are not publicly traded, which on or before the inception of the **Policy Period** is more than 50% owned by the **Named Entity**, either directly or indirectly through one or more of its **Subsidiaries**;

        (ii)    automatically any for-profit organization that is not formed as a partnership or joint venture, whose equity securities are not publicly traded and whose assets total less than 25% of the total consolidated assets of the **Company** at the date such organization is acquired and which organization becomes a **Subsidiary** during the **Policy Period**. The **Named Entity** shall provide the **Insurer** with full particulars of the new **Subsidiary** before the end of the **Policy Period**; and

        (iii)   automatically any for-profit organization that is not formed as a partnership or joint venture, whose equity securities are not publicly traded and whose assets total 25% or more of the total consolidated assets of the **Company** at the date such organization is acquired, but such entity shall be a **Subsidiary** only: (i) for a period of ninety (90) days from the date the organization became a **Subsidiary**; or (ii) until the end of the **Policy Period**, whichever ends or occurs first (hereinafter "**Auto-Subsidiary Period**"); provided that the **Named Entity** or any other **Insured** shall report such **Subsidiary** to the **Insurer**, in writing, prior to the end of the **Policy Period**.

**MR CONTRACT**
ENQ/QUO :



A **Subsidiary** ceases to be a **Subsidiary** when the **Named Entity** ceases to own more than a 50% ownership in such **Subsidiary**, either directly, or indirectly through one or more of its **Subsidiaries**.

(2) If the equity securities of the **Named Entity** are publicly traded at the inception date of the policy:

    (i) any for-profit organization that is not formed as a partnership, of which the **Named Entity** has **Management Control ("Controlled Entity")** on or before the inception of the **Policy Period** either directly or indirectly through one or more other **Controlled Entities**;

    (ii) automatically any for-profit organization that is not formed as a partnership of which the **Named Entity** first had **Management Control** during the **Policy Period**, whether directly or indirectly through one or more other **Subsidiaries**, and whose assets total less than 25% of the total consolidated assets of the **Company** as of the inception date of this policy, provided that the **Named Entity** or any other **Insured** shall report such **Subsidiary** to the **Insurer**, in writing, prior to the end of the **Policy Period**;

    (iii) automatically any for-profit organization that is not formed as a partnership of which the **Named Entity** first had **Management Control** during the **Policy Period**, whether directly or indirectly through one or more other **Subsidiaries**, and, whose assets total 25% or more of the total consolidated assets of the **Company** as of the inception date of this policy, but such entity shall be a **Subsidiary** only: (i) for a period of sixty (60) days from the date the **Named Entity** first had **Management Control** of such entity; or (ii) until the end of the **Policy Period**, whichever ends or occurs first (hereinafter "**Auto-Subsidiary Period**"); provided that the **Named Entity** or any other **Insured** shall report such **Subsidiary** to the **Insurer**, in writing, prior to the end of the **Policy Period**; and

    (iv) any not-for-profit entity under section 501(c)(3) of the Internal Revenue Code of 1986 (as amended) sponsored exclusively by a **Company**.

        A **Subsidiary** ceases to be a **Subsidiary** when the **Named Entity** no longer maintains **Management Control** of a **Subsidiary** either directly or indirectly through one or more of its **Subsidiaries**.

(3) Irrespective of whether or not the equity securities of the **Named Entity** are publicly traded at the inception date of the policy, the following provisions apply:

    (i) The **Insurer** shall extend coverage for any **Subsidiary** described in (II)(1)(iii) and (II)(2)(iii) above, and any **Individual Insured** thereof, beyond its respective **Auto-Subsidiary Period** if during such **Auto-Subsidiary Period**, the **Named Entity** shall have provided the **Insurer** with full particulars of the new **Subsidiary** and agreed to any additional premium and amendment of the provisions of this policy as required by the **Insurer** relating to such **Subsidiary**. Further, coverage as shall be afforded to any **Subsidiary** and any **Individual Insured** thereof is conditioned



upon the **Named Entity** paying when due any additional premium required by the **Insurer** relating to such **Subsidiary**.

(ii)    In all events, coverage as is afforded under this policy with respect to a **Claim** made against **Individual Insureds** of any **Subsidiary**, or any **Subsidiary**, shall only apply for **Wrongful Acts** committed or allegedly committed after the effective time that such **Individual Insured** or **Subsidiary** became an **Individual Insured** or **Subsidiary** and prior to the time that such **Individual Insured** or **Subsidiary** ceased to be an **Individual Insured** or **Subsidiary**.

(mm)    "**Wrongful Act**" means a **Wrongful Act**, as that term is defined within each **Coverage Section**.

## 3. EXTENSIONS

Subject otherwise to the terms herein, this policy shall cover **Loss** arising from any **Claim** made against: (i) the estates, heirs, or legal representatives of deceased **Individual Insureds**, and the legal representatives of **Individual Insureds** in the event of incompetency, insolvency or bankruptcy, who were **Individual Insureds** at the time the **Wrongful Acts** upon which such **Claims** are based were committed; or (ii) the lawful spouse (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world) or **Domestic Partner** of an **Individual Insured** for all **Claims** arising solely out of his or her status as the spouse or **Domestic Partner** of an **Individual Insured**, including a **Claim** that seeks damages recoverable from marital community property, property jointly held by the **Individual Insured** and the spouse or **Domestic Partner**, or property transferred from the **Individual Insured** to the spouse or **Domestic Partner**; provided, however, that this extension shall not afford coverage for any **Claim** for any **Wrongful Act** of the spouse or **Domestic Partner**, but shall apply only to **Claims** arising out of any **Wrongful Acts** of an **Individual Insured**, subject to the policy's terms, conditions and exclusions.

## 4. EXCLUSIONS

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

(a)    arising out of, based upon or attributable to the gaining of any profit or advantage to which any final adjudication establishes the **Insured(s)** were not legally entitled;

(b)    alleging, arising out of, based upon or attributable to the facts alleged, or to the same as or a **Related Wrongful Act** alleged or contained in any **Claim** which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

(c)    alleging, arising out of, based upon or attributable to, directly or indirectly, as of the **Continuity Date**, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation of which an **Insured** had notice, or alleging any **Wrongful Act** which is the same as or a **Related Wrongful Act** to that alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation;

**MR CONTRACT**
ENQ/QUO :



(d) alleging, arising out of, based upon or attributable to, directly or indirectly, any actual, alleged or threatened discharge, dispersal, release or escape of **Pollutants**; or for any direction or request to test, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**; provided, however, this exclusion shall not apply:

   (i)   with respect to the D&O **Coverage Section** only, to:

      (1) **Non-Indemnifiable Loss,** other than **Non-Indemnifiable Loss** constituting **Cleanup Costs**; or
      (2) a **Securities Claim** (as defined in the D&O **Coverage Section**), other than:

         (a)  **Loss** constituting **Cleanup Costs**; or

         (b)  any **Securities Claim** brought derivatively on behalf of a **Company** by a securities holder of such **Company** alleging, arising out of, based upon, or attributable to, directly or indirectly, **Cleanup Costs**;

   (ii)  with respect to the EPL **Coverage Section** only, to any **Claim** for **Retaliation**;

   (iii) with respect to the FLI **Coverage Section** only, to **Non-Indemnifiable Loss** from a **Claim** alleging damage to a **Plan** (as defined in the FLI **Coverage Section**);

(e) alleging, arising out of, based upon or attributable to, directly or indirectly, **Bodily Injury** or **Property Damage**; provided, however, this exclusion shall not apply:

   (i)   with respect to the D&O **Coverage Section** only, to any **Securities Claim** (as defined in the D&O **Coverage Section**); and

   (ii)  with respect to the FLI **Coverage Section** only, to **Defense Costs** incurred in the defense of a **Claim** alleging a **Breach of Fiduciary Duty** (as defined in the FLI **Coverage Section**);

(f) for violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, that with respect to the EPL **Coverage Section** only, this exclusion shall not apply to a **Claim** for **Retaliation**; provided, further that solely with respect to violations of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974 and the Consolidated Omnibus Budget Reconciliation Act, this exclusion shall not apply to the extent coverage is afforded pursuant to the FLI **Coverage Section**;

(g) alleging, arising out of, based upon, or attributable to, directly or indirectly, the refusal, failure or inability of any **Insured(s)** to pay wages or overtime pay for services rendered (hereinafter, "**Earned Wages**") (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions taken by any **Insured(s)** from any **Employee(s)** or purported employee(s), including,



but not limited to, (i) any unfair business practice claim alleged because of the failure to pay **Earned Wages**, or (ii) any **Claim** seeking **Earned Wages** because any **Employee(s)** or purported employee(s) was improperly classified or mislabelled as "exempt;" or

(h) alleging, arising out of, based upon or attributable to, directly or indirectly, any obligation pursuant to any workers' compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar benefits; provided, however, this exclusion shall not apply:

   (1) with respect to the EPL **Coverage Section** only, to a **Claim** for **Retaliation**; and
   (2) to the extent coverage is afforded pursuant to the FLI **Coverage Section** only.

For the purpose of determining the applicability of the foregoing exclusion 4(a): (1) the facts pertaining to and knowledge possessed by any **Insured** shall not be imputed to any other **Individual Insured**; and (2) facts pertaining to and knowledge possessed by any past, present or future chairman of the board, president, chief executive officer, chief operating officer, chief financial officer or general counsel (or equivalent positions) of the **Company** shall be imputed only to the **Company**.

## 5. AGGREGATE LIMIT OF LIABILITY (FOR ALL LOSS UNDER THIS POLICY COMBINED - INCLUDING DEFENSE COSTS)

The **Policy Aggregate Limit of Liability** stated in Item 5(a) of the Declarations is the maximum limit of the **Insurer's** liability for all **Loss** under all **Coverage Sections** combined, arising out of all **Claims** first made against the **Insureds** during the **Policy Period** or the **Discovery Period** (if applicable); provided, however, the **Policy Aggregate Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** for the **Policy Period**. Further, a **Claim** which is made subsequent to the **Policy Period** or **Discovery Period** (if applicable) which pursuant to Clause 7(b) or 7(c) is considered made during the **Policy Period** or **Discovery Period**, shall also be subject to the **Policy Aggregate Limit of Liability** stated in Item 5(a) of the Declarations and subject to the applicable **Separate Limits of Liability** or **Shared Limit of Liability**, if any.

If **Separate Limits of Liability** are stated in Item 3 of the Declarations, then each such **Separate Limit of Liability** shall be the maximum limit of the **Insurer's** liability for all **Loss** arising out of all **Claims** first made against the **Insureds** during the **Policy Period** or the **Discovery Period** (if applicable) with respect to the applicable **Coverage Section** as stated on the Declarations; provided, however, the **Separate Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to, the **Separate Limit of Liability** for the **Policy Period**. The **Separate Limit of Liability** shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** for all **Loss** under this policy as stated in Item 5(a) of the Declarations and shall in no way serve to increase the **Policy Aggregate Limit of Liability** as therein stated.

If **Shared Limits of Liability** are stated in Item 3 of the Declarations, then each such **Shared Limit of Liability** shall be the maximum limit of the **Insurer's** liability for all **Loss** arising out of all **Claims** first made against the **Insureds** during the **Policy Period** or the **Discovery Period** (if applicable) with respect to all **Coverage Sections** for which such **Shared Limit of Liability** is applicable, as indicated on the Declarations; provided, however, with respect to all **Coverage Sections** that have a **Shared Limit of Liability**, the **Shared Limit of Liability** for the **Discovery Period** shall be part of, and not in addition to,



the **Shared Limit of Liability** for the **Policy Period**. Any **Shared Limit of Liability** shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** for all **Loss** under this policy as stated in Item 5(a) of the Declarations and shall in no way serve to increase the **Policy Aggregate Limit of Liability** as therein stated.

**Defense Costs are not payable by the Insurer in addition to the Policy Aggregate Limit of Liability or any Separate Limit of Liability or Shared Limit of Liability. Defense Costs are part of Loss and as such are subject to the Policy Aggregate Limit of Liability for Loss and any applicable Separate Limit of Liability or Shared Limit of Liability. Amounts incurred for Defense Costs shall be applied against the Retention amount.**

6.  **RETENTION CLAUSE**

For each **Claim**, the **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim** which is in excess of the applicable Retention amount stated in Item 3 of the Declarations, such Retention amount to be borne by the **Company** and/or the **Insureds** and shall remain uninsured, with regard to: (i) all **Loss** under the Security & Privacy **Coverage Section**, BPL **Coverage Section** and ICL **Coverage Section**; and (ii) all **Indemnifiable Loss** and all **Loss** of the **Company** under all other **Coverage Sections**.   A single Retention amount shall apply to **Loss** arising from all **Claims** alleging the same **Wrongful Act** or **Related Wrongful Act**. In the event a **Claim** triggers more than one amount stated in Item 3 of the Declarations, only the highest such amount shall apply, which amount shall apply to all **Loss** under such **Claim**.

In the event a **Company** refuses or is unable to pay **Indemnifiable Loss** due to **Financial Insolvency**, then the **Insurer** shall commence advancing such **Indemnifiable Loss** within the Retention, and shall pay such **Indemnifiable Loss** in excess of the Retention, subject to the other terms, conditions and exclusions of this policy, provided that the **Insurer** shall be entitled to recover the amount of such **Indemnifiable Loss** advanced within the Retention from the **Company** pursuant to Clause 11 of the General Terms and Conditions.

7.  **NOTICE/CLAIM REPORTING PROVISIONS**

**Notice hereunder shall be given in writing to Premier Claims Management, 2020B North Tustin Avenue, Santa Ana, CA 92705. Notice shall include and reference the Policy Number as indicated in the Declarations. If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.**

**A Claim shall be considered to have been first made against an Insured when written notice of such Claim is received by any Insured, by the Company on the behalf of any Insured, or by the Insurer, whichever comes first.**

(a)  The **Company** or the **Insureds** shall, as a condition precedent to the obligations of the **Insurer** under this policy, give written notice to the **Insurer** of any **Claim** made against an **Insured** or an **Employment Crisis** (as defined in the EPL **Coverage Section**) as soon as practicable and either:

(1)  any time during the **Policy Period** or during the **Discovery Period** (if applicable); or

**MR CONTRACT**
ENQ/QUO :



    (2) within forty-five (45) days after the end of the **Policy Period** or the **Discovery Period** (if applicable), as long as such **Claim** was first made against an **Insured** within the final thirty (30) days of the **Policy Period** or the **Discovery Period** (if applicable).

(b) If written notice of a **Claim** has been given to the **Insurer** pursuant to Clause 7(a) above, then any **Claim** which is subsequently made against the **Insureds** and reported to the **Insurer** alleging a **Related Wrongful Act** to the **Claim** for which such notice has been given shall be considered made at the time such notice was given.

(c) If during the **Policy Period** or **Discovery Period** (if applicable), the **Company** or the **Insureds** shall become aware of any circumstances which may reasonably be expected to give rise to a **Claim** being made against the **Insureds** and shall give written notice to the **Insurer** of the circumstances, the **Wrongful Act** allegations anticipated, and the reasons for anticipating such a **Claim**, with full particulars as to dates, persons and entities involved, then any **Claim** which is subsequently made against the **Insureds** and reported to the **Insurer** alleging, arising out of, based upon or attributable to such circumstances or alleging any **Related Wrongful Act** to such circumstances, shall be considered made at the time such notice of such circumstances was given.

## 8. DISCOVERY CLAUSE

Except as indicated below, if the **Named Entity** shall cancel or the **Named Entity** or the **Insurer** shall refuse to renew this policy, the **Named Entity** shall have the right to a period of either one, two or three years following the effective date of such cancellation or nonrenewal (herein referred to as the "**Discovery Period**") upon payment of the respective "**Additional Premium Amount**" described below in which to give to the **Insurer** written notice of **Claims** first made against the **Insureds** during said **Discovery Period** for any **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by this policy. The rights contained in this paragraph shall terminate, however, unless written notice of such election together with the additional premium due is received by the **Insurer** within thirty (30) days of the effective date of cancellation or nonrenewal.

The **Additional Premium Amount** for: (1) one year shall be 75% of the "full annual premium" indicated in Item 4 of the Declarations; (2) two years shall be 150% of the "full annual premium" indicated in Item 4 of the Declarations; and (3) three years shall be a reasonable premium amount to be mutually agreed upon by the **Named Entity** and the **Insurer**.

In the event of a **Transaction** (as defined in Clause 10 below), the **Named Entity** shall have the right, within thirty (30) days before the end of the **Policy Period**, to request an offer from the **Insurer** of a **Discovery Period** (with respect to **Wrongful Acts** occurring prior to the effective time of the **Transaction**) for a period of no less than three (3) years or for such longer or shorter period as the **Named Entity** may request. The **Insurer** shall offer such **Discovery Period** pursuant to such terms, conditions and premium as the **Insurer** may reasonably decide. In the event of a **Transaction**, the right to a **Discovery Period** shall not otherwise exist except as indicated in this paragraph.




The **Discovery Period** is not cancelable by the **Insureds** or the **Insurer**, except that the **Insurer** may cancel the **Discovery Period** for non-payment of premium. This Clause 8 and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.

### 9. CANCELLATION CLAUSE

This policy may be canceled by the **Named Entity** at any time only by mailing written prior notice to the **Insurer** or by surrender of this policy to the **Insurer** or its authorized agent.

This policy may be canceled by or on the behalf of the **Insurer** only in the event of non-payment of premium by the **Named Entity**. In the event of non-payment of premium by the **Named Entity**, the **Insurer** may cancel this policy by delivering to the **Named Entity** or by mailing to the **Named Entity**, by registered, certified, or other first class mail, at the **Named Entity's** address as shown in Item 1(a) of the Declarations, written notice stating when, not less than the minimum time allowed pursuant to the applicable state law, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. The **Policy Period** terminates at the date and hour specified in such notice, or at the date and time of surrender. The **Insurer** shall have the right to the premium amount for the portion of the **Policy Period** during which the policy was in effect.

If this policy shall be canceled by the **Named Entity**, the **Insurer** shall retain the customary short rate proportion of the premium herein.

### 10. CHANGE IN CONTROL OF NAMED ENTITY

(1) If the equity securities of the **Named Entity** are not publicly traded at the inception date of the policy and if during the **Policy Period**:

    (a) the **Named Entity** shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

    (b) any person or entity or group of persons or entities acting in concert shall acquire an amount of the outstanding securities representing more than 50% of the voting power for the election of directors of the **Named Entity**, or acquires the voting rights of such an amount of such securities;

(either of the above events herein referred to as the "**Transaction**"),

then this policy shall continue in full force and effect as to **Wrongful Acts** occurring prior to the effective time of the **Transaction**, but there shall be no coverage afforded by any provision of this policy for any **Wrongful Act** occurring after the effective time of the **Transaction**.

(2) If the equity securities of the **Named Entity** are publicly traded at the inception date of the policy and if during the **Policy Period**:

    (a) the **Named Entity** shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

    (b) any person or entity or group of persons or entities acting in concert shall acquire **Management Control** of the **Named Entity**;



(either of the above events herein referred to as the "**Transaction**"),

then this policy shall continue in full force and effect as to **Wrongful Acts** occurring prior to the effective time of the **Transaction**, but there shall be no coverage afforded by any provision of this policy for any **Wrongful Act** occurring after the effective time of the **Transaction**.

(3)   This policy may not be cancelled after the effective time of the **Transaction** and the entire premium for this policy shall be deemed earned as of such time. The **Named Entity** shall also have the right to an offer by the **Insurer** of a **Discovery Period** described in Clause 8 above.

(4)   The **Named Entity** shall give the **Insurer** written notice of the **Transaction** as soon as practicable, but not later than thirty (30) days after the effective date of the **Transaction**.

## 11. SUBROGATION AND RIGHT OF DIRECT RECOVERY AGAINST INSUREDS

(a)   In the event of any payment under this policy, the **Insurer** shall be subrogated to the extent of such payment to all of each and every **Company's** and **Insureds'** rights of recovery thereof, and each such **Company** and **Insured** shall execute all papers required and shall do everything that may be necessary to secure such rights (including, without limitation, the assertion of indemnification or contribution rights), including the execution of any and all documents necessary to enable the **Insurer** effectively to bring suit in the name of each such **Company** and each such **Insured**. In no event, however, shall the **Insurer** exercise its rights of subrogation against an **Insured** under this policy unless (i) the **Insurer** is seeking recovery from the **Company** pursuant to subparagraph (b)(i) of this Clause, or (ii) such **Insured** has been convicted of a deliberate criminal act, or been determined by any final adjudication to have committed a deliberate fraudulent act, or been determined by any final adjudication to have obtained any profit or advantage to which such **Insured** was not legally entitled.

(b)   In the event that the **Insurer** shall for any reason pay **Indemnifiable Loss**, the **Insurer**:

     (i)   shall be subrogated to the **Individual Insured's** right of recovery from the **Company**, or in the event of a bankruptcy of the **Company**, from the debtor-in-possession (or equivalent status outside the United States), of the amount of such **Loss** equal to the amount of the Retention not satisfied by the **Company** (hereinafter "**Retention Loss**"); and

     (ii)   shall have a direct contractual right under the policy to recover from the **Company**, or in the event of a bankruptcy of the **Company**, from the debtor-in-possession (or equivalent status outside the United States), the **Retention Loss**. Such direct contractual right of recovery against the **Company** shall be in addition to and independent of the **Insurer's** subrogation rights pursuant to subparagraph (b)(i) above.

(c)   The **Insurer** shall have a direct contractual right under the policy to recover **Loss** paid under the policy from each and every **Insured**, severally and according to their respective interests, in the event and to the extent that such **Insureds** shall not be entitled under this policy to payment of such **Loss**.

(d)   Solely with respect to the FLI **Coverage Section**, in the event this policy has been purchased by an **Insured** other than a **Plan** (as defined in the FLI **Coverage Section**), the **Insurer** shall have no right

**MR CONTRACT**
ENQ/QUO :



of recourse against an **Insured**. Notwithstanding the foregoing, the **Insurer** shall have a right of recourse against an **Insured** arising out of a **Claim** by an **Insured** against another **Insured** unless such **Claim** is instigated and continued totally independent of, and totally without the solicitation of, assistance of or active participation by the **Insured** claimed against.

## 12. OTHER INSURANCE

Solely with respect to the EPL **Coverage Section**, unless expressly written to be excess over other applicable insurance, it is intended that the insurance provided by the EPL **Coverage Section** shall be primary.

With respect to all **Coverage Sections** other than the EPL **Coverage Section**, such insurance as is provided by this policy shall apply only as excess over any other valid and collectible insurance, unless such other insurance is written only as specific excess insurance over the **Policy Aggregate Limit of Liability** provided by this policy. This policy specifically shall be excess of any other policy pursuant to which any other insurer has a duty to defend a **Claim** for which this policy may be obligated to pay **Loss**.

In the event of a **Claim** against an **Insured** arising out of his or her service as an **Outside Entity Executive**; or a **Claim** against an **Insured** for the **Insured's** liability with respect to a leased **Employee**, coverage as is afforded by this policy shall be specifically excess of indemnification provided by such **Outside Entity** or such leasing company and any insurance provided to such **Outside Entity** or such leasing company.

Further, in the event other insurance is provided to the **Outside Entity** or leasing company referenced in the above paragraph, or is provided under any pension trust or employee benefit plan fiduciary liability insurance policy, and such other insurance is provided by the **Insurer** (or would be provided but for the application of the retention amount, exhaustion of the limit of liability or failure to submit a notice of a **Claim**), then the **Insurer's** maximum aggregate limit of liability for all **Loss** combined in connection with a **Claim** covered, in part or in whole, by this policy and such other insurance policy issued by the **Insurer**, shall not exceed the greater of the **Policy Aggregate Limit of Liability** or any **Separate Limit of Liability** or **Shared Limit of Liability** of this policy or the limit of liability of such other insurance policy.

## 13. NOTICE AND AUTHORITY

It is agreed that the **Named Entity** shall act on behalf of its **Subsidiaries** and all **Insureds** with respect to the giving of notice of a **Claim**, the giving and receiving of notice of cancellation and nonrenewal, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy, the exercising or declining of the right to tender the defense of a **Claim** to the **Insurer** and the exercising or declining to exercise any right to a **Discovery Period**.

## 14. ASSIGNMENT

This policy and any and all rights hereunder are not assignable without the prior written consent of the **Insurer**, which shall be in the sole and absolute discretion of the **Insurer**.




## 15. DISPUTE RESOLUTION PROCESS

(a) It is hereby understood and agreed that all disputes or differences which may arise under or in connection with this policy, whether arising before or after termination of this policy, and including any determination of the amount of **Loss**, shall be submitted to the alternative dispute resolution process set forth in this Clause 15.

(b) The **Insurer** and **Insured(s)** shall, in the first instance, seek to resolve all such disputes governed by this Clause 15 and referred to in the preceding paragraph (collectively "disputes," or individually "dispute") through non-binding mediation administered by the American Arbitration Association. It shall be a condition precedent to the right(s) of the **Insurer** and **Insured(s)** to commence an arbitration or judicial proceeding that the **Insurer** and **Insured(s)** first seek to resolve all such disputes by non-binding mediation. In the event that the **Insurer** or an **Insured** shall commence an arbitration or judicial proceeding in violation of this paragraph, the other party shall have the right, but not the obligation, to seek the dismissal of or a stay of such arbitration or judicial proceeding. The costs incurred, including legal fees, in seeking such dismissal or stay shall be paid by the party commencing the arbitration or judicial proceeding in violation of this Clause 15.

(c) After the date on which the mediation terminates pursuant to the terms set forth in Appendix GTC-1 to this policy, the **Insurer** and **Insureds** shall wait at least sixty (60) days prior to filing an arbitration or judicial proceeding. Either the **Insurer** or an **Insured** may elect to file arbitration or a judicial proceeding; provided, however, that such **Insured** shall have the right to reject the **Insurer's** choice of either arbitration or a judicial proceeding prior to or after such proceeding is commenced, but only so long as such rejection shall be in writing and mailed to the **Insurer** within fourteen (14) days from the date on which the **Insurer** demands arbitration or commences a judicial proceeding. In the event an **Insured** rejects the **Insurer's** choice pursuant to the terms of this paragraph, such **Insured's** choice of either arbitration or a judicial proceeding shall control. In the event the dispute between the **Insurer** and **Insured(s)** that is the subject of this Clause 15 concerns a **Claim**, the rejection notice shall be addressed to the claims department responsible for handling such **Claim**.

(d) Any such mediation, arbitration or judicial proceeding shall be subject to the terms and conditions set forth in Appendix GTC-1 to this policy.

(e) Notwithstanding any preceding provision in this Clause 15, this Clause 15 shall not apply or govern any dispute concerning the issue of whether the policy, for any reason, is void or voidable.

## 16. ACTION AGAINST INSURER

Except as provided in Clause 15 above, no action shall lie against the **Insurer** unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the **Insureds'** obligation to pay shall have been finally determined either by judgment against the **Insureds** after actual trial or by written agreement of the **Insureds**, the claimant and the **Insurer**.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the **Insurer** as a party to any action against the **Insureds** or the **Company** to determine the **Insureds'** liability, nor shall the **Insurer** be impleaded by the **Insureds** or the **Company** or their legal representatives. Bankruptcy or

**MR CONTRACT**
ENQ/QUO :



insolvency of the **Company** or the **Insureds** or of their estates shall not relieve the **Insurer** of any of its obligations hereunder.

## 17. CHANGE IN THIS POLICY

Notices to any agent or broker or knowledge possessed by any agent or broker or by any other person shall not effect a waiver or a change in any part of this policy or estop the **Insurer** from asserting any right under the terms of this policy, nor shall the terms of this policy be waived or changed except by endorsement issued to form a part of this policy and signed by an authorized representative of the **Insurer**.

## 18. TERRITORY

Where legally permissible, this policy shall apply to any **Claim** made against any **Insured** anywhere in the world. Payment of **Loss** under this policy shall only be made in full compliance with all United States of America economic or trade sanction laws or regulations, including, but not limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

## 20. HEADINGS

The descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.



## APPENDIX GTC-1

### DISPUTE RESOLUTION PROCESS

Any mediation, arbitration or judicial proceeding commenced in accordance with Clause 15 of the General Terms & Conditions, shall be subject to the terms and conditions set forth below:

A. General Terms

    (1)    At any mediation or arbitration commenced pursuant to Clause 15 of the General Terms & Conditions, there shall be present a representative of the **Company** with full authority to settle or compromise any dispute under the policy, or in the case of an **Insured Person** that is a party to a mediation or arbitration, such **Insured Person** shall be present at the mediation or arbitration unless otherwise agreed to by the **Insurer.**

    (2)    The mediator or arbitrators shall give due consideration to the general principles of the law of the state where the **Named Entity** is incorporated in the construction or interpretation of the provisions of this policy.

    (3)    Any mediation, arbitration or judicial proceeding held pursuant to the terms of Clause 15 of the General Terms & Conditions shall be conducted in New York, New York; Atlanta, Georgia; Chicago, Illinois; Denver, Colorado; in the state designated in Item 1 of the Declarations as the mailing address of the **Named Entity**; or in the state where the **Named Entity** is incorporated, unless otherwise agreed to by the parties.

    (4)    Unless otherwise agreed to, all expenses of the mediation or arbitration other than defense costs which are the sole responsibility of each party, shall be borne equally by the parties to the mediation or arbitration, including any filing fee or mediator's or arbitrator's fee.

    (5)    In all instances under Clause 15 of the General Terms & Conditions where the **Insureds** are provided with a choice of alternatives and cannot unanimously agree on which alternative to choose, the right of election on behalf of the **Insureds** shall rest with the **Named Entity**, and such election shall be binding on all **Insureds**, including without limitation an **Insured's** choice of either arbitration or a judicial proceeding pursuant to paragraph (c) of Clause 15 of the General Terms & Conditions.

B. Non-Binding Mediation

    (1) The **Insurer** and **Insured(s)** shall attempt in good faith to settle their disputes by mediation in accordance with the American Arbitration Association's ("**AAA**") then-prevailing Commercial Mediation Rules (hereinafter "**Mediation Rules**"). The mediation shall be terminated upon the occurrence of any one of the following events:

(a) the execution of a settlement agreement by the parties;

(b) a written declaration of the mediator that further efforts are unlikely to result in a settlement agreement;

(c) mutual agreement of the **Insurer** and **Insured(s)** that further efforts are unlikely to result in a settlement agreement;

(d) if within sixty (60) days after the first day of mediation, a settlement agreement has not been reached and the parties have not otherwise agreed to extend the time for the mediation; or

(e) as otherwise provided by the **AAA** or the **Mediation Rules**.

(2) Notwithstanding any rule governing the conduct of the mediation, the parties shall attempt in good faith to mutually agree to the appointment of a mediator. In the event the parties cannot agree the mediator shall be appointed pursuant to the **Mediation Rules**. A condition precedent to the selection of any mediator, whether such mediator is mutually agreed upon or appointed pursuant to the **Mediation Rules**, is that he or she be "disinterested" as that term is defined in paragraph C.(1) below and be an active or retired attorney who has practiced law for at least ten (10) years in the area of commercial litigation.

C. Arbitration

(1) Subsequent to the termination of the mediation process pursuant to paragraph B.(1) above, either the **Insurer** or the **Insured(s)** may submit their dispute for arbitration to the **AAA**. The arbitration shall be conducted in accordance with the then-prevailing Commercial Arbitration Rules (hereinafter "**Arbitration Rules**"). Upon application of one or more of the parties to the arbitration, the arbitrators will decide if any inconsistency exists between the **Arbitration Rules**, the provisions of Clause 15 of the General Terms & Conditions and this Appendix. If any such inconsistency exists, the provisions of Clause 15 of the General Terms & Conditions and this Appendix will control and supersede the **Arbitration Rules**. The arbitration shall be conducted by a panel of three disinterested individuals. All **Insureds** shall jointly select one disinterested arbitrator and the **Insurer** shall select one disinterested arbitrator. The arbitrators selected by the **Insureds** and the **Insurer** shall then mutually select a third disinterested arbitrator. "Disinterested" for purposes of Clause 15 of the General Terms & Conditions and this Appendix shall mean:

(a) an individual who, in the five years preceding the date on which he or she is selected to be an arbitrator, has not represented or been an adversary of any **Insured** or the **Insurer** in any civil, criminal, administrative, regulatory or arbitration proceeding or in any civil, criminal, administrative or regulatory investigation, and has not made any demand for monetary or non-

**MR CONTRACT**
ENQ/QUO :



monetary relief of any **Insureds** or the **Insurer** that the **Insureds** or the **Insurer** disputed;

(b) an individual who has no financial or personal interest, direct or indirect, in the outcome of the arbitration; and

(c) an individual who provides a written, signed statement representing that he or she has not, in the five years preceding the date on which he or she was selected to be an arbitrator represented or been an adversary of any **Insured** or the **Insurer** in any civil, criminal, administrative, regulatory or arbitration proceeding or in any civil, criminal, administrative or regulatory investigation, and has not made any demand for monetary or non-monetary relief of any **Insureds** or the **Insurer** that the **Insureds** or the **Insurer** disputed. The Individual will also state in writing that he or she is aware of no circumstances that would interfere with his or her ability to render a fair, unbiased decision in the arbitration.

(2) If the arbitrators selected by the **Insureds** and the **Insurer** cannot agree upon a third disinterested arbitrator then each arbitrator shall provide the other with a list of three proposed disinterested arbitrators. The arbitrators shall then flip a coin and the loser of the coin toss shall choose an arbitrator from the winner's list. The third arbitrator shall decide any and all disputes among the **Insureds** and the **Insurer** concerning whether or not the arbitrators chosen by the **Insureds** and **Insurer** are disinterested. That decision shall be final and binding and not subject to any appeal.

(3) A condition precedent to the selection of the third disinterested arbitrator, regardless of the selection method as set forth in the preceding paragraph, is that he or she be an active or retired attorney with at least 10 years of experience practicing primarily in property/casualty insurance coverage law at a law firm, or as in-house counsel at an insurance company or reinsurance company, insurance broker or agent, or other company.

(4) In the event of arbitration, the decision of the arbitrators shall be final and binding and provided in writing to both parties and the arbitrators' award shall not include attorneys fees or other costs. The award shall not include punitive, exemplary or multiple damages, or any similar form of damages designed to punish or penalize a party. Should the arbitrators include punitive or exemplary damages, or attorneys fees or other costs in the award, then the arbitrators' decision and award shall be automatically null and void and have no effect on the parties in the arbitration, unless all such parties against whom such damages or fees or costs are awarded agree in writing, in their sole and absolute discretion, to waive the requirements of this paragraph.



Financial Institutions Risk Protector

**DIRECTORS, OFFICERS AND PRIVATE FINANCIAL INSTITUTION LIABILITY**
**("D&O COVERAGE SECTION")**

**Notice**: Pursuant to Clause 1 of the General Terms and Conditions, the General Terms and Conditions are incorporated by reference into, made a part of, and are expressly applicable to this Coverage Section, unless otherwise explicitly stated to the contrary in either the General Terms and Conditions or in this Coverage Section.

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by application, including its attachments and the material incorporated therein, which form a part of this policy, the **Insurer** agrees as follows:

1. **INSURING AGREEMENTS**

   **COVERAGE A: INDIVIDUAL INSURED INSURANCE**

   This policy shall pay the **Loss** of each and every **Individual Insured** arising from a **Claim** first made against such **Individual Insureds** during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy for any **Wrongful Act** of such **Individual Insured**, except when and to the extent that the **Company** has indemnified such **Individual Insureds**. The **Insurer** shall, in accordance with Clause 5 of this **Coverage Section**, advance **Defense Costs** of such **Claim** prior to its final disposition.

   **COVERAGE B: PRIVATE COMPANY INSURANCE**

   This policy shall pay the **Loss** of the **Company** arising from a:

   (i) **Claim** first made against the **Company**, or

   (ii) **Claim** first made against an **Individual Insured**,

   during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy for any **Wrongful Act**, but, in the case of (ii) above, only when and to the extent that the **Company** has indemnified the **Individual Insured** for such **Loss**. The **Insurer** shall, in accordance with Clause 5 of this **Coverage Section**, advance **Defense Costs** of such **Claim** prior to its final disposition.



### COVERAGE C:  INVESTIGATION COSTS FOR DERIVATIVE CLAIMS

This policy shall pay the **Investigation Costs** of the **Company** arising from an **Investigation** in response to a **Derivative Demand** first made upon the **Company** during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy.

It shall be the duty of the **Company** and not the duty of the **Insurer** to conduct, investigate and evaluate any **Investigation** against its own **Directors and Officers**, provided that the **Insurer** shall be entitled to effectively associate in the **Investigation** and in the evaluation and negotiation of any settlement of any such **Investigation**.

Nothing in this Coverage C shall be construed to afford coverage under this policy for any **Claim** brought by the **Company** against one or more of its own **Directors or Officers** other than **Investigation Costs** incurred in a covered **Investigation**.  Payment of any **Investigation Costs** under this policy shall not waive any of the **Insurer's** rights under this policy or at law.

The **Company** shall be entitled to payment under this Coverage C of its covered **Investigation Costs** ninety (90) days after: (i) it has made its final decision not to bring a civil proceeding in a court of law against any of its **Director or Officers**, and (ii) such decision has been communicated to the **Complaining Shareholders**.  Such payment shall be subject to an undertaking by the **Company**, in a form acceptable to the **Insurer**, that the **Company** shall return to the **Insurer** such payment in the event any **Company** or **Complaining Shareholders** bring a **Claim** alleging, arising out of, based upon or attributable to any **Wrongful Acts** which were the subject of the **Derivative Demand**.

No Retention amount is applicable to Coverage C.

## 2.   DEFINITIONS

(a)  **"Claim"** means:

    (1)    a written demand for monetary, non-monetary or injunctive relief (including any request to toll or waive any statute of limitations); or

    (2)    a civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by:

        (i)    service of a complaint or similar pleading; or

        (ii)    return of an indictment, information or similar document (in the case of a criminal proceeding); or

        (iii)    receipt or filing of a notice of charges.

    (3)    a civil, criminal, administrative or regulatory investigation of an **Individual Insured**:

        (i)    once such **Individual Insured** is identified in writing by such investigating authority as a person against whom a proceeding described in paragraph (2) of this definition, may be commenced; or

        (ii)    in the case of an investigation by the SEC or a similar state or foreign government authority, after the service of a subpoena upon such **Individual Insured**.



The term "**Claim**" shall include any **Derivative Demand**, but solely with respect to the coverage provided under Coverage C.

(b) "**Individual Insured(s)**" means any:

    (1)    **Director(s) or Officer(s)** of the **Company**;
    (2)    **Employee(s)** of the **Company**; and
    (3)    **Outside Entity Executive(s)**.

(c) "**Insured(s)**" mean:

    (1)    any **Individual Insured**; and
    (2)    the **Company**.

(d) "**Loss**" means damages, judgments (including pre-judgment and post-judgment interest on that part of any judgment paid under this **Coverage Section**), settlements and **Defense Costs**; however, **Loss** (other than **Defense Costs**) shall not include: (1) civil or criminal fines or penalties; (2) taxes; (3) any amount for which the **Insureds** are not financially liable or which are without legal recourse to the **Insureds**; and (4) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

Notwithstanding the foregoing paragraph, "**Loss**" shall specifically include (subject to this policy's other terms, conditions and limitations, including but not limited to Exclusions (a) and (b) of this **Coverage Section** and Exclusion (a) of the General Terms and Conditions): (1) civil penalties assessed against any **Individual Insured** pursuant to Section 2(g) (2)(B) of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2(g)(2)(B); and (2) punitive, exemplary and multiple damages. Enforceability of this paragraph shall be governed by such applicable law that most favors coverage for such penalties and punitive, exemplary and multiple damages. For purposes of such coverage, "applicable law" includes, but is not limited to, the following jurisdictions: (a) where the **Wrongful Act** actually or allegedly took place; (b) where the damages are awarded; (c) where the **Named Entity** resides, is incorporated or has its principal place of business; and (d) where the **Insurer** is incorporated or has its principal place of business.

In the event of a **Claim** alleging that the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of all or substantially all the ownership interest in or assets of an entity is inadequate, **Loss** with respect to such **Claim** shall not include any amount of any judgment or settlement representing the amount by which such price or consideration is effectively increased; provided, however, that this paragraph shall not apply to **Defense Costs** or to any **Non-Indemnifiable Loss** in connection therewith.

The term "**Loss**" shall include **Investigation Costs**, but solely with respect to the coverage provided by Coverage C.

(e) "**Securities Claim**" means a **Claim** (including a civil lawsuit or criminal proceeding brought by the Securities & Exchange Commission) made against an **Insured** anywhere in the world alleging a violation of any law, regulation or rule, whether statutory or common law, which is:



    (1) brought by any person or entity alleging, arising out of, based upon or attributable to, in part or in whole, the purchase or sale, or offer or solicitation of an offer to purchase or sell, any securities of the **Company**, or

    (2) brought by a security holder of the **Company**, whether directly, by class action, or derivatively on the behalf of the **Company**, or otherwise, with respect to such security holder's interest in securities of such **Company**.

(e) "**Settlement Opportunity**" means an **Insurer** recommended settlement that is within the **Policy Aggregate Limit of Liability** or **Separate Limit of Liability**, if any, and that is acceptable to the claimant, provided that the **Insureds** consent to such settlement within thirty (30) days of the date the **Insureds** are first made aware of the **Settlement Opportunity**, or in the case of a **Settlement Opportunity** which arises from a settlement offer by the claimant, then within the time permitted by the claimant to accept such settlement offer, but in all events no later than thirty (30) days after the settlement offer was made.

(g) "**Wrongful Act**" means any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act:

    (1) with respect to any **Director or Officer** or **Employee** of the **Company**, by such **Director or Officer** or **Employee** in his or her capacity as such or any matter claimed against such **Director or Officer** or **Employee** solely by reason of his or her status as such;

    (2) with respect to any **Outside Entity Executive**, by such **Outside Entity Executive** in his or her capacity as such or any matter claimed against such **Outside Entity Executive** solely by reason of his or her status as such; or

    (3) with respect to Coverage B(i), by the **Company**.

## 3. EXCLUSIONS

In addition to the exclusions set forth in Clause 4 of the General Terms and Conditions, the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

(a) arising out of, based upon or attributable to the committing of any deliberate criminal, fraudulent or dishonest act or any willful violation of any statute, rule or law by the **Insured**, if any final adjudication establishes that such deliberate criminal, fraudulent, dishonest act or willful violation of any statute, rule or law was committed;

(b) arising out of, based upon or attributable to payments to an **Insured** of any remuneration without the previous approval of the stockholders of the **Company**, once any such unapproved payments shall be established by any final adjudication to have been illegal;

(c) alleging, arising out of, based upon, or attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, employment of any individual or any employment practice (including but not limited to wrongful dismissal, discharge or termination, discrimination, harassment, retaliation or other employment-related claim);



(d) with respect to serving in a capacity as an **Outside Entity Executive**, for any **Wrongful Act** occurring prior to the **Continuity Date** if the **Insured** knew or could have reasonably foreseen that such **Wrongful Act** could lead to a **Claim** under this policy;

(e) alleging, arising out of, based upon or attributable to, directly or indirectly, any actual or alleged act or omission of an **Individual Insured** serving in his or her capacity as a **Director or Officer** or **Employee** of any entity that is not the **Company** or an **Outside Entity**, or by reason of his or her status as a **Director or Officer** or **Employee** of such other entity;

(f) for any **Wrongful Act** arising out of an **Individual Insured** serving in a capacity as an **Outside Entity Executive**, if such **Claim** is brought by the **Outside Entity** or a director, officer, trustee or governor thereof;

(g) alleging, arising out of, based upon or attributable to, directly or indirectly, the purchase by the **Company** of securities of a "publicly traded entity" in a transaction which resulted, or would result, in such entity becoming an **Affiliate** or **Subsidiary** of the **Company**; provided, however, this exclusion shall not apply in the event that within thirty (30) days prior to it becoming an **Affiliate** or **Subsidiary**, the **Named Entity** gives written notice of the transaction to the **Insurer** together with full particulars and underwriting information required and agrees to any additional premium or amendment of the provisions of this policy required by the **Insurer** relating to the transaction. Further, coverage as shall be afforded to the transaction is conditioned upon the **Named Entity** paying when due any additional premium required by the **Insurer** relating to the transaction. An entity is a "publicly traded entity" if any securities of such entity have previously been subject to a public offering;

(h) with respect to Coverage B(i) only:

   (1) for any actual or alleged plagiarism, misappropriation, infringement or violation of copyright, patent, trademark, trade secret or any other intellectual property rights;

   (2) alleging, arising out of, based upon or attributable to, directly or indirectly, any actual or alleged contractual liability of any **Insured** under any contract or agreement (either oral or written);

   (3) seeking fines or penalties or non-monetary relief against the **Company**; provided, however, that this subsection (3) shall not apply to any **Securities Claim**;

(i) which is brought by, on behalf of or in the right of, the **Company** or any **Individual Insured** other than an **Employee** who is not a **Director or Officer**; or which is brought by any security holder or member of the **Company**, whether directly or derivatively, unless such security holder's or member's **Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any **Individual Insured** of the **Company** or the **Company**; provided, however, this exclusion shall not apply to:

**MR CONTRACT**
ENQ/QUO :



(1) any **Claim** brought by an **Individual Insured** in the form of a cross-claim or third-party claim for contribution or indemnity which is part of, and results directly from a **Claim** that is covered by this policy;

(2) any bankruptcy proceeding by or against a **Company**, any **Claim** brought by the examiner, trustee, receiver, liquidator or rehabilitator (or any assignee thereof) of such **Company**, if any;

(3) any **Claim** brought by any past **Director or Officer** of a **Company** who has not served as a duly elected or appointed director, officer, trustee, governor, management committee member, member of the management board, general counsel or risk manager (or equivalent position) of or consultant for a **Company** for at least four (4) years prior to such **Claim** being first made against any person;

(4) any **Claim** brought by a **Director or Officer** of a **Company** formed and operating in a **Foreign Jurisdiction** against such **Company** or any **Director or Officer** thereof, provided that such **Claim** is brought and maintained outside the United States, Canada or any other common law country (including any territories thereof); or

(5) any **Securities Claim**, provided that such **Securities Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any **Company** or any **Director or Officer** of the **Company**; provided, however, solely with respect to this subsection (5), a **Director or Officer** of the **Company** engaging in any protected activity specified in 18 U.S.C. 1514A(a) ("whistleblower" protection pursuant to the Sarbanes-Oxley Act of 2002) or any protected activity specified in any other "whistleblower" protection pursuant to any similar state, local or foreign securities laws shall not be deemed to trigger this exclusion.

Notwithstanding the forgoing exception, this Exclusion (i) shall apply where the actions of any **Director or Officer** of the **Company** includes the filing of any proceeding or voluntarily testifying, voluntarily participating in or voluntarily assisting (other than de minimis assistance) in the filing or prosecution of any proceeding against an **Insured** relating to any violation of any rule or regulation of the Securities and Exchange Commission or any similar provision of any federal, state, local or foreign rule or law relating to fraud against shareholders, other than such actions in connection with a proceeding that is brought by the Securities and Exchange Commission, any similar state, local or foreign regulatory body that regulates securities, or any state, local or foreign law enforcement authority;

(j) alleging, arising out of, based upon or attributable to, directly or indirectly, any **Insured(s)'** performance of or failure to perform professional services for others for a fee, or any act(s), error(s) or omission(s) relating thereto;

(k) for emotional distress, or for injury from libel or slander, or defamation or disparagement, or for injury from a violation of a person's right of privacy; provided, however, that this exclusion shall not apply to any **Securities Claim**; or

(l) alleging, arising out of, based upon or attributable to, directly or indirectly, any public offering of securities by the **Company**, an **Outside Entity** or an **Affiliate** or alleging a purchase or sale of such securities subsequent to such public offering;

provided, however, that this exclusion shall not apply to:



(1)    any purchase or sale of securities exempted pursuant to Section 3(b) of the Securities Act of 1933. Coverage for such purchase or sale transaction shall not be conditioned upon payment of any additional premium; however, the **Named Entity** shall give the **Insurer** written notice of any public offering exempted pursuant to Section 3(b), together with full particulars and as soon as practicable, but not later than thirty (30) days after the effective date of the public offering; or

(2)    any public offering of securities (other than a public offering described in subsection (1) above), as well as any purchase or sale of such securities subsequent to such public offering, in the event that within thirty (30) days prior to the effective time of such public offering: (i) the **Named Entity** shall give the **Insurer** written notice of such public offering together with full particulars and underwriting information required thereto, and (ii) the **Named Entity** accepts such terms, conditions and additional premium required by the **Insurer** for such coverage. Such coverage is also subject to the **Named Entity** paying when due any such additional premium. In the event the **Company** gives written notice with full particulars and underwriting information pursuant to (i) above, then the **Insurer** must offer a quote for coverage under this subsection (2).

For the purpose of determining the applicability of the foregoing Exclusions 3(a) and 3(b): (1) the facts pertaining to and knowledge possessed by any **Insured** shall not be imputed to any other **Individual Insured**; and (2) facts pertaining to and knowledge possessed by any past, present or future chairman of the board, president, chief executive officer, chief operating officer, chief financial officer or general counsel (or equivalent positions) of the **Company** shall be imputed only to the **Company**.

## 4. LIMIT OF LIABILITY

Clause 5 of the General Terms and Conditions is modified to the extent necessary to provide the following:

The maximum limit of the **Insurer's** liability for **Investigation Costs** arising from all **Investigations** combined occurring during the **Policy Period** or the **Discovery Period** (if applicable), in the aggregate, shall be the amount stated in Item 5(b) of the Declarations (hereinafter, "**Derivative Investigation Sublimit of Liability**"). The **Derivative Investigation Sublimit of Liability** shall be the aggregate limit of the **Insurer's** liability under this policy regardless of the number of such **Investigations** occurring during the **Policy Period** or the **Discovery Period** (if applicable), or the number of **Directors or Officers** subject to such **Investigations**. Provided, however, that the **Derivative Investigation Sublimit of Liability** shall be part of and not in addition to the **Policy Aggregate Limit of Liability** stated in Item 5(a) of the Declarations or any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **Coverage Section** as stated in Item 3 of the Declarations, and will in no way serve to increase the **Insurer's Policy Aggregate Limit of Liability** or any **Separate Limit of Liability** or **Shared Limit of Liability** as stated therein.

## 5. DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)

The **Insurer** does not assume any duty to defend. The **Insureds** shall defend and contest any **Claim** made against them.

Notwithstanding the foregoing, the **Insureds** shall have the right to tender the defense of any **Claim** to the **Insurer**, which right shall be exercised in writing by the **Named Entity** on behalf of all **Insureds** to the **Insurer** pursuant to the notice provisions of Clause 7 of the General Terms and Conditions. This right shall terminate if not exercised within thirty (30) days of the date the **Claim** is first made against an **Insured**, pursuant to Clause 7 of the General Terms and Conditions. Further, from the date the **Claim** is first made against the **Insureds** to the date when the **Insurer** accepts the tender of the defense of such **Claim**, the **Insureds** shall take no action, or fail to take any required action, that prejudices the rights of the **Insureds** or the **Insurer** with respect to such **Claim**. Provided that the **Insureds** have complied with the foregoing, the **Insurer** shall be obligated to assume the defense of the **Claim**, even if such **Claim** is groundless, false or fraudulent. The assumption of the defense of the **Claim** shall be effective upon written confirmation sent thereof by the **Insurer** to the **Named Entity**. Once the defense has been so tendered, the **Insured** shall have the right to effectively associate with the **Insurer** in the defense and negotiation of any settlement of any **Claim**, subject to the provisions of this Clause 5. However, the **Insurer** shall not be obligated to defend such **Claim** after the **Policy Aggregate Limit of Liability** or **Separate Limit of Liability** or **Shared Limit of Liability**, if any, has been exhausted, or after an **Insured's** rejection of a **Settlement Opportunity**.

When the **Insurer** has not assumed the defense of a **Claim** pursuant to this Clause 5, the **Insurer** shall advance nevertheless, at the written request of the **Insured**, **Defense Costs** prior to the final disposition of a **Claim**. Such advanced payments by the **Insurer** shall be repaid to the **Insurer** by the **Insureds** or the **Company**, severally according to their respective interests, in the event and to the extent that the **Insureds** or the **Company** shall not be entitled under the terms and conditions of this policy to payment of such **Loss**.

The **Insureds** shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** without the prior written consent of the **Insurer**. Only those settlements, stipulated judgments and **Defense Costs**, which have been consented to by the Insurer, in writing, shall be recoverable as **Loss** under the terms of this policy. The **Insurer's** consent shall not be unreasonably withheld, provided that the **Insurer**, when it has not assumed the defense of a **Claim** pursuant to this Clause 5, shall be entitled to fully and effectively associate in the defense and negotiation of any settlement of any **Claim**, and provided further that in all events the **Insurer** may withhold consent to any settlement, stipulated judgment or **Defense Costs**, or any portion thereof, to the extent such **Loss** is not covered under the terms of this policy.

The **Insurer** shall have the right to fully and effectively associate with the **Company** in the defense of any **Claim** that appears reasonably likely to involve the **Insurer**, including but not limited to negotiating a settlement. The **Company** and the **Insureds** shall give the **Insurer** full cooperation and such information as it may reasonably require.

In the event the **Insureds** do not consent to the first **Settlement Opportunity**, then, subject to the **Policy Aggregate Limit of Liability** and **Separate Limit of Liability** or **Shared Limit of Liability**, if any, the **Insurer's** liability for all **Loss** on account of such **Claim** shall not exceed: (1) the amount for which the **Insurer** could have settled such **Claim** plus **Defense Costs** incurred as of the date such settlement was proposed in writing by the **Insurer** ("**Settlement Opportunity Amount**"), plus (2) 60% of covered **Loss** in excess of such **Settlement Opportunity Amount**, it being a condition of this insurance that the remaining 40% of such **Loss** excess of the **Settlement Opportunity Amount** shall be carried by the **Company** and the **Insureds** at their own risk and be uninsured. Notwithstanding the foregoing,



this paragraph shall not apply until the **Settlement Opportunity Amount** exceeds the applicable Retention amount stated in Item 3 of the Declarations.

With respect to: (i) **Defense Costs** jointly incurred by, (ii) any joint settlement entered into by, or (iii) any judgment of joint and several liability against the **Company** and any **Individual Insured** in connection with any **Claim**, there shall be a fair and equitable allocation as between the **Company** and any such **Individual Insured**, taking into account the relative legal and financial exposures and the relative benefits obtained by any such **Individual Insured** and the **Company**, without any presumption that the coverage afforded to the **Individual Insured** shall in any way reduce the allocation to the **Company** which shall not be insured for such allocation. In the event that a determination as to the amount of **Defense Costs** to be advanced under the policy cannot be agreed to, then the **Insurer** shall advance **Defense Costs** excess of any applicable Retention amount which the **Insurer** states to be fair and equitable until a different amount shall be agreed upon or determined pursuant to the provisions of this policy and applicable law.

This Clause 5 shall not be applicable to **Costs of Investigation**.

6.  **REPRESENTATIONS AND SEVERABILITY**

In granting coverage under this **Coverage Section**, it is agreed that the **Insurer** has relied upon the statements, warranties and representations contained in the application for this policy (including materials submitted thereto and, if this is a renewal application, all such previous policy applications for which this policy is a renewal) as being accurate and complete.  All such statements, warranties and representations are the basis for this **Coverage Section** and are to be considered as incorporated into this **Coverage Section**.

The **Insureds** agree that in the event that such statements, warranties and representations are not accurate and complete and materially affect either the acceptance of the risk or the hazard assumed by the **Insurer** under the policy, then this **Coverage Section** shall be void *ab initio* solely with respect to any of the following **Insureds**:

(a)     solely with respect to **Loss** other than **Non-Indemnifiable Loss**, any **Individual Insured** who knew as of the inception date of the **Policy Period** the facts that were not accurately and completely disclosed in the application;

(b)     a **Company**, under Clause 1. Insuring Agreements, COVERAGE B(ii), to the extent it indemnifies any **Individual Insured** referenced in (a) above; and

(c)     a **Company**, under Clause 1. Insuring Agreement, COVERAGE B(i), if any past or present chief executive officer, chief financial officer or general counsel (or any equivalent position) of the **Company** knew as of the inception date of the **Policy Period**, the facts that were not accurately and completely disclosed in the application;

whether or not such **Individual Insured** knew that such facts were not accurately and completely disclosed in the application.

Except as provided in (a) through (c) above, no **Individual Insured's** knowledge shall be imputed to any other **Insured**.




Solely with respect to any **Non-Indemnifiable Loss** of any **Individual Insured**, under no circumstances shall the coverage provided by this **Coverage Section** be deemed void, whether by rescission or otherwise, but such coverage will be subject to all other terms, conditions and exclusions of the policy.

## 7.   ORDER OF PAYMENTS

In the event of **Loss** arising from a covered **Claim** for which payment is due under the provisions of this **Coverage Section**, then the **Insurer** shall in all events:

(a)   first, pay **Loss** for which coverage is provided under Coverage A of this **Coverage Section**; then

(b)   only after payment of **Loss** has been made pursuant to Clause 8(a) above, with respect to whatever remaining amount of the **Policy Aggregate Limit of Liability** or **Separate Limit of Liability** or **Shared Limit of Liability**, if any, is available after such payment, at the written request of the **Named Entity**, either pay or withhold payment of such other **Loss** for which coverage is provided under Coverage B(ii) of this **Coverage Section**; and then

(c)   only after payment of **Loss** has been made pursuant to Clause 7(a) and Clause 7(b) above, with respect to whatever remaining amount of the **Policy Aggregate Limit of Liability** or **Separate Limit of Liability** or **Shared Limit of Liability**, if any, is available after such payment, at the written request of the **Named Entity**, either pay or withhold payment of such other **Loss** for which coverage is provided under Coverages B(i) and C of this **Coverage Section**.

In the event the **Insurer** withholds payment pursuant to Clause 7(b) and/or Clause 7(c) above, then the **Insurer** shall at such time and in such manner as shall be set forth in written instructions of the **Named Entity** remit such payment to the **Company** or directly to or on behalf of an **Individual Insured**.

The bankruptcy or insolvency of any **Company** or any **Individual Insured** shall not relieve the **Insurer** of any of its obligations to prioritize payment of covered **Loss** under this policy pursuant to this Clause 7.

**MR CONTRACT**
ENQ/QUO :



**Financial Institutions Risk Protector**

EMPLOYMENT PRACTICES LIABILITY
COVERAGE SECTION
("EPL COVERAGE SECTION")

<u>Notice</u>: **Pursuant to Clause 1 of the General Terms and Conditions, the General Terms and Conditions are incorporated by reference into, made a part of, and are expressly applicable to this Coverage Section, unless otherwise explicitly stated to the contrary in either the General Terms and Conditions or in this Coverage Section.**

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by application, including its attachments and the material incorporated therein, which form a part of this policy, the **Insurer** agrees as follows:

1. **INSURING AGREEMENTS**

   **COVERAGE A.     EMPLOYMENT PRACTICES LIABILITY INSURANCE**

   This policy shall pay the **Loss** of each and every **Insured** arising from a **Claim** first made against such **Insured** during the **Policy Period** or **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy for any **Wrongful Act**. The **Insurer** shall, in accordance with Clause 5 of this **Coverage Section**, advance **Defense Costs** of such **Claim** prior to its final disposition.

   **COVERAGE B.     EMPLOYMENT CRISIS MANAGEMENT INSURANCE**

   This policy shall pay the **Employment Crisis Management Loss** of a **Company** solely with respect to an **Employment Crisis** occurring during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy, up to the amount of the respective **Employment Crisis Management Fund**, from first dollar; provided that payment of any **Employment Crisis Management Loss** under this policy shall not waive any of the **Insurer's** rights under this policy or at law. This Coverage B shall apply regardless of whether a **Claim** is ever made against an **Insured** arising from such **Employment Crisis** and, in the case where a **Claim** is made, regardless of whether the amount is incurred prior to or subsequent to the making of the **Claim**.

   The **Insured** shall notify the **Insurer** of an **Employment Crisis** in accordance with the notice provisions of Clause 7 of the General Terms and Conditions.

   No Retention amount is applicable to Coverage B.

**MR CONTRACT**
ENQ/QUO :


L/UWR

## 2. DEFINITIONS

(a) "**Claim**" means:

    (1)    a written demand for monetary or non-monetary relief (including any request to toll or waive any statute of limitations); or

    (2)    a civil, administrative, regulatory or arbitration proceeding for monetary or non-monetary relief which is commenced by:
        (i)      service of a complaint or similar pleading;
        (ii)    return of an indictment (in the case of a criminal proceeding); or
        (iii)   receipt or filing of a notice of charges.

The term **Claim** shall include an Equal Employment Opportunity Commission ("EEOC") (or similar federal, state or local agency) proceeding or investigation commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to the **Insured**.

However, in no event shall the term **Claim** include any labor or grievance proceeding which is subject to a collective bargaining agreement.

(b) "**Employment Crisis**" has the meaning as defined in Appendix EP-1 attached to this policy.

(c) "**Employment Crisis Management Fund**" has the meaning as defined in Appendix EP-1 attached to this policy.

(d) "**Employment Crisis Management Loss**" has the meaning as defined in Appendix EP-1 attached to this policy.

(e) "**Individual Insured(s)**" means any **Director or Officer**, **Outside Entity Executive** or **Employee** of the **Company**.

(f) "**Insured(s)**" means:
    (1)    any **Individual Insured**; and
    (2)    the **Company**.

(g) "**Loss**" means damages (including front pay and back pay), judgments (including pre-judgment and post-judgment interest on that part of any judgment paid under this **Coverage Section**), settlements, **Defense Costs** and **Employment Crisis Management Loss**; however, **Loss** (other than **Defense Costs**) shall not include: (1) civil or criminal fines or penalties; (2) taxes; (3) any amount for which the **Insureds** are not financially liable or which are without legal recourse to the **Insureds**; (4) employment-related benefits, stock options, perquisites, deferred compensation or any other type of compensation other than salary, wages or bonus compensation; (5) any liability or costs incurred by any **Insured** to modify any building or property in order to make said building or property more accessible or accommodating to any disabled person; or any liability or costs incurred in connection with any educational, sensitivity or other corporate program, policy or seminar relating to a **Claim**

**MR CONTRACT**
ENQ/QUO :



alleging discrimination or other **Wrongful Act**; or (6) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

Notwithstanding the foregoing paragraph, "**Loss**" shall specifically include (subject to this policy's other terms, conditions and limitations, including but not limited to Exclusion (a) of this **Coverage Section** and Exclusion (a) of the General Terms and Conditions) punitive, exemplary and multiple damages. Enforceability of this paragraph shall be governed by such applicable law that most favors coverage for such penalties and punitive, exemplary and multiple damages. For purposes of such coverage, "applicable law" includes, but is not limited to, the following jurisdictions: (a) where the **Wrongful Act** actually or allegedly took place; (b) where the damages are awarded; (c) where the **Named Entity** resides, is incorporated or has its principal place of business; and (d) where the **Insurer** is incorporated or has its principal place of business.

(h) "**Settlement Opportunity**" means an **Insurer** recommended settlement that is within the **Policy Aggregate Limit of Liability** or **Separate Limit of Liability**, if any, and that is acceptable to the claimant, provided that the **Insureds** consent to such settlement within thirty (30) days of the date the **Insureds** are first made aware of the **Settlement Opportunity**, or in the case of a **Settlement Opportunity** which arises from a settlement offer by the claimant, then within the time permitted by the claimant to accept such settlement offer, but in all events no later than thirty (30) days after the settlement offer was made.

(i) "**Wrongful Act**" means any actual or alleged:

(1) wrongful dismissal, discharge or termination (either actual or constructive), including breach of an implied contract;

(2) harassment (including sexual harassment, whether "quid pro quo", hostile work environment or otherwise);

(3) discrimination (including, but not limited to, discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy, or disability);

(4) **Retaliation**;

(5) employment-related misrepresentation(s) to an **Employee** or applicant for employment with the **Company**;

(6) wrongful failure to employ or promote;

(7) employment-related libel, slander, humiliation, defamation or invasion of privacy, including the giving of negative or defamatory statements in connection with an **Employee** reference;

(8) wrongful deprivation of career opportunity with the **Company**, wrongful demotion or negligent **Employee** evaluation;

(9) wrongful discipline;

(10) failure to grant tenure; and

(11) with respect to any of the foregoing items (1) through (10) of this definition: negligent hiring, retention, training or supervision, infliction of emotional distress, mental anguish, failure to provide or enforce adequate or consistent corporate policies and procedures, or violation of an individual's civil rights;

**MR CONTRACT**
ENQ/QUO :



621
MIL

but only if the **Wrongful Act(s)** relates to an **Employee(s)**, or applicants for employment, with the **Company** or an **Outside Entity**, whether direct, indirect, intentional or unintentional.

With respect to any customer or client of the **Company**, whether individually or as a class or group, **Wrongful Act** shall mean only any actual or alleged sexual harassment or violation of an individual's civil rights relating to such sexual harassment, whether direct, indirect, intentional or unintentional.

## 3. EXCLUSIONS

In addition to the exclusions set forth in Clause 4 of the General Terms and Conditions, the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

(a) arising out of, based upon or attributable to the committing of any deliberate criminal, fraudulent or dishonest act or any willful violation of any statute, rule or law, if any judgment, final adjudication or any alternative dispute resolution proceeding adverse to the **Insured(s)** establishes that such deliberate criminal, fraudulent, dishonest act or willful violation of any statute, rule or law occurred;

(b) alleging, arising out of, based upon or attributable to, directly or indirectly, any actual or alleged contractual liability of the **Company** or any other **Insured** under any express contract or agreement; provided, however, that this exclusion shall not apply to the extent any liability does not arise under such express contract or agreement;

(c) with respect to serving in a capacity as an **Outside Entity Executive**, for any **Wrongful Act** occurring prior to the **Continuity Date** if the **Insured** knew or could have reasonably foreseen that such **Wrongful Act** could lead to a **Claim** under this policy;

(d) alleging, arising out of, based upon or attributable to, directly or indirectly, any actual or alleged act or omission of an **Individual Insured** serving in his or her capacity as a **Director or Officer** or **Employee** of any entity that is not the **Company** or an **Outside Entity**, or by reason of his or her status as a **Director or Officer** or **Employee** of such other entity;

(e) for any **Wrongful Act** arising out of an **Individual Insured** serving in a capacity as an **Outside Entity Executive,** if such **Claim** is brought by the **Outside Entity** or a director, officer, trustee or governor thereof; or

(f) alleging, arising out of, based upon or attributable to, directly or indirectly, any **Claim** brought by a securities holder of the **Company,** an **Outside Entity** or an **Affiliate** in their capacity as such whether directly, derivatively on behalf of the **Company,** or an **Affiliate,** or by class action.

For the purpose of determining the applicability of the foregoing Exclusion 3(a), the **Wrongful Act** of an **Insured** shall not be imputed to any other **Insured**.



Clause 3 of this **Coverage Section** and Clause 4 of the General Terms and Conditions shall not be applicable to **Employment Crisis Management Loss**.

### 4. LIMIT OF LIABILITY

Clause 5 of the General Terms and Conditions is modified to the extent necessary to provide the following:

The maximum limit of the **Insurer's** liability for **Employment Crisis Management Loss** arising from all **Employment Crises** combined occurring during the **Policy Period** or the **Discovery Period** (if applicable), in the aggregate, shall be the amount set forth in Item 5(e) of the Declarations as the **Employment Crisis Management Fund**. The **Employment Crisis Management Fund** shall be the aggregate limit of the **Insurer's** liability under this policy for all **Employment Crises** regardless of the number of **Employment Crises** occurring during the **Policy Period** or the **Discovery Period** (if applicable). The **Employment Crisis Management Fund** shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** stated in Item 5(a) of the Declarations of this policy or any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **Coverage Section** as stated in Item 3 of the Declarations, and will in no way serve to increase the **Insurer's Policy Aggregate Limit of Liability** or any **Separate Limit of Liability** or **Shared Limit of Liability** as stated therein.

### 5. DEFENSE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE ADVANCEMENT OF DEFENSE COSTS)

The **Insurer** does not assume any duty to defend. The **Insureds** shall defend and contest any **Claim** made against them.

Notwithstanding the foregoing, the **Insureds** shall have the right to tender the defense of any **Claim** to the **Insurer**, which right shall be exercised in writing by the **Named Entity** on behalf of all **Insureds** to the **Insurer** pursuant to the notice provisions of Clause 7 of the General Terms and Conditions. This right shall terminate if not exercised within thirty (30) days of the date the **Claim** is first made against an **Insured**, pursuant to Clause 7 of the General Terms and Conditions. Further, from the date the **Claim** is first made against the **Insureds** to the date when the **Insurer** accepts the tender of the defense of such **Claim**, the **Insureds** shall take no action, or fail to take any required action, that prejudices the rights of the **Insureds** or the **Insurer** with respect to such **Claim**. Provided that the **Insureds** have complied with the foregoing, the **Insurer** shall be obligated to assume the defense of the **Claim**, even if such **Claim** is groundless, false or fraudulent. The assumption of the defense of the **Claim** shall be effective upon written confirmation sent thereof by the **Insurer** to the **Named Entity**. Once the defense has been so tendered, the **Insured** shall have the right to effectively associate with the **Insurer** in the defense and negotiation of any settlement of any **Claim**, subject to the provisions of this Clause 5. However, the **Insurer** shall not be obligated to defend such **Claim** after the **Policy Aggregate Limit of Liability** or **Separate Limit of Liability** or **Shared Limit of Liability**, if any, has been exhausted, or after an **Insured's** rejection of a **Settlement Opportunity**.

**MR CONTRACT**
ENQ/QUO :



When the **Insurer** has not assumed the defense of a **Claim** pursuant to this Clause 5, the **Insurer** shall advance nevertheless, at the written request of the **Insured**, **Defense Costs** prior to the final disposition of a **Claim**.  Such advanced payments by the **Insurer** shall be repaid to the **Insurer** by the **Insureds** or the **Company**, severally according to their respective interests, in the event and to the extent that the **Insureds** or the **Company** shall not be entitled under the terms and conditions of this policy to payment of such **Loss**.

The **Insureds** shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** without the prior written consent of the **Insurer**.  Only those settlements, stipulated judgments and **Defense Costs**, which have been consented to by the **Insurer**, in writing, shall be recoverable as **Loss** under the terms of this policy.  The **Insurer's** consent shall not be unreasonably withheld, provided that the **Insurer**, when it has not assumed the defense of a **Claim** pursuant to this Clause 5, shall be entitled to fully and effectively associate in the defense and negotiation of any settlement of any **Claim**, and provided further that in all events the **Insurer** may withhold consent to any settlement, stipulated judgment or **Defense Costs**, or any portion thereof, to the extent such **Loss** is not covered under the terms of this policy.

The **Insurer** shall have the right to fully and effectively associate with the **Company** in the defense of any **Claim** that appears reasonably likely to involve the **Insurer**, including but not limited to negotiating a settlement. The **Company** and the **Insureds** shall give the **Insurer** full cooperation and such information as it may reasonably require.

In the event the **Insureds** do not consent to the first **Settlement Opportunity**, then, subject to the **Policy Aggregate Limit of Liability** and **Separate Limit of Liability** or **Shared Limit of Liability**, if any, the **Insurer's** liability for all **Loss** on account of such **Claim** shall not exceed: (1) the amount for which the **Insurer** could have settled such **Claim** plus **Defense Costs** incurred as of the date such settlement was proposed in writing by the **Insurer** ("**Settlement Opportunity Amount**"), plus (2) 60% of covered **Loss** in excess of such **Settlement Opportunity Amount**, it being a condition of this insurance that the remaining 40% of such **Loss** excess of the **Settlement Opportunity Amount** shall be carried by the **Company** and the **Insureds** at their own risk and be uninsured.  Notwithstanding the foregoing, this paragraph shall not apply until the **Settlement Opportunity Amount** exceeds the applicable Retention amount stated in Item 3 of the Declarations.

This Clause 5 shall not be applicable to **Employment Crisis Management Loss.**

**MR CONTRACT**
ENQ/QUO :



## APPENDIX EP-1

### EMPLOYMENT CRISIS MANAGEMENT INSURANCE

For the Employment Crisis Management Insurance coverage only, the following Definitions apply:

(a)     **"Allegation"** means any complaint, whether written or verbal, communicated to the **Company's** human     resources department by:

   (i)   an individual who believes that he or she was a victim of the alleged **Wrongful Act;** or

   (ii)  such individual's direct or indirect supervisor, if such supervisor is an **Employee** and such supervisor's conduct is not the subject matter of the alleged **Wrongful Act.**

(b)     **"Discovery"** means either:

   (i)   an observation by any **Senior Executive** or any human resources manager; or

   (ii)  an internal investigation conducted by the **Company,** at the **Company's** own expense, which concludes that there is a reasonable basis to believe that a **Wrongful Act** has occurred.

(c)     **"Employment Crisis"** means an **Allegation, Discovery or Media Report** of a **Wrongful Act,** specifically including, but not limited to, a hostile work environment, which, in the good faith opinion of the **Company's** general counsel (or equivalent position), resulted or is reasonably likely to result, in any:

   (i)   civil action or compliance audit by the EEOC or any similar state agency or commission;
   (ii)  civil or criminal action alleging sexual harassment or conduct by an executive officer;
   (iii) civil class action;
   (iv)  civil action involving multiple plaintiffs; or
   (v)   civil action by a person alleging retaliatory conduct by an Insured in response to such person's actions or threatened actions as a "whistleblower".

Provided, however, that the term **Employment Crisis** shall not include any:

(1)     preparing, revising or rewriting of personnel policies or procedures;
(2)     sensitivity or awareness training;
(3)     accommodations made by the **Company** pursuant to the Americans With Disabilities Act;
(4)     **Claim** which has been reported, or any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;
(5)     pending or prior litigation, or EEOC (other similar foreign, state or local) litigation or proceeding , as of the **Employment Crisis Continuity Date;**
(6)     **Claim** alleging, arising out of, based upon or attributable to, directly or indirectly, any actual, alleged or threatened discharge, dispersal, release or escape of



L/UWR

      **Pollutants** or other hazardous materials; or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants** or other hazardous materials; or

(7)     **Claim** alleging, arising out of, based upon or attributable to, directly or indirectly, the hazardous properties of nuclear materials; provided, however, the foregoing shall not apply to any **Employment Crisis** arising from the ownership of, operation of, construction of, management of, planning of, maintenance of or investment in any nuclear facility.

An **Employment Crisis** shall first commence when the **Company's** general counsel first has knowledge of the **Allegation, Discovery** or **Media Report** giving rise to the **Employment Crisis**, and shall conclude at the earliest of: (1) the time when the **Employment Crisis Management Firm** advises the **Company** that the **Employment Crisis** no longer exists; or (2) when the **Employment Crisis Management Fund** has been exhausted.

(d)     **"Employment Crisis Continuity Date"** means the Employment Practices Liability **Continuity Date** set forth in Item 3 of the Declarations.

(e)     **"Employment Crisis Management Firm"** means any public relations firm, media management consultant, investigative firm or law firm hired by the **Company** to perform **Employment Crisis Management Services** in connection with the **Employment Crisis**.

(f)     **"Employment Crisis Management Fund"** means the dollar amount set forth as such in Item 5 of the Declarations.

(g)     **"Employment Crisis Management Loss"** means any of the following amounts incurred during the pendency of the **Employment Crisis**, regardless of whether a **Claim** is ever made against an **Insured** arising from the **Employment Crisis**, and in the case where a **Claim** is made, regardless of whether the amount is incurred prior to or subsequent to the making of the **Claim**:

     (1)     amounts for which the **Company** is legally liable for the reasonable and necessary fees and expenses incurred by an **Employment Crisis Management Firm** in the performance of **Employment Crisis Management Services** for the **Company** arising from an **Employment Crisis**; and

     (2)     amounts for which the **Company** is legally liable for the reasonable and necessary printing, advertising, mailing of materials, or travel by directors, officers, employees or agents of the **Company** or the **Employment Crisis Management Firm**, solely in connection with the **Employment Crisis**.

(h)     **"Employment Crisis Management Services"** means those services performed by an **Employment Crisis Management Firm** in advising the **Company** on minimizing potential harm to the **Company** arising from the **Employment Crisis**; including, but not limited to, maintaining and restoring public and employee confidence in the **Company**.

(i)     **"Media Report"** means any of the following publications or reports received in the geographic

area of the **Company:** (i) a daily newspaper of general circulation; (ii) a weekly, monthly or quarterly newsletter or magazine of general circulation; (iii) a newsletter or trade publication applicable to the **Company's** industry; or (iv) a radio or television newscast.

(j)      **"Senior Executive"** means a director or duly appointed or elected corporate officer of the **Company**



**Financial Institutions Risk Protector**

FIDUCIARY LIABILITY INSURANCE
COVERAGE SECTION
("FLI COVERAGE SECTION")

<u>Notice</u>: **Pursuant to Clause 1 of the General Terms and Conditions, the General Terms and Conditions are incorporated by reference into, made a part of, and are expressly applicable to this Coverage Section, unless otherwise explicitly stated to the contrary in either the General Terms and Conditions or in this Coverage Section.**

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by application, including its attachments and the material incorporated therein, which form a part of this policy, the **Insurer** agrees as follows:

1. **INSURING AGREEMENTS**

    (a) Solely with respect to **Claims** first made against an **Insured** during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy, and subject to the other terms, conditions and limitations of this policy, this policy shall pay the **Loss** of each and every **Insured** arising from a **Claim** first made against an **Insured** for any **Wrongful Act** by any such **Insured** or by any employee for whom such **Insured** is legally responsible.

    (b) Solely with respect to **CAP Penalties** and **Delinquent Filer Penalties** assessed against an **Insured**, and **Voluntary Fiduciary Correction Loss** incurred by an **Insured**, during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy, and subject to the other terms, conditions and limitations of this policy, this policy shall:

    (i)    pay the **CAP Penalties** and **Delinquent Filer Penalties**; and
    (ii)   reimburse the **Voluntary Fiduciary Correction Loss**,

    of each and every **Insured**, collectively not to exceed the amount of the **Voluntary Compliance Loss Sublimit of Liability**, as defined in Clause 5 of this **Coverage Section**;

    The payment of any **Voluntary Compliance Loss** under this policy shall not waive any of the **Insurer's** rights under this policy or at law, including in the event that a **Voluntary Compliance Loss** results in a **Claim**.

    (c) Solely with respect to **HIPAA Penalties** incurred by an **Insured** during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy, and subject to the other terms, conditions and limitations of this policy, this policy shall pay the **HIPAA Penalties** of each and every **Insured**, collectively not to exceed the amount of the **HIPAA Penalties Sublimit of Liability,** as defined in Clause 5 of this **Coverage Section**.

**MR CONTRACT**
ENQ/QUO :



## 2. DEFENSE AGREEMENT

(a) INSURER'S DUTY TO DEFEND

Except as hereinafter stated, the **Insurer** shall have both the right and duty to defend any **Claim** against an **Insured** alleging a **Wrongful Act**, even if such **Claim** is groundless, false or fraudulent.

The **Insured** shall have the right to effectively associate with the **Insurer** in the defense of any **Claim**, including, but not limited to, negotiating a settlement, subject to the provisions of this clause. However, the **Insurer** shall not be obligated to defend any **Claim** after the **Policy Aggregate Limit of Liability** or any **Separate Limit of Liability** or **Shared Limit of Liability** has been exhausted, or pursuant to subparagraph (b) below, after the rejection of a settlement offer.

(b) GENERAL PROVISIONS (applicable to (a) above)

The **Insurer** shall advance **Defense Costs** prior to the final disposition of a **Claim**, subject to the other provisions of this policy. Such advance payments by the **Insurer** shall be repaid to the **Insurer** by the **Insureds**, severally according to their respective interests, in the event and to the extent that the **Insureds** shall not be entitled under the terms and conditions of this policy to payment of such **Loss**.

The **Insured** shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any **Defense Costs** without the prior written consent of the **Insurer**. Only those settlements, stipulated judgments and **Defense Costs** which have been consented to by the **Insurer** shall be recoverable as **Loss** under the terms of this policy.

The **Insureds** shall give the **Insurer** full cooperation and such information as the **Insurer** may reasonably require. The **Insurer** may make any settlement of any **Claim** it deems expedient with respect to any **Insured** subject to such **Insured's** written consent. If any **Insured** withholds consent to such settlement, the **Insurer's** liability for all **Loss** on account of such **Claim** shall not exceed: (1) the amount for which the **Insurer** could have settled such **Claim** plus **Defense Costs** incurred as of the date such settlement was proposed in writing by the **Insurer** (herein, the "**Settlement Opportunity Amount**"), plus (2) 60% of covered **Loss** in excess of such **Settlement Opportunity Amount**, it being a condition of this insurance that the remaining 40% of such **Loss** excess of the **Settlement Opportunity Amount** shall be carried by the **Insureds** at their own risk and be uninsured.

## 3. DEFINITIONS

(a) "**Administrator**" means an **Insured** with respect to any **Wrongful Act** described in subparagraph (2) of the definition of "**Wrongful Act**" in this **Coverage Section**.

(b) "**Benefits**" means any obligation under a **Plan** to a participant or beneficiary under a **Plan** which is a payment of money or property, or the grant of a privilege, right, option or perquisite.

(c) "**Breach of Fiduciary Duty**" means a violation of the responsibilities, obligations or duties imposed upon **Insureds** by **ERISA**.



(d) "**CAP Penalties**" means fines, penalties, sanctions, voluntary correction fees, compliance fees or user fees assessed against or collected from an **Insured** by the Internal Revenue Service ("**IRS**") pursuant to a written agreement to correct an inadvertent **Plan** defect under an Employee Plans Compliance Resolution System, provided that such agreement to correct such **Plan** defect was entered into in writing by the **Insured** with the **IRS** during the **Policy Period** (or during the policy period of a policy issued by the **Insurer** of which this policy is a continuous renewal).

(e) "**Claim**" means:

  (1) a written demand for monetary, non-monetary or injunctive relief; or
  (2) a civil, criminal or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by:
    (i) service of a complaint or similar pleading; or
    (ii) return of an indictment (in the case of a criminal proceeding); or
    (iii) receipt or filing of a notice of charges; or
  (3) a formal agency adjudicative proceeding anywhere in the world to which an **Insured** is subject.

(f) "**Consulting Fees**" means fees charged by a third party actuary, benefits consultant or accountant resulting solely from the correction of an actual or potential **Breach of Fiduciary Duty**, but excluding any fees, costs or expenses associated with: (i) a **Plan** audit; or (ii) identifying, finding or assessing such **Breach of Fiduciary Duty**.

(g) "**Defense Expenses**" means reasonable and necessary attorney's fees, costs or expenses consented to in writing by the **Insurer** resulting solely from the correction of an actual or potential **Breach of Fiduciary Duty**, but excluding any fees, costs and expenses associated with finding or assessing such **Breach of Fiduciary Duty** and any compensation of **Individual Insureds** or employees of an **Insured**.

(h) "**Delinquent Filer Penalties**" means penalties assessed by the U.S. Department of Labor or the **IRS** under a Delinquent Filer Voluntary Compliance Program for inadvertent failure to file Form 5500, provided that the failure to file such Form 5500 occurred during the **Policy Period** (or during the policy period of a policy issued by the **Insurer** of which this policy is a continuous renewal).

(i) "**Employee Benefit Law**" means **ERISA** or any similar common or statutory law of the United States, Canada or any state or other jurisdiction anywhere in the world to which a **Plan** is subject.

  (1) Solely with respect to paragraph (2) of the definition of **Wrongful Act**, **Employee Benefit Law** shall also include Part 164 of the regulations under the Health Insurance Portability and Accountability Act of 1996, unemployment insurance, Social Security, government-mandated disability benefits or similar law.
  (2) In no event shall **Employee Benefit Law**, other than as set forth in paragraph (1) of this definition of **Employee Benefit Law**, include any law concerning worker's compensation, unemployment insurance, Social Security, government-mandated disability benefits or similar law.

L/UWR

(j) "**ERISA**" means the Employee Retirement Income Security Act of 1974 (including, but not limited to, amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985, Health Insurance Portability and Accountability Act of 1996 as it relates to Sections 102(b) and 104(b)(1) of **ERISA**, the Newborns' and Mothers' Health Protection Act of 1996, the Mental Health Parity Act of 1996, and the Women's Health and Cancer Rights Act of 1998), and including any amendment or revision thereto.

(k) "**ESOP**" means any employee stock ownership plan as defined in **ERISA**, or any other **Plan** under which investments are made primarily in securities of or issued by (i) the **Company**, (ii) the parent of the **Company**, (iii) any acquired **Subsidiary**, or (iv) any parent of any acquired **Subsidiary**, or whose assets at any time within twelve months prior to the inception date of this policy were comprised of 10% or more of securities of the **Company**, the parent of the **Company**, any acquired **Subsidiary**, or any parent of any acquired **Subsidiary**.

(l) "**Fiduciary**" means a fiduciary as defined in any applicable **Employee Benefit Law** with respect to a **Plan**, or a person or entity who exercises discretionary control respecting the management of a **Plan** or the disposition of its assets.

(m) "**HIPAA Penalties**" means civil money penalties imposed upon an **Insured** for violation of the privacy provisions of the Health Insurance Portability and Accountability Act of 1996.

(n) "**Individual Insured**" means any past, present or future natural person director, officer or employee of the **Company** or, if applicable, of a **Plan**, and as to all of the above, in his or her capacity as a **Fiduciary**, **Administrator** or trustee of a **Plan**.

(o) "**Insured(s)**" means:

      (1) any **Individual Insured**;
      (2) any **Plan(s)**;
      (3) the **Company**; and
      (4) any other person or entity in his, her or its capacity as a **Fiduciary**, **Administrator** or trustee of a **Plan** who is included in the definition of "**Insured**" by specific written endorsement attached to this policy.

(p) "**Loss**" means damages, judgments (including pre and post-judgment interest on that part of any judgment paid under this **Coverage Section**), settlements and **Defense Costs**; however, **Loss** (other than **Defense Costs**) shall not include: (1) civil or criminal fines or penalties imposed by law, except (i) to the extent set forth in Item 5(f) of the Declarations for **Voluntary Compliance Loss**, (ii) **UK Fines and Penalties**, (iii) the five percent (5%) or less civil penalty imposed upon an **Insured** under Section 502(i) of **ERISA**, (iv) the twenty percent (20%) or less penalty imposed upon an **Insured** under Section 502(l) of **ERISA**, with respect to covered settlements or judgments under this **Coverage Section**, and (v) to the extent set forth in Item 5(g) of the Declarations for **HIPAA Penalties**; (2) the multiplied portion of multiplied damages; (3) taxes or tax penalties; (4) any amount for which an **Insured** is not financially liable or which is without legal recourse to the **Insured**; (5) **Benefits**, or that portion of any settlement or award in an amount equal to such **Benefits**, unless and to the extent that recovery of such **Benefits** is based upon a covered **Wrongful Act** and is payable as a personal obligation of an **Individual Insured**; or (6) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.



Where permitted by law, **Loss** shall include punitive or exemplary damages imposed upon any **Insured**, subject to the policy's other terms, conditions and exclusions, including but not limited to Exclusion (a) of this Coverage Section and Exclusion (a) of the General Terms and Conditions.

**Loss** shall include **Voluntary Compliance Loss** and **HIPAA Penalties**.

(q) "**Non-Qualified Plan**" means any of the following plans for a select group of management or highly compensated directors, officers and/or employees: deferred compensation plan, supplemental executive retirement plan, top-hat plan or excess benefit plan.

(r) "**Plan**" means:

    (i) any **Non-Qualified Plan**; or

    (ii) any payroll deduction IRA (Individual Retirement Account), SEP (Simplified Employee Pension Plan), SARSEP (Salary Reduction Simplified Employee Pension Plan) or SIMPLE IRA (Savings Incentive Match Plan for Employees), established or administered by the **Company**, solely for the benefit of the employees and/or the **Directors or Officers**; or

    (iii) any plan as defined under **Employee Benefit Law**, other than a **Non-Qualified Plan**, which is:

        (1) a welfare plan, as defined under **Employee Benefit Law** which was, is now, or hereinafter becomes sponsored solely by the **Company**, or sponsored jointly by the **Company** and a labor organization, solely for the benefit of the employees and/or the **Director(s) or Officer(s)** of the **Company**;

        (2) a pension plan as defined under **Employee Benefit Law** (other than an **ESOP** or stock option plan) which was, on or prior to the inception date of the policy, sponsored solely by the **Company**, or sponsored jointly by the **Company** and a labor organization, solely for the benefit of the employees and/or the **Director(s) or Officer(s)** of the **Company**, provided that at any time prior to the inception date of this policy such plan has been reported in writing to the **Insurer** by the **Named Entity** pursuant to the terms of the application for this policy, or any prior policy or its application issued by the **Insurer** and the **Named Entity** shall have paid any required premium relating to such plan;

        (3) subject to the requirements of sub-paragraphs (1) and (2) above, any pension or welfare plan that was sold, spun-off or terminated during or prior to the inception date of this policy, but solely with respect to **Wrongful Acts** that occurred prior to the date of such sale or spin-off, or in the case of a terminated plan, prior to the final date of asset distribution of such plan, provided that notice of such sale, spin-off or termination is provided to the **Insurer** before the end of the **Policy Period**;

        (4) a pension plan as defined in **Employee Benefit Law** (other than an **ESOP** or stock option plan) which:

            (a) is acquired during the **Policy Period** as a result of the **Company's** acquisition of a **Subsidiary** whose assets total more than 25% of the total consolidated assets of the **Company** as of the inception date of this policy; or



    (b)    is acquired during the **Policy Period** and such plan's assets total more than 25% of the total consolidated assets of all covered pension plans as of the inception date of this policy, or

    (c)    is created during the Policy Period,

but only upon the condition that within ninety (90) days of its acquisition or creation, the **Named Entity** shall have provided the **Insurer** with a completed application for such new plan and agreed to any additional premium or amendment of the provisions of the policy required by the **Insurer** relating to such new plan;

    (5)    a pension plan which, during or prior to the **Policy Period** of this policy, has been merged into or consolidated with a pension plan for which coverage is afforded under this policy; and

    (6)    (i)    a plan which is both a welfare plan and a pension plan as defined in **Employee Benefit Law** (other than an **ESOP** or stock option plan) subject to the requirements of this Definition (r);

            (ii)    the following government-mandated programs: unemployment insurance, Social Security or disability benefits, solely with respect to a **Wrongful Act** defined in subparagraph (2) of the definition of "**Wrongful Act**" in this **Coverage Section**;

            (iii)    any other plan, fund or program, including an **ESOP**, which is included in the definition of "**Plan**" by specific written endorsement attached to this policy.

Notwithstanding the foregoing, the term "**Plan**" shall not include any multiemployer plan as defined under any **Employee Benefit Law**.

(s) "**UK Fines and Penalties**" means civil fines and penalties assessed against an **Insured** by either the Pensions Ombudsman appointed by the Secretary of State for Social Services in the United Kingdom or by the Pensions Regulator in the United Kingdom or any successor body thereto, subject to the other terms, conditions and exclusions of the policy.

(t) "**Voluntary Compliance Loss**" means **CAP Penalties**, **Delinquent Filer Penalties** and **Voluntary Fiduciary Correction Loss**.

(u) "**Voluntary Fiduciary Correction Loss**" means damages, **Defense Expenses** and **Consulting Fees** incurred in connection with the U.S. Department of Labor's ("**DOL**") Voluntary Fiduciary Correction Program as set forth in the Federal Register, resulting from an inadvertent **Breach of Fiduciary Duty** occurring during the **Policy Period** (or during the policy period of a policy issued by the **Insurer** of which this policy is a continuous renewal), provided that such compliance with the **DOL's** Voluntary Fiduciary Correction Program results in the **Insured** obtaining a "No Action" letter from the **DOL**; however, **Voluntary Fiduciary Correction Loss** shall not include: (1) civil or criminal fines or penalties imposed by law; (2) punitive or exemplary damages; (3) the multiplied portion of multiplied damages; (4) taxes or tax penalties; (5) any amount for which an **Insured** is not financially liable or which is without legal recourse to the **Insured**; (6) **Benefits**, or that portion of damages equal to such **Benefits**; (7) matters of which the **Insured** had knowledge prior to the inception date of this policy or the first policy issued by the **Insurer** to the **Named Entity** of which this policy is a continuous renewal; or (8) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.



(v) "**Wrongful Act**" means:

(1) as respects an **Insured**: a violation of any of the responsibilities, obligations or duties imposed upon **Fiduciaries** by **Employee Benefit Law** with respect to a **Plan**; or any matter claimed against an **Insured** solely by reason of his, her or its status as a **Fiduciary**, but only with respect to a **Plan**; and

(2) as respects an **Administrator**, any act, error or omission solely in the performance of one or more of the following administrative duties or activities, but only with respect to a **Plan**:
    (i)   counseling employees, participants and beneficiaries; or
    (ii)  providing interpretations; or
    (iii) handling of records; or
    (iv) activities effecting enrollment, termination or cancellation of employees, participants and beneficiaries under the **Plan**,
or any matter claimed against an **Insured** solely by reason of his, her or its status as an **Administrator**, but only with respect to a **Plan**;

(3) as respects an **Individual Insured**, any matter claimed against him or her arising out of his or her service as a **Fiduciary** or **Administrator** of any multiemployer plan as defined by **ERISA**, but only if such service is at the specific written request or direction of the **Company** and such multiemployer plan is added by specific written endorsement attached to this policy, identified as a multiemployer plan and any required premium is paid. In no event shall coverage under this policy extend to a **Claim** against a multiemployer plan itself, its contributing employer(s) or any other fiduciaries or administrators of such plan, other than an **Individual Insured**.

## 4. EXCLUSIONS

In addition to the exclusions set forth in Clause 4 of the General Terms and Conditions, the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

(a) arising out of, based upon or attributable to the committing of any criminal or deliberate fraudulent act, or knowing or willful violation of any statute, rule or law, including, but not limited to **Employee Benefit Law** if a judgment or final adjudication or an alternative dispute resolution proceeding adverse to the **Insured(s)** establishes such criminal or deliberate fraudulent act, or knowing or willful violation of any statute, rule or law, including but not limited to **Employee Benefit Law**;

(b) for discrimination in violation of any law, except that this exclusion shall not apply to discrimination in violation of **Employee Benefit Law**;

(c) for failure to fund a **Plan** in accordance with **Employee Benefit Law** or the **Plan** instrument or the failure to collect contributions owed to the **Plan**; except that this exclusion shall not apply to **Defense Costs**;

(d) alleging, arising out of, based upon or attributable to any act or omission in his, her or its capacity as a **Fiduciary** or **Administrator** of any plan, fund or program, other than a **Plan** as defined in this policy, or by reason of his, her or its status as a **Fiduciary** or **Administrator** of such other plan, fund or program;

**MR CONTRACT**
ENQ/QUO :



(e) for emotional distress of any person; except that this exclusion shall not apply to **Defense Costs** incurred in the defense of a **Claim** for **Breach of Fiduciary Duty**; or

(f) alleging, arising out of, based upon or attributable to any **Wrongful Act** as respects the **Plan** taking place at any time when the **Company** did not sponsor such **Plan** or when the **Individual Insured** was not a **Fiduciary**, **Administrator**, trustee, **Director(s) or Officer(s)**, or employee of the **Company** or if applicable, a **Plan**.

For the purpose of determining the applicability of the foregoing Exclusion 4(a), the facts pertaining to and knowledge possessed by any **Insured** shall not be imputed to any other **Individual Insured**.

## 5. LIMIT OF LIABILITY

Clause 5 of the General Terms and Conditions is modified to the extent necessary to provide the following:

The maximum limit of the **Insurer's** liability for all **Voluntary Compliance Loss** occurring during the **Policy Period** or the **Discovery Period** (if applicable), in the aggregate, shall be the amount set forth in Item 5(f) of the Declarations ("**Voluntary Compliance Loss Sublimit of Liability**"). The **Voluntary Compliance Loss Sublimit of Liability** shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** stated in Item 5(a) of the Declarations of this policy or any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **Coverage Section** as stated in Item 3 of the Declarations, and will in no way serve to increase the **Insurer's Policy Aggregate Limit of Liability** or any **Separate Limit of Liability** or **Shared Limit of Liability** as stated therein.

The maximum limit of the **Insurer's** liability for all **HIPAA Penalties** occurring during the **Policy Period** or the **Discovery Period** (if applicable), in the aggregate, shall be the amount set forth in Item 5(g) of the Declarations ("**HIPAA Penalties Sublimit of Liability**"). The **HIPAA Penalties Sublimit of Liability** shall be part of, and not in addition to, the **Policy Aggregate Limit of Liability** stated in Item 5(a) of the Declarations of this policy and any **Separate Limit of Liability** or **Shared Limit of Liability** applicable to this **Coverage Section** as stated in Item 3 of the Declarations, and will in no way serve to increase the **Insurer's Policy Aggregate Limit of Liability** or any **Separate Limit of Liability** or **Shared Limit of Liability** as stated therein.



**Financial Institutions Risk Protector**

INSURANCE COMPANY LIABILITY
("ICL COVERAGE SECTION")

<u>Notice</u>: **Pursuant to Clause 1 of the General Terms and Conditions, the General Terms and Conditions are incorporated by reference into, made a part of, and are expressly applicable to this Coverage Section, unless otherwise explicitly stated to the contrary in either the General Terms and Conditions or in this Coverage Section.**

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by application, including its attachments and the material incorporated therein, which form a part of this policy, the **Insurer** agrees as follows:

1. **INSURING AGREEMENT**
    This policy shall pay the **Loss** of each and every **Insured** arising from a **Claim** first made against such **Insured** during the **Policy Period** or **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy for any **Wrongful Act** of the **Insured** in the rendering of or failure to render **Professional Services**. The **Insurer** shall, in accordance with Clause 4 of this **Coverage Section**, advance **Defense Costs** of such **Claim** prior to its final disposition.

2. **DEFINITIONS**

    (a) "**Claim**" means:
        (1) a written demand for monetary relief; or
        (2) a civil, administrative or arbitration proceeding for monetary relief which is commenced by:
            (i) service of a complaint or similar pleading; or
            (ii) receipt or filing of a notice of charges.

    (b) "**Individual Insured**" means any **Director or Officer** or **Employee** of the **Company.**

    (c) "**Insured**" means:
            (i) any **Individual Insured**; and
            (ii) the **Company**.

    (d) "**Loss**" means damages, judgments (including pre-judgment and post-judgment interest on that part of any judgment paid under this **Coverage Section**), settlements and any **Defense Costs**; provided, however, that **Loss** (other than **Defense Costs**) shall not include: (1) civil fines or penalties; (2)taxes; (3) punitive or exemplary damages; (4) the multiplied portion of multiplied damages; (5) any liability or cost incurred by any **Insured** in complying with any judgment, award or settlement for non-monetary relief; (6) any amounts for which the **Insured** is or is alleged to be liable under any insurance or reinsurance policy, contract, treaty, binder, slip, certificate, cover note, agreement, suretyship, endorsement, endowment or annuity; (7) any amounts for which the **Insured** is entitled to indemnity and/or payment under any other insurance or reinsurance contract; (8) any amount for which an **Insured** is not financially liable or which is without legal recourse to the **Insured**; or (9)

**MR CONTRACT**
ENQ/QUO :



matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

Notwithstanding the foregoing paragraph, **Loss** shall specifically include (subject to this policy's other terms, conditions and limitations, including but not limited to Exclusions (a) and (b) of this **Coverage Section** and Exclusion (a) of the General Terms and Conditions) punitive or exemplary damages and the multiplied portion of multiplied damages. Enforceability of this paragraph shall be governed by such applicable law that most favors coverage for such punitive and exemplary damages. For purposes of such coverage, "applicable law" includes, but is not limited to, the following jurisdictions: (a) where the **Wrongful Act** actually or allegedly took place; (b) where the damages are awarded; (c) where the **Named Entity** resides, is incorporated or has its principal place of business; and (d) where the **Insurer** is incorporated or has its principal place of business.

(e) "**Professional Services**" means services rendered or required to be rendered solely in the conduct of the **Insured's** claims handling and adjusting, risk management, safety engineering, safety inspections and loss control operations, salvage operations, recovery subrogation services, premium financing operations, or actuarial consulting services.

(f) "**Wrongful Act**" means:

(1) with respect to **Directors or Officers** and **Employees**, any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by such **Insureds** in their respective capacities as such, or any matter claimed against such **Insured** solely by reason of their status as **Directors or Officers** or **Employees**; or

(2) with respect to the **Company**, any actual or alleged breach of duty, neglect, error, misstatement, omission or act by the **Company**.

## 3. EXCLUSIONS

In addition to the exclusions set forth in Clause 4 of the General Terms and Conditions, the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

(a) alleging, arising out of, based upon or attributable to any criminal act;

(b) alleging, arising out of, based upon or attributable to any dishonest or fraudulent act or omission; provided, however, that this exclusion shall not apply to any **Claim** seeking both compensatory and punitive damages based upon or arising out of allegations of both fraud and bad faith in the rendering of or failure to render **Professional Services**;

(c) alleging, arising out of, based upon or attributable to, directly or indirectly, (1) false arrest, detention or imprisonment; (2) libel, slander, disparagement, defamation or violation of the right of privacy; (3) wrongful entry or eviction, or invasion of any right of private occupancy; (4) discrimination; or (5) emotional distress or mental anguish of any person;

**MR CONTRACT**
ENQ/QUO :



(d) brought by, on the behalf of or in the right of any **Insured**; provided, however, that this exclusion shall not apply to a **Claim** by any **Insured** in its capacity as a policyholder or customer or client of the **Company**;

(e) alleging, arising out of, based upon or attributable to, directly or indirectly, premiums, return premiums, commissions or tax monies, or arising out of any commingling of funds;

(f) alleging, arising out of, based upon or attributable to, directly or indirectly, any allegations that any **Insured** intentionally or negligently permitted, or aided or abetted others in using, was aware of others using, or was a participant or connected in any way in the use of an agreement or other arrangement between an insurance broker or insurance agent and an insurance carrier involving the payment of increased fees, commissions or other compensation based on the volume, profitability or type of business referred to the insurance carrier, whether referred to as a Market Placement Agreement, Market Service Agreement, Placement Services Agreement or Contingent Commission Agreement or similar agreement or arrangement, however named.

This policy shall exclude such **Loss** regardless of the form, style, or denomination of any such **Claim**, regardless of whether the **Claim** is criminal, administrative or civil, and shall specifically apply but not be limited to **Claims** alleging bid rigging, bribes or kickbacks, schemes to provide fictitious quotes, conflict of interest, breach of contract, failure to supervise, negligent supervision or negligence of any contract, controlling person liability, breach of fiduciary duty, personal profiting, improper, undisclosed or unlawful fees, commissions or charges of any kind, criminal activity, market manipulation, violation of any law related to the insurance industry, misrepresentation, estoppel or repudiation of any commitment and any other theory of liability;

(g) alleging, arising out of, based upon or attributable to, directly or indirectly, claim reserves;

(h) alleging, arising out of, based upon or attributable to, directly or indirectly, any warranties or guaranties, estimates of probable construction costs, or costs exceeding estimates made in connection with **Professional Services**;

(i) brought by any pool, association or syndicate (including any officer, director or employee thereof) in which any of the **Insureds** are participants, or by any participant (including any officer, director or employee thereof) in any such pool, association or syndicate involving the business or operations of such pool, association or syndicate;

(j) alleging, arising out of, based upon or attributable to, directly or indirectly, the bankruptcy, insolvency, receivership, liquidation or inability of any **Insured** to pay claims or perform **Professional Services**;

(k) alleging, arising out of, based upon or attributable to, directly or indirectly, the performance of or failure to perform services for any person or entity:

(1) which is owned by or controlled by any **Insured**; or

**MR CONTRACT**
ENQ/QUO :


L/UWR

(2) which owns or controls any **Insured**; or,

(3) which is affiliated with any **Insured** through any common ownership or control;

(l) alleging, arising out of, based upon or attributable to, directly or indirectly, the actual or alleged harmful properties of asbestos;

(m) brought by any reinsurer of any **Insured**;

(n) alleging, arising out of, based upon or attributable to, directly or indirectly, the underwriting, marketing or selling of any insurance policy or annuity, or any other insurance or investment product;

(o) alleging, arising out of, based upon or attributable to, directly or indirectly, infringement of any patent, copyright or trademark, or servicemark;

(p) alleging, arising out of, based upon or attributable to, directly or indirectly, any allegations that any **Insured** intentionally or negligently permitted, or aided or abetted others in using, was aware of others using, or was a participant or connected in any way in the use of a finite risk reinsurance agreement, transaction or arrangement, or financial reinsurance agreement, transaction, or arrangement, including but not limited to, any agreement, transaction or arrangement involving aggregate stop loss covers, finite quota shares, funded catastrophe contracts, loss portfolio transfers and adverse loss development covers, or any other similar agreement, transaction or arrangement, however named.

This policy shall exclude such **Loss** regardless of the form, style, or denomination of any such **Claim**, regardless of whether the **Claim** is criminal, administrative or civil, and shall specifically apply but not be limited to any **Claim** alleging failure to supervise, negligent supervision or negligence of any contract, improper revenue or expense recognition or improper accounting of any kind, securities violations, fraud, breach of fiduciary duty, personal profiting, improper, undisclosed or unlawful fees, commissions or charges of any kind, criminal activity, market manipulation, violation of any law related to the insurance industry, misrepresentation, or any other theory of liability; or

(q) for any actual or alleged violation of any law, whether statutory, regulatory or common law, with respect to any of the following activities: anti-trust, business competition, unfair trade practices or tortious interference in another's business or contractual relationships; provided, however, this exclusion shall not apply to any **Non-Indemnifiable Loss**.

For the purpose of determining the applicability of the foregoing Exclusions 3(a) and 3(b): (1) the facts pertaining to and knowledge possessed by any **Insured** shall not be imputed to any other **Individual Insured**; and (2) facts pertaining to and knowledge possessed by any **Individual Insured** shall be imputed only to the **Company**.

**MR CONTRACT**
ENQ/QUO :



4.   **DEFENSE COSTS, SETTLEMENTS AND JUDGMENTS (INCLUDING ADVANCEMENT OF DEFENSE COSTS)**

   (1)   The **Insurer** does not assume any duty to defend.  The **Insureds** shall defend and contest any **Claim** made against them.

   Notwithstanding the foregoing, the **Insurer** may, in its absolute discretion, assume the defense and/or investigation of any **Claim** for which reasonable grounds exist for possible involvement of the **Insurer**.  In such an event, the **Insured** shall promptly reimburse the **Insurer** for those **Defense Costs** incurred by the **Insurer** to the extent of the Retention amount, or which the **Insureds** are not otherwise entitled under the terms and conditions of this policy to payment of such **Loss**.  In no event will the **Insurer** have the obligation to continue to defend any **Claim** (if it has assumed the defense pursuant to this paragraph) once the **Policy Aggregate Limit of Liability** stated in Item 5(a) of the Declarations or any **Separate Limit of Liability** or **Shared Limit of Liability** stated in Item 3 of the Declarations has been exhausted.

   When the **Insurer** has not assumed the defense of a **Claim** pursuant to this Clause 4, the **Insurer** shall advance nevertheless, at the written request of the **Insured**, Defense Costs prior to the final disposition of a **Claim**.  Such advanced payments by the **Insurer** shall be repaid to the **Insurer** by the **Insureds** or the **Company**, severally according to their respective interests, in the event and to the extent that the **Insureds** or the **Company** shall not be entitled under the terms and conditions of this policy to payment of such **Loss**.

   (2)   In the event that the **Insurer** does not assume the defense and/or investigation of a **Claim** pursuant to paragraph (1) above, it shall nevertheless have the right to fully and effectively associate with the **Insured** in the defense of any **Claim** that appears reasonably likely to involve the **Insurer**, including but not limited to negotiating a settlement. The **Insured** shall give the **Insurer** full cooperation and such information as it may reasonably require.

   (3)   Neither the **Insurer** nor the **Insured** shall admit or assume any liability, enter into any settlement, stipulate to any judgment or incur any **Defense Costs** without the prior written consent of the other; however, if the **Insurer** recommends settlement of a **Claim** which is agreeable to the claimant and the **Insured** refuses, then the **Insurer's** liability for **Loss** shall be fixed at the amount so recommended together with such **Defense Costs** incurred as of the date the recommendation was made, and shall withdraw from the defense of the **Claim** (if it has assumed the **Insured's** defense). Only those settlements, stipulated judgments and **Defense Costs**, which have been consented to by the **Insurer**, in writing, shall be recoverable as **Loss** under the terms of this policy.  The **Insurer's** consent shall not be unreasonably withheld, provided that the **Insurer**, when it has not assumed the defense of a Claim **pursuant** to this Clause 4, shall be entitled to fully and effectively associate in the defense and negotiation of any settlement of any **Claim**, and provided further that in all events the **Insurer** may withhold consent to any settlement, stipulated judgment or **Defense Costs**, or any portion thereof, to the extent such loss is not covered under the terms of this policy.

**MR CONTRACT**
ENQ/QUO :



## ENDORSEMENTS

<u>**U.S.A.**</u>

### NUCLEAR INCIDENT EXCLUSION CLAUSE - LIABILITY - DIRECT (BROAD)
*(Approved by Lloyd's Underwriters'Non-Marine Association)*

*For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:-*

> *Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability). not being insurances of the classifications to which the Nuclear Incident Exclusion Clause - Liability - Direct (Limited) applies.*

<u>This policy*</u>

does not apply:-

    I.      Under any Liability Coverage, to injury, sickness, disease, death or destruction

        (a)    with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

        (b)    resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

    II.     Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

    III.    Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if

        (a)    the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

**MR CONTRACT**
ENQ/QUO :



(b)    the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

(c)    the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.    As used in this endorsement:

**"hazardous properties"** include radioactive, toxic or explosive properties; **"nuclear material"** means source material, special nuclear material or byproduct material; **"source material"**, **"special nuclear material"**, and **"byproduct material"** have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof; **"spent fuel"** means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiations in a nuclear reactor; **"waste"** means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; **"nuclear facility"** means

(a)    any nuclear reactor,

(b)    any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c)    any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams or uranium 235,

(d)    any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; **"nuclear reactor"** means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

With respect to injury to or destruction of property, with word **"injury"** or **"destruction"** includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

**MR CONTRACT**
ENQ/QUO :



\* NOTE:- As respect policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.

17/3/60
N.M.A. 1256



**621
MIL**

<u>U.S.A.</u>

### RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE - LIABILITY - DIRECT
*(Approved by Lloyd's Underwriters' Non-Marine Association)*

*For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause - Liability - Direct) to liability insurances affording worldwide coverage.*

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the Canal Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

13/2/64
N.M.A. 1477

**MR CONTRACT**
ENQ/QUO :



## WAR AND CIVIL WAR EXCLUSION CLAUSE

(Approved by Lloyd's Underwriters' Non-Marine Association)

Notwithstanding anything to the contrary contained herein this Policy does not cover Loss or Damage directly or indirectly occasioned by, happening through or in consequence of war, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalisation or requisition or destruction of or damage to property by or under the order of any government or public or local authority.

1/1/38
NMA 464



**MR CONTRACT**
ENQ/QUO :



### PREMIUM PAYMENT CLAUSE

Notwithstanding any provision to the contrary within this contract or any endorsement hereto, in respect of non payment of premium only the following clause will apply.

The (Re)Insured undertakes that premium will be paid in full to (Re)Insurers within 60 days of inception of this contract (or, in respect of instalment premiums, when due).

If the premium due under this contract has not been so paid to (Re)Insurers by the 60th day from the inception of this contract (and, in respect of instalment premiums, by the date they are due) (Re)Insurers shall have the right to cancel this contract by notifying the (Re)Insured via the broker in writing. In the event of cancellation, premium is due to (Re)Insurers on a pro rata basis for the period that (Re)Insurers are on risk but the full contract premium shall be payable to (Re)Insurers in the event of a loss or occurrence prior to the date of termination which gives rise to a valid claim under this contract.

It is agreed that (Re)Insurers shall give not less than 15 days prior notice of cancellation to the (Re)Insured via the broker. If premium due is paid in full to (Re)Insurers before the notice period expires, notice of cancellation shall automatically be revoked. If not, the contract shall automatically terminate at the end of the notice period.

If any provision of this clause is found by any court or administrative body of competent jurisdiction to be invalid or unenforceable, such invalidity or unenforceability will not affect the other provisions of this clause which will remain in full force and effect.

30/09/08
LSW3001

**MR CONTRACT**
ENQ/QUO :



### SERVICE OF SUIT CLAUSE (U.S.A.)

It is agreed that in the event of the failure of the Underwriters hereon to pay any amount claimed to be due hereunder, the Underwriters hereon, at the request of the Insured (or Reinsured), will submit to the jurisdiction of a Court of competent jurisdiction within the United States. Nothing in this Clause constitutes or should be understood to constitute a waiver of Underwriters' rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States.

It is further agreed that service of process in such suit may be made upon

Mendes & Mount LLP
750 Seventh Avenue, New York, NY 10019

and that in any suit instituted against any one of them upon this contract, Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The above-named are authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of the Insured (or Reinsured) to give a written undertaking to the Insured (or Reinsured) that they will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, Underwriters hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured (or Reinsured) or any beneficiary hereunder arising out of this contract of insurance (or reinsurance), and hereby designate the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

NMA 1998 (24/4/86)



## SHORT RATE CANCELLATION TABLE

Notwithstanding anything to the contrary contained herein and in consideration of the premium for which this Insurance is written it is agreed that in the event of cancellation thereof by the Insured the Earned Premium shall be computed as follows:-

A.      For insurances written for one year:-

| Days Insurance in Force | | Percent of One Year Premium | Days Insurance in Force | | Percent of One Year Premium |
|---|---|---|---|---|---|
| 1 - 54 | ........................... | 25 | 192 - 196 | .......................... | 63 |
| 55 - 58 | ..... | 26 | 197 - 200 | ........ | 64 |
| 59 - 62 | ..... (2 months)........ | 27 | 201 - 205 | ........ | 65 |
| 63 - 65 | ........................... | 28 | 206 - 209 | ........ | 66 |
| 66 - 69 | ..... | 29 | 210 - 214 | ........ (7 months) ...... | 67 |
| 70 - 73 | ..... | 30 | 215 - 218 | .......................... | 68 |
| 74 - 76 | ..... | 31 | 219 - 223 | ........ | 69 |
| 77 - 80 | ..... | 32 | 224 - 228 | ........ | 70 |
| 81 - 83 | ..... | 33 | 229 - 232 | ........ | 71 |
| 84 - 87 | ..... | 34 | 233 - 237 | ........ | 72 |
| 88 - 91 | ..... (3 months) ...... | 35 | 238 - 241 | .......................... | 73 |
| 92 - 94 | ........................... | 36 | 242 - 246 | ........ (8 months) ...... | 74 |
| 95 - 98 | ..... | 37 | 247 - 250 | .......................... | 75 |
| 99 - 102 | ..... | 38 | 251 - 255 | ........ | 76 |
| 103 - 105 | ..... | 39 | 256 - 260 | ........ | 77 |
| 106 - 109 | ..... | 40 | 261 - 264 | ........ | 78 |

**MR CONTRACT**
ENQ/QUO :



| 110 - 113 | ........................... | 41 | 265 - 269 | ........................... | 79 |
| 114 - 116 | ........................... | 42 | 270 - 273 | (9 months) ....... | 80 |
| 117 - 120 | ........................... | 43 | 274 - 278 | ........................... | 81 |
| 121 - 124 | (4 months) ...... | 44 | 279 - 282 | ........................... | 82 |
| 125 - 127 | ........................... | 45 | 283 - 287 | ........................... | 83 |
| 128 - 131 | ........................... | 46 | 288 - 291 | ........................... | 84 |
| 132 - 135 | ........................... | 47 | 292 - 296 | ........................... | 85 |
| 136 - 138 | ........................... | 48 | 297 - 301 | ........................... | 86 |
| 139 - 142 | ........................... | 49 | 302 - 305 | (10 months) ..... | 87 |
| 143 - 146 | ........................... | 50 | 306 - 310 | ........................... | 88 |
| 147 - 149 | ........................... | 51 | 311 - 314 | ........................... | 89 |
| 150 - 153 | (5 months) ...... | 52 | 315 - 319 | ........................... | 90 |
| 154 - 156 | ........................... | 53 | 320 - 323 | ........................... | 91 |
| 157 - 160 | ........................... | 54 | 324 - 328 | ........................... | 92 |
| 161 - 164 | ........................... | 55 | 329 - 332 | ........................... | 93 |
| 165 - 167 | ........................... | 56 | 333 - 337 | (11months)...... | 94 |
| 168 - 171 | ........................... | 57 | 338 - 342 | ........................... | 95 |
| 172 - 175 | ........................... | 58 | 343 - 346 | ........................... | 96 |
| 176 - 178 | ........................... | 59 | 347 - 351 | ........................... | 97 |
| 179 - 182 | (6 months) ...... | 60 | 352 - 355 | ........................... | 98 |
| 183 - 187 | ........................... | 61 | 356 - 360 | ........................... | 99 |
| 188 - 191 | ........................... | 62 | 361 - 365 | (12 months) ... | 100 |

B. For Insurances written for more or less than one year:-




1. If insurance has been in force for 12 months or less, apply the standard short rate table for annual insurances to the full annual premium determined as for an insurance written for a term of one year.

2. If insurance has been in force for more than 12 months:

    (a)    Determine full annual premium as for an insurance written for a term of one year.

    (b)    Deduct such premium from the full insurance premium, and on the remainder calculate the pro rata Earned Premium on the basis of the ratio of the length of time beyond one year the insurance has been in force to the length of time beyond one year for which the insurance was originally written.

    (c)    Add premium produced in accordance with items (a) and (b) to obtain Earned Premium during full period insurance has been in force.

Furthermore and notwithstanding the foregoing, Underwriters shall retain the total premium for this Insurance, such total premium to be deemed earned upon inception of the Policy if any claim or any circumstance that could reasonably be the basis for a claim is reported to Underwriters under this Insurance on or before such date of cancellation.

**MR CONTRACT**
ENQ/QUO :



### PRIOR AND PENDING LITIGATION EXCLUSION

In consideration of the premium charged for the Policy, it is hereby understood and agreed that the **Insurers** shall not make any payment under this Policy in connection with or resulting from any written demand, suit or other proceeding pending, or order, decree or judgement entered, against any **Insureds** prior to

Directors and Officers:            31st August 2010
Employment Practices Liability:  25th June 1995
Fiduciary:                       1st January 2015
Insurance Company Liability:     6th November 2014

or any act, fact, circumstance or situation underlying or alleged therein.

**MR CONTRACT**
ENQ/QUO :



## LIBERALIZATION CLAUSE

This endorsement modifies insurance provided under the following:

**INSURANCE COMPANY MODULAR LIABILITY POLICY**

In consideration of the premium charged for this Policy, it is hereby understood and agreed that the **Insureds** shall receive the benefit of the broadest terms of this Policy or expiring policy number 50003400116 issued by Underwriters, except in relation to the **Policy Period**, the **Optional Extension Period**, the Limit of Liability and the Retentions of this Policy or with respect to any limitation in any Endorsement attaching to this Policy.

The Underwriters shall not be obligated to issue this Endorsement on any renewal of this Policy.

All other terms and conditions of this Policy remain unchanged.

01/14
LSW4037



**PLAN DEFINITION ENDORSEMENT**

FIDUCIARY LIABILITY coverage section 3. Definitions (r) is deleted and replaced by the following:

FIDUCIARY LIABILITY coverage section

(r) "**Plan**" means:

- (j) any **Non-Qualified Plan**; or

- (ii) any payroll deduction IRA (Individual Retirement Account), SEP (Simplified Employee Pension Plan), SARSEP (Salary Reduction Simplified Employee Pension Plan) or SIMPLE IRA (Savings Incentive Match Plan for Employees), established or administered by the **Company**, solely or jointly for the benefit of the employees and/or the **Directors or Officers**; or

- (iii) any plan as defined under **Employee Benefit Law**, other than a **Non-Qualified Plan**, which is:

    (1) a welfare plan, as defined under **Employee Benefit Law** which was, is now, or hereinafter becomes sponsored solely by the **Company**, or sponsored jointly by the **Company** and a labor organization, solely for the benefit of the employees and/or the **Director(s) or Officer(s)** of the **Company**;

    (2) a pension plan as defined under **Employee Benefit Law** (other than an **ESOP** or stock option plan) which was, on or prior to the inception date of the policy, sponsored solely by the **Company**, or sponsored jointly by the **Company** and a labor organization, solely for the benefit of the employees and/or the **Director(s) or Officer(s)** of the **Company**, provided that at any time prior to the inception date of this policy such plan has been reported in writing to the **Insurer** by the **Named Entity** pursuant to the terms of the application for this policy, or any prior policy or its application issued by the **Insurer** and the **Named Entity** shall have paid any required premium relating to such plan;

    (3) subject to the requirements of sub-paragraphs (1) and (2) above, any pension or welfare plan that was sold, spun-off or terminated during or prior to the inception date of this policy, but solely with respect to **Wrongful Acts** that occurred prior to the date of such sale or spin-off, or in the case of a terminated plan, prior to the final date of asset distribution of such plan, provided that notice of such sale, spin-off or termination is provided to the **Insurer** before the end of the **Policy Period**;

    (4) a pension plan as defined in **Employee Benefit Law** (other than an **ESOP** or stock option plan) which:
        (a) is acquired during the **Policy Period** as a result of the **Company's** acquisition of a **Subsidiary** whose assets total more than 25% of the total consolidated assets of the **Company** as of the inception date of this policy; or

MR CONTRACT
ENQ/QUO :

    (b)    is acquired during the **Policy Period** and such plan's assets total more than 25% of the total consolidated assets of all covered pension plans as of the inception date of this policy, or

    (c)    is created during the Policy Period, but only upon the condition that within ninety (90) days of its acquisition or creation, the **Named Entity** shall have provided the **Insurer** with a completed application for such new plan and agreed to any additional premium or amendment of the provisions of the policy required by the **Insurer** relating to such new plan;

(5)    a pension plan which, during or prior to the **Policy Period** of this policy, has been merged into or consolidated with a pension plan for which coverage is afforded under this policy; and

(6)    (i)    a plan which is both a welfare plan and a pension plan as defined in **Employee Benefit Law** (other than an **ESOP** or stock option plan) subject to the requirements of this Definition (r);

        (ii)    the following government-mandated programs: unemployment insurance, Social Security or disability benefits, solely with respect to a **Wrongful Act** defined in subparagraph (2) of the definition of "**Wrongful Act**" in this **Coverage Section**;

        (iii)    any other plan, fund or program, including an **ESOP**, which is included in the definition of "**Plan**" by specific written endorsement attached to this policy.

Notwithstanding the foregoing, the term "**Plan**" shall not include any multiemployer plan as defined under any **Employee Benefit Law**.



## GENERAL TERMS AND CONDITIONS ENDORSEMENT

1. **DEFINITIONS** (l), (o) and (ll) are deleted and replaced by the following:

(l)     "**Director(s) or Officer(s)**" means any:

   (1)   past, present and future duly elected or appointed director or officer of a corporation and member of the Board of Managers and member of the management board of a limited liability company (or equivalent positions formed anywhere in the world);

   (2)   with respect to operations of the **Company** in a **Foreign Jurisdiction**, such past, present and future persons in duly elected or appointed positions of the **Company** that are equivalent to an executive position listed in paragraph (1) of this definition; and

   (3)   past, present and future in house general counsel and risk manager (or equivalent position formed anywhere in the world) of the **Named Entity**.

(o)     "**Employee(s)**" means any past, present or future employee, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any part-time, seasonal, volunteer, intern and temporary employee in his or her capacity as such. An individual who is leased to the **Company**, who is contracted to perform work for the **Company**, or who is an independent contractor for the **Company** shall also be an **Employee**, but only if the **Company** provides indemnification to such       individual in the same manner as is provided to the **Company's** employees.

(ll)    "**Subsidiary**" means:

   (1) If the equity securities of the **Named Entity** are not publicly traded at the inception date of the policy:

      (i)    any for-profit organization that is not formed as a partnership or joint venture, whose equity securities are not publicly traded, which on or before the inception of the **Policy Period** is more than 35% owned by the **Named Entity**, either directly or indirectly through one or more of its **Subsidiaries**;

      (ii)   automatically any for-profit organization that is not formed as a partnership or joint venture, whose equity securities are not publicly traded and whose assets total less than 25% of the total consolidated assets of the **Company** at the date such organization is acquired and which organization becomes a **Subsidiary** during the **Policy Period**. The **Named Entity** shall provide the **Insurer** with full particulars of the new **Subsidiary** before the end of the **Policy Period**; and



(iii)     automatically any for-profit organization that is not formed as a partnership or joint venture, whose equity securities are not publicly traded and whose assets total 25% or more of the total consolidated assets of the **Company** at the date such organization is acquired, but such entity shall be a **Subsidiary** only: (i) for a period of ninety (90) days from the date the organization became a **Subsidiary**; or (ii) until the end of the **Policy Period**, whichever ends or occurs first (hereinafter "**Auto-Subsidiary Period**"); provided that the **Named Entity** or any other **Insured** shall report such **Subsidiary** to the **Insurer**, in writing, prior to the end of the **Policy Period**.

A **Subsidiary** ceases to be a **Subsidiary** when the **Named Entity** ceases to own more than a 35% ownership in such **Subsidiary**, either directly, or indirectly through one or more of its **Subsidiaries**.

(2)  If the equity securities of the **Named Entity** are publicly traded at the inception date of the policy:

(i)     any for-profit organization that is not formed as a partnership, of which the **Named Entity** has **Management Control ("Controlled Entity")** on or before the inception of the **Policy Period** either directly or indirectly through one or more other **Controlled Entities**;

(ii)    automatically any for-profit organization that is not formed as a partnership of which the **Named Entity** first had **Management Control** during the **Policy Period**, whether directly or indirectly through one or more other **Subsidiaries**, and whose assets total less than 35% of the total consolidated assets of the **Company** as of the inception date of this policy, provided that the **Named Entity** or any other **Insured** shall report such **Subsidiary** to the **Insurer**, in writing, prior to the end of the **Policy Period**;

(iii)   automatically any for-profit organization that is not formed as a partnership of which the **Named Entity** first had **Management Control** during the **Policy Period**, whether directly or indirectly through one or more other **Subsidiaries**, and, whose assets total 35% or more of the total consolidated assets of the **Company** as of the inception date of this policy,  but such entity shall be a **Subsidiary** only: (i) for a period of sixty (60) days from the date the **Named Entity** first had **Management Control** of such entity; or (ii) until the end of the **Policy Period**, whichever ends or occurs first (hereinafter "**Auto-Subsidiary Period**"); provided that the **Named Entity** or any other **Insured** shall report such **Subsidiary** to the **Insurer**, in writing, prior to the end of the **Policy Period**; and

(iv)    any not-for-profit entity under section 501(c)(3) of the Internal Revenue Code of 1986 (as amended) sponsored exclusively by a **Company**.

A **Subsidiary** ceases to be a **Subsidiary** when the **Named Entity** no longer maintains **Management Control** of a **Subsidiary** either directly or indirectly through one or more of its **Subsidiaries**.



**MR CONTRACT**
ENQ/QUO :



(3) Irrespective of whether or not the equity securities of the **Named Entity** are publicly traded at the inception date of the policy, the following provisions apply:

    (i) The **Insurer** shall extend coverage for any **Subsidiary** described in (II)(1)(iii) and (II)(2)(iii) above, and any **Individual Insured** thereof, beyond its respective **Auto-Subsidiary Period** if during such **Auto-Subsidiary Period**, the **Named Entity** shall have provided the **Insurer** with full particulars of the new **Subsidiary** and agreed to any additional premium and amendment of the provisions of this policy as required by the **Insurer** relating to such **Subsidiary**. Further, coverage as shall be afforded to any **Subsidiary** and any **Individual Insured** thereof is conditioned upon the **Named Entity** paying when due any additional premium required by the **Insurer** relating to such **Subsidiary**.

    (ii) In all events, coverage as is afforded under this policy with respect to a **Claim** made against **Individual Insureds** of any **Subsidiary**, or any **Subsidiary**, shall only apply for **Wrongful Acts** committed or allegedly committed after the effective time that such **Individual Insured** or **Subsidiary** became an **Individual Insured** or **Subsidiary** and prior to the time that such **Individual Insured** or **Subsidiary** ceased to be an **Individual Insured** or **Subsidiary**.

**8. DISCOVERY CLAUSE** is deleted and replaced by the following:

**8. DISCOVERY CLAUSE**

Except as indicated below, if the **Named Entity** shall cancel or the **Named Entity** or the **Insurer** shall refuse to renew this policy, the **Named Entity** shall have the right to a period of either one, two or three years following the effective date of such cancellation or nonrenewal (herein referred to as the "**Discovery Period**") upon payment of the respective "**Additional Premium Amount**" described below in which to give to the **Insurer** written notice of **Claims** first made against the **Insureds** during said **Discovery Period** for any **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by this policy. The rights contained in this paragraph shall terminate, however, unless written notice of such election together with the additional premium due is received by the **Insurer** within thirty (30) days of the effective date of cancellation or nonrenewal.

The **Additional Premium Amount** for: (1) one year shall be 100% of the "full annual premium" indicated in Item 4 of the Declarations; (2) two years shall be 125% of the "full annual premium" indicated in Item 4 of the Declarations; and (3) three years shall be a 150% of the "full annual premium" indicated in Item 4 of the Declarations.

In the event of a **Transaction** (as defined in Clause 10 below), the **Named Entity** shall have the right, within thirty (30) days before the end of the **Policy Period**, to request an offer from the **Insurer** of a **Discovery Period** (with respect to **Wrongful Acts** occurring prior to the effective time of the **Transaction**) for a period of no less than three (3) years or for such longer or shorter period as the **Named Entity** may request. The **Insurer** shall offer such **Discovery Period** pursuant to such terms,



conditions and premium as the **Insurer** may reasonably decide.  In the event of a **Transaction**, the right to a **Discovery Period** shall not otherwise exist except as indicated in this paragraph.

The **Discovery Period** is not cancellable by the **Insureds** or the **Insurer**, except that the **Insurer** may cancel the **Discovery Period** for non-payment of premium.  This Clause 8 and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.



## NAMED INSURED SCHEDULE

1.  **Solely in respect of Directors and Officers Liability**

    | Named Insured | Retroactive Date |
    |---|---|
    | Anchor Insurance Holdings, Inc. | Full Prior Acts |
    | Anchor Property & Casualty Insurance Company | 25th June 2014 |
    | Anchor Specialty Insurance Company fka Ranchers & Farmers Insurance Company | Full Prior Acts, except 7th November 2014 for limits excess of USD 2,000,000 |
    | Southeast Surplus Underwriters General Agency, Inc. | Full Prior Acts, except 7th November 2014 for limits excess of USD 2,000,000 |
    | Spindletop Premium Finance, Inc. | Full Prior Acts, except 6th November 2014 for limits excess of USD 2,000,000 |
    | Anchor Insurance Managers Inc. | 25th June 2014 |
    | Lozano Insurance Adjusters Inc. | 1st July 2015 |
    | Anchor Realty Partners LLC | 6th November 2016 |

2.  **Solely in respect of Employment Practices Liability**

    | Named Insured | Retroactive Date |
    |---|---|
    | Anchor Insurance Holdings, Inc. | Full Prior Acts |
    | Anchor Property & Casualty Insurance Company | 25th June 2014 |
    | Anchor Specialty Insurance Company fka Ranchers & Farmers Insurance Company | Full Prior Acts, except 7th November 2014 for limits excess of USD 1,000,000 |
    | Southeast Surplus Underwriters General Agency, Inc. | Full Prior Acts, except 7th November 2014 for limits excess of USD 1,000,000 |

**MR CONTRACT**
ENQ/QUO :



| | |
|---|---|
| Spindletop Premium Finance, Inc. | Full Prior Acts, except 6th November 2014 for limits excess of USD 1,000,000 |
| Anchor Insurance Managers Inc | 25th June 2014 |
| Lozano Insurance Adjusters Inc | 1st July 2015 |
| Anchor Realty Partners LLC | 25th June 2014 |

**3.    Solely in respect of Fiduciary Liability**

| **Named Insured** | **Retroactive Date** |
|---|---|
| Anchor Insurance Holdings, Inc. | 1st January 2015 |
| Anchor Property & Casualty Insurance Company | 1st January 2015 |
| Anchor Specialty Insurance Company fka Ranchers & Farmers Insurance Company | 1st January 2015 |
| Southeast Surplus Underwriters General Agency, Inc. | 1st January 2015 |
| Spindletop Premium Finance, Inc. | 1st January 2015 |
| Anchor Insurance Managers Inc. | 1st January 2015 |
| Lozano Insurance Adjusters Inc. | 1st July 2015 |
| Anchor Realty Partners LLC | 6th November 2016 |

**4.    Solely in respect of Professional Liability (Insurance Company Liability)**

| **Named Insured** | **Retroactive Date** |
|---|---|
| Anchor Insurance Holdings, Inc. | Full Prior Acts |
| Anchor Property & Casualty Insurance Company | 25th June 2014 |
| Anchor Specialty Insurance Company fka Ranchers & Farmers Insurance Company | Full Prior Acts except 7th November 2014 for limits excess of USD 2,000,000 |

**MR CONTRACT**
ENQ/QUO :



### CHOICE OF LAW AND JURISDICTION

This Insurance shall be governed by and construed in accordance with the laws of Florida, each party agrees to submit to the exclusive jurisdiction of any competent court within the United States of America.

**MR CONTRACT**
ENQ/QUO :



### ADDITIONAL INSURED/CO-DEFENDANT

In consideration of the premium charged, it is hereby agreed that coverage under this **Policy** shall be extended to include any **Claim** made against the following persons or entities:

Mirage Interests, Inc. MCS
Risk Services, Inc.

hereinafter referred to as an **"Additional Insured"**, provided however, that any such **Claim**: (1) is made and continuously maintained against at least one **Insured**, other than an **Additional Insured**, and (2) arises out a **Wrongful Act** committed or allegedly committed by any **Insured**, other than an **Additional Insured**, and otherwise covered under this policy, and (3) such **Wrongful Act** was committed prior to November 6, 2014.



## THIRD PARTY EMPLOYMENT PRACTICES LIABILITY

In consideration of the premium charged, it is hereby agreed that coverage under this **Policy** shall be amended as follows:

A. Employment Practices Liability Coverage Section 2. Definitions shall be amended to include the following:

   (j) **"Third Party Wrongful Act"** means any actual or alleged discrimination or sexual harassment by any **Insured** against any natural person who is not an **Insured Person** or prospective **Employee** of the **Named Insured** or its **Subsidiary**;

B. Employment Practices Liability Coverage Section 1. Insuring Agreements Coverage A shall be deleted and replaced with the following:

   The **Insurer** will indemnify the **Insured** for **Loss** from any **Claim** first made against it during the **Policy Period** (or Extended Reporting Period, if applicable), for any **Employment Practices Wrongful Act** or **Third Party Wrongful Act** committed on or after the **Retroactive Date** and prior to the end of the **Policy Period**, and reported pursuant to the terms of this **Policy**.

   In consideration of the above item 3 Employment Practices Separate Limit of Liability is deleted and replaced by the following:

   USD 3,000,000   Insuring Agreements Coverage A for all **Claims** for **Employment Practices Wrongful Acts**

   USD 3,000,000   Insuring Agreements Coverage A for all **Claims** for **Third Party Wrongful Acts**

   USD 3,000,000   Aggregate Limit for all **Claims** under Insuring Agreements Coverage A

**MR CONTRACT**
ENG/QUO :



## AGENCY SERVICES ENDORSEMENT
### (SUB-LIMIT OF LIABILITY)

In consideration of the premium charged it is hereby agreed that:

1.  Insurance Company Liability Coverage Section 1. Insuring Agreement is amended by the addition of the following:

    The **Insurer** will indemnify the **Agency Insured** for **Loss** from any **Claim** first made against it during the **Policy Period** (or Extended Reporting Period, if applicable), for any **Agency Services Wrongful Act** committed on or after the **Retroactive Date** and prior to the end of the **Policy Period**, and reported pursuant to the terms of this **Policy**.

2.  Solely as respects the coverage provided under this Endorsement, Section II.M, definition of **Insured**, is amended to include any **Agency Insured**.

3.  Solely as respects the coverage provided under this Endorsement, Insurance Company Liability Coverage Section 2 Definitions (c) Definitions is amended by the addition of the following:

    G.   **"Agency Insured"** means the following duly licensed persons or organizations that perform **Agency Professional Services** on behalf of the **Named Insured** or any **Subsidiary**, and pursuant to a written contract. The **Agency Insureds** shall be subject to any applicable **Retroactive Date** listed below.

| Agency Insured | Retroactive Date |
|---|---|
| Anchor Insurance Managers | November 6, 2014 |
| Southeast Surplus Underwriters General Agency, Inc. | February 24, 1994, except November 6, 2014 for limits excess of USD2,000,000 |
| Spindletop Premium Finance, Inc. | February 24, 1994, except November 6, 2014 for limits excess of USD2,000,000 |

    H.   **"Agency Professional Services"** means services performed for a fee or other business consideration as an insurance agent, insurance producer, insurance broker, managing general agent, managing general underwriter, general agent, program administrator, surplus lines broker, wholesale broker, third party claims administrator, appraiser, risk manager, notary, premium finance services, captive manager or attorney in fact.

    I.   **"Agency Services Wrongful Act"** means any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty committed by any **Agency Insured** in the performance of or failure to perform **Agency Professional Services**.

4.  The coverage provided under this Endorsement shall be subject to the following Sub-Limit of

Liability and Retention. Such Sub-Limit of Liability shall be part of, and not in addition to, the amount stated in ITEM 3 of the Declarations applicable to Insurance Company Coverage Section.

| Sub-Limit of Liability (per claim / aggregate) | Retention (each and every Claim) |
|---|---|
| USD 3,000,000 | USD 100,000 |

5.   Other than as respects the coverage provided in this endorsement, Section 3 of the Insurance Company Coverage Section shall remain unchanged, however, solely as respects the coverage provided under this Agency Services Endorsement, Section 3 of the Insurance Company Coverage Section shall be deleted and replaced with the following exclusions:

A.   No coverage will be available under Insurance Company Liability Coverage Section 1. Insuring Agreement of this **Policy** for **Loss**, including **Defense Expenses**, from any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving:

(1)   any prior and/or pending civil, criminal, administrative or regulatory proceeding against any **Agency Insured** occurring prior to, or pending as of November 6, 2014;

(2)   any **Claim** brought by any **Insured** against any other **Insured**;

(3)   any liability of others assumed by the **Agency Insured** under any contract or agreement, unless such liability would have attached to the **Insured** even in the absence of such agreement;

(4)   the capacity of any **Agency Insured** as an officer, director, partner, member, trustee or fiduciary;

(5)   any actual or alleged placement of a risk or an insurance or reinsurance contract, policy or other risk transfer mechanism, device or funding vehicle with any insurance company, self-insured trust, group insurance trust, risk retention group, joint underwriting association or other risk assuming entity that is unable to meet a financial, legal or other obligation to another party, including but not limited to a policyholder.

This Exclusion shall not apply to any placement with an entity:

(i)   which is rated B+ or higher by A.M. Best Company at the time of binding of coverage; or

(ii)   which is rated A' or higher by Demotech at the time of binding coverage; or

(iii)   specifically listed below:
Federated National Insurance Company
Anchor Specialty Insurance Co. fka Ranchers & Farmers Insurance Co.
Ranchers & Farmers Mutual Insurance Company
Anchor Property & Casualty Insurance Company

(6)    any **Claim** or investigation brought by any federal, state or municipal agency, insurance department, or other governmental or quasi-governmental authority,

in any capacity, whether in its own right, on behalf of an individual or entity, or by an individual or entity on the agency's or authority's behalf. This includes any written notice or demand for monetary relief and any civil proceeding in a court of law or any administrative proceeding made against any **Agency Insured** seeking to hold such **Insured** responsible for **Loss**;

(7)    any breach of privacy, breach of network security, corruption, alteration, destruction, deletion or damage to, the disclosure or release of **Personal Information**, or the unauthorized use of or access to, any **Insured's** computer or computer network, including the hardware, software, programs and any data or information maintained by or on behalf of any **Insured**;

(8)    any actual or alleged lack of good faith or fair dealing in the handling of any **Claim** or obligation arising out of an insurance or benefit plan provided, however, that this Exclusion will not apply unless there is an admission, finding or a final adjudication in any proceeding establishing that such conduct occurred;

(9)    the performance or failure to perform actuarial services;

(10)    any actual or alleged commingling or misuse of funds;

(11)    notarization of a signature without the physical appearance of the signer before the **Insured** at the time of notarization including the failure of the **Insured** to obtain documentation of the identity of the signer;

(12)    any loss alleged to have been sustained through fluctuation in market value to any security, or any actual or alleged guarantee of any future premium payment, of any investment result or return, of any interest rate or yield, or any tax consequence in connection with any security;

**B.**    No coverage will be available under Insurance Company Liability Coverage Section 1. Insuring Agreement of this **Policy** for **Loss**, including **Defense Expenses**, from any **Claim** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

(1)    any actual or alleged violation of the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, the Investment Advisers Act of 1940, the Jumpstart Our Business Startups Act, any similar state statute, any rule or regulations promulgated under any of the foregoing, or any amendment to any of the foregoing, or any provision of the common law imposing liability in connection with the offer, sale or purchase of securities;

**MR CONTRACT**
ENQ/QUO :



(2)      any actual or alleged **Personal Injury** or discrimination of any kind, including but not limited to race, creed, religion, age, handicap, sex, marital status or financial condition;

(3)      any actual or alleged refusal to employ, termination of employment, coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination, breach of any employment contract or agreement, or any other employment-related practices, policies, acts, errors, or omissions;

**(4)**      any actual or alleged infringement of copyright, patent, trademark or service mark or any other intellectual property violation;

**(5)**      any actual or alleged bodily injury or property damage, sickness, disease, or death of any person, or damage to or destruction of any tangible property including the loss of use thereof;

**(6)**      any **Agency Insured's** actual or alleged activities in a fiduciary capacity as respects any employee benefit or pension plan, including any **Claim** involving the Employee Retirement Income Security Act of 1974 (ERISA), as now hereafter amended, or any similar state laws;

**(7)**      any injury or damage which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of **Pollutants**, including but not limited to asbestos, at any time;

(i)      any request, demand, or order that any **Insured** or others, test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of **Pollutants**; or

(ii)      any action brought by or on behalf of a governmental authority for **Damages** because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of **Pollutants**;

**(8)**      water intrusion, condensation or other accumulation of moisture that results directly or indirectly in the presence of:

(i)      any mold, fungi, lichen, virus, bacteria or other growing organism that has toxic, hazardous, noxious, pathogenic, irritating or allergen qualities or characteristics; or

(ii)      any substance, vapor or gas produced by or arising out of any mold, fungi, lichen, virus, bacteria or other growing organism that has toxic, hazardous, noxious, pathogenic, irritating or allergen qualities or characteristics;

This Exclusion B does not apply to liability of the **Agency Insured** arising out of an **Agency Services Wrongful Act**.

**MR CONTRACT**
ENQ/QUO :



C.    No coverage will be available under Insurance Company Liability Coverage Section 1. Insuring Agreement of this **Policy** for **Loss**, other than **Defense Expenses**, from any **Claim** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

    **(1)**    any dishonest, fraudulent or criminal act, error or omission committed by or at the direction of any **Agency Insured**, provided, however, that this Exclusion shall not apply:

        (i)    unless there is an admission, finding or a final adjudication in any proceeding establishing that such conduct occurred; or

        (ii)    to any natural person who did not actually commit, or have prior knowledge of, or participate in a concealment of such criminal, fraudulent, dishonest, or malicious act, error, or omission;

    **(2)**    the gaining in fact of any profit or advantage to which the **Agency Insured** is not legally entitled to, provided, however that this Exclusion shall not apply:

        (i)    unless there is an admission, finding or a final adjudication in any proceeding establishing that such conduct occurred; or

        **(ii)**    to any natural person who did not actually commit, or have prior knowledge of, or participate in a concealment of such criminal, fraudulent, dishonest, or malicious act, error, or omission;

    **(3)**    any actual or alleged breach:

        (i)    of any contract, warranty, guarantee or promise unless liability would have attached to the **Agency Insured** even in the absence of such contract, warranty, guarantee or promise, provided, however, that this Exclusion will not apply unless there is an admission, finding or a final adjudication in any proceeding establishing that such conduct occurred;

        (ii)    of underwriting or binding authority, provided, however, that this Exclusion will not apply unless there is an admission, finding or a final adjudication in any proceeding establishing that such conduct occurred;



### MANUSCRIPT ENDORSEMENT
### (AMEND INSURING AGREEMENTS)

In consideration of the premium charged, it is hereby agreed that coverage under this **Policy** shall be amended as follows:

D&O Coverage Section, Item 1. Insuring Agreements shall be deleted in its entirety and replaced with the following:

(1) The **Insurer** will indemnify an **Insured Person** for **Loss** which is not indemnified by the **Named Insured** and any **Subsidiary**, from any **Claim** first made against the **Insured Person** during the **Policy Period** (or Extended Reporting Period, if applicable), for any **Directors and Officers Wrongful Act** committed on or after the **Retroactive Date** and prior to the end of the **Policy Period**, and reported in accordance with General Terms and Conditions 7. Notice / Claim Reporting Provisions;

(2) The **Insurer** will indemnify the **Named Insured** and any **Subsidiary** for **Loss** which the **Named Insured** and any **Subsidiary** are required to pay as indemnification to any **Insured Person**, resulting from any **Claim** against the **Insured Person** during the **Policy Period** (or Extended Reporting Period, if applicable), for any **Directors and Officers Wrongful Act** committed on or after the **Retroactive Date** and prior to the end of the **Policy Period**, and reported in accordance with General Terms and Conditions 7. Notice / Claim Reporting Provisions;

(3) The **Insurer** will indemnify the **Named Insured** and any **Subsidiary** for **Loss** from any **Claim** first made against the **Named Insured** and any **Subsidiary** during the **Policy Period** (or Extended Reporting Period, if applicable), for any **Directors and Officers Wrongful Act** committed on or after the **Retroactive Date** and prior to the end of the **Policy Period**, and reported in accordance with General Terms and Conditions 7. Notice / Claim Reporting Provisions.

EPL Coverage Section, item 1. Insuring Agreements shall be deleted in its entirety and replaced with the following:

The **Insurer** will indemnify the **Insured** for **Loss** from any **Claim** first made against it during the **Policy Period** (or Extended Reporting Period, if applicable), for any **Employment Practices Wrongful Act** committed on or after the **Retroactive Date** and prior to the end of the **Policy Period**, and reported in accordance with General Terms and Conditions 7. Notice / Claim Reporting Provisions.

FLI Coverage Section, item 1. Insuring Agreements shall be deleted in its entirety and replaced with the following:

The **Insurer** will indemnify the **Insured** for **Loss** from any **Claim** first made against it during the **Policy Period** (or Extended Reporting Period, if applicable), for any **Fiduciary Wrongful Act** committed on or after the **Retroactive Date** and prior to the end of the **Policy Period**, and reported in accordance with General Terms and Conditions 7. Notice / Claim Reporting Provisions.

ICL Coverage Section, item 1. Insuring Agreement shall be deleted in its entirety and replaced with the following:

**MR CONTRACT**
ENQ/QUO :



The **Insurer** will indemnify the **Insured** for **Loss** from any **Claim** or **Extra-Contractual Claim** first made against it during the **Policy Period** (or Extended Reporting Period, if applicable), for any **Professional Liability Wrongful Act** committed on or after the **Retroactive Date** and prior to the end of the **Policy Period**, and reported in accordance with General Terms and Conditions 7. Notice / Claim Reporting Provisions.

ICL Coverage Section 2. DEFINITIONS should be further amended by the addition of the following:

"**Extra-Contractual Claim**" means a **Claim** requesting, in whole or in part, amounts not covered under any provision of an insurance policy issued by the **Insured,** including punitive, exemplary or multiplied damages, in connection with an alleged breach of any duty of good faith or fair dealing by an **Insured**. An "insurance policy" shall include any policy, contract or certificate or other evidence of insurance.



## MANUSCRIPT ENDORSEMENT

### (AMEND REGULATORY EXCLUSIONS – INSURANCE COMPANY LIABILITY)

In consideration of the premium charged, it is hereby agreed that coverage under this **Policy** shall be

amended as follows:

Solely as respects the cancellation, non-renewal, rescission, or premium finance of any insurance policy or contract issued by the **Insured**: ICL Coverage section 3, Exclusions (n) shall not apply to any **Claim** brought by any regulator, including any federal, state or local governmental, regulatory or supervisory agency, board, body, official, department of insurance, insurance commission or commissioner.

**MR CONTRACT**
ENQ/QUO :



Employed Lawyers Professional Liability Insurance Coverage Section is added to this policy, as follows;

### Financial Institutions Risk Protector®

#### EMPLOYED LAWYERS PROFESSIONAL LIABILITY INSURANCE

#### COVERAGE SECTION

#### ("EMPLOYED LAWYERS COVERAGE SECTION")

**Notice**: **Pursuant to Clause 1 of the General Terms and Conditions, the General Terms and Conditions are incorporated by reference into, made a part of, and are expressly applicable to this Coverage Section, unless otherwise explicitly stated to the contrary in either the General Terms and Conditions or in this Coverage Section**.

In consideration of the payment of the premium, and in reliance upon the statements made to the **Insurer** by application, including its attachments and the material incorporated therein, which form a part of this policy, the **Insurer** agrees as follows:

## 1. INSURING AGREEMENTS

### COVERAGE A: EMPLOYED LAWYER INSURANCE

This policy shall pay on behalf of the **Employed Lawyer** all sums which the **Employed Lawyer** shall become legally obligated to pay as **Damages** arising from a **Claim** first made against the **Employed Lawyer** during the **Policy Period** or **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy for any **Wrongful Act** of the **Employed Lawyer**, except when and to the extent that the **Employer** has indemnified such **Employed Lawyer**.

### COVERAGE B: EMPLOYER INDEMNIFICATION

This policy shall pay on behalf of the **Employer** all sums which the **Employer** may be required or permitted by law to indemnify an **Employed Lawyer** for any sum which the **Employed Lawyer** becomes legally obligated to pay as **Loss** arising from a **Claim** first made against the **Employed Lawyer** during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy for any **Wrongful Act** of the **Employed Lawyer** while acting in the course of said **Employed Lawyer's** employment by the **Employer**, but only when and to the extent that the **Employer** has indemnified the **Employed Lawyer** for such **Loss** pursuant to law, common or statutory, or contract, or the charter or by-laws of the **Employer** duly effective under such law which determines and defines such rights of indemnity.



**MR CONTRACT**
ENQ/QUO :



### COVERAGE C:  DEFENSE COSTS, CHARGES AND EXPENSES

The **Insurer** shall have the right and duty to defend, subject to the applicable Retention amount and subject to and as part of the applicable Limits of Liability, any **Claim** against the **Employed Lawyer** seeking **Damages** which are payable under the terms of this policy, even if any of the allegations of the **Claim** are groundless, false or fraudulent.  The **Insurer** shall be entitled to exercise all rights of an **Employed Lawyer** in the choice of arbitrators and in the conduct of any arbitration proceeding involving a **Claim** covered by this policy.

The **Insurer** shall have the right to make any investigation it deems necessary and, with the written consent of the **Employed Lawyer**, settle any **Claim** covered by this policy.  If the **Employed Lawyer** shall refuse to consent to any settlement recommended by the **Insurer** and acceptable to the claimant and elects to contest the **Claim**, then the **Insurer's** liability shall not exceed the amount for which the **Insurer** would have been liable for **Loss** if the **Claim** had been so settled when and as recommended, and the **Insurer** shall have no liability for **Defense Costs** accruing thereafter, and the **Insurer** shall have the right to withdraw from the further defense thereof by tendering control of said defense to the **Employed Lawyer**.

The **Employed Lawyer** shall not, except at the **Employed Lawyer's** own cost, admit liability, voluntarily make any payment, assume any obligation or incur any expenses without the written consent of the **Insurer**.

The **Insurer** shall not be obligated to pay any **Loss**, or to undertake or continue defense of any **Claim** after the applicable limit of the **Insurer's** liability has been exhausted by payment of **Loss** or after deposit of the applicable limit of the **Insurer's** liability in a court of competent jurisdiction, and in such a case, the **Insurer** shall have the right to withdraw from the further defense thereof by tendering control of said defense to the **Employed Lawyer**.

### 2.  DEFINITIONS

(a) "**Claim**" means:

    (1) a written demand for monetary, non-monetary or injunctive relief;

    (2) a civil, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by service of a complaint or similar pleading; or

    (3) a judicial, administrative, bar association or other proceeding against an **Employed Lawyer** solely concerning the eligibility or license of such **Employed Lawyer** to practice law.

(b) "**Damages**" means a monetary judgment award or monetary settlement arising from a **Claim**, but does not include fines, sanctions or statutory penalties whether imposed by law or otherwise, nor the return of or restitution of legal fees, costs and expenses.

(c) "**Employed Lawyer**" means:

    (1) any person admitted to practice law who is, was or becomes employed as a lawyer full time and salaried by the **Employer**, but only as regards **Wrongful Acts** which occur during the term of such employment; and

**MR CONTRACT**
ENQ/QUO :



L/UWR

    (2) non-lawyer employees of the **Employer** who are, were or become assistants of an **Employed Lawyer** as defined in sub-paragraph (1) above, while acting under the direction and control of such **Employed Lawyer** in the performance of professional services on behalf of the **Employer**.

(d) "**Employer**" means the **Named Entity** and any **Subsidiary** thereof.

(e) "**Executive**" means any:

    (1) past, present or future duly elected or appointed director, officer, trustee or governor of the **Employer**, management committee member of a joint venture and member of the management board of a limited liability company (or equivalent position) of the **Employer**; or

    (2) past, present or future general counsel and risk manager (or equivalent position) of the **Employer**.

(f) "**Individual Insured**" means any **Employed Lawyer**.

(g) "**Insured(s)**" means:

    (1) any **Employed Lawyer**; and
    (2) any **Employer**, but solely with respect to Coverage B and such **Employer's** indemnification of an **Employed Lawyer**.

This **Coverage Section** affords no coverage for **Defense Costs** incurred by, settlements by or on behalf of, contractual obligations of, or judgments against any entity whether arising out of a **Claim** made against an **Employer**, based upon any legal obligation to pay any amount that an **Employer** has or may have to a claimant, or derived from the acts or omissions of **Employed Lawyers**.

No **Employer** is covered in any respect under Coverage A or Coverage C of this **Coverage Section**. An **Employer** is covered, subject to this **Coverage Section's** terms, conditions, exclusions and other limitations only with respect to its indemnification of **Employed Lawyers** under Coverage B as respects a **Claim** against such **Employed Lawyers**.

(h) "**Legal Services**" means any professional legal services rendered by:
    (1) an **Employed Lawyer** in his or her capacity as an **Employee** of an **Employer**; and
    (2) any **Employed Lawyer** while a full time, permanent **Employee** of an **Employer**, including, but not limited to, any moonlighting or *pro bono* services.

(i) "**Loss**" means **Damages** and **Defense Costs**; provided, however, **Loss** shall not include: (1) civil or criminal fines or penalties; (2) punitive or exemplary damages; (3) the multiplied portion of multiplied damages; (4) taxes; (5) any amount for which the **Insureds** are not financially liable or which are without legal recourse to the **Insureds**; and (6) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

(j) "**Personal Injury Peril**" means the following offenses:

---

**MR CONTRACT**
ENQ/QUO :



(1) false arrest, detention or imprisonment, wrongful entry or eviction or other invasion of the right of private occupancy, or malicious prosecution; or

(2) the publication or utterance of a libel or slander or other defamatory or disparaging material, or a publication or an utterance in violation of an individual's right of privacy.

(k) "**Wrongful Act**" means any actual or alleged:

(1) negligent act, error, omission, breach of duty, misstatement or misleading statement; or

(2) **Personal Injury Peril**;

committed or omitted in the performance of **Legal Services**.

## 3. EXCLUSIONS

Exclusion 4(a) (profit or advantage) and the paragraph following Exclusion 4(h) of the General Terms and Conditions do not apply to this **Coverage Section**.

In addition to the exclusions set forth in Clause 4 of the General Terms and Conditions, except as indicated in the preceding paragraph, the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

(a) arising out of, based upon or attributable to the committing in fact of any criminal, fraudulent or dishonest act by an **Employed Lawyer**; provided, however, the **Insurer** shall defend such **Claim** alleging the foregoing conduct, until there is a judgment, final adjudication, adverse admission or finding of fact against the **Employed Lawyer** as to such conduct, at which time the **Insured** shall reimburse the **Insurer** for **Defense Costs**;

(b) against an **Employed Lawyer** that is brought, directly or indirectly, by or on behalf of any: (1) **Employed Lawyer**; (2) **Employer**; (3) business entity that is controlled, managed or operated, directly or indirectly, in whole or in part, by the **Employer**; (4) parent company, partner, trustee, successor or assignee of the **Employer**, or any person or entity affiliated with the **Employer**; (5) receiver, conservator, trustee, creditor or assignee of creditors or for the benefit of creditors or similar representative in the event of the insolvency or bankruptcy of the **Employer**; or (6) security holder or member of the **Employer**, whether directly or derivatively, unless such security holder or member claim is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of an **Employed Lawyer**, the **Employer** or any **Executive** of the **Employer**; provided, however, this exclusion shall not apply to **Defense Costs** incurred in the defense of any **Claim** brought by or on behalf of the **Employer**;

(c) for discrimination or other unfair employment practices; provided, however, this exclusion shall not apply to any **Claim** alleging a **Wrongful Act** in the performance of **Legal Services**;

(d) arising out of any breach of fiduciary duty, responsibility, or obligation in connection with any employee benefit or pension plan, including violations of the responsibilities, obligations or duties imposed upon fiduciaries by the Employee Retirement Income Security Act of 1974, as amended, or similar statutory or common law of the United States of America or any state or jurisdiction therein;

**MR CONTRACT**
ENQ/QUO :



(e) alleging, arising out of, based upon, or in connection with any offering of securities by the Company or alleging a purchase or sale of such securities subsequent to such offering;

(f) arising out of mental anguish, emotional distress or humiliation; provided, however, this exclusion shall not apply to any **Claim** alleging the forgoing if such allegations result from a **Personal Injury Peril**;

(g) alleging, arising out of, based upon or attributable to any actual or alleged act or omission of an **Employed Lawyer** serving in the capacity of an **Executive**; provided, however, this exclusion shall not apply to alleging a **Wrongful Act** in the performance of **Legal Services**;

(h) against an **Employed Lawyer** for a **Wrongful Act** that was committed or allegedly committed at a time when the **Employed Lawyer** was not employed by the **Employer;** or

alleging, arising out of, based upon or attributable to any violation of the provisions of the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, any regulation promulgated under the foregoing statutes or any federal, state, local or foreign laws (i) similar to the foregoing laws (including "Blue Sky" laws) or (ii) regulating the same or similar conduct whether such law is statutory, regulatory or common law.

**MR CONTRACT**
ENQ/QUO :



### SEVERAL LIABILITY NOTICE

The subscribing insurers' obligations under contracts of insurance to which they subscribe are several and not joint and are limited solely to the extent of their individual subscriptions. The subscribing insurers are not responsible for the subscription of any co-subscribing insurer who for any reason does not satisfy all or part of its obligations.

LSW1001 (Insurance)



### SOFT HAMMER ENDORSEMENT

This endorsement modifies insurance provided under the following:

FINANCIAL INSTITUTIONS RISK PROTECTOR

In consideration of the premium charged, it is hereby agreed that Section VIII.C(5) is deleted and replaced with the following:

**(5)**      The **Insurer** shall have the right to recommend a settlement of any **Claim** as the **Insurer** deems expedient, subject to consent of the **Insured**. If the **Insured** shall refuse to consent to any settlement or compromise recommended by the **Insurer** and acceptable to the claimant, and shall elect to instead contest or continue to contest the **Claim**, then the **Insurer's** liability shall not exceed:

     **(i)**      the amount in excess of the Retention, for which such **Claim** could have been settled by the **Insurer** plus **Defense Expenses** up to the date the **Insured** refused to settle such **Claim**; plus

     **(ii)**      60 percent (60%) of any **Loss** and/or **Defense Expenses** in excess of the amount in clause (I) above, incurred in connection with such **Claim**. The remaining 40 percent (40%) of any **Loss** and/or **Defense Expenses** will be carried by the **Insured** at its own risk and will be uninsured.

**MR CONTRACT**
ENQ/QUO :



**Information**

As seen by underwriters and held on file




**Security Details**

<u>LMA3333</u>

**(RE)INSURERS LIABILITY CLAUSE**

**(Re)insurer's liability several not joint**

The liability of a (re)insurer under this contract is several and not joint with other (re)insurers party to this contract. A (re)insurer is liable only for the proportion of liability it has underwritten. A (re)insurer is not jointly liable for the proportion of liability underwritten by any other (re)insurer. Nor is a (re)insurer otherwise responsible for any liability of any other (re)insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by a (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp. This is subject always to the provision concerning "signing" below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is a (re)insurer. Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together). The liability of each member of the syndicate is several and not joint with other members. A member is liable only for that member's proportion. A member is not jointly liable for any other member's proportion. Nor is any member otherwise responsible for any liability of any other (re)insurer that may underwrite this contract. The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA. The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

**Proportion of liability**

Unless there is "signing" (see below), the proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp and is referred to as its "written line".

Where this contract permits, written lines, or certain written lines, may be adjusted ("signed"). In that case a schedule is to be appended to this contract to show the definitive proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together). A definitive proportion (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of a Lloyd's syndicate taken together) is referred to as a "signed line". The signed lines shown in the schedule will prevail over the written lines unless a proven error in calculation has occurred.

Although reference is made at various points in this clause to "this contract" in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.

**Order Hereon:**     100% of 100%

**Basis of**
**Written Lines:**     Percentage of Whole

**MR CONTRACT**
ENQ/QUO :



**Signing Provisions:** In the event that the written lines hereon exceed 100% of the order, any lines written "to stand" will be allocated in full and all other lines will be signed down in equal proportions so that the aggregate signed lines are equal to 100% of the order without further agreement of any of the (re)insurers.

However:

a) in the event that the placement of the order is not completed by the commencement date of the period of insurance then all lines written by that date will be signed in full;

b) the signed lines resulting from the application of the above provisions can be varied, before or after the commencement date of the period of insurance, by the documented agreement of the (re)insured and all (re)insurers whose lines are to be varied. The variation to the contracts will take effect only when all such (re)insurers have agreed, with the resulting variation in signed lines commencing from the date set out in that agreement.

## MODE OF EXECUTION CLAUSE

This contract and any changes to it may be executed by:

a. electronic signature technology employing computer software and a digital signature or digitiser pen pad to capture a person's handwritten signature in such a manner that the signature is unique to the person signing, is under the sole control of the person signing, is capable of verification to authenticate the signature and is linked to the document signed in such a manner that if the data is changed, such signature is invalidated;

b. a unique authorisation provided via a secure electronic trading platform

c. a timed and dated authorisation provided via an electronic message/system;

d. an exchange of facsimile/scanned copies showing the original written ink signature of paper documents;

e. an original written ink signature of paper documents (or a true representation of a signature, such as a rubber stamp).;
The use of any one or a combination of these methods of execution shall constitute a legally binding and valid signing of this contract. This contract may be executed in one or more of the above counterparts, each of which, when duly executed, shall be deemed an original

**MR CONTRACT**
ENQ/QUO :



**Written Lines:**

In a co-insurance placement, following (re)insurers may, but are not obliged to, follow the premium charged by the lead (re)insurer.

(Re)insurers may not seek to guarantee for themselves terms as favourable as those which others subsequently achieve during the placement.

| SIGNED LINE % | |
|---|---|
| *100%* | Castel Underwriting Agencies Ltd t/a Verve Risk Partners<br>Underwriting on behalf of: Syndicates at Lloyd's          100.000%<br><br>`5 0 0 0 3 4 0 0 1 1 8 1 1 1`   18/12/18<br><br>Premiums and Claims to be settled direct to Castel in accordance with the terms of Binding Authority: B0901LI1833887000 |

## Contract Administration and Advisory Sections

**Subscription Agreement**

**Slip Leader:** Verve Risk Partners (on behalf of Castel Underwriting Agencies Ltd.), *per authority*
*ref: B0701LI183586700*

**Bureau Leader:** Verve Risk Partners (on behalf of Castel Underwriting Agencies Ltd.)

**Basis of Agreement to Contract Changes:**

### Broker Clauses/Slip Conditions (Not To Appear In Policy Documents)

Underwriters hereon agree that the following slip conditions will apply

1. Underwriters hereon agree that claims or circumstances advised subsequent to the participation of underwriters hereon and prior to inception to be advised to Slip Leader only. Slip Leader to determine whether terms as quoted to stand. Such determination to be binding on all participating underwriters hereon.

2. GUA (Version 2.0 February 2014) with Professional Indemnity Schedule (May 2005)

3. If required underwriters hereon agree

   - Wordings to be agreed by Slip Leader and leading Lloyd's (if applicable) only.
   - To the collection and taking down of claims and premiums on copy/duplicates slips without production of letter of indemnity.
   - Second and subsequent premiums to be taken down as additional premiums.

**Other Agreement Parties for Contract Changes for part 2 GUA Changes only:**

Where no other agreement parties for contract changes are stated herein, the agreement parties will be the slip leader only.

**Agreement Parties for Contract Changes for their proportion only:**

Where no other agreement parties for contract changes are stated herein, the agreement parties will be the slip leader only.

**MR CONTRACT**
ENQ/QUO :



**Basis of Claims Agreement:**

As specified under the CLAIMS AGREEMENT PARTIES and to be managed in accordance with:

i) The SINGLE CLAIMS AGREEMENT PARTY ARRANGEMENTS - LMA9150 for claims or circumstances assigned as Single Claims Agreement Party Claims (SCAP Claims)

or, where it is not applicable, then the following shall apply as appropriate:

ii) the Lloyd's Claims Scheme (Combined), or as amended or any successor thereto.

iii) IUA Claims Agreement Practices.

iv) The practices of any company(ies) electing to agree claims in respect of their own participation.

**Claims Agreement Parties:**

A. Claims falling within the scope of the LMA9150 to be agreed by Slip Leader only on behalf of all (re)insurers subscribing (1) to this Contract on the same contractual terms (other than premium and brokerage) and (2) to these Arrangements.

For the purposes of calculating the Threshold Amount, the sterling rate on the date that a financial value of the claim is first established by the Slip Leader shall be used and the rate of exchange shall be the Bank of England spot rate for the purchase of sterling at the time of the deemed conversion.

SLIP LEADER: OPT IN / OPT OUT

(RE)INSURERS OPTING OUT OF SCAP:

In respect of Verve Risk Partners, all claims and circumstances to be reported to:

Attn: Marilyn Bonetati
Premier Claims Management
2020B North Tustin Avenue, Santa Ana, CA 92705
Email: mbonetati@premierclaimsllc.com



**MR CONTRACT**
ENQ/QUO :



B.    For all other claims:

i)    For Lloyd's syndicates

The leading Lloyd's syndicate and, where required by the applicable Lloyd's Claims Scheme, the second Lloyd's syndicate and/or the Scheme Service Provider.

The second Lloyd's syndicate is:

ii)   Those companies acting in accordance with the IUA claims agreement practices, excepting those that may have opted out via iii) below.

iii)  Those companies that have specifically elected to agree claims in respect of their own participation:

iv)   All other subscribing insurers that are not party to the Lloyd's/IUA claims agreement practices, each in respect of their own participation:

v)    Notwithstanding anything contained in the above to the contrary, any ex gratia payments to be agreed by each (re)insurer for their own participation.

**Claims**
**Administration:**

Where appropriate, Miller Insurance Services LLP and insurers agree that any claims hereunder (including any claims related costs / fees) will be notified and administered via an Electronic Claims File with any payment(s) processed via CLASS, unless both parties agree to do otherwise.

Where claims or circumstances are not administered via ECF, notification, administration and payment(s) will be electronic.

Where a Lloyd's syndicate or IUA company is not an agreement party to the claim or circumstance (per CLAIMS AGREEMENT PARTIES A. above), they agree to accept correct ECF sequences for administrative purposes to ensure information is circulated to all subscribing parties.

**Rules and Extent of**
**any other Delegated**
**Claims Authority:**        None

**Expert(s) Fees**
**Collection:**              Miller Insurance Services LLP will not collect fee invoices of third parties unless the work exclusively benefits the (re)insured, or forms part of the (re)insured's claim. In the event of Miller Insurance Services LLP not collecting third party fees the following applies:



Xchanging Claims Services Ltd to collect fees for all slip security, including overseas (re)insurers unless the leading Claims Agreement Party elects an alternate on a case by case basis

**Notice of Cancellation**
**Provisions (Format**
**and Delivery Provisions):**    The content and format of any such notice should be in accordance with the 'Notice of Cancellation' standard, as published by the London Market Group (LMG), or their successor body, on behalf of London Market Associations and participants. However failure to comply with this standard will not affect the validity of the notice given.

Where (re)insurers have the right to give notice of cancellation, in accordance with the provisions of the contract, then to the extent provided by the contract the notice shall be provided to the broker by the following means:

By an email to noc@miller-insurance.com

Failure to comply with this delivery requirement will make the notice null and void. Satisfactory delivery of the notice will cause it to be effective irrespective of whether the broker has acknowledged receipt.

**Settlement Due Date:**    28th January 2019

**Bureaux**
**Arrangements:**    Delinked accounts to be presented by the broker to Xchanging Ins-sure Services as appropriate.

Where a premium Settlement Due Date or Premium Payment Condition expiry date falls on either a weekend or UK public holiday, presentation to the appropriate Lloyd's or XIS signing bureau on the next working day subsequent thereto shall be deemed to achieve compliance with the Settlement Due Date or Premium Payment Condition in question.

Where a premium Settlement Due Date or Premium Payment Condition expiry date falls on either a weekend or UK public holiday, receipt of the premium by the non-Bureau market on the next working day subsequent thereto shall be deemed to achieve compliance with the Settlement Due Date or Premium Payment Condition in question.

Where a Premium Payment Warranty or Premium Payment Condition due date is later than the Settlement Due Date, the Settlement Due Date is deemed updated to be the same as the Premium Payment Warranty or Premium Payment Condition due date.

**MR CONTRACT**
ENQ/QUO :



**621**
**MIL**

**Fiscal and Regulatory**

| | |
|---|---|
| **Tax Payable by Insurer(s):** | None |
| **Country of Origin:** | United States of America |
| **Regulatory Risk Location:** | 100% |
| **Overseas Broker:** | ECC Insurance Brokers, LLC<br>One Tower Lane, Suite 2850, Oakbrook Terrace, IL 60181 |
| **Surplus Lines Broker:** | ECC Insurance Brokers, LLC<br>One Tower Lane, Suite 2850, Oakbrook Terrace, IL 60181<br><br>Surplus Lines License Number: P133810 |
| **State of Filing:** | Home State: Florida |
| **US Classification:** | US Surplus Lines |
| **Allocation of Premium to Coding:** | E8 100% |
| **Regulatory Client Classification:** | Commercial Customer |

**MR CONTRACT**
ENQ/QUO :



**Broker Remuneration and Deductions Section**

**Fee Payable
by Client:**          No

**Total Brokerage:**     22.50%

**Other Deductions
from Premium:**       None



# EXHIBIT "B"

# DECLARATION OF SCOTT SIMMONS

I, Scott Simmons, Declare pursuant to 28 U.S.C. § 1746, as follows:

1.      My name is Scott Simmons and I am a Partner of Verve Risk Partners, LLP ("Verve"), which is the managing general agent for Syndicate 4020, the lead Syndicate of Policy No. B0621PANCH001718, effective 11/30/2018 to 11/30/2019, ("Policy") which Anchor Insurance Holdings, Inc. ("Anchor") applied for and then purchased from Certain Underwriters at Lloyd's London ("Underwriters").

2.      I have personal and institutional knowledge regarding the statements in this declaration.

3.      Additionally, I have personal knowledge of the statements in this declaration based on my review of the exhibits attached to my declaration and certain filings from this coverage action.

4.      Verve underwrites insurance policies on behalf of Underwriters, including the Policy that is at issue in this appeal. (*See Policy*, Ex. 8, Pg. 101.)

5.      Verve is listed as the Slip Leader in the Contract Administration and Advisory Sections of the Policy ("Contract Administration"), Binding Authority Reference B0901L1833887000. (*Id.*, Pg. 103.)

6.      Pursuant to the Contract Administration, Verve has underwriting authority on behalf of the Syndicates subscribing to the Policy.

7.      In 2018, Verve had a Binding Authority Agreement ("BAA") with seven Syndicates.

8.      The BAA authorized Verve to underwrite on behalf of these Syndicates.

.

9.    The Syndicates identified in the BAA subscribed to the risk of the Policy. (*See BAA - List of Syndicates*, Ex. 9.)

10.    The particular risk at issue here, is the D&O and Private Company Coverage, with a $3,000,000 Limit of Liability. (*See* Ex. 8, Pg. 1.)

11.    Pursuant to the BAA, the following are the seven Syndicates subscribing to the Policy:

- o   **Syndicate 4020.** Ark Corporate Member Limited ("Ark Corp.") is the sole member of Syndicate 4020. (*See Articles of Incorporation for Ark Corp.*, online records of Companies House, the United Kingdom's registrar of Companies, Ex. 1.) Ark Corp. is a private limited company incorporated in and is a citizen of the United Kingdom. Ark Corp. has 22.5% interest in the $3,000,000 limit of insurance of the D&O Coverage section of the Policy, *i.e.*, $675,000.

- o   **Syndicate 2001.** MS Amlin Corporate Member Limited ("MS Amlin Corp.") is the sole member of Syndicate 2001. (*See Articles of Incorporation for MS Amlin Corp.*, online records of Companies House, the United Kingdom's registrar of Companies, Ex. 2.) MS Amlin Corp. is a private limited company incorporated in and is a citizen of the United Kingdom. MS Amlin Corp. has 22.5% interest in the $3,000,000 limit of insurance of the D&O Coverage section of the Policy, *i.e.*, $675,000.

- o   **Syndicate 1458.** RenaissanceRe Corporate Capital (UK) Limited ("RenaissanceRe Corp.") is the sole member of Syndicate 1458. (*See Articles of Incorporation for RenaissanceRe Corp.*, online records of Companies House, the United Kingdom's registrar of Companies, Ex. 3.) RenaissanceRe Corp. is a private limitedcompany incorporated in and is a citizen of the United Kingdom. Renaissance Re Corp has 20% interest in the $3,000,000 limit of insurance of the D&O Coverage section of the Policy, *i.e.*, $600,000.

- o   **Syndicate 1084.** Chaucer Corporate Capital No. 3 ("Chaucer Corp.") is the sole member of Syndicate 1084. (*See Articles of Incorporation for Chaucer Corp.*, online records of Companies House, the United Kingdom's registrar of Companies, Ex. 4.) Chaucer Corp. is a private limited company incorporated in and is a citizen of the United Kingdom. Chaucer Corp. has 20% interest in the $3,000,000 limit of insurance of the D&O Coverage section of the Policy, *i.e.*, $600,000.

- o   **Syndicate 435.** Faraday Capital Limited ("Faraday Ltd.") is the sole member of Syndicate 435. (*See Articles of Incorporation for Faraday Ltd.*, online records of Companies House, the United Kingdom's registrar of Companies, Ex. 5.) Faraday Ltd. is a private limited company incorporated in and is a citizen of the United Kingdom.

Faraday Ltd. has 5% interest in the $3,000,000 limit of insurance of the D&O Coverage section of the Policy, *i.e.*, $150,000.

o **Syndicate 5678.** VIBE Corporate Member Limited ("VIBE Corp.") is the sole member of Syndicate 5678. (*See Articles of Incorporation for VIBE Corp.*, online records of Companies House, the United Kingdom's registrar of Companies, Ex. 6.) VIBE Corp. is a private limited company incorporated in and is a citizen of the United Kingdom. VIBE Corp. has 5% interest in the $3,000,000 limit of insurance of the D&O Coverage section of the Policy, *i.e.*, $150,000.

o **Syndicate 3000.** Markel Capital Limited ("Markel Ltd.") is the sole member of Syndicate 3000. (*See Articles of Incorporation for Markel Ltd.*, online records of Companies House, the United Kingdom's registrar of Companies, Ex. 7.) Markel Ltd. is a private limited company incorporated in and is a citizen of the United Kingdom. Markel Ltd. has 5% interest in the $3,000,000 limit of insurance of the D&O Coverage section of the Policy, *i.e.*, $150,000.

12.     On 02/16/2021, Underwriters sued Anchor for rescission, monetary damages, and declaratory relief under 28 U.S.C. § 2201, in the United States District Court for the Middle District of Florida, Case No. 8:21-cv-370-TPB-AEP. (*See* D.E. 1.)

13.     An amended complaint was filed on 07/06/2021. (*See* D.E. 20.)

14.     At the time of the amended complaint, the sole corporate member of each Syndicate identified in paragraph 11 above, was a citizen of the United Kingdom. (*See* Ex. 1 to 7.)

15.     At the time of the amended complaint, the sole corporate member of each Syndicate identified in paragraph 11 above, was not a citizen of Florida. (*Id.*)

16.     At the time of the amended complaint, the sole corporate member of each Syndicate identified in paragraph 11 above, was not incorporated in the state of Florida and did not have its principal place of business in the state of Florida. (*Id.*)

UNDER PENALTY OF PERJURY

SCOTT SIMMONS_____
Name



_____
Signature

7TH March 2023__
Date

# EXHIBIT 1

**File Copy**



# CERTIFICATE OF INCORPORATION
# OF A PRIVATE LIMITED COMPANY

## Company No.   6081055

The Registrar of Companies for England and Wales hereby certifies that

ARK CORPORATE MEMBER LIMITED

is this day incorporated under the Companies Act 1985 as a private
company and that the company is limited.

Given at Companies House, Cardiff, the 2nd February 2007





**THE OFFICIAL SEAL OF THE
REGISTRAR OF COMPANIES**

N0 6081055Q



The above information was communicated in non-legible form and authenticated by the
Registrar of Companies under section 710A of the Companies Act 1985



**Companies House**
—— *for the record* ——

Electronic statement of compliance with requirements on application for registration of a company pursuant to section 12(3A) of the Companies Act 1985

| | |
|---|---|
| Company number | 6081055 |
| Company name | ARK CORPORATE MEMBER LIMITED |
| I, | SWIFT INCORPORATIONS LIMITED |
| of | 1 MITCHELL LANE<br>BRISTOL<br>BS1 6BU |
| a | person named as a secretary of the company in the statement delivered to the registrar of companies under section 10(2) of the Companies Act 1985 |

make the following statement of compliance in pursuance of section 12(3A) of the Companies Act 1985

| | |
|---|---|
| Statement: | I hereby state that all the requirements of the Companies Act 1985 in respect of the registration of the above company and of matters precedent and incidental to it have been complied with. |

Confirmation of electronic delivery of information

This statement of compliance was delivered to the registrar of companies electronically and authenticated in accordance with the registrar's direction under section 707B of the Companies Act 1985.

WARNING: The making of a false statement could result in liability to criminal prosecution



**Companies House**
—— *for the record* ——

# 10(ef)

## First directors and secretary and intended situation of registered office

*Received for filing in Electronic Format on the:* **02/02/2007**

XHV1RMQD

---

*Company Name in full:* **ARK CORPORATE MEMBER LIMITED**

*Proposed Registered Office:* **7TH FLOOR
BEAUFORT HOUSE
15 ST BOTOLPH ST
LONDON
EC3A 7NJ**

---

*memorandum delivered by an agent for the subscriber(s):* **Yes**

*Agent's Name:* **JORDANS LIMITED**
*Agent's Address:* **21 ST THOMAS STREET
BRISTOL
BS1 6JS**

---

## Company Secretary

*Name* **BLG (PROFESSIONAL SERVICES) LIMITED**

*Address:* **7TH FLOOR
BEAUFORT HOUSE
15 ST BOTOLPH STREET
LONDON
EC3A 7NJ**

*Consented to Act:* **Y**       *Date authorised* **02/02/2007**       *Authenticated:* **Y**

---

*Name*            **SWIFT INCORPORATIONS LIMITED**

*Address:*        **1 MITCHELL LANE**
                  **BRISTOL**
                  **BS1 6BU**

*Consented to Act:* **Y**   *Date authorised* **02/02/2007**   *Authenticated:* **Y**

## Director 1:

*Name*            **DAVID FOREMAN**

*Address:*        **RINEERS FARM**
                  **RUSS HILL ROAD**
                  **CHARLWOOD**
                  **HORLEY**
                  **RH6 0EJ**
*Nationality:*    **BRITISH**
*Business occupation:* **CHIEF UNDERWRITING OFFICER**
*Date of birth:*  **05/09/1952**

*Consented to Act:* **Y**   *Date authorised* **02/02/2007**   *Authenticated:* **Y**

## Director 2:

*Name*            **ANEIL PAUL DESHPANDE**

*Address:*        **20 BLENHEIM ROAD**
                  **ST. ALBANS**
                  **AL1 4NR**
*Nationality:*    **BRITISH**
*Business occupation:* **OPERATIONS OFFICER**
*Date of birth:*  **29/09/1956**

*Consented to Act:* **Y**   *Date authorised* **02/02/2007**   *Authenticated:* **Y**

## Authorisation

*Authoriser Designation:* **AGENT** *Date Authorised:* **02/02/2007**   *Authenticated:* **Yes**

THE COMPANIES ACTS 1985 to 1989

PRIVATE COMPANY LIMITED BY SHARES

MEMORANDUM OF ASSOCIATION OF

ARK CORPORATE MEMBER LIMITED

1.      The Company's name is " ARK CORPORATE MEMBER LIMITED ".

2.      The Company's registered office is to be situated in England and Wales.

3.1     The object of the Company is to carry on business as a general commercial company.

3.2     Without prejudice to the generality of the object and the powers of the Company derived from section 3A of the Act the Company has power to do all or any of the following things:-

3.2.1   To purchase or by any other means acquire and take options over any property whatever, and any rights or privileges of any kind over or in respect of any property.

3.2.2    To apply for, register, purchase, or by other means acquire and protect, prolong and renew, whether in the United Kingdom or elsewhere, any trade marks, patents, copyrights, trade secrets, or other intellectual property rights, licences, secret processes, designs, protections and concessions and to disclaim, alter, modify, use and turn to account and to manufacture under or grant licences or privileges in respect of the same, and to expend money in experimenting upon, testing and improving any patents, inventions or rights which the Company may acquire or propose to acquire.

3.2.3    To acquire or undertake the whole or any part of the business, goodwill, and assets of any person, firm, or company carrying on or proposing to carry on any of the businesses which the Company is authorised to carry on and as part of the consideration for such acquisition to undertake all or any of the liabilities of such person, firm or company, or to acquire an interest in, amalgamate with, or enter into partnership or into any arrangement for sharing profits, or for co-operation, or for mutual assistance with any such person, firm or company, or for subsidising or otherwise assisting any such person, firm or company, and to give or accept, by way of consideration for any of the acts or things aforesaid or property acquired, any shares, debentures, debenture stock or securities that may be agreed upon, and to hold and retain, or sell, mortgage and deal with any shares, debentures, debenture stock or securities so received.

3.2.4    To improve, manage, construct, repair, develop, exchange, let on lease or otherwise, mortgage, charge, sell, dispose of, turn to account, grant licences, options, rights and privileges in respect of, or otherwise deal with all or any part of the property and rights of the Company.

3.2.5    To invest and deal with the moneys of the Company not immediately required in such manner as may from time to time be determined and to hold or otherwise deal with any investments made.

3.2.6    To lend and advance money or give credit on any terms and with or without security to any person, firm or company (including without prejudice to the generality of the foregoing any holding company, subsidiary or fellow subsidiary of, or any other company associated in any way with, the Company), to enter into guarantees, contracts of indemnity and suretyships of all kinds, to receive money on deposit or loan upon any terms, and to secure or guarantee in any manner and upon any terms the payment of any sum of money or the performance of any obligation by any person, firm or company (including without prejudice to the generality of the foregoing any such holding company, subsidiary, fellow subsidiary or associated company as aforesaid).

3.2.7    To borrow and raise money in any manner and to secure the repayment of any money borrowed, raised or owing by mortgage, charge, standard security, lien or other security upon the whole or any part of the Company's property or assets (whether present or future), including its uncalled capital, and also by a similar mortgage, charge, standard security, lien or security to secure and guarantee the performance by the Company of any obligation or liability it may undertake or which may become binding on it.

3.2.8    To draw, make, accept, endorse, discount, negotiate, execute and issue cheques, bills of exchange, promissory notes, bills of lading, warrants, debentures, and other negotiable or transferable instruments.

3.2.9    To apply for, promote, and obtain any Act of Parliament, order, or licence of the Department of Trade or other authority for enabling the Company to carry any of its objects into effect, or for effecting any modification of the Company's constitution, or for any other purpose which may seem calculated directly or indirectly to promote the Company's interests, and to oppose any proceedings or applications which may seem calculated directly or indirectly to prejudice the Company's interests.

3.2.10    To enter into any arrangements with any government or authority (supreme, municipal, local, or otherwise) that may seem conducive to the attainment of the Company's objects or any of them, and to obtain from any such government or authority any charters, decrees, rights, privileges or concessions which the Company may think desirable and to carry out, exercise, and comply with any such charters, decrees, rights, privileges, and concessions.

3.2.11    To subscribe for, take, purchase, or otherwise acquire, hold, sell, deal with and dispose of, place and underwrite shares, stocks, debentures, debenture stocks, bonds, obligations or securities issued or guaranteed by any other company constituted or carrying on business in any part of the world, and debentures, debenture stocks, bonds, obligations or securities issued or guaranteed by any government or authority, municipal, local or otherwise, in any part of the world.

3.2.12    To control, manage, finance, subsidise, co-ordinate or otherwise assist any company or companies in which the Company has a direct or indirect financial interest, to provide secretarial, administrative, technical, commercial and other services and facilities of all kinds for any such company or companies and to make payments by way of subvention or otherwise and any other arrangements which may seem desirable with respect to any business or operations of or generally with respect to any such company or companies.

3.2.13    To promote any other company for the purpose of acquiring the whole or any part of the business or property or undertaking or any of the liabilities of the Company, or of undertaking any business or operations which may appear likely to assist or benefit the Company or to enhance the value of any property or business of the Company, and to place or guarantee the placing of, underwrite, subscribe for, or otherwise acquire all or any part of the shares or securities of any such company as aforesaid.

3.2.14    To sell or otherwise dispose of the whole or any part of the business or property of the Company, either together or in portions, for such consideration as the Company may think fit, and in particular for shares, debentures, or securities of any company purchasing the same.

3.2.15    To act as agents or brokers and as trustees for any person, firm or company, and to undertake and perform sub-contracts.

3.2.16    To remunerate any person, firm or company rendering services to the Company either by cash payment or by the allotment of shares or other securities of the Company credited as paid up in full or in part or otherwise as may be thought expedient.

3.2.17    To distribute among the members of the Company in kind any property of the Company of whatever nature.

3.2.18    To pay all or any expenses incurred in connection with the promotion, formation and incorporation of the Company, or to contract with any person, firm or company to pay the same, and to pay commissions to brokers and others for underwriting, placing, selling, or guaranteeing the subscription of any shares or other securities of the Company.

3.2.19    To support and subscribe to any charitable or public object and to support and subscribe to any institution, society, or club which may be for the benefit of the Company or its directors or employees, or may be connected with any town or place where the Company carries on business; to give or award pensions, annuities, gratuities, and superannuation or other allowances or benefits or charitable aid and generally to provide advantages, facilities and services for any persons who are or have been directors of, or who are or have been employed by, or who are serving or have served the Company, or any company which is a subsidiary of the Company or the holding company of the Company or a fellow subsidiary of the Company or the predecessors in business of the Company or of any such subsidiary, holding or fellow subsidiary company and to the wives, widows, children and other relatives and dependants of such persons; to make payments towards insurance including insurance for any director, officer or auditor against any liability in respect of any negligence, default, breach of duty or breach of trust (so far as permitted by law); and to set up, establish, support and maintain superannuation and other funds or schemes (whether contributory or non-contributory) for the benefit of any of such persons and of their wives, widows, children and other relatives and dependants; and to set up, establish, support and maintain profit sharing or share purchase schemes for the benefit of any of the employees of the Company or of any such subsidiary, holding or fellow subsidiary company and to lend money to any such employees or to trustees on their behalf to enable any such schemes to be established or maintained.

3.2.20    Subject to and in accordance with the provisions of the Act (if and so far as such provisions shall be applicable) to give, directly or indirectly, financial assistance for the acquisition of shares or other securities of the Company or of any other company or for the reduction or discharge of any liability incurred in respect of such acquisition.

3.2.21    To procure the Company to be registered or recognised in any part of the world.

3.2.22    To do all or any of the things or matters aforesaid in any part of the world and either as principals, agents, contractors or otherwise, and by or through agents, brokers, sub-contractors or otherwise and either alone or in conjunction with others.

3.2.23    To do all such other things as may be deemed incidental or conducive to the attainment of the Company's objects or any of them.

3.2.24    AND so that:-

3.2.24.1 None of the provisions set forth in any sub-clause of this clause shall be restrictively construed but the widest interpretation shall be given to each such provision, and none of such provisions shall, except where the context expressly so requires, be in any way limited or restricted by reference to or inference from any other provision set forth in such sub-clause, or by reference to or inference from the terms of any other sub-clause of this clause, or by reference to or inference from the name of the Company.

3.2.24.2 The word "company" in this clause, except where used in reference to the Company, shall be deemed to include any partnership or other body of persons, whether incorporated or unincorporated and whether domiciled in the United Kingdom or elsewhere.

3.2.24.3 In this clause the expression "the Act" means the Companies Act 1985, but so that any reference in this clause to any provision of the Act shall be deemed to include a reference to any statutory modification or re-enactment of that provision for the time being in force.

4.        The liability of the members is limited.

5.        The Company's share capital is £1000 divided into 1000 shares of £1 each.

I, the subscriber to this Memorandum of Association, wish to be formed into a Company pursuant to this Memorandum; and I agree to take the number of shares shown opposite my name.

| Name and address of Subscriber | Number of shares taken by the Subscriber |
|---|---|
| 1  For and on behalf of<br>Ark Syndicate Management Limited<br>c/o Barlow Lyde & Gilbert<br>Beaufort House<br>15 St Botolph Street<br>LONDON<br>EC3A 7NJ | -  One |
| Total shares taken | -  1 |

Dated 02/02/2007

THE COMPANIES ACTS 1985 to 1989


PRIVATE COMPANY LIMITED BY SHARES


ARTICLES OF ASSOCIATION OF


ARK CORPORATE MEMBER LIMITED


1.      PRELIMINARY

1.1     The regulations contained in Table A in the Schedule to the Companies (Tables A to F) Regulations 1985 (SI 1985 No. 805) as amended by the Companies (Tables A to F) (Amendment) Regulations 1985 (SI 1985 No. 1052) and as further amended by The Companies Act 1985 (Electronic Communications) Order 2000 (SI 2000 No. 3373) (such Table being hereinafter called "Table A") shall apply to the Company save in so far as they are excluded or varied hereby and such regulations (save as so excluded or varied) and the Articles hereinafter contained shall be the Articles of Association of the Company.

1.2     In these Articles the expression "the Act" means the Companies Act 1985, but so that any reference in these Articles to any provision of the Act shall be deemed to include a reference to any statutory modification or re-enactment of that provision for the time being in force.

2.      ALLOTMENT OF SHARES

2.1     Shares which are comprised in the authorised share capital with which the Company is incorporated shall be under the control of the directors who may (subject to section 80 of the Act and to article 2.4 below) allot, grant options over or otherwise dispose of the same, to such persons, on such terms and in such manner as they think fit.

2.2     All shares which are not comprised in the authorised share capital with which the Company is incorporated and which the directors propose to issue shall first be offered to the members in proportion as nearly as may be to the number of the existing shares held by them respectively unless the Company in general meeting shall by special resolution otherwise direct.  The offer shall be made by notice specifying the number of shares offered, and limiting a period (not being less than 14 days) within which the offer, if not accepted, will be deemed to be declined. After the expiration of that period, those shares so deemed to be declined shall be offered in the proportion aforesaid to the persons who have, within the

said period, accepted all the shares offered to them; such further offer shall be made in like terms in the same manner and limited by a like period as the original offer. Any shares not accepted pursuant to such offer or further offer as aforesaid or not capable of being offered as aforesaid except by way of fractions and any shares released from the provisions of this article by any such special resolution as aforesaid shall be under the control of the directors, who may allot, grant options over or otherwise dispose of the same to such persons, on such terms, and in such manner as they think fit, provided that, in the case of shares not accepted as aforesaid, such shares shall not be disposed of on terms which are more favourable to the subscribers therefor than the terms on which they were offered to the members. The foregoing provisions of this article 2.2 shall have effect subject to section 80 of the Act.

2.3     In accordance with section 91(1) of the Act sections 89(1) and 90(1) to (6) (inclusive) of the Act shall not apply to the Company.

2.4     The directors are generally and unconditionally authorised for the purposes of section 80 of the Act to exercise any power of the Company to allot and grant rights to subscribe for or convert securities into shares of the Company up to the amount of the authorised share capital with which the Company is incorporated at any time or times during the period of five years from the date of incorporation and the directors may, after that period, allot any shares or grant any such rights under this authority in pursuance of an offer or agreement so to do made by the Company within that period. The authority hereby given may at any time (subject to the said section 80) be renewed, revoked or varied by ordinary resolution.

3.      SHARES

3.1     The lien conferred by regulation 8 in Table A shall attach also to fully paid-up shares, and the Company shall also have a first and paramount lien on all shares, whether fully paid or not, standing registered in the name of any person indebted or under liability to the Company, whether he shall be the sole registered holder thereof or shall be one of two or more joint holders, for all moneys presently payable by him or his estate to the Company. Regulation 8 in Table A shall be modified accordingly.

3.2     The liability of any member in default in respect of a call shall be increased by the addition at the end of the first sentence of regulation 18 in Table A of the words "and all expenses that may have been incurred by the Company by reason of such non-payment".

4.      GENERAL MEETINGS AND RESOLUTIONS

4.1     Every notice convening a general meeting shall comply with the provisions of section 372(3) of the Act as to giving information to members in regard to their right to appoint proxies; and notices of and other communications relating to any general meeting which any member is entitled to receive shall be sent to the directors and to the auditors for the time being of the Company.

4.2.1    No business shall be transacted at any general meeting unless a quorum is present.  Subject to article 4.2.2 below, two persons entitled to vote upon the business to be transacted, each being a member or a proxy for a member or a duly authorised representative of a corporation, shall be a quorum.

4.2.2    If and for so long as the Company has only one member, that member present in person or by proxy or (if that member is a corporation) by a duly authorised representative shall be a quorum.

4.2.3    If a quorum is not present within half an hour from the time appointed for a general meeting the general meeting shall stand adjourned to the same day in the next week at the same time and place or to such other day and at such other time and place as the directors may determine; and if at the adjourned general meeting a quorum is not present within half an hour from the time appointed therefor such adjourned general meeting shall be dissolved.

4.2.4    Regulations 40 and 41 in Table A shall not apply to the Company.

4.3.1    If and for so long as the Company has only one member and that member takes any decision which is required to be taken in general meeting or by means of a written resolution, that decision shall be as valid and effectual as if agreed by the Company in general meeting, subject as provided in article 4.3.3 below.

4.3.2    Any decision taken by a sole member pursuant to article 4.3.1 above shall be recorded in writing and delivered by that member to the Company for entry in the Company's minute book.

4.3.3    Resolutions under section 303 of the Act for the removal of a director before the expiration of his period of office and under section 391 of the Act for the removal of an auditor before the expiration of his period of office shall only be considered by the Company in general meeting.

4.4    A member present at a meeting by proxy shall be entitled to speak at the meeting and shall be entitled to one vote on a show of hands.  In any case where the same person is appointed proxy for more than one member he shall on a show of hands have as many votes as the number of members for whom he is proxy. Regulation 54 in Table A shall be modified accordingly.

4.5    Unless resolved by ordinary resolution that regulation 62 in Table A shall apply without modification, the appointment of a proxy and any authority under which the proxy is appointed or a copy of such authority certified notarially or in some other way approved by the directors may be deposited or received at the place specified in regulation 62 in Table A up to the commencement of the meeting or (in any case where a poll is taken otherwise than at the meeting) of the taking of the poll or may be handed to the chairman of the meeting prior to the commencement of the business of the meeting.

5.    APPOINTMENT OF DIRECTORS

5.1.1    Regulation 64 in Table A shall not apply to the Company.

5.1.2    The maximum number and minimum number respectively of the directors may be determined from time to time by ordinary resolution. Subject to and in default of any such determination there shall be no maximum number of directors and the minimum number of directors shall be one.  Whenever the minimum number of directors is one, a sole director shall have authority to exercise all the powers and discretions by Table A and by these Articles expressed to be vested in the directors generally, and regulation 89 in Table A shall be modified accordingly.

5.2    The directors shall not be required to retire by rotation and regulations 73 to 80 (inclusive) in Table A shall not apply to the Company.

5.3    No person shall be appointed a director at any general meeting unless either:-

(a)    he is recommended by the directors; or

(b)    not less than 14 nor more than 35 clear days before the date appointed for the general meeting, notice signed by a member qualified to vote at the general meeting has been given to the Company of the intention to propose that person for appointment, together with notice signed by that person of his willingness to be appointed.

5.4.1    Subject to article 5.3 above, the Company may by ordinary resolution appoint any person who is willing to act to be a director, either to fill a vacancy or as an additional director.

5.4.2    The directors may appoint a person who is willing to act to be a director, either to fill a vacancy or as an additional director, provided that the appointment does not cause the number of directors to exceed any number determined in accordance with article 5.1.2 above as the maximum number of directors and for the time being in force.

5.5    In any case where as the result of death or deaths the Company has no members and no directors the personal representatives of the last member to have died shall have the right by notice in writing to appoint a person to be a director of the Company and such appointment shall be as effective as if made by the Company in general meeting pursuant to article 5.4.1 above.  For the purpose of this article, where two or more members die in circumstances rendering it uncertain which of them survived the other or others, the members shall be deemed to have died in order of seniority, and accordingly the younger shall be deemed to have survived the elder.

6.    BORROWING POWERS

6.1    The directors may exercise all the powers of the Company to borrow money without limit as to amount and upon such terms and in such manner as they think fit, and subject (in the case of any security convertible into shares) to section 80 of the Act to grant any mortgage, charge or standard security over its undertaking, property and uncalled capital, or any part thereof, and to issue debentures, debenture stock, and other securities whether outright or as security for any debt, liability or obligation of the Company or of any third party.

7.      ALTERNATE DIRECTORS

7.1     Unless otherwise determined by the Company in general meeting by ordinary resolution an alternate director shall not be entitled as such to receive any remuneration from the Company, save that he may be paid by the Company such part (if any) of the remuneration otherwise payable to his appointor as such appointor may by notice in writing to the Company from time to time direct, and the first sentence of regulation 66 in Table A shall be modified accordingly.

7.2     A director, or any such other person as is mentioned in regulation 65 in Table A, may act as an alternate director to represent more than one director, and an alternate director shall be entitled at any meeting of the directors or of any committee of the directors to one vote for every director whom he represents in addition to his own vote (if any) as a director, but he shall count as only one for the purpose of determining whether a quorum is present.

8.      GRATUITIES AND PENSIONS

8.1.1   The directors may exercise the powers of the Company conferred by its Memorandum of Association in relation to the payment of pensions, gratuities and other benefits and shall be entitled to retain any benefits received by them or any of them by reason of the exercise of any such powers.

8.1.2   Regulation 87 in Table A shall not apply to the Company.

9.      PROCEEDINGS OF DIRECTORS

9.1.1   A director may vote, at any meeting of the directors or of any committee of the directors, on any resolution, notwithstanding that it in any way concerns or relates to a matter in which he has, directly or indirectly, any kind of interest whatsoever, and if he shall vote on any such resolution his vote shall be counted; and in relation to any such resolution as aforesaid he shall (whether or not he shall vote on the same) be taken into account in calculating the quorum present at the meeting.

9.1.2   Each director shall comply with his obligations to disclose his interest in contracts under section 317 of the Act.

9.1.3   Regulations 94 to 97 (inclusive) in Table A shall not apply to the Company.

10.     THE SEAL

10.1    If the Company has a seal it shall only be used with the authority of the directors or of a committee of directors.  The directors may determine who shall sign any instrument to which the seal is affixed and unless otherwise so determined it shall be signed by a director and by the secretary or second director. The obligation under regulation 6 in Table A relating to the sealing of share certificates shall apply only if the Company has a seal.  Regulation 101 in Table A shall not apply to the Company.

10.2    The Company may exercise the powers conferred by section 39 of the Act with regard to having an official seal for use abroad, and such powers shall be vested in the directors.

11.    PROTECTION FROM LIABILITY

For the purposes of this Article a "Liability" is any liability incurred by a person in connection with any negligence, default, breach of duty or breach of trust by him in relation to the Company or otherwise in connection with his duties, powers or office and "Associated Company" shall bear the meaning referred to in section 309A(6) of the Act. Subject to the provisions of the Act and without prejudice to any protection from liability which may otherwise apply:

11.1    the directors shall have power to purchase and maintain for any director of the Company, any director of an Associated Company, any auditor of the Company and any officer of the Company (not being a director or auditor of the Company), insurance against any Liability.

11.2    every director or auditor of the Company and every officer of the Company (not being a director or auditor of the Company) shall be indemnified out of the assets of the Company against any loss or liability incurred by him in defending any proceedings in which judgment is given in his favour or in which he is acquitted or in connection with any application in which relief is granted to him by the court from any Liability.

11.3    Regulation 118 shall not apply to the Company.

12.    TRANSFER OF SHARES

12.1    The directors may, in their absolute discretion and without assigning any reason therefor, decline to register the transfer of a share, whether or not it is a fully paid share, and the first sentence of regulation 24 in Table A shall not apply to the Company.

_____

Name and address of Subscriber

_____

For and on behalf of
Ark Syndicate Management Limited
c/o Barlow Lyde & Gilbert
Beaufort House
15 St Botolph Street
LONDON
EC3A 7NJ

_____

Dated 02/02/2007

# EXHIBIT 2

 **GOV.UK**

# Find and update company information

Companies House does not verify the accuracy of the information filed
(http://resources.companieshouse.gov.uk/serviceInformation.shtml#compInfo)
Advanced company search (/advanced-search)

MS AMLIN CORPORATE MEMBER LIMITED

Company number **02969411**

> ### Follow this company

> ### File for this company (https://beta.companieshouse.gov.uk/company/02969411/authorise?return_to=/company/02969411)

— Overview (https://beta.companieshouse.gov.uk/company/02969411)

— Filing history (https://beta.companieshouse.gov.uk/company/02969411/filing-history)

— People (https://beta.companieshouse.gov.uk/company/02969411/officers)

— Charges (https://beta.companieshouse.gov.uk/company/02969411/charges)

— More (https://beta.companieshouse.gov.uk/company/02969411/more)

Registered office address
   The Leadenhall Building, 122 Leadenhall Street, London, United Kingdom, EC3V 4AG

Company status
   Active

Company type
   Private limited Company

Incorporated on
   19 September 1994

## Accounts

Next accounts made up to **31 December 2022**
due by **30 September 2023**

Last accounts made up to **31 December 2021**

## Confirmation statement

Next statement date **29 July 2023**
due by **12 August 2023**

Last statement dated **29 July 2022**

# Nature of business (SIC)

- 65120 - Non-life insurance

# Previous company names

| Name | Period |
| --- | --- |
| AMLIN CORPORATE MEMBER LIMITED | 29 Sep 1998 - 11 May 2016 |
| SEXTANT CORPORATE MEMBER LIMITED | 19 Oct 1994 - 29 Sep 1998 |
| FIRSTHOBBY LIMITED | 19 Sep 1994 - 19 Oct 1994 |

Tell us what you think of this service (https://www.smartsurvey.co.uk/s/getcompanyinformation/) Is there anything wrong with this page? (/help/feedback?sourceurl=https://find-and-update.company-information.service.gov.uk/company/02969411)

Policies Link opens in new tab

Cookies (https://beta.companieshouse.gov.uk/help/cookies)

Contact us Link opens in new tab

Accessibility statement (https://beta.companieshouse.gov.uk/help/accessibility-statement)

Developers Link opens in new tab

Built by Companies House



© Crown copyright



# CS01 (ef)

**Confirmation Statement**

Company Name: **MS AMLIN CORPORATE MEMBER LIMITED**
Company Number: **02969411**

Received for filing in Electronic Format on the: **16/08/2022**

XBAIVTYR

Company Name: **MS AMLIN CORPORATE MEMBER LIMITED**

Company Number: **02969411**

Confirmation
Statement date: **29/07/2022**

# Full details of Shareholders

The details below relate to individuals/corporate bodies that were shareholders during the review period or that had ceased to be shareholders since the date of the previous confirmation statement.

Shareholder information for a non-traded company as at the confirmation statement date is shown below

Shareholding 1: **1700000 transferred on 2020-01-01**
**1700000 ORDINARY shares held as at the date of this confirmation statement**
Name: **MITSUI SUMITOMO INSURANCE COMPANY, LIMITED**

# Confirmation Statement

I confirm that all information required to be delivered by the company to the registrar in relation to the confirmation period concerned either has been delivered or is being delivered at the same time as the confirmation statement

# Authorisation

Authenticated

This form was authorised by one of the following:

Director, Secretary, Person Authorised, Charity Commission Receiver and Manager, CIC Manager, Judicial Factor

FILE COPY



# CERTIFICATE OF INCORPORATION

# OF A PRIVATE LIMITED COMPANY

## Company No. 2969411

The Registrar of Companies for England and Wales hereby certifies that
FIRSTHOBBY LIMITED

is this day incorporated under the Companies Act 1985 as a private

company and that the company is limited.

Given at Companies House, Cardiff, the 19th September 1994



*N02969411J*

For the Registrar of Companies



*COMPANIES HOUSE*

HC007B



COMPANIES FORM No. 12

# Statutory Declaration of compliance with requirements on application for registration of a company



Pursuant to section 12(3) of the Companies Act 1985

Please do not write in this margin

To the Registrar of Companies

For official use

For official use

Please complete legibly, preferably in black type, or bold block lettering

Name of company

* insert full name of Company

* **FIRSTHOBBY LIMITED**

I, MICHAEL RICHARD COUNSELL, signing on behalf

of SWIFT INCORPORATIONS LIMITED

1 MITCHELL LANE

BRISTOL BS1 6BU

† delete as appropriate

do solemnly and sincerely declare that I am a [~~Solicitor engaged in the formation of the company~~]† [person named as director or secretary of the company in the statement delivered to the registrar under section 10(2)† and that all the requirements of the above Act in respect of the registration of the above company and of matters precedent and incidental to it have been complied with,

And I make this solemn declaration conscientiously believing the same to be true and by virtue of the provisions of the Statutory Declarations Act 1835

Declared at 11, SHIP STREET

BRECON,

POWYS

The 2nd Day of August 1994

Declarant to sign below

before me

A Commissioner for Oaths or Notary Public or Justice of the Peace or Solicitor having the powers conferred on a Commissioner for Oaths.

Presentor's name, address and reference (if any):

For official use

New Companies Section

Post room

Printed and supplied by

**Jordans**

Jordan & Sons Limited

21 St Thomas Street, Bristol BS1 6JS
Tel 0272 230600  Telex 449119

CHA108

This form should be completed in black.

# 10

## Statement of first directors and secretary and intended situation of registered office

| CN | | For official use |
|----|--|------------------|

**Company name** *(in full)*

FIRSTHOBBY LIMITED

**Registered office** of the company on incorporation.

| RO | 1 MITCHELL LANE |
|----|-----------------|

Post town  BRISTOL

County/Region

Postcode  BS1 6BU

If the memorandum is delivered by an agent for the subscribers of the memorandum mark 'X' in the box opposite and give the agent's name and address.

| X |
|---|

| | Name | JORDAN & SONS LIMITED |
|--|------|------------------------|
| RA | | 21 ST. THOMAS STREET |

Post town  BRISTOL

County/Region

Postcode  BS1 6JS

Number of continuation sheets attached

To whom should Companies House direct any enquiries about the information shown in this form?

C.F.P.U. JORDAN & SONS LIMITED

21 ST. THOMAS STREET

BRISTOL                 Postcode  BS1 6JS

Telephone  0272 230600        Extension  349

JRM10/94

## Company Secretary *(See notes 1 - 5)*

| | | |
|---|---|---|
| Name | *Style/Title | **CS** |
| | Forenames | |
| | Surname | SWIFT INCORPORATIONS LIMITED |
| | *Honours etc | N/A |
| | Previous forenames | N/A |
| | Previous surname | N/A |

Address

*Usual residential address must be given. In the case of a corporation, give the registered or principal office address.*

| | |
|---|---|
| **AD** | 1 MITCHELL LANE |
| Post town | BRISTOL |
| County/Region | |
| Postcode | BS1 6BU   Country  ENGLAND |

I consent to act as secretary of the company named on page 1

Consent signature     Signed *WRConnell* (Authorised Signatory)  Date  02-08-94

## Directors *(See notes 1 - 5)*
*Please list directors in alphabetical order.*

| | | |
|---|---|---|
| Name | *Style/Title | **CD** |
| | Forenames | |
| | Surname | INSTANT COMPANIES LIMITED |
| | *Honours etc | N/A |
| | Previous forenames | N/A |
| | Previous surname | N/A |

Address

*Usual residential address must be given. In the case of a corporation, give the registered or principal office address.*

| | |
|---|---|
| **AD** | 1 MITCHELL LANE |
| Post town | BRISTOL |
| County/Region | |
| Postcode | BS1 6BU   Country  ENGLAND |

| | | | |
|---|---|---|---|
| Date of birth | **DO** 1 8 0 2 8 1 | Nationality | **NA** UK REGISTERED |
| Business occupation | **OC** COMPANY REGISTRATION AGENT | | |
| Other directorships | **OD** NONE | | |

ª Voluntary details

I consent to act as director of the company named on page 1

Consent signature     Signed *BHadler* (Authorised Signatory)  Date  02-08-94

---

Signature of agent on behalf of all subscribers     Date  02-08-94

*Delete if the form is signed by the subscribers*

THE COMPANIES ACTS 1985 to 1989

*2969411*

A PRIVATE COMPANY
LIMITED BY SHARES

# Memorandum and Articles of Association

1. The Company's name is

## FIRSTHOBBY LIMITED

2. The Company's registered office is to be situated in England and Wales.

3.    (i)    The object of the Company is to carry on business as a general commercial company.

    (ii)    Without prejudice to the generality of the object and the powers of the Company derived from Section 3A of the Act the Company has power to do all or any of the following things:-

*214165*

OBMGEN

(a)  To purchase or by any other means acquire and take options over any property whatever, and any rights or privileges of any kind over or in respect of any property.

(b)  To apply for, register, purchase, or by other means acquire and protect, prolong and renew, whether in the United Kingdom or elsewhere any patents, patent rights, brevets d'invention, licences, secret processes, trade marks, designs, protections and concessions and to disclaim, alter, modify, use and turn to account and to manufacture under or grant licences or privileges in respect of the same, and to expend money in experimenting upon, testing and improving any patents, inventions or rights which the Company may acquire or propose to acquire.

(c)  To acquire or undertake the whole or any part of the business, goodwill, and assets of any person, firm, or company carrying on or proposing to carry on any of the businesses which the Company is authorised to carry on and as part of the consideration for such acquisition to undertake all or any of the liabilities of such person, firm or company, or to acquire an interest in, amalgamate with, or enter into partnership or into any arrangement for sharing profits, or for co-operation, or for mutual assistance with any such person, firm or company, or for subsidising or otherwise assisting any such person, firm or company, and to give or accept, by way of consideration for any of the acts or things aforesaid or property acquired, any shares, debentures, debenture stock or securities that may be agreed upon, and to hold and retain, or sell, mortgage and deal with any shares, debentures, debenture stock or securities so received.

(d)  To improve, manage, construct, repair, develop, exchange, let on lease or otherwise, mortgage, charge, sell, dispose of, turn to account, grant licences, options, rights and privileges in respect of, or otherwise deal with all or any part of the property and rights of the Company.

(e)  To invest and deal with the moneys of the Company not immediately required in such manner as may from time to time be determined and to hold or otherwise deal with any investments made.

(f)  To lend and advance money or give credit on any terms and with or without security to any person, firm or company (including without prejudice to the generality of the foregoing any holding company, subsidiary or fellow subsidiary of, or any other company associated in any way with, the Company), to enter into guarantees, contracts of indemnity and suretyships of all kinds, to receive money on deposit or loan upon any terms, and to secure or guarantee in any manner and upon any terms the payment of any sum of money or the performance of any obligation by any person, firm or company (including without prejudice to the generality of the foregoing any such holding company, subsidiary, fellow subsidiary or associated company as aforesaid).

(g)  To borrow and raise money in any manner and to secure the repayment of any money borrowed, raised or owing by mortgage, charge, standard security, lien or other security upon the whole or any part of the Company's property or assets (whether present or future), including its uncalled capital, and also by a similar mortgage, charge, standard security, lien or security to secure and guarantee the performance by the Company of any obligation or liability it may undertake or which may become binding on it.

(h)  To draw, make, accept, endorse, discount, negotiate, execute and issue cheques, bills of exchange, promissory notes, bills of lading, warrants, debentures, and other negotiable or transferable instruments.

(i)  To apply for, promote, and obtain any Act of Parliament, order, or licence of the Department of Trade or other authority for enabling the Company to carry any of its objects into effect, or for effecting any modification of the Company's constitution, or for any other purpose which may seem calculated directly or indirectly to promote the Company's interests, and to oppose any proceedings or applications which may

seem calculated directly or indirectly to prejudice the Company's interests.

(j)  To enter into any arrangements with any government or authority (supreme, municipal, local, or otherwise) that may seem conducive to the attainment of the Company's objects or any of them, and to obtain from any such government or authority any charters, decrees, rights, privileges or concessions which the Company may think desirable and to carry out, exercise, and comply with any such charters, decrees, rights, privileges, and concessions.

(k)  To subscribe for, take, purchase, or otherwise acquire, hold, sell, deal with and dispose of, place and underwrite shares, stocks, debentures, debenture stocks, bonds, obligations or securities issued or guaranteed by any other company constituted or carrying on business in any part of the world, and debentures, debenture stocks, bonds, obligations or securities issued or guaranteed by any government or authority, municipal, local or otherwise, in any part of the world.

(l)  To control, manage, finance, subsidise, co-ordinate or otherwise assist any company or companies in which the Company has a direct or indirect financial interest, to provide secretarial, administrative, technical, commercial and other services and facilities of all kinds for any such company or companies and to make payments by way of subvention or otherwise and any other arrangements which may seem desirable with respect to any business or operations of or generally with respect to any such company or companies.

(m)  To promote any other company for the purpose of acquiring the whole or any part of the business or property or undertaking or any of the liabilities of the Company, or of undertaking any business or operations which may appear likely to assist or benefit the Company or to enhance the value of any property or business of the Company, and to place or guarantee the placing of, underwrite, subscribe for, or otherwise acquire all or any part of the shares or securities of any such company as aforesaid.

(n)  To sell or otherwise dispose of the whole or any part of the business or property of the Company, either together or in portions, for such consideration as the Company may think fit, and in particular for shares, debentures, or securities of any company purchasing the same.

(o)  To act as agents or brokers and as trustees for any person, firm or company, and to undertake and perform sub-contracts.

(p)  To remunerate any person, firm or company rendering services to the Company either by cash payment or by the allotment to him or them of shares or other securities of the Company credited as paid up in full or in part or otherwise as may be thought expedient.

(q)  To distribute among the Members of the Company in kind any property of the Company of whatever nature.

(r)  To pay all or any expenses incurred in connection with the promotion, formation and incorporation of the Company, or to contract with any person, firm or company to pay the same, and to pay commissions to brokers and others for underwriting, placing, selling, or guaranteeing the subscription of any shares or other securities of the Company.

(s)  To support and subscribe to any charitable or public object and to support and subscribe to any institution, society, or club which may be for the benefit of the Company or its Directors or employees, or may be connected with any town or place where the Company carries on business; to give or award pensions, annuities, gratuities, and superannuation or other allowances or benefits or charitable aid and generally to provide advantages, facilities and services for any persons who are or have been Directors of, or who are or have been employed by, or who are serving or have served the Company, or any company which is a subsidiary of the Company or the holding company of the Company or a fellow subsidiary of the

Company or the predecessors in business of the Company or of any such subsidiary, holding or fellow subsidiary company and to the wives, widows, children and other relatives and dependants of such persons; to make payments towards insurance including insurance for any Director, officer or Auditor against any liability as is referred to in Section 310(1) of the Act, and to set up, establish, support and maintain superannuation and other funds or schemes (whether contributory or non-contributory) for the benefit of any of such persons and of their wives, widows, children and other relatives and dependants; and to set up, establish, support and maintain profit sharing or share purchase schemes for the benefit of any of the employees of the Company or of any such subsidiary, holding or fellow subsidiary company and to lend money to any such employees or to trustees on their behalf to enable any such purchase schemes to be established or maintained.

(t)    Subject to and in accordance with a due compliance with the provisions of Sections 155 to 158 (inclusive) of the Act (if and so far as such provisions shall be applicable), to give, whether directly or indirectly, any kind of financial assistance (as defined in Section 152(1)(a) of the Act) for any such purpose as is specified in Section 151(1) and/or Section 151(2) of the Act.

(u)    To procure the Company to be registered or recognised in any part of the world.

(v)    To do all or any of the things or matters aforesaid in any part of the world and either as principals, agents, contractors or otherwise, and by or through agents, brokers, sub-contractors or otherwise and either alone or in conjunction with others.

(w)    To do all such other things as may be deemed incidental or conducive to the attainment of the Company's object or of any of the powers given to it by the Act or by this Clause.

AND so that:-

(1)    None of the provisions set forth in any sub-clause of this Clause shall be restrictively construed but the widest interpretation shall be given to each such provision, and none of such provisions shall, except where the context expressly so requires, be in any way limited or restricted by reference to or inference from any other provision set forth in such sub-clause, or by reference to or inference from the terms of any other sub-clause of this Clause, or by reference to or inference from the name of the Company.

(2)    The word "Company" in this Clause, except where used in reference to the Company, shall be deemed to include any partnership or other body of persons, whether incorporated or unincorporated and whether domiciled in the United Kingdom or elsewhere.

(3)    In this Clause the expression "the Act" means the Companies Act 1985, but so that any reference in this Clause to any provision of the Act shall be deemed to include a reference to any statutory modification or re-enactment of that provision for the time being in force.

4.    The liability of the Members is limited.

5.    The Company's share capital is £1000 divided into 1000 shares of £1 each.

We, the subscribers to this Memorandum of Association, wish to be formed into a Company pursuant to this Memorandum; and we agree to take the number of shares shown opposite our respective names.

| Names and addresses of Subscribers | Number of shares taken by each Subscriber |
| --- | --- |
| 1.   For and on behalf of Instant Companies Limited 1 Mitchell Lane Bristol BS1 6BU | - One |
| 2.   For and on behalf of Swift Incorporations Limited 1 Mitchell Lane Bristol BS1 6BU | - One |
| Total shares taken | - Two |

Dated    02.08.94

Witness to the above Signatures:-    Mark Anderson
1 Mitchell Lane
Bristol BS1 6BU

THE COMPANIES ACTS 1985 to 1989

PRIVATE COMPANY LIMITED BY SHARES

ARTICLES OF ASSOCIATION

PRELIMINARY

1.    (a)    The Regulations contained in Table A in the Schedule to the Companies (Tables A to F) Regulations 1985 (SI 1985 No. 805) as amended by the Companies (Tables A to F) (Amendment) Regulations 1985 (SI 1985 No. 1052) (such Table being hereinafter called "Table A") shall apply to the Company save in so far as they are excluded or varied hereby and such Regulations (save as so excluded or varied) and the Articles hereinafter contained shall be the regulations of the Company.

(b)    In these Articles the expression "the Act" means the Companies Act 1985, but so that any reference in these Articles to any provision of the Act shall be deemed to include a reference to any statutory modification or re-enactment of that provision for the time being in force.

## ALLOTMENT OF SHARES

2. (a) Shares which are comprised in the authorised share capital with which the Company is incorporated shall be under the control of the Directors who may (subject to Section 80 of the Act and to paragraph (d) below) allot, grant options over or otherwise dispose of the same, to such persons, on such terms and in such manner as they think fit.

(b) All shares which are not comprised in the authorised share capital with which the Company is incorporated and which the Directors propose to issue shall first be offered to the Members in proportion as nearly as may be to the number of the existing shares held by them respectively unless the Company in General Meeting shall by Special Resolution otherwise direct. The offer shall be made by notice specifying the number of shares offered, and limiting a period (not being less than fourteen days) within which the offer, if not accepted, will be deemed to be declined. After the expiration of that period, those shares so deemed to be declined shall be offered in the proportion aforesaid to the persons who have, within the said period, accepted all the shares offered to them; such further offer shall be made in like terms in the same manner and limited by a like period as the original offer. Any shares not accepted pursuant to such offer or further offer as aforesaid or not capable of being offered as aforesaid except by way of fractions and any shares released from the provisions of this Article by any such Special Resolution as aforesaid shall be under the control of the Directors, who may allot, grant options over or otherwise dispose of the same to such persons, on such terms, and in such manner as they think fit, provided that, in the case of shares not accepted as aforesaid, such shares shall not be disposed of on terms which are more favourable to the subscribers therefor than the terms on which they were offered to the Members. The foregoing provisions of this paragraph (b) shall have effect subject to Section 80 of the Act.

(c) In accordance with Section 91(1) of the Act Sections 89(1) and 90(1) to (6) (inclusive) of the Act shall not apply to the Company.

(d) The Directors are generally and unconditionally authorised for the purposes of Section 80 of the Act, to exercise any power of the Company to allot and grant rights to subscribe for or convert securities into shares of the Company up to the amount of the authorised share capital with which the Company is incorporated at any time or times during the period of five years from the date of incorporation and the Directors may, after that period, allot any shares or grant any such rights under this authority in pursuance of an offer or agreement so to do made by the Company within that period. The authority hereby given may at any time (subject to the said Section 80) be renewed, revoked or varied by Ordinary Resolution of the Company in General Meeting.

## SHARES

3. The lien conferred by Clause 8 in Table A shall attach also to fully paid-up shares, and the Company shall also have a first and paramount lien on all shares, whether fully paid or not, standing registered in the name of any person indebted or under liability to the Company, whether he shall be the sole registered holder thereof or shall be one of two or more joint holders, for all moneys presently payable by him or his estate to the Company. Clause 8 in Table A shall be modified accordingly.

4. The liability of any Member in default in respect of a call shall be increased by the addition at the end of the first sentence of Clause 18 in Table A of the words "and all expenses that may have been incurred by the Company by reason of such non-payment".

## GENERAL MEETINGS AND RESOLUTIONS

5. (a) Every notice convening a General Meeting shall comply with the provisions of Section 372(3) of the Act as to giving information to Members in regard to their right to appoint proxies; and notices of and other communications relating to any General Meeting which any Member is entitled to receive shall be sent to the Directors and to the Auditors for the time being of the Company.

(b) No business shall be transacted at any General Meeting unless a quorum is present. Subject to paragraph (c) below two persons entitled to vote upon the business to be transacted, each being a Member or a proxy for a Member or a duly authorised representative of a corporation, shall be a quorum.

(c) If and for so long as the Company has only one Member, that Member present in person or by proxy or if that Member is a corporation by a duly authorised representative shall be a quorum.

(d) If a quorum is not present within half an hour from the time appointed for a General Meeting the General Meeting shall stand adjourned to the same day in the next week at the same time and place or to such other day and at such other time and place as the Directors may determine; and if at the adjourned General Meeting a quorum is not present within half an hour from the time appointed therefor such adjourned General Meeting shall be dissolved.

(e) Clauses 40 and 41 in Table A shall not apply to the Company.

6. (a) If and for so long as the Company has only one Member and that Member takes any decision which is required to be taken in General Meeting or by means of a written resolution, that decision shall be as valid and effectual as if agreed by the Company in General Meeting save that this paragraph shall not apply to resolutions passed pursuant to sections 303 and 391 of the Act.

(b) Any decision taken by a sole Member pursuant to paragraph (a) above shall be recorded in writing and delivered by that Member to the Company for entry in the Company's Minute Book.

## APPOINTMENT OF DIRECTORS

7. (a) Clause 64 in Table A shall not apply to the Company.

(b) The maximum number and minimum number respectively of the Directors may be determined from time to time by Ordinary Resolution in General Meeting of the Company. Subject to and in default of any such determination there shall be no maximum number of Directors and the minimum number of Directors shall be one. Whensoever the minimum number of Directors shall be one, a sole Director shall have authority to exercise all the powers and discretions by Table A and by these Articles expressed to be vested in the Directors generally, and Clause 89 in Table A shall be modified accordingly.

(c) The Directors shall not be required to retire by rotation and Clauses 73 to 80 (inclusive) in Table A shall not apply to the Company.

(d) No person shall be appointed a Director at any General Meeting unless either:-

(i) he is recommended by the Directors; or

(ii) not less than fourteen nor more than thirty-five clear days before the date appointed for the General Meeting, notice signed by a Member qualified to vote at the General Meeting has been given to the Company of the intention to propose that person for appointment, together with notice signed by that person of his willingness to be appointed.

(e) Subject to paragraph (d) above, the Company may by Ordinary Resolution in General Meeting appoint any person who is willing to act to be a Director, either to fill a vacancy or as an additional Director.

(f) The Directors may appoint a person who is willing to act to be a Director, either to fill a vacancy or as an additional Director, provided that the appointment does not cause the number of Directors to exceed any number determined in accordance with paragraph (b) above as the maximum number of Directors and for the time being in force.

(g) In any case where as the result of the death of a sole Member of the Company the Company

has no Members and no Directors the personal representatives of such deceased member shall have the right by notice in writing to appoint a person to be a Director of the Company and such appointment shall be as effective as if made by the Company in General Meeting pursuant to paragraph (e) of this Article.

## BORROWING POWERS

8.    The Directors may exercise all the powers of the Company to borrow money without limit as to amount and upon such terms and in such manner as they think fit, and subject (in the case of any security convertible into shares) to Section 80 of the Act to grant any mortgage, charge or standard security over its undertaking, property and uncalled capital, or any part thereof, and to issue debentures, debenture stock, and other securities whether outright or as security for any debt, liability or obligation of the Company or of any third party.

## ALTERNATE DIRECTORS

9.    (a)    An alternate Director shall not be entitled as such to receive any remuneration from the Company, save that he may be paid by the Company such part (if any) of the remuneration otherwise payable to his appointer as such appointor may by notice in writing to the Company from time to time direct, and the first sentence of Clause 66 in Table A shall be modified accordingly.

      (b)    A Director, or any such other person as is mentioned in Clause 65 in Table A, may act as an alternate Director to represent more than one Director, and an alternate Director shall be entitled at any meeting of the Directors or of any committee of the Directors to one vote for every Director whom he represents in addition to his own vote (if any) as a Director, but he shall count as only one for the purpose of determining whether a quorum is present.

## GRATUITIES AND PENSIONS

10.    (a)    The Directors may exercise the powers of the Company conferred by Clause 3(ii)(s) of the Memorandum of Association of the Company and shall be entitled to retain any benefits received by them or any of them by reason of the exercise of any such powers.

      (b)    Clause 87 in Table A shall not apply to the Company.

## PROCEEDINGS OF DIRECTORS

11.    (a)    A Director may vote, at any meeting of the Directors or of any committee of the Directors, on any resolution, notwithstanding that it in any way concerns or relates to a matter in which he has, directly or indirectly, any kind of interest whatsoever, and if he shall vote on any such resolution as aforesaid his vote shall be counted; and in relation to any such resolution as aforesaid he shall (whether or not he shall vote on the same) be taken into account in calculating the quorum present at the meeting.

      (b)    Clauses 94 to 97 (inclusive) in Table A shall not apply to the Company.

## THE SEAL

12.    (a)    If the Company has a seal it shall only be used with the authority of the Directors or of a committee of Directors. The Directors may determine who shall sign any instrument to which the seal is affixed and unless otherwise so determined it shall be signed by a Director and by the Secretary or second Director. The obligation under Clause 6 of Table A relating to the sealing of share certificates shall apply only if the Company has a seal. Clause 101 of Table A shall not apply to the Company.

      (b)    The Company may exercise the powers conferred by Section 39 of the Act with regard to having an official seal for use abroad, and such powers shall be vested in the Directors.

## INDEMNITY

13.    (a)    Every Director or other officer or Auditor of the Company shall be indemnified out of the assets of the Company against all losses or liabilities which he may sustain or incur in or about the execution of the duties of his office or otherwise in relation thereto, including any liability incurred by him in defending any proceedings, whether civil or criminal, or in connection with any application under Section 144 or Section 727 of the Act in which relief is granted to him by the Court, and no Director or other officer shall be liable for any loss, damage or misfortune which may happen to or be incurred by the Company in the execution of the duties of his office or in relation thereto. But this Article shall only have effect in so far as its provisions are not avoided by Section 310 of the Act.

      (b)    The Directors shall have power to purchase and maintain for any Director, officer or Auditor of the Company insurance against any such liability as is referred to in Section 310(1) of the Act.

      (c)    Clause 118 in Table A shall not apply to the Company.

## TRANSFER OF SHARES

14.    The Directors may, in their absolute discretion and without assigning any reason therefor, decline to register the transfer of a share, whether or not it is a fully paid share, and the first sentence of Clause 24 in Table A shall not apply to the Company.

---

Names and addresses of Subscribers

---

For and on behalf of
1.    Instant Companies Limited
      1 Mitchell Lane
      Bristol BS1 6BU

For and on behalf of
2.    Swift Incorporations Limited
      1 Mitchell Lane
      Bristol BS1 6BU

---

Dated  02.08.94

Witness to the above Signatures:-      Mark Anderson
                                       1 Mitchell Lane
                                       Bristol BS1 6BU

# EXHIBIT 3


# GOV.UK

# Find and update company information

Companies House does not verify the accuracy of the information filed (http://resources.companieshouse.gov.uk/serviceInformation.shtml#compInfo)

Advanced company search (/advanced-search)

RENAISSANCERE CORPORATE CAPITAL (UK) LIMITED

Company number **06838321**

Follow this company

File for this company (https://beta.companieshouse.gov.uk/company/06838321/authorise?return_to=/company/06838321)

— Overview (https://beta.companieshouse.gov.uk/company/06838321)

— Filing history (https://beta.companieshouse.gov.uk/company/06838321/filing-history)

— People (https://beta.companieshouse.gov.uk/company/06838321/officers)

— Charges (https://beta.companieshouse.gov.uk/company/06838321/charges)

— More (https://beta.companieshouse.gov.uk/company/06838321/more)

Registered office address
　18th Floor, 125, Old Broad Street, London, EC2N 1AR

Company status
　Active

Company type
　Private limited Company

Incorporated on
　5 March 2009

# Accounts

Next accounts made up to **31 December 2022**
due by **30 September 2023**

Last accounts made up to **31 December 2021**

# Confirmation statement

Next statement date **1 March 2024**
due by **15 March 2024**

Last statement dated **1 March 2023**

# Nature of business (SIC)

- 65120 - Non-life insurance
- 65202 - Non-life reinsurance

Tell us what you think of this service (https://www.smartsurvey.co.uk/s/getcompanyinformation/) Is there anything wrong with this page? (/help/feedback?sourceurl=https://find-and-update.company-information.service.gov.uk/company/06838321)

Policies Link opens in new tab

Cookies (https://beta.companieshouse.gov.uk/help/cookies)

Contact us Link opens in new tab

Accessibility statement (https://beta.companieshouse.gov.uk/help/accessibility-statement)

Developers Link opens in new tab

Built by Companies House

© Crown copyright

# File Copy



# CERTIFICATE OF INCORPORATION
# OF A PRIVATE LIMITED COMPANY

## Company No. 06838321

The Registrar of Companies for England and Wales hereby certifies that

RENAISSANCERE CORPORATE CAPITAL (UK) LIMITED

is this day incorporated under the Companies Act 1985 as a
private company and that the company is limited.

Given at Companies House on 5th March 2009



*N06838321I*



THE OFFICIAL SEAL OF THE
REGISTRAR OF COMPANIES



*Companies House*

—— *for the record* ——

The above information was communicated in non-legible form and authenticated by the
Registrar of Companies under section 710A of the Companies Act 1985



**Companies House**
—— *for the record* ——

Electronic statement of compliance with requirements on application for registration of a company pursuant to section 12(3A) of the Companies Act 1985

| Company number | 6838321 |
|---|---|

| Company name | RENAISSANCERE CORPORATE CAPITAL (UK) LIMITED |
|---|---|

| I, | JAMIE LEWIS |
|---|---|

| of | 105 WOODSIDE<br>LONDON<br>UNITED KINGDOM<br>SW19 7BA |
|---|---|

| a | person named as a director of the company in the statement delivered to the registrar of companies under section 10(2) of the Companies Act 1985 |
|---|---|

make the following statement of compliance in pursuance of section 12(3A) of the Companies Act 1985

| Statement: | I hereby state that all the requirements of the Companies Act 1985 in respect of the registration of the above company and of matters precedent and incidental to it have been complied with. |
|---|---|

Confirmation of electronic delivery of information

This statement of compliance was delivered to the registrar of companies electronically and authenticated in accordance with the registrar's direction under section 707B of the Companies Act 1985.

WARNING: The making of a false statement could result in liability to criminal prosecution





**First directors and secretary and
intended situation
of registered office**

*Received for filing in Electronic Format on the:* **05/03/2009**



XVM8B7W0

| | |
|---|---|
| *Company Name in full:* | **RENAISSANCERE CORPORATE CAPITAL (UK) LIMITED** |
| *Proposed Registered Office:* | **2ND FLOOR 6 BEVIS MARKS**<br>**LONDON**<br>**EC3A 7HL** |

*memorandum delivered by an agent for the subscriber(s):*  **Yes**

| | |
|---|---|
| *Agent's Name:* | **JORDANS LIMITED** |
| *Agent's Address:* | **21 ST THOMAS STREET**<br>**BRISTOL**<br>**BS1 6JS** |

# *Company Secretary*

*Name*    **KIM THERESA FOX**

*Address:*    **2ND FLOOR**
**6 BEVIS MARKS**
**LONDON**
**UNITED KINGDOM**
**EC3A 7HL**

*The address above is a service address for the beneficiary of a Confidentiality Order granted under the provisions of section 723B of the Companies Act 1985.*

*Consented to Act:* **Y**    *Date authorised* **05/03/2009**  *Authenticated:* **YES**

## *Director 1:*

*Name*    **MR JAMIE  LEWIS**

*Address:*    **105 WOODSIDE**
**LONDON**
**UNITED KINGDOM**
**SW19 7BA**

*Nationality:*  **BRITISH**
*Business occupation:*  **UNDERWRITER**
*Date of birth:*  **19/06/1965**

*Consented to Act:* **Y**    *Date Authorised:* **05/03/2009** *Authenticated:* **YES**

-------------------------------------------------------------------------------

## Director 2:

*Name*      **MR KEVIN  O'DONNELL**

*Address:*    **"SPONCY" 7 POINT SHARES ROAD**
              **PEMBROKE**
              **BERMUDA**
              **H M06**

*Nationality:*   **AMERICAN**
*Business occupation:*  **UNDERWRITER**
*Date of birth:*  **10/03/1967**

*Consented to Act:* **Y**    *Date Authorised:* **05/03/2009**  *Authenticated:* **YES**

## Authorisation

*Authoriser Designation:* **agent**    *Date Authorised:* **05/03/2009**    *Authenticated:* **Yes**

THE COMPANIES ACTS 1985 to 2006


PRIVATE COMPANY LIMITED BY SHARES


MEMORANDUM OF ASSOCIATION OF


RenaissanceRe Corporate Capital (UK) Limited


1.      The Company's name is "RenaissanceRe Corporate Capital (UK) Limited".

2.      The Company's registered office is to be situated in England and Wales.

3.1     The object of the Company is to carry on business as a general commercial company.

3.2     Without prejudice to the generality of the object and the powers of the Company derived from section 3A of the Act the Company has power to do all or any of the following things:-

3.2.1   To purchase or by any other means acquire and take options over any property whatever, and any rights or privileges of any kind over or in respect of any property.

3.2.2   To apply for, register, purchase, or by other means acquire and protect, prolong and renew, whether in the United Kingdom or elsewhere, any trade marks, patents, copyrights, trade secrets, or other intellectual property rights, licences, secret processes, designs, protections and concessions and to disclaim, alter, modify, use and turn to account and to manufacture under or grant licences or privileges in respect of the same, and to expend money in experimenting upon, testing and improving any patents, inventions or rights which the Company may acquire or propose to acquire.

3.2.3   To acquire or undertake the whole or any part of the business, goodwill, and assets of any person, firm, or company carrying on or proposing to carry on any of the businesses which the Company is authorised to carry on and as part of the consideration for such acquisition to undertake all or any of the liabilities of such person, firm or company, or to acquire an interest in, amalgamate with, or enter into partnership or into any arrangement for sharing profits, or for co-operation, or for mutual assistance with any such person, firm or company, or for subsidising or otherwise assisting any such person, firm or company, and to give or accept, by way of consideration for any of the acts or things aforesaid or property acquired, any shares, debentures, debenture stock or securities that may be agreed

upon, and to hold and retain, or sell, mortgage and deal with any shares, debentures, debenture stock or securities so received.

3.2.4    To improve, manage, construct, repair, develop, exchange, let on lease or otherwise, mortgage, charge, sell, dispose of, turn to account, grant licences, options, rights and privileges in respect of, or otherwise deal with all or any part of the property and rights of the Company.

3.2.5    To invest and deal with the moneys of the Company not immediately required in such manner as may from time to time be determined and to hold or otherwise deal with any investments made.

3.2.6    To lend and advance money or give credit on any terms and with or without security to any person, firm or company (including without prejudice to the generality of the foregoing any holding company, subsidiary or fellow subsidiary of, or any other company associated in any way with, the Company), to enter into guarantees, contracts of indemnity and suretyships of all kinds, to receive money on deposit or loan upon any terms, and to secure or guarantee in any manner and upon any terms the payment of any sum of money or the performance of any obligation by any person, firm or company (including without prejudice to the generality of the foregoing any such holding company, subsidiary, fellow subsidiary or associated company as aforesaid).

3.2.7    To borrow and raise money in any manner and to secure the repayment of any money borrowed, raised or owing by mortgage, charge, standard security, lien or other security upon the whole or any part of the Company's property or assets (whether present or future), including its uncalled capital, and also by a similar mortgage, charge, standard security, lien or security to secure and guarantee the performance by the Company of any obligation or liability it may undertake or which may become binding on it.

3.2.8    To draw, make, accept, endorse, discount, negotiate, execute and issue cheques, bills of exchange, promissory notes, bills of lading, warrants, debentures, and other negotiable or transferable instruments.

3.2.9    To apply for, promote, and obtain any Act of Parliament, order, or licence of the Department of Trade or other authority for enabling the Company to carry any of its objects into effect, or for effecting any modification of the Company's constitution, or for any other purpose which may seem calculated directly or indirectly to promote the Company's interests, and to oppose any proceedings or applications which may seem calculated directly or indirectly to prejudice the Company's interests.

3.2.10    To enter into any arrangements with any government or authority (supreme, municipal, local, or otherwise) that may seem conducive to the attainment of the Company's objects or any of them, and to obtain from any such government or authority any charters, decrees, rights, privileges or concessions which the Company may think desirable and to carry out, exercise, and comply with any such charters, decrees, rights, privileges, and concessions.

3.2.11   To subscribe for, take, purchase, or otherwise acquire, hold, sell, deal with and dispose of, place and underwrite shares, stocks, debentures, debenture stocks, bonds, obligations or securities issued or guaranteed by any other company constituted or carrying on business in any part of the world, and debentures, debenture stocks, bonds, obligations or securities issued or guaranteed by any government or authority, municipal, local or otherwise, in any part of the world.

3.2.12   To control, manage, finance, subsidise, co-ordinate or otherwise assist any company or companies in which the Company has a direct or indirect financial interest, to provide secretarial, administrative, technical, commercial and other services and facilities of all kinds for any such company or companies and to make payments by way of subvention or otherwise and any other arrangements which may seem desirable with respect to any business or operations of or generally with respect to any such company or companies.

3.2.13   To promote any other company for the purpose of acquiring the whole or any part of the business or property or undertaking or any of the liabilities of the Company, or of undertaking any business or operations which may appear likely to assist or benefit the Company or to enhance the value of any property or business of the Company, and to place or guarantee the placing of, underwrite, subscribe for, or otherwise acquire all or any part of the shares or securities of any such company as aforesaid.

3.2.14   To sell or otherwise dispose of the whole or any part of the business or property of the Company, either together or in portions, for such consideration as the Company may think fit, and in particular for shares, debentures, or securities of any company purchasing the same.

3.2.15   To act as agents or brokers and as trustees for any person, firm or company, and to undertake and perform sub-contracts.

3.2.16   To remunerate any person, firm or company rendering services to the Company either by cash payment or by the allotment of shares or other securities of the Company credited as paid up in full or in part or otherwise as may be thought expedient.

3.2.17   To distribute among the members of the Company in kind any property of the Company of whatever nature.

3.2.18   To pay all or any expenses incurred in connection with the promotion, formation and incorporation of the Company, or to contract with any person, firm or company to pay the same, and to pay commissions to brokers and others for underwriting, placing, selling, or guaranteeing the subscription of any shares or other securities of the Company.

3.2.19   To support and subscribe to any charitable or public object and to support and subscribe to any institution, society, or club which may be for the benefit of the Company or its directors or employees, or may be connected with any town or place where the Company carries on business; to give or award pensions, annuities, gratuities, and superannuation or other allowances or benefits or charitable aid and generally to provide advantages, facilities and services for any

persons who are or have been directors of, or who are or have been employed by, or who are serving or have served the Company, or any company which is a subsidiary of the Company or the holding company of the Company or a fellow subsidiary of the Company or the predecessors in business of the Company or of any such subsidiary, holding or fellow subsidiary company and to the wives, widows, children and other relatives and dependants of such persons; to make payments towards insurance including insurance for any director, officer or auditor against any liability in respect of any negligence, default, breach of duty or breach of trust (so far as permitted by law); and to set up, establish, support and maintain superannuation and other funds or schemes (whether contributory or non-contributory) for the benefit of any of such persons and of their wives, widows, children and other relatives and dependants; and to set up, establish, support and maintain profit sharing or share purchase schemes for the benefit of any of the employees of the Company or of any such subsidiary, holding or fellow subsidiary company and to lend money to any such employees or to trustees on their behalf to enable any such schemes to be established or maintained.

3.2.20    Subject to and in accordance with the provisions of the Act (if and so far as such provisions shall be applicable) to give, directly or indirectly, financial assistance for the acquisition of shares or other securities of the Company or of any other company or for the reduction or discharge of any liability incurred in respect of such acquisition.

3.2.21    To procure the Company to be registered or recognised in any part of the world.

3.2.22    To do all or any of the things or matters aforesaid in any part of the world and either as principals, agents, contractors or otherwise, and by or through agents, brokers, sub-contractors or otherwise and either alone or in conjunction with others.

3.2.23    To do all such other things as may be deemed incidental or conducive to the attainment of the Company's objects or any of them.

3.2.24    AND so that:-

3.2.24.1 None of the provisions set forth in any sub-clause of this clause shall be restrictively construed but the widest interpretation shall be given to each such provision, and none of such provisions shall, except where the context expressly so requires, be in any way limited or restricted by reference to or inference from any other provision set forth in such sub-clause, or by reference to or inference from the terms of any other sub-clause of this clause, or by reference to or inference from the name of the Company.

3.2.24.2 The word "company" in this clause, except where used in reference to the Company, shall be deemed to include any partnership or other body of persons, whether incorporated or unincorporated and whether domiciled in the United Kingdom or elsewhere.

3.2.24.3 In this clause the expression "the Act" means the Companies Act 1985, but so that any reference in this clause to any provision of the Act shall be deemed

to include a reference to any statutory modification or re-enactment of that provision for the time being in force.

4.      The liability of the members is limited.

5.      The Company's share capital is £1000 divided into 1000 shares of £1 each.

I, the subscriber to this Memorandum of Association, wish to be formed into a Company pursuant to this Memorandum; and I agree to take the number of shares shown opposite my name.

Name and address of Subscriber

Number of shares
taken
by the Subscriber

For and behalf of
Renaissance Reinsurance Limited          -        One
Renaissance House                                 Ordinary Share
8 - 20 East Broadway
PEMBROKE
H M19
Bermuda

Total shares taken                          -        1

Dated 05/03/2009

THE COMPANIES ACTS 1985 to 2006


PRIVATE COMPANY LIMITED BY SHARES


ARTICLES OF ASSOCIATION OF


RenaissanceRe Corporate Capital (UK) Limited


1.      PRELIMINARY

1.1      The regulations contained in Table A in the Schedule to the Companies (Tables A to F) Regulations 1985 (SI 1985 No. 805) as amended by The Companies (Tables A to F) (Amendment) Regulations 1985 (SI 1985 No. 1052), The Companies Act 1985 (Electronic Communications) Order 2000 (SI 2000 No. 3373), the Companies (Tables A to F) (Amendment) Regulations 2007 (SI 2007 No. 2541) and the Companies (Tables A to F) (Amendment) (No 2) Regulations 2007 (SI 2007 No. 2826) so far as it relates to private companies limited by shares (such Table being hereinafter called "Table A") shall apply to the Company save in so far as they are excluded or varied hereby and such regulations (save as so excluded or varied) and the Articles hereinafter contained shall be the Articles of Association of the Company.

1.2      In these Articles the expression "the Act" means the Companies Act 1985 and "the 2006 Act" means the Companies Act 2006, but so that any reference in these Articles to any provision of the Act or the 2006 Act shall be deemed to include a reference to any statutory modification or re-enactment of that provision for the time being in force.

2.      ALLOTMENT OF SHARES

2.1      Shares which are comprised in the authorised share capital with which the Company is incorporated shall be under the control of the directors who may (subject to section 80 of the Act and to article 2.4 below) allot, grant options over or otherwise dispose of the same, to such persons, on such terms and in such manner as they think fit.

2.2      All shares which are not comprised in the authorised share capital with which the Company is incorporated and which the directors propose to issue shall first be offered to the members in proportion as nearly as may be to the number of the existing shares held by them respectively unless the Company in general meeting shall by special resolution otherwise direct.  The offer shall be made by notice specifying the number of shares offered, and limiting a period (not being less than 14 days) within which the offer, if not accepted, will be deemed to be

declined. After the expiration of that period, those shares so deemed to be declined shall be offered in the proportion aforesaid to the persons who have, within the said period, accepted all the shares offered to them; such further offer shall be made in like terms in the same manner and limited by a like period as the original offer. Any shares not accepted pursuant to such offer or further offer as aforesaid or not capable of being offered as aforesaid except by way of fractions and any shares released from the provisions of this article by any such special resolution as aforesaid shall be under the control of the directors, who may allot, grant options over or otherwise dispose of the same to such persons, on such terms, and in such manner as they think fit, provided that, in the case of shares not accepted as aforesaid, such shares shall not be disposed of on terms which are more favourable to the subscribers therefor than the terms on which they were offered to the members. The foregoing provisions of this article 2.2 shall have effect subject to section 80 of the Act.

2.3     In accordance with section 91(1) of the Act sections 89(1) and 90(1) to (6) (inclusive) of the Act shall not apply to the Company.

2.4     The directors are generally and unconditionally authorised for the purposes of section 80 of the Act to exercise any power of the Company to allot and grant rights to subscribe for or convert securities into shares of the Company up to the amount of the authorised share capital with which the Company is incorporated at any time or times during the period of five years from the date of incorporation and the directors may, after that period, allot any shares or grant any such rights under this authority in pursuance of an offer or agreement so to do made by the Company within that period. The authority hereby given may at any time (subject to the said section 80) be renewed, revoked or varied by ordinary resolution.

3.     SHARES

3.1     The lien conferred by regulation 8 in Table A shall attach also to fully paid-up shares, and the Company shall also have a first and paramount lien on all shares, whether fully paid or not, standing registered in the name of any person indebted or under liability to the Company, whether he shall be the sole registered holder thereof or shall be one of two or more joint holders, for all moneys presently payable by him or his estate to the Company. Regulation 8 in Table A shall be modified accordingly.

3.2     The liability of any member in default in respect of a call shall be increased by the addition at the end of the first sentence of regulation 18 in Table A of the words "and all expenses that may have been incurred by the Company by reason of such non-payment".

4.     GENERAL MEETINGS AND RESOLUTIONS

4.1     Every notice convening a general meeting shall comply with the provisions of section 325(1) of the 2006 Act as to giving information to members in regard to their right to appoint proxies; and notices of and other communications relating to any general meeting which any member is entitled to receive shall be sent to the directors and to the auditors for the time being of the Company.

4.2.1    No business shall be transacted at any general meeting unless a quorum is present.  Subject to article 4.2.2 below, two persons entitled to vote upon the business to be transacted, each being a member or a proxy for a member or a duly authorised representative of a corporation, shall be a quorum.

4.2.2    If and for so long as the Company has only one member, that member present in person or by proxy or (if that member is a corporation) by a duly authorised representative shall be a quorum.

4.2.3    If a quorum is not present within half an hour from the time appointed for a general meeting the general meeting shall stand adjourned to the same day in the next week at the same time and place or to such other day and at such other time and place as the directors may determine; and if at the adjourned general meeting a quorum is not present within half an hour from the time appointed therefor such adjourned general meeting shall be dissolved.

4.2.4    Regulations 40 and 41 in Table A shall not apply to the Company.

4.3.1    If and for so long as the Company has only one member and that member takes any decision which is required to be taken in general meeting or by means of a written resolution, that decision shall be as valid and effectual as if agreed by the Company in general meeting, subject as provided in article 4.3.3 below.

4.3.2    Any decision taken by a sole member pursuant to article 4.3.1 above shall be recorded in writing and delivered by that member to the Company for entry in the Company's minute book.

4.3.3    Resolutions under section 168 of the 2006 Act for the removal of a director before the expiration of his period of office and under section 510 of the 2006 Act for the removal of an auditor before the expiration of his period of office shall only be considered by the Company in general meeting.

4.4    A member present at a meeting by proxy shall be entitled to speak at the meeting and shall be entitled to one vote on a show of hands.  In any case where the same person is appointed proxy for more than one member he shall on a show of hands have as many votes as the number of members for whom he is proxy.  A member present at a meeting by more than one proxy shall be entitled to speak at the meeting through each of the proxies but the proxies together shall be entitled to only one vote on a show of hands. In the event that the proxies do not reach agreement as to how their vote should be exercised on a show of hands, the voting power is treated as not exercised.   Regulation 54 in Table A shall be modified accordingly.

4.5    Unless resolved by ordinary resolution that regulation 62 in Table A shall apply without modification, the appointment of a proxy and any authority under which the proxy is appointed or a copy of such authority certified notarially or in some other way approved by the directors may be deposited or received at the place specified in regulation 62 in Table A up to the commencement of the meeting or (in any case where a poll is taken otherwise than at the meeting) of the taking of

the poll or may be handed to the chairman of the meeting prior to the commencement of the business of the meeting.

5.    APPOINTMENT OF DIRECTORS

5.1.1    Regulation 64 in Table A shall not apply to the Company.

5.1.2    The maximum number and minimum number respectively of the directors may be determined from time to time by ordinary resolution. Subject to and in default of any such determination there shall be no maximum number of directors and the minimum number of directors shall be one.  Whenever the minimum number of directors is one, a sole director shall have authority to exercise all the powers and discretions by Table A and by these Articles expressed to be vested in the directors generally, and regulation 89 in Table A shall be modified accordingly.

5.2    Regulations 76 to 79 (inclusive) in Table A shall not apply to the Company.

5.3    No person shall be appointed a director at any general meeting unless either:-

        (a)    he is recommended by the directors; or

        (b)    not less than 14 nor more than 35 clear days before the date appointed for the general meeting, notice signed by a member qualified to vote at the general meeting has been given to the Company of the intention to propose that person for appointment, together with notice signed by that person of his willingness to be appointed.

5.4.1    Subject to article 5.3 above, the Company may by ordinary resolution appoint any person who is willing to act to be a director, either to fill a vacancy or as an additional director.

5.4.2    The directors may appoint a person who is willing to act to be a director, either to fill a vacancy or as an additional director, provided that the appointment does not cause the number of directors to exceed any number determined in accordance with article 5.1.2 above as the maximum number of directors and for the time being in force.

5.5    In any case where as the result of death or deaths the Company has no members and no directors the personal representatives of the last member to have died shall have the right by notice in writing to appoint a person to be a director of the Company and such appointment shall be as effective as if made by the Company in general meeting pursuant to article 5.4.1 above.  For the purpose of this article, where two or more members die in circumstances rendering it uncertain which of them survived the other or others, the members shall be deemed to have died in order of seniority, and accordingly the younger shall be deemed to have survived the elder.

6. BORROWING POWERS

6.1 The directors may exercise all the powers of the Company to borrow money without limit as to amount and upon such terms and in such manner as they think fit, and subject (in the case of any security convertible into shares) to section 80 of the Act to grant any mortgage, charge or standard security over its undertaking, property and uncalled capital, or any part thereof, and to issue debentures, debenture stock, and other securities whether outright or as security for any debt, liability or obligation of the Company or of any third party.

7. ALTERNATE DIRECTORS

7.1 Unless otherwise determined by the Company in general meeting by ordinary resolution an alternate director shall not be entitled as such to receive any remuneration from the Company, save that he may be paid by the Company such part (if any) of the remuneration otherwise payable to his appointor as such appointor may by notice in writing to the Company from time to time direct, and the first sentence of regulation 66 in Table A shall be modified accordingly.

7.2 A director, or any such other person as is mentioned in regulation 65 in Table A, may act as an alternate director to represent more than one director, and an alternate director shall be entitled at any meeting of the directors or of any committee of the directors to one vote for every director whom he represents in addition to his own vote (if any) as a director, but he shall count as only one for the purpose of determining whether a quorum is present.

8. GRATUITIES AND PENSIONS

8.1.1 The directors may exercise the powers of the Company conferred by its Memorandum of Association in relation to the payment of pensions, gratuities and other benefits and shall be entitled to retain any benefits received by them or any of them by reason of the exercise of any such powers.

8.1.2 Regulation 87 in Table A shall not apply to the Company.

9. PROCEEDINGS OF DIRECTORS

9.1 Regulation 88 in Table A shall be read and construed as if the third sentence were omitted therefrom.

9.2 Subject to article 9.3, the directors may, in accordance with section 175(5)(a) of the 2006 Act, authorise any matter which would otherwise involve or may involve a director breaching his duty under section 175(1) of the 2006 Act to avoid conflicts of interest (a "Conflict").

9.3 When a Conflict is considered by the directors the director seeking authorisation in relation to the Conflict and any other director with a similar interest:

(a) shall not count in the quorum nor vote on a resolution authorising the Conflict; and

(b)        may, if the other directors so decide, be excluded from the board meeting while the Conflict is considered.

9.4      Each director shall comply with his obligations to disclose his interest in existing and proposed transactions or arrangements with the Company pursuant to sections 177 and 182 of the 2006 Act.

9.5      Save in relation to a resolution authorising a Conflict, a director may vote, at any meeting of the directors or of any committee of the directors, on any resolution, notwithstanding that it in any way concerns or relates to a matter in which he has, directly or indirectly, any kind of interest whatsoever, and if he shall vote on any such resolution his vote shall be counted; and in relation to any such resolution as aforesaid he shall (whether or not he shall vote on the same) be taken into account in calculating the quorum present at the meeting.

9.6      Regulations 94 to 97 (inclusive) in Table A shall not apply to the Company.

10.      COMMUNICATION BY MEANS OF A WEBSITE

10.1     Subject to the provisions of the 2006 Act, a document or information may be sent or supplied by the Company to a person by being made available on a website.

11.      THE SEAL

11.1     If the Company has a seal it shall only be used with the authority of the directors or of a committee of directors. The directors may determine who shall sign any instrument to which the seal is affixed and unless otherwise so determined it shall be signed by two directors, a director and the secretary or, if there is only one director and no secretary in office, by the sole director. The obligation under regulation 6 in Table A relating to the sealing of share certificates shall apply only if the Company has a seal. Regulation 101 in Table A shall not apply to the Company.

11.2     The Company may exercise the powers conferred by section 39 of the Act with regard to having an official seal for use abroad, and such powers shall be vested in the directors.

12.      PROTECTION FROM LIABILITY

12.1     For the purposes of this article:

(a)        a "Liability" is any liability incurred by a director in connection with any negligence, default, breach of duty or breach of trust by him in relation to the Company or otherwise in connection with his duties, powers or office or any liability incurred by an auditor in connection with any negligence, default, breach of duty or breach of trust by him in relation to the Company occurring in the course of the audit of accounts; and

(b)     "Associated Company" shall bear the meaning referred to in section 256 of the 2006 Act.

12.2    Subject to the provisions of the 2006 Act and without prejudice to any protection from liability which may otherwise apply:

(a)     the directors shall have power to purchase and maintain for any director of the Company, any director of an Associated Company and any officer of the Company (not being a director or auditor of the Company), insurance against any Liability; and

(b)     every director or auditor of the Company and every officer of the Company (not being a director or auditor of the Company) shall be indemnified out of the assets of the Company against any liability incurred by him in defending any proceedings, whether civil or criminal, in which judgment is given in his favour or in which he is acquitted or in connection with any application in which relief is granted to him by the court from any Liability.

12.3    Regulation 118 in Table A shall not apply to the Company.

13.     TRANSFER OF SHARES

13.1    The directors may, in their absolute discretion, decline to register the transfer of a share, whether or not it is a fully paid share, and the first sentence of regulation 24 in Table A shall not apply to the Company.

13.2    If the directors refuse to register a transfer of a share, they shall within two months after the date on which the transfer was lodged with the Company send to the transferee notice of the refusal, together with their reasons for the refusal.  Regulation 25 in Table A shall not apply to the Company.

_____

Name and address of Subscriber

_____

For and behalf of
Renaissance Reinsurance Limited
Renaissance House
8 - 20 East Broadway
PEMBROKE
H M19
Bermuda

_____

Dated 05/03/2009

# EXHIBIT 4

**GOV.UK**

# Find and update company information

Companies House does not verify the accuracy of the information filed (http://resources.companieshouse.gov.uk/serviceInformation.shtml#compInfo)
Advanced company search (/advanced-search)

CHAUCER CORPORATE CAPITAL (NO. 3) LIMITED

Company number **05203226**

Follow this company

File for this company (https://beta.companieshouse.gov.uk/company/05203226/authorise?return_to=/company/05203226)

— Overview (https://beta.companieshouse.gov.uk/company/05203226)

— Filing history (https://beta.companieshouse.gov.uk/company/05203226/filing-history)

— People (https://beta.companieshouse.gov.uk/company/05203226/officers)

— Charges (https://beta.companieshouse.gov.uk/company/05203226/charges)

— More (https://beta.companieshouse.gov.uk/company/05203226/more)

Registered office address
52 Lime Street, London, United Kingdom, EC3M 7AF

Company status
Active

Company type
Private limited Company

Incorporated on
11 August 2004

# Accounts

Next accounts made up to **31 December 2022**
due by **30 September 2023**

Last accounts made up to **31 December 2021**

# Confirmation statement

Next statement date **12 August 2023**
due by **26 August 2023**

Last statement dated **12 August 2022**

# Nature of business (SIC)

- 66290 - Other activities auxiliary to insurance and pension funding

# Previous company names

| Name | Period |
|------|--------|
| PEMBROKE 4000 LIMITED | 21 Feb 2008 - 10 Sep 2008 |
| QUANTA 4000 LIMITED | 30 Sep 2004 - 21 Feb 2008 |
| QUANTA AT LLOYD'S LIMITED | 19 Aug 2004 - 30 Sep 2004 |
| 3380TH SINGLE MEMBER SHELF TRADING COMPANY LIMITED | 11 Aug 2004 - 19 Aug 2004 |

Tell us what you think of this service (https://www.smartsurvey.co.uk/s/getcompanyinformation/) Is there anything wrong with this page? (/help/feedback?sourceurl=https://find-and-update.company-information.service.gov.uk/company/05203226)

Policies Link opens in new tab

Cookies (https://beta.companieshouse.gov.uk/help/cookies)

Contact us Link opens in new tab

Accessibility statement (https://beta.companieshouse.gov.uk/help/accessibility-statement)

Developers Link opens in new tab

Built by Companies House

© Crown copyright



# CS01 (ef)

**Confirmation Statement**

Company Name: **Chaucer Corporate Capital (No 3) Limited**
Company Number: **05203226**

Received for filing in Electronic Format on the: **12/08/2022**

XBA8H7Z6

---

Company Name: **Chaucer Corporate Capital (No 3) Limited**

Company Number: **05203226**

Confirmation Statement date: **12/08/2022**

# Confirmation Statement

I confirm that all information required to be delivered by the company to the registrar in relation to the confirmation period concerned either has been delivered or is being delivered at the same time as the confirmation statement

# Authorisation

Authenticated

This form was authorised by one of the following:

Director, Secretary, Person Authorised, Charity Commission Receiver and Manager, CIC Manager, Judicial Factor

**FILE COPY**



# CERTIFICATE OF INCORPORATION

# OF A PRIVATE LIMITED COMPANY

## Company No. 5203226

The Registrar of Companies for England and Wales hereby certifies that

3380TH SINGLE MEMBER SHELF TRADING COMPANY LIMITED

is this day incorporated under the Companies Act 1985 as a private

company and that the company is limited.

Given at Companies House, Cardiff, the 11th August 2004



*N052032267*



THE OFFICIAL SEAL OF THE
REGISTRAR OF COMPANIES



*Companies House*
—— *for the record* ——

HC007B



# 12

## Declaration on application for registration

*Please complete in typescript,
or in bold black capitals.*
CHFP010.

05203226

**Company Name in full**

3380th Single Member Shelf Trading Company Limited

I,

Simon Falcon Fisher, Secretary of Sisec Limited

of

21 Holborn Viaduct, London EC1A 2DY

do solemnly and sincerely declare that I am a † [Solicitor engaged in the formation of the company][person named as director or secretary of the company in the statement delivered to the Registrar under section 10 of the Companies Act 1985] and that all the requirements of the Companies Act 1985 in respect of the registration of the above company and of matters precedent and incidental to it have been complied with.

† Please delete as appropriate

And I make this solemn Declaration conscientiously believing the same to be true and by virtue of the Statutory Declarations Act 1835.

**Declarant's signature**

SISEC LIMITED
By

Declared at

Travers Smith Braithwaite, 10 Snow Hill, London  EC21A 2AL

| Day | Month | Year |
|-----|-------|------|
| 0 6 | 0 8 | 2 0 0 4 |

on

❶Please print name          ❶before me

SIMON RICHARD ATTEY

**Signed**

Attey

**Date**   06 . 08 . 04

A Commissioner for Oaths or Notary Public or Justice of the Peace or Solicitor

Please give the name, address, telephone number and, if available, a DX number and Exchange of the person Companies House should contact if there is any query.

Ref:  Company Office

Lovells, Atlantic House, Holborn Viaduct, London

EC1A 2FG          Tel 020 7296 2000

DX number 57          DX exchange  London/Chancery Lane



A45          0600
COMPANIES HOUSE     10/08/04

When you have completed and signed the form please send it to the Registrar of Companies at:
**Companies House, Crown Way, Cardiff, CF14 3UZ      DX 33050 Cardiff**
for companies registered in England and Wales
**or**
**Companies House, 37 Castle Terrace, Edinburgh, EH1 2EB**
for companies registered in Scotland          **DX 235 Edinburgh**



**10**

*Please complete in typescript,
or in bold black capitals.*
CHFP010.
Notes on completion appear on final page

## First directors and secretary and intended situation of registered office

**Company Name in full**

> 3380th Single Member Shelf Trading Company Limited

**Proposed Registered Office**

> 21 Holborn Viaduct

(PO Box numbers only, are not acceptable)

Post town
> London

County / Region
>  

Postcode
> EC1A 2DY

If the memorandum is delivered by an agent for the subscriber(s) of the memorandum mark the box opposite and give the agent's name and address.

Agent's Name
> Lovells

Address
> Atlantic House

> Holborn Viaduct

Post town
> London

County / Region
>  

Postcode
> EC1A 2FG

Number of continuation sheets attached

Please give the name, address, telephone number and, if available, a DX number and Exchange of the person Companies House should contact if there is any query.

> Ref: Company Office
>
> Lovells, Atlantic House, Holborn Viaduct, Lodnon
>
> EC1A 2FG   Tel 020 7296 2000
>
> DX number 57   DX exchange London/Chancery Lane



A45   *AUTHJXJE*   0599
COMPANIES HOUSE   10/08/04

When you have completed and signed the form please send it to the Registrar of Companies at:
**Companies House, Crown Way, Cardiff, CF14 3UZ**   **DX 33050 Cardiff**
for companies registered in England and Wales
**or**
**Companies House, 37 Castle Terrace, Edinburgh, EH1 2EB**
for companies registered in Scotland   **DX 235 Edinburgh**

## Company Secretary  (See notes 1-5)

| | | |
|---|---|---|
| Company name | 3380th Single Member Shelf Trading Company Limited | |

**Name**  * Style / Title: `-`  * Honours etc: `-`

* Voluntary details.

Forename(s): `-`

Surname: Sisec Limited

Previous forename(s): None

Previous surname(s): None

**Address**: 21 Holborn Viaduct

**Usual residential address**
For a corporation, give the registered or principal office address.

Post town: London

County / Region: [blank]    Postcode: EC1A 2DY

Country: England

I consent to act as secretary of the company named on page 1

**Consent signature**   SISEC LIMITED By...[signature]...   Date: - 4 AUG 2004

## Directors  (see notes 1-5)

Please list directors in alphabetical order

**Name**  * Style / Title: `-`   * Honours etc: `-`

Forename(s): `-`

Surname: Serjeants' Inn Nominees Limited

Previous forename(s): None

Previous surname(s): None

**Address**: 21 Holborn Viaduct

**Usual residential address**
For a corporation, give the registered or principal office address.

Post town: London

County / Region: [blank]    Postcode: EC1A 2DY

Country: England

| | Day | Month | Year | | |
|---|---|---|---|---|---|
| **Date of Birth** | | | | **Nationality** | Registered in England |

**Business occupation**: Company limited by shares

**Other directorships**: None

I consent to act as director of the company named on page 1

**Consent signature**   SERJEANTS' INN NOMINEES LIMITED By...[signature]... Authorized Signatory   Date: - 4 AUG 2004

coform

## Directors (continued)    (see notes 1-5)

**Name**

* Voluntary details.

| | |
|---|---|
| * Style / Title | - |
| * Honours etc | - |
| Forename(s) | - |
| Surname | Loviting Limited |
| Previous forename(s) | None |
| Previous surname(s) | None |

**Address**

**Usual residential address**
For a corporation, give
the registered or principal
office address.

| | |
|---|---|
| Address | 21 Holborn Viaduct |
| Post town | London |
| County / Region | |
| Postcode | EC1A 2DY |
| Country | England |

| Date of Birth | Day | Month | Year |
|---|---|---|---|
| | | | |

**Nationality** Registered in England

**Business occupation** Company limited by shares

**Other directorships** None

I consent to act as director of the company named on page 1

**Consent signature**

LOVITING LIMITED

By _____
Authorized Signatory

**Date** - 4 AUG 2004

---

**This section must be signed by Either**
an agent on behalf of all subscribers

**Signed** _Lovells_    **Date** - 4 AUG 2004

**Or the subscribers**

(i.e. those who signed as members on the memorandum of association).

**Signed**     **Date**

**Signed**     **Date**

**Signed**     **Date**

**Signed**     **Date**

**Signed**     **Date**

**Signed**     **Date**



UNCLASSIFIED

The Companies Act 1985

1934671/60

———————————————

A PRIVATE COMPANY LIMITED BY SHARES

———————————————



MEMORANDUM OF ASSOCIATION

OF

NC
1 0 AUG 2004
COMPANIES HOUSE

011966

## 3380TH SINGLE MEMBER SHELF TRADING COMPANY LIMITED

1.  The name of the company is 3380th Single Member Shelf Trading Company Limited.

2.  The registered office of the company is to be situated in England and Wales.

3.  The objects of the company are:

    (a)  to carry on all or any of the businesses of, and to carry out any of the operations performed (whether on the company's account or otherwise) by traders, merchants, agents, importers, exporters, shippers, advertisers, distributors, owners, hirers, operators, letters on hire, manufacturers, and dealers, of and in goods, wares, products, stores, commodities, consumable articles, merchandise, chattels and effects of all kinds; to carry on all or any of the businesses of providing services of all kinds, and acting as consultants, advisers, specialists, financiers and capitalists; and to participate in, undertake, perform and carry out all kinds of commercial, industrial, trading and financial operations and enterprises;

    (b)  to carry on the business of merchants and traders generally and to buy, sell, hire, manufacture, repair, let on hire, alter, improve, treat and deal in all apparatus, machines, materials and articles of all kinds;

    (c)  to invest and deal with the moneys of the company in or upon investments or securities of any nature (whether as principal or agent) and generally to acquire, hold, deal in and otherwise dispose of investments and other securities;

(d)   to carry on any other business or activity, whether trading, manufacturing, investing or otherwise;

(e)   to purchase, take on lease or in exchange, hire or otherwise acquire, hold deal in and otherwise dispose of all or any estate or interest in or over any lands, buildings, easements, rights, privileges, concessions, patents, patent rights, licences, secret processes, machinery, plant, stock-in-trade and any real or personal property (whether tangible or intangible) of any kind;

(f)   to receive money on deposit or loan from any person, firm or company;

(g)   to make advances to any person, firm or company with or without security;

(h)   to guarantee, support or secure, whether by direct obligation or covenant or by mortgaging or charging all or any part of the undertaking, property and assets (present and future) and uncalled capital of the company or by issuing any security of the company by way of mortgage, or by any one or more or all of such methods or by any other method, and whether or not the company receives any advantage therefor, the performance of any obligations or commitments and the repayment or payment of the principal amounts of, or the premiums, interest and dividends on any securities of any person, firm or company, including (without prejudice to the generality of the foregoing) any company which is for the time being a subsidiary company or holding company of the company or is a subsidiary of such a holding company or which is otherwise directly or indirectly associated with the company in business or through shareholdings;

(i)   to establish and maintain or procure the establishment and maintenance of any share option or share incentive or profit sharing schemes or trusts or any non-contributory or contributory pension or superannuation schemes or funds for the benefit of, and to make or give or procure the making or giving of loans, donations, gratuities, pensions, allowances or emoluments (whether in money or money's worth) to, or to trustees on behalf of, any persons who are or were at any time in the employment of the company, or of any company which is a subsidiary of the company or is allied to or associated with the company or with any such subsidiary, or who are or were at any time directors or officers of the company or of any such other company as aforesaid, or any persons in whose welfare the company or any such other company as aforesaid is or has been at any time interested, and the wives, husbands, widows, widowers, families and dependants of any such persons, and to establish and subsidise or subscribe to any institutions, associations, clubs or funds calculated to be for the benefit of or to advance the interests and well-being of the company or of any such other company as aforesaid, or of any such persons as aforesaid, and to make payments for or towards policies of assurance on the lives of any such persons

and policies of insurance for the benefit of or in respect of any such persons as aforesaid (including insurance against their negligence or breach of duty to the company) and to pay, subscribe or guarantee money to or for any charitable or benevolent objects or for any exhibition or for any political, public, general or useful object, and to do any of the above things, either alone or in conjunction with any such other company as aforesaid;

(j)     to enter into any joint venture, partnership or joint-purse arrangement or arrangement for sharing profits, union of interests or co-operation with any person, firm, or company and to subsidise or otherwise assist any person, firm or company;

(k)     to establish or promote or concur in establishing or promoting any other company and to guarantee the payment of the dividends, interest or capital of any shares, stock or other securities issued by or any other obligations of any such company;

(l)     to purchase or otherwise acquire and undertake all or any part of the business, property, assets, liabilities and transactions of any person, firm or company;

(m)     to sell, improve, manage, develop, turn to account, exchange, let on rent, royalty, share of profits or otherwise, grant licences, easements and other rights in or over and in any other manner deal with or dispose of the undertaking and all or any of the property and assets for the time being of the company including without limitation, any such dealing or disposal on terms that are wholly or partly gratuitous or of a non-commercial nature;

(n)     to distribute among the members in specie any property of the company, or any proceeds of sale or disposal of any property of the company, but so that no distribution amounting to a reduction of capital be made except with the sanction (if any) for the time being required by law;

(o)     to make known the businesses or any of them or the products or any of them of the company or the businesses or products of any other person firm or company, in particular by advertising in the press, by circulars, by purchase and exhibition of works of art or interest, by publication in books and periodicals, and by granting prizes, rewards and donations, and by carrying on and conducting prize and competition schemes or any scheme or arrangement of any kind, either alone or in conjunction with any other person, firm or company, whereby the said businesses or any of them may be promoted or developed, or whereby the said products may be advertised and made known;

(p)     to enter into any arrangement with any government or authority, supreme, municipal, local or otherwise, of any country, and to obtain from any such

government or authority all legislation, orders, rights, concessions and privileges that may seem requisite;

(q)     to borrow or raise or secure the payment of money for the purposes of or in connection with any of the company's business or businesses;

(r)     to mortgage and charge the undertaking and all or any of the real and personal property and assets, present or future, and all or any of the uncalled capital for the time being of the company, and to issue in cash at par or at a premium or discount, or for any other consideration, debentures, mortgage debentures or debenture stock or other similar securities, payable to bearer or otherwise, and either permanent or redeemable or repayable, and collaterally or further to secure any securities of the company by a trust deed or other assurance;

(s)     to draw, make, accept, endorse, negotiate, discount and execute promissory notes, bills of exchange and other negotiable instruments;

(t)     to pay or otherwise give consideration for any property or rights acquired by the company in any manner whatsoever and in particular but without limitation in cash or fully or partly paid-up shares, with or without preferred or deferred or guaranteed rights in respect of dividend or repayment of capital or otherwise, or by any securities which the company has power to issue, or partly in one mode and partly in another;

(u)     to accept payment or other consideration for any property or rights sold or otherwise disposed of or dealt with by the company in any manner whatsoever and in particular but without limitation in cash, whether by instalments or otherwise, or in fully or partly paid-up shares of any company or corporation, with or without deferred or preferred or guaranteed rights in respect of dividend or repayment of capital or otherwise, or in debentures or mortgage debentures or debenture stock, mortgages or other securities of any company or corporation, or partly in one mode and partly in another, and to hold, dispose of or otherwise deal with any shares, stock or securities so acquired;

(v)     to amalgamate with any other company, whether by sale or purchase (for fully or partly paid-up shares or otherwise) of the undertaking, subject to the liabilities of this or any other such company as aforesaid, with or without winding-up or by sale or purchase (for fully or partly paid-up shares or otherwise) of all or a controlling interest in the shares or stock of this or any other such company as aforesaid, or by partnership, or any arrangement of the nature of partnership, or in any other manner;

(w)     to pay out of the funds of the company all expenses which the company may lawfully pay in respect of or incidental to the formation, registration and advertising

of or raising money for the company and the issue of its capital, including brokerage and commissions for obtaining applications for or taking, placing or underwriting shares, debentures or debenture stock, and to apply at the cost of the company to Parliament for any extension of the company's objects and powers;

(x)    to do all or any of the above things in any part of the world, and either as principals, agents, trustees, contractors or otherwise, and either alone or in conjunction with others, and either by or through agents, sub-contractors, trustees or otherwise; and

(y)    to do all such other things as are in the opinion of the company incidental or conducive to the above objects or any of them.

The objects specified in each of the paragraphs of this clause shall not, except where the context expressly so requires, be in any way limited or restricted by the terms of any other paragraph and shall be construed as separate, distinct and independent objects capable of being performed and carried out separately, distinctly and independently of each other.

4.    The liability of the members is limited.

5.    The share capital of the company is £100 divided into 100 ordinary shares of £1 each.

The subscriber to this memorandum of association wishes to be formed into a company pursuant to this memorandum; and agrees to take the number of shares shown opposite its name.

| Name and address of subscriber | Number of shares taken by subscriber |
|---|---|
| SERJEANTS' INN NOMINEES LIMITED<br>By ....................................................<br>Authorized Signatory | One |
| for and on behalf of<br>SERJEANTS' INN NOMINEES LIMITED<br>Registered office<br>21 Holborn Viaduct<br>London EC1A 2DY | |
| A company limited by shares | |
| Total shares taken | One |

Dated 6 August 2004

Witness to the above signature,

*(signature)*

(Holly Richards)

Atlantic House
Holborn Viaduct
London EC1A 2FG

The Companies Act 1985

---

A PRIVATE COMPANY LIMITED BY SHARES

---

ARTICLES OF ASSOCIATION

OF

3380TH SINGLE MEMBER SHELF TRADING COMPANY LIMITED

REGULATIONS OF THE COMPANY

1.    The articles comprise these Articles and, save insofar as it is modified by these Articles, Table A (which expression means that Table as prescribed by regulations made pursuant to the Companies Act 1985 (the "Act") and in force on the date of incorporation of the company).

2.    Regulations 8, 24, 53, 54, 60-62 (inclusive), 65-69 (inclusive), 73-80 (inclusive), 87, 90, 93, 100 and 118 in Table A do not apply to the company.

SHARE CAPITAL

3.    The share capital of the company is £100 divided into 100 ordinary shares of £1 each.

4.    Subject to Article 5 the directors shall not without the authority of the company in general meeting allot any of the shares in the capital of the company. Where authority has been given to the directors to allot shares in the capital of the company the directors may, subject to the terms of such authority and subject to any terms on which any shares are created or issued, allot such shares to such persons (including any directors) at such times and generally on such conditions as they think proper provided that no shares shall be issued at a discount contrary to the Act. In the foregoing sentences of this Article, references to allotment of shares shall include references to the grant of any right to subscribe for, or to convert any security into, shares. Where authority has been given to the directors as referred to in this Article to grant a right to subscribe for, or to convert any security into, shares the directors may without further authority allot such shares as may require to be allotted pursuant to the exercise of such right.

5.	Section 89(1) of the Act is hereby excluded.

**VARIATION OF RIGHTS**

6.	The rights attached to any existing shares shall not (unless otherwise expressly provided by the terms of issue of such shares) be deemed to be varied by the creation or issue of further shares ranking pari passu therewith or subsequent thereto.

**SHARE CERTIFICATES**

7.	In Regulation 6 in Table A there shall be inserted after the word "seal" the following words, namely: "or the official seal of the company if the company has a seal, or otherwise executed in such manner as may be permitted by the Act".

**LIEN**

8.	The company shall have a first and paramount lien on all the shares registered in the name of any member (whether solely or jointly with others) for all moneys due to the company from him or his estate, whether solely or jointly with any other person (whether a member or not) and whether such moneys are presently payable or not. The company's lien on a share shall extend to all dividends or other moneys payable thereon or in respect thereof. The directors may at any time resolve that any share shall be exempt, wholly or partly, from the provisions of this Article.

**CALLS ON SHARES**

9.	The directors may accept from any member the whole or any part of the amount remaining unpaid on any share held by him notwithstanding that no part of that amount has been called up.

**TRANSFER OF SHARES**

10.	No transfer of any share may be registered without the approval of a member or members holding a majority in nominal value of the issued shares for the time being conferring the right to vote at general meetings of the company, and the directors shall be bound to approve a transfer which has such approval.

**TRANSMISSION OF SHARES**

11.	There shall be inserted at the end of Regulation 31 in Table A the following proviso, namely: "provided always that the directors may at any time give notice requiring any such person to elect either to become or to have another person registered as the holder of the share and if the requirements of the notice are not complied with within 90 days the directors may thereafter withhold payment of all dividends, bonuses or other moneys payable in respect of the share until the requirements of the notice have been complied with".

## PROCEEDINGS AT GENERAL MEETINGS

12.     In paragraph (b) of Regulation 38 in Table A there shall be inserted after the words: "giving that right", the following words, namely: "(or such lesser percentage as may be permitted by the Act and agreed by the members)".

13.     In Regulation 40 in Table A the following words shall be added to the end of the second sentence, namely: "Except where the company is a private company limited by shares or by guarantee and having one member, in which case the quorum shall be one person, being the member or a proxy for the member or a duly authorised representative of a corporation"

14.     In Regulation 41 in Table A there shall be inserted after the words "the directors may determine" the following words, namely: "and if at the adjourned meeting such a quorum is not present within half an hour from the time appointed for the meeting, one member present in person or by proxy or (being a corporation) by its duly authorised representative shall be a quorum".

15.     A poll may be demanded by any member present in person or by proxy or (being a corporation) by its duly authorised representative.  Regulation 46 in Table A shall be construed accordingly.

16.     A resolution in writing of all the members who would have been entitled to vote upon it if it had been proposed at a general meeting at which they were present shall be as effectual as if it had been passed at a general meeting duly convened and held either:

(a)     if it consists of an instrument executed by or on behalf of each such member; or

(b)     if it consists of several instruments in the like form each either:

(i)     executed by or on behalf of one or more of such members; or

(ii)    sent by or on behalf of one or more of such members by telex or facsimile transmission and deposited or received at the office or received by the secretary.

## VOTES OF MEMBERS

17.     Subject to any rights or restrictions as to voting attached to any shares by the terms on which they were issued or by or in accordance with the Articles or otherwise, on a show of hands every member who (being an individual) is present in person or (being a corporation) is present by its duly authorised representative not being himself a member entitled to vote, shall have one vote, and on a poll every member who is present in person or by proxy or (being a corporation) is present by its duly authorised representative shall have one vote for every share of which he is the holder.

18.   The instrument appointing a proxy shall be in writing in any usual or common form and shall (except in the case of an appointment by telex or a facsimile transmission of an appointment otherwise complying with the requirements of this Article) be executed by the appointor or his attorney duly authorised in writing or in such other form as the directors may approve.  A proxy need not be a member of the company.

19.   The instrument appointing a proxy and the power of attorney or other authority (if any) under which it is executed, or a notarially certified copy of such power or authority, shall be deposited or received at the office (or at such other place in the United Kingdom as is specified for that purpose in any instrument of proxy sent by the company in relation to the meeting) not less than 48 hours before the time for holding the meeting or adjourned meeting at which the person named in the instrument proposes to vote, or handed to the chairman of the meeting or adjourned meeting, and, in default, the instrument of proxy shall be invalid.

**ALTERNATE DIRECTORS**

20.   A director may by written notice signed by him (except in the case of an appointment by telex or a facsimile transmission of an appointment otherwise complying with the requirements of this Article) and deposited or received at the office or received by the secretary or in such other manner as the directors may approve appoint another director or any other person to be and act as his alternate director.

21.   Every alternate director shall (subject to his giving to the company an address within the United Kingdom at which notices may be given to him) be entitled to notice of meetings of the directors or of committees of directors, and to attend and vote as a director at any such meeting at which the director appointing him is entitled to attend and vote but is not personally present and generally at such meeting to exercise all the powers, rights, duties and authorities of the director appointing him.  Every alternate director shall also be entitled to sign or, in the case of a telex or facsimile transmission, send on behalf of the director appointing him a resolution in writing of the directors pursuant to Article 35.

22.   An alternate director shall neither be an officer of the company nor entitled to any remuneration from the company for acting as an alternate director.

23.   A director may by written notice signed by him or sent by him by telex or facsimile transmission and deposited or received at the office or received by the secretary or in such other manner as the directors may approve at any time revoke the appointment of an alternate director appointed by him.

24.   If a director shall cease to hold the office of director for any reason, the appointment of his alternate director shall thereupon automatically cease.

**DELEGATION OF DIRECTORS' POWERS**

25.  The following words shall be added at the end of the first sentence of Regulation 72 in Table A, namely: "and may also appoint to any such committee persons who are not directors provided that the chairman and a majority of such committee shall be directors".

**RETIREMENT, APPOINTMENT AND REMOVAL OF DIRECTORS**

26.  A member or members holding a majority in nominal value of the issued shares for the time being conferring the right to vote at general meetings of the company shall have power from time to time and at any time to appoint any person or persons as a director or directors and to remove from office any director howsoever appointed. Any such appointment or removal shall be effected by an instrument which shall be in writing and shall (except in the case of an appointment or removal by telex or a facsimile copy of an appointment or removal otherwise complying with the requirements of this Article) be executed by the member or members making the same or by their duly authorised attorneys or in such other manner as the directors may approve, and shall take effect upon such appointment or removal being deposited or received at the office or otherwise communicated to the company at the office or being handed or otherwise communicated to the chairman of a meeting of the directors at which a quorum is present.

27.  Without prejudice to Article 26 the company may by ordinary resolution appoint any person to be a director either to fill a vacancy or as an additional director.

**DISQUALIFICATION AND REMOVAL OF DIRECTORS**

28.  In Regulation 81 in Table A:

   (a)  there shall be inserted after the word "company" in paragraph (d) the following words, namely: ", provided that such action shall be without prejudice to the terms of and to any rights of the company under any contract between the director and the company"; and

   (b)  paragraph (e) shall be deleted.

**REMUNERATION OF DIRECTORS**

29.  The following sentence shall be added at the end of Regulation 82 in Table A, namely: "Any director who serves on any committee, or who devotes special attention to the business of the company, or who otherwise performs services which in the opinion of the directors are in addition to or outside the scope of the ordinary duties of a director (which services shall include, without limitation, visiting or residing abroad in connection with the company's affairs), may be paid such extra remuneration by way of salary, percentage of profits or otherwise as the directors may determine".

**DIRECTORS' APPOINTMENTS AND INTERESTS**

30.    In Regulation 84 in Table A there shall be substituted for the words "shall not be subject to retirement by rotation" the following words, namely: "shall be subject to the same provisions as to resignation and removal as other directors of the company".

**DIRECTORS' AND EMPLOYEES' GRATUITIES AND PENSIONS**

31.    The directors may:

(a)    establish and maintain, or procure the establishment and maintenance of, any share option or share incentive or profit sharing schemes or trusts or any non-contributory or contributory pension or superannuation schemes or funds for the benefit of, and may make or give or procure the making or giving of loans, donations, gratuities, pensions, allowances or emoluments (whether in money or money's-worth) to, or to trustees on behalf of, any persons who are or were at any time in the employment or service of the company, or of any company which is a subsidiary of the company, or is allied to or associated with the company or with any such subsidiary, or who are or were at any time directors or officers of the company or of any such other company as aforesaid, and to the wives, husbands, widows, widowers, families and dependants of any such persons;

(b)    establish and subsidise or subscribe to any institutions, associations, clubs or funds calculated to be for the benefit of, or to advance the interests and well-being of the company, or of any such other company as aforesaid, or of any such persons as aforesaid;

(c)    make payments for or towards policies of assurance on the lives of any such persons and policies of insurance for the benefit of or in respect of any such persons (including insurance against their negligence or breach of duty to the company) as aforesaid;

(d)    pay, subscribe or guarantee money to or for any charitable or benevolent objects, or for any exhibition, or for any political, public, general or useful object; and

(e)    do any of the above things either alone or in conjunction with any such other company as aforesaid.

Subject always, if the Act shall so require, to particulars with respect to the proposed payment being disclosed to the members of the company and to the payment being approved by the company, any director shall be entitled to participate in and retain for his own benefit any such loan, donation, gratuity, pension, allowance or emolument.

**PROCEEDINGS OF DIRECTORS**

32. In Regulation 88 in Table A there shall be substituted for the third sentence the following sentences, namely: "Every director shall be given not less than 48 hours' notice of every meeting of the directors, such notice to be sent to such address as is notified by him to the company for this purpose or otherwise communicated to him personally. Any director may by notice to the company either before or after the meeting waive his right to receive notice of the meeting and any director who either:

   (a) is present at the commencement of a meeting whether personally or by his alternate director; or

   (b) does not, within seven days following its coming to his attention that a meeting has taken place without prior notice of such meeting having been given to him pursuant to this Regulation, notify the company that he desires the proceedings at such meeting to be regarded as a nullity,

   shall be deemed hereafter to have waived his right to receive notice of such meeting pursuant to this Regulation".

33. In Regulation 89 in Table A there shall be substituted for the final sentence the following sentence, namely: "A person attending a meeting of the board of directors, who is acting as an alternate director for one or more directors shall be counted as one for each of the directors for whom he is so acting and, if he is a director, shall also be counted as a director, but not less than two individuals constitute a quorum".

34. A meeting of the board of directors may consist of a conference between directors some or all of whom are in different places if each director who participates is able:

   (a) to hear each of the other participating directors addressing the meeting; and

   (b) if the director so wishes, to address all of the other participating directors simultaneously,

   whether directly, by conference telephone or any other form of communications equipment (whether in use when these Articles are adopted or developed subsequently) or by a combination of these methods. Each director so participating in a meeting is deemed to be "present" at that meeting for the purpose of these Articles. A quorum is deemed to be present if those conditions are satisfied in respect of at least the number of directors required to form a quorum. A meeting held in this way is deemed to take place at the place where the largest group of participating directors is assembled or, if no such group is readily identifiable, at the place from where the chairman of the meeting participates.

35.     A resolution in writing of all the directors or all the members of a committee of directors shall be as effectual as if it had been passed at a meeting of directors or (as the case may be) a committee of directors duly convened and held either:

    (a)     if it consists of an instrument executed by or on behalf of each such director or committee member; or

    (b)     if it consists of several instruments in the like form each either:

        (i)     executed by or on behalf of one or more of such directors or committee members; or

        (ii)    sent by or on behalf of one or more of such directors or committee members by telex or facsimile transmission and deposited or received at the office or received by the secretary.

36.     Subject to any requisite declaration of interest in accordance with the provisions of the Act and (if applicable) Regulation 85 in Table A having been made by him a director may vote as a director in regard to any transaction or arrangement in which he is interested, or upon any matter arising therefrom and Regulation 94 in Table A shall be construed subject to this provision.

37.     In Regulation 97 in Table A:

    (a)     there shall be inserted after the words "the appointment" the following words, namely: "or the terms of appointment"; and

    (b)     the following words shall be deleted, namely: "and be counted in the quorum" and there shall be inserted after the words "his own appointment" the following words, namely: "and shall be counted in the quorum in respect of each resolution including that concerning his own appointment, and Regulation 95 shall be construed subject to this provision."

**MINUTES**

38.     The directors shall cause minutes to be made in books kept for the purpose:

    (a)     of all appointments of officers and alternate directors made by the directors; and

    (b)     of all proceedings at meetings of the company, of the holders of any class of shares in the company, of the directors, and of committees of directors, including the names of the persons present at each such meeting.

**THE SEAL**

39.     In Regulation 101 of Table A, there shall be substituted for the first sentence the following sentence, namely: "The company need not have a seal but if the company does have a

seal, the seal shall only be used by the authority of the directors or of a committee of directors authorised by the directors".

40. The company is authorised pursuant to section 39 of the Act for so long as its objects require or comprise the transaction of business in foreign countries to have an official seal for use in any territory, district, or place elsewhere than in the United Kingdom.

**NOTICES**

41. In Regulation 112 of Table A, the final sentence shall be deleted and the following words shall be inserted at the end of the first sentence, namely: "or by sending it by telex or facsimile transmission to such telex or facsimile number as the member shall have given to the company for the purpose".

42. In Regulation 115 of Table A, there shall be inserted:

   (a) after the words: "prepaid and posted", the following words, namely: "or that a notice was properly sent by telex or facsimile transmission"; and

   (b) after the words: "it was posted", the following words, namely: "or after the time at which it was sent by telex or facsimile transmission".

**INDEMNITY**

43. Subject to the provisions of the Act, every director, other officer or auditor of the company or person acting as an alternate director shall be entitled to be indemnified out of the assets of the company against all costs, charges, expenses, losses or liabilities which he may sustain or incur in or about the execution of his duties to the company or otherwise in relation thereto.

Name, address and description of subscriber

**SERJEANTS' INN NOMINEES LIMITED**

By ...................................................

**Authorized Signatory**

for and on behalf of

SERJEANTS' INN NOMINEES LIMITED

Registered office

21 Holborn Viaduct

London EC1A 2DY

A company limited by shares

Dated  6 August  2004

Witness to the above signature,

*H. Richards.*

(Holly Richards)

Atlantic House

Holborn Viaduct

London EC1A 2FG

# EXHIBIT 5


# GOV.UK

# Find and update company information

Companies House does not verify the accuracy of the information filed (http://resources.companieshouse.gov.uk/serviceInformation.shtml#compInfo)
Advanced company search (/advanced-search)

FARADAY CAPITAL LIMITED

Company number **02982540**

Follow this company

File for this company (https://beta.companieshouse.gov.uk/company/02982540/authorise?
return_to=/company/02982540)

— Overview (https://beta.companieshouse.gov.uk/company/02982540)

— Filing history (https://beta.companieshouse.gov.uk/company/02982540/filing-history)

— People (https://beta.companieshouse.gov.uk/company/02982540/officers)

— Charges (https://beta.companieshouse.gov.uk/company/02982540/charges)

— More (https://beta.companieshouse.gov.uk/company/02982540/more)

Registered office address
Corn Exchange, 55 Mark Lane, London, EC3R 7NE

Company status
Active

Company type
Private limited Company

Incorporated on
24 October 1994

## Accounts

Next accounts made up to **31 December 2022**
due by **30 September 2023**

Last accounts made up to **31 December 2021**

## Confirmation statement

Next statement date **24 October 2023**
due by **7 November 2023**

Last statement dated **24 October 2022**

# Nature of business (SIC)

- 66290 - Other activities auxiliary to insurance and pension funding

# Previous company names

| Name | Period |
| --- | --- |
| DP MANN CAPITAL LIMITED | 14 Jun 2000 - 04 May 2001 |
| D P MANN CORPORATE NAME LIMITED | 12 Sep 1997 - 14 Jun 2000 |
| DPM CORPORATE NAME LIMITED | 16 Nov 1994 - 12 Sep 1997 |
| HERONGREEN LIMITED | 24 Oct 1994 - 16 Nov 1994 |

Tell us what you think of this service (https://www.smartsurvey.co.uk/s/getcompanyinformation/) Is there anything wrong with this page? (/help/feedback?sourceurl=https://find-and-update.company-information.service.gov.uk/company/02982540)

Policies Link opens in new tab

Cookies (https://beta.companieshouse.gov.uk/help/cookies)

Contact us Link opens in new tab

Accessibility statement (https://beta.companieshouse.gov.uk/help/accessibility-statement)

Developers Link opens in new tab

Built by Companies House

© Crown copyright



# CS01 (ef)

Company Name: **FARADAY CAPITAL LIMITED**
Company Number: **02982540**

Received for filing in Electronic Format on the: **24/10/2022**

XBFA9K28

Company Name: **FARADAY CAPITAL LIMITED**

Company Number: **02982540**

Confirmation Statement date: **24/10/2022**

# Confirmation Statement

I confirm that all information required to be delivered by the company to the registrar in relation to the confirmation period concerned either has been delivered or is being delivered at the same time as the confirmation statement

# Authorisation

Authenticated

This form was authorised by one of the following:

Director, Secretary, Person Authorised, Charity Commission Receiver and Manager, CIC Manager, Judicial Factor

**FILE COPY**



# CERTIFICATE OF INCORPORATION
# OF A PRIVATE LIMITED COMPANY

Company No. 2982540

The Registrar of Companies for England and Wales hereby certifies that
HERONGREEN LIMITED

is this day incorporated under the Companies Act 1985 as a private

company and that the company is limited.

Given at Companies House, Cardiff, the 24th October 1994



*N02982540H*

For the Registrar of Companies



*C O M P A N I E S   H O U S E*

HC0075

# G

**COMPANIES FORM No. 12**

## Statutory Declaration of compliance with requirements on application for registration of a company

CHA 196

Please do not write in this margin

Pursuant to section 12(3) of the Companies Act 1985

**12**

Please complete legibly, preferably in black type, or bold block lettering

To the Registrar of Companies

For official use

For official use

* Insert full name of Company

Name of company

* HERONGREEN LIMITED

I, ANGELA ORBAN ON BEHALF OF LEGIBUS SECRETARIES LIMITED

of 200 ALDERSGATE STREET

LONDON EC1A 4JJ

† delete as appropriate

do solemnly and sincerely declare that I am a [Solicitor engaged in the formation of the company] † [person named as director or secretary of the company in the statement delivered to the registrar under section 10(2)] † and that all the requirements of the above Act in respect of the registration of the above company and of matters precedent and incidental to it have been complied with.

And I make this solemn declaration conscientiously believing the same to be true and by virtue of the provisions of the Statutory Declarations Act 1835

Declared at ___ 35 BASINGHALL STREET

LONDON EC2

the _____ 14th _____ day of _ October _

One thousand nine hundred and __ 94 _

before me ___ Mark Williams

A Commissioner for Oaths or Notary Public or Justice of the Peace or Solicitor having the powers conferred on a Commissioner for Oaths.

Declarant to sign below

For and on behalf of LEGIBUS SECRETARIES LTD

MARK WILLIAMS
Solicitor

Presentor's name address and reference (if any):
Legibus Secretaries Ltd
200 Aldersgate Street
London
EC1A 4JJ

For official Use
New Companies Section

Post room

*K7GKY5KE*
COMPANIES HOUSE 17/10/94

PJC/CAL

# 10

## Statement of first directors and secretary and intended situation of registered office

This form should be completed in black.

| CN | | For official use | |

**Company name** *(in full)*

HERONGREEN LIMITED

---

**Registered office of the company on incorporation.**

RO  200 Aldersgate Street

Post town    London

County/Region

Postcode    EC1A 4JJ

---

If the *memorandum* is delivered by an agent for the subscribers of the memorandum mark 'X' in the box opposite and give the agent's name and address.

X

Name    LEGIBUS SECRETARIES LIMITED

RA  200 Aldersgate Street

Post town    London

County/Region

Postcode    EC1A 4JJ

KLO   ‖K7GKX5KD‖   255
COMPANIES HOUSE 17/10/94

---

Number of continuation sheets attached

---

To whom should Companies House direct any enquiries about the information shown in this form?

LEGIBUS SECRETARIES LIMITED   ATTN: MRS. D. WARD

200 Aldersgate Street

London                          Postcode   EC1A 4JJ

Telephone   071-600 1000        Extension   1562

## Company Secretary

| | | |
|---|---|---|
| **Name** | *Style/Title | CS |
| | Forenames | |
| | Surname | LEGIBUS SECRETARIES LIMITED |
| | *Honours etc | |
| | Previous forenames | |
| | Previous surname | |

**Address**

Usual residential address must be given.
In the case of a corporation, give the registered or principal office address.

AD 200 Aldersgate Street

Post town  London

County/Region

Postcode  EC1A 4JJ    Country  England

I consent to act as secretary of the company named on page 1

*For and on behalf of* LEGIBUS SECRETARIES LTD.

**Consent signature**  Signed _____  Date 10.10.94

*Assistant Secretary*

## Directors

*Please list directors in alphabetical order.*

| | | |
|---|---|---|
| **Name** | *Style/Title | CD  MR. |
| | Forenames | Peter John |
| | Surname | CHARLTON |
| | *Honours etc | |
| | Previous forenames | |
| | Previous surname | |

**Address**

Usual residential address must be given.
In the case of a corporation, give the registered or principal office address.

AD  17 Kirkdale Road

Post town  Harpenden

County/Region  Hertfordshire

Postcode _____  Country  England

Date of birth  DO 1 6 1 2 5 5    Nationality  NA  British

Business occupation  OC  Solicitor

Other directorships  OD  Legibus Secretaries Ltd.

Legibus Nominees Ltd.  CLIFFORD CHANCE LTD.

I consent to act as director of the company named on page 1

* Voluntary details

**Consent signature**  Signed _____  Date 10.10.94

Page 2

## Directors (continued)

**Name**

**\*Style/Title** `CD` MR.

**Forenames** Martin Edgar

**Surname** RICHARDS

**\*Honours etc**

**Previous forenames**

**Previous surname**

**Address**

Usual residential address must be given.
In the case of a corporation, give the registered or principal office address.

`AD` 89 Thurleigh Road

Post town London

County/Region

Postcode SW1 8TY       Country England

**Date of birth** `DO` 2 | 7 | 0 | 2 | 4 | 3       Nationality `NA` British

**Business occupation** `OC` Solicitor

**Other directorships** `OD` Legibus Secretaries Ltd., Legibus Nominees Ltd.

**\* Voluntary details**

I consent to act as director of the company named on page 1

**Consent signature**   Signed  *[signature]*   Date 10 10 94

---

Delete if the form is signed by the subscribers.

Signature of agent on behalf of all subscribers    Date

---

Delete if the form is signed by an agent on behalf of all the subscribers.

All the subscribers must sign either personally or by a person or persons authorised to sign for them.

Signed  *[signature]*   Date 10 10 94

Signed  For and on behalf of  Legibus Nominees Limited   Date

Signed  *[signature]*   Date 11 10 94

Signed  For and on behalf of  Legibus Secretaries Limited   Date

Signed   Date

Signed   Date

Page 2



THE COMPANIES ACTS 1985 AND 1989



PRIVATE COMPANY LIMITED BY SHARES

2982540

MEMORANDUM OF ASSOCIATION

of

HERONGREEN LIMITED



1. The Company's name is "HERONGREEN LIMITED".

2. The Company's registered office is to be situated in England and Wales.

3. The Company's objects are:

(A)    (i)    To carry on business as manufacturers, builders and suppliers of and dealers in goods of all kinds, and as mechanical, general, electrical, marine, radio, electronic, aeronautical, chemical, petroleum, gas civil and constructional engineers, and manufacturers, importers and exporters of, dealers in machinery, plant and equipment of all descriptions and component parts thereof, forgings, castings, tools, implements, apparatus and all other articles and things.

(ii)    To act as an investment holding company and to co-ordinate the business of any companies in which the Company is for the time being interested, and to acquire (whether by original subscription, tender, purchase exchange or otherwise) the whole of or any part of the stock, shares, debentures, debenture stocks, bonds and other securities issued or guaranteed by a body corporate constituted or carrying on business in any part of the world or by any government, sovereign ruler, commissioners, public body or authority and to hold the same as investments, and to sell, exchange, carry and dispose of the same.

(iii)    To carry on the businesses in any part of the world as importers, exporters, buyers, sellers, distributors and dealers and to win, process and work produce of all kinds.

(B)    To carry on the following businesses, namely, contractors, garage proprietors, filling station proprietors, owners and charterers of road vehicles, aircraft and ships and boats of every description, lightermen and carriers of goods and passengers by road, rail, water or air, forwarding, transport and commission agents, customs agents, stevedores, wharfingers, cargo superintendents, packers, warehouse storekeepers, cold store keepers,

- 1 -

hotel proprietors, caterers, publicans, consultants, advisers, financiers, bankers, advertising agents, insurance brokers, travel agents, ticket agents and agency business of all kinds and generally to provide entertainment for and render services of all kinds to others and to carry on any other trade or business whatsoever which can in the opinion of the directors be advantageously carried on by the Company in connection with or as ancillary to any of the businesses of the Company.

(C)     To buy, sell, manufacture, repair, alter, improve, manipulate, prepare for market, let on hire, and generally deal in all kinds of plant, machinery, apparatus, tools, utensils, materials, produce, substances, articles and things for the purpose of any of the businesses specified in this clause 3, or which are likely to be required by customers or other persons having, or about to have, dealings with the Company.

(D)     To build, construct, maintain, alter, enlarge, pull down and remove or replace any buildings, shops, factories, offices, works, machinery, engines and to clear sites for the same or to join with any person, firm or company in doing any of the things aforesaid and to work, manage and control the same or join with others in so doing.

(E)     To enter into contracts, agreements and arrangements with any other company for the carrying out by such other company on behalf of the Company of any of the objects for which the Company is formed.

(F)     To acquire, undertake and carry on the whole or any part of the business, property and liabilities of any person or company carrying on any business which may in the opinion of the directors be capable of being conveniently carried on or calculated directly or indirectly to enhance the value of or render profitable any of the Company's property or rights, or any property suitable for the purposes of the Company.

(G)     To enter into any arrangements with any government or authority national, international, supreme, municipal, local or otherwise, that may in the opinion of the directors be conducive to the Company's objects or any of them, and to obtain from any such government or authority any rights, privileges, and concessions which in the opinion of the directors is desirable, and to carry out, exercise and comply with any such arrangements, rights, privileges and concessions.

(H)     To apply for, or join in applying for, purchase or by other means acquire and protect, prolong and renew, whether in the United Kingdom or elsewhere any patents, patent rights, brevets d'invention, licences, secret processes, trade marks, service marks, copyrights, registered designs, protections, concessions and the like, and to use and turn to account and to manufacture under or grant licences or privileges in respect of the same, and to expend money in experimenting and testing and making researches, and in improving or seeking to improve any patents, inventions or rights which the Company may acquire or propose to acquire.

(I)     To acquire an interest in, amalgamate with or enter into partnership or into any arrangement for the sharing of profits, union of interests, co-operation, joint adventure, reciprocal concession, or otherwise with any company, or with any employees of the Company.   To lend money to, guarantee the contracts of, or otherwise assist any such

- 2 -

company, and to take or otherwise acquire shares or securities of any such company, and to sell, hold, re-issue, with or without guarantee, or otherwise deal with the same.

(J)     To lend money to, to subsidise and assist any persons or companies and to act as agents for the collection, receipt or payment of money and generally to act as agents or brokers for and render services to any company, and to undertake and perform sub-contracts.

(K)     To enter into any guarantee, contract of indemnity or suretyship and in particular (without prejudice to the generality of the foregoing) to guarantee or otherwise provide security for, with or without the Company receiving any consideration therefor or advantage therefrom, directly or indirectly, by personal covenant or by mortgage, charge or lien over all or any part of the undertaking, property and assets present and future and uncalled capital of the Company or by any other means whatsoever, the performance of the obligations and the payment of any moneys (including but not limited to capital or principal, premiums, dividends or interest, commissions, charges, discount and any related costs or expenses whether on any stocks, shares or securities or in any other manner) by any company, firm or person including but not limited to any company which is for the time being the Company's holding company or a subsidiary of the Company each as defined by section 736 of the Companies Act 1985 or of the Company's holding company as so defined or any company, firm or person who is for the time being a member or otherwise has any interest in the Company or is associated with the Company in any business or venture, or any other person firm or company whatsoever. For the purposes of this paragraph (K) "guarantee" includes any other obligation howsoever described to pay, satisfy, provide funds (whether by advance of money the purchase of or the subscription of shares or other securities, the purchase of assets or services, or otherwise) for the payment or satisfaction of, or to indemnify against the consequences of default in the payment of or otherwise be responsible for any indebtedness of any other company firm or person.

(L)     To promote, finance or assist any company for the purpose of acquiring all or any of the property, rights or undertaking or assuming the liabilities of the Company, or for any other purpose which may be in the opinion of the directors directly or indirectly calculated to benefit the Company, and to place or guarantee the placing of, underwrite, subscribe for, or otherwise acquire all or any part of the shares or securities of such company as aforesaid.

(M)     To pay out of the funds of the Company all or any expenses which the Company may lawfully pay of or incidental to the formation, registration, promotion and advertising of or raising money for the Company, and the issue of its capital including those incurred in connection with the advertising or offering the same for sale or subscription, including brokerage and commissions for obtaining applications for or taking, placing or underwriting or procuring the underwriting of shares or other securities.

(N)     To remunerate any person, firm or company rendering service to the Company whether by cash payment or by the allotment to him or them of shares or securities of the Company credited as paid up in full or in part or otherwise.

- 3 -

(O)    Generally to purchase, take on lease or exchange, hire, or otherwise acquire any real or personal property and any rights or privileges over or in respect of it.

(P)    To receive money on deposit on such terms as the directors may approve.

(Q)    To invest and deal with the moneys of the Company in such manner as may from time to time be determined by the directors.

(R)    To lend money or give credit with or without security.

(S)    To borrow or raise or secure the payment of money in such manner as the Directors shall approve and in particular by the issue of debentures or debenture stock, perpetual or otherwise charged upon all or any of the Company's property (both present and future), including its uncalled capital, and to purchase, redeem or pay off any such securities.

(T)    To remunerate any company for services rendered or to be rendered, in placing, or assisting to place, or guaranteeing the placing or procuring the underwriting of any of the shares or debentures, or other securities of the Company or of any company in which this Company may be interested or propose to be interested, or in or about the conduct of the business of the Company, whether by cash payment or by the allotment of shares, or securities of the Company credited as paid up in full or in part, or otherwise.

(U)    To subscribe for either absolutely or conditionally or otherwise acquire and hold shares, stocks, debentures, debenture stock or other obligations of any other company and to co-ordinate, finance and manage the business and operation of any company in which the Company holds any such interest.

(V)    To draw, make, accept, endorse, discount, execute and issue promissory notes, bills of exchange, bills of lading, warrants, debentures and other negotiable or transferable instruments.

(W)    To sell, lease, exchange, let on hire, or dispose of any real or personal property or the undertaking of the Company, or any part or parts thereof, for such consideration as the directors shall approve, and, in particular, for shares whether fully or partly paid up, debentures or securities of any other company, whether or not having objects altogether, or in part, similar to those of the Company, and to hold and retain any shares, debentures or securities so acquired, and to improve, manage, develop, sell, exchange, lease, mortgage, dispose of, grant options over or turn to account or otherwise deal with all or any part of the property or rights of the Company.

(X)    To adopt such means of making known the businesses and products of the Company as may in the opinion of the directors seem expedient, and in particular by advertising in the press, by circulars, by purchase and exhibition of works of art or interest, by publication of books and periodicals, and by granting prizes, rewards and donations.

(Y)    To support, subscribe or contribute to any charitable or public object or any institution, society or club which may be for the benefit of the Company or its directors, officers or employees, or the directors, officers and employees of its predecessors in business or of

any subsidiary, allied or associated company, or which may be connected with any town or place where the Company carries on business and to subsidise or assist any association of employers or employees or any trade association. To grant pensions, gratuities, annuities or charitable aid and generally to provide advantages, facilities and services to any person (including any directors or former directors) who may have served the Company or its predecessors in business or any subsidiary, allied or associated company or to the wives, children or other dependants or relatives of such persons, to make advance provision for the payment of such pensions, gratuities or annuities as aforesaid by establishing or acceding to such trusts schemes or arrangements (whether or not capable of approval by the Commissioners of Inland Revenue under any relevant legislation for the time being in force) as may seem expedient, to appoint trustees or to act as trustee of any such schemes or arrangements, and to make payments towards insurance for the benefit of such persons or to their wives, children, or other dependants or relatives.

(Z)     To establish and contribute to any scheme for the purchase or subscription by trustees of shares in the Company to be held for the benefit of the employees of the Company or any subsidiary, allied or associated company, and to lend money to such employees or to trustees on their behalf to enable them to purchase or subscribe for shares in the Company and to formulate and carry into effect any scheme for sharing the profits of the Company with employees or any of them.

(AA)    To apply for, promote and obtain any Act of Parliament, order or licence of the Department of Trade and Industry or other authority for enabling the Company to carry any of its objects into effect or for effecting any modifications of the Company's constitution or for any other purposes which may in the opinion of the directors seem expedient, and to oppose any proceedings or applications which may in the opinion of the directors seem calculated directly or indirectly to prejudice the Company's interests.

(BB)    To establish, grant and take up agencies in any part of the world, and to do all such other things as the Company may deem conducive to the carrying on of the Company's business, either as principals, or agents, and to remunerate any persons in connection with the establishment or granting of such agencies upon such terms and conditions as the Company may think fit.

(CC)    To distribute among the shareholders in specie any of the property of the Company or any proceeds of sale or disposal of any property of the Company and for such purpose to distinguish and separate capital from profits, but so that no distribution amounting to a reduction of capital shall be made except with the sanction (if any) for the time being required by law.

(DD)    To purchase and maintain insurance for the benefit of any person who is an officer or employee, or former officer or employee, of the Company or of a subsidiary of the Company or in which the Company has an interest whether direct or indirect or who is or was trustee of any retirement benefits scheme or any other trust in which any such officer or employee or former officer or employee is or has been interested indemnifying such person against liability for negligence, default, breach of duty or breach of trust or any other liabilities which may lawfully be insured against.

(EE)    To amalgamate with any other company.

(FF)    Subject to and in accordance with due compliance with the provisions of sections 155 to 158 (inclusive) of the Act (if and so far as such provisions shall be applicable), to give, whether directly or indirectly, any kind of financial assistance (as defined in section 152(1)(a) of the Act) for any such purpose as is specified in section 151(1) and/or section 151(2) of the Act.

(GG)    To do all or any of the above things in any part of the world and as principals, agents, contractors, trustees or otherwise, and by or through trustees, agents, subcontractors or otherwise, and either alone or in conjunction with others and to procure the Company to be registered or recognised in any foreign country or place.

(HH)    To do all such other things as are in the opinion of the directors incidental or conducive to the attainment of all or any of the Company's objects, or the exercise of all or any of its powers.

        The objects specified in each paragraph of this clause shall, except where otherwise expressed in such paragraph, be regarded as independent objects, and are not limited or restricted by reference to or inference from the terms of any other paragraph or the name of the Company. None of the paragraphs of this clause or the objects or powers specified or conferred in or by them are deemed subsidiary or ancillary to the objects or powers mentioned in any other paragraph, but the Company has as full a power to exercise all or any of the objects and powers provided in each paragraph as if each paragraph contained the objects of a separate company.

        The word "company" in this clause (except where used in reference to the Company) is deemed to include any person or partnership or other body of persons whether domiciled in the United Kingdom or elsewhere and whether incorporated or unincorporated, and words denoting the singular number only shall include the plural number and vice versa. The word "Act" in this Clause means the Companies Act 1985, and any reference in this clause to any provision of the Act is deemed to include a reference to any modification or re-enactment of that provision for the time being in force.

4.     The liability of the members is limited.

5.     The Company's share capital is £100 divided into 100 shares of £1 each.

WE, the subscribers to this memorandum of association, wish to be formed into a company pursuant to this memorandum; and we agree to take the number of shares in the capital of the company shown opposite our respective names.

---

NAMES AND ADDRESSES OF SUBSCRIBERS

Number of shares
taken by each
Subscriber

---

*Kalpna Shah*

KALPNA SHAH
For and on behalf of
Legibus Nominees Limited
200 Aldersgate Street
London EC1A 4JJ

one
ONE

*Angela Orban*

ANGELA ORBAN
For and on behalf of
Legibus Secretaries Limited
200 Aldersgate Street
London EC1A 4JJ

one
ONE

---

DATED the 12th day of October , 1994.

WITNESS to all the above Signatures:-

DENISE WARD
200 Aldersgate Street
London EC1A 4JJ

*Denise ward*

THE COMPANIES ACTS 1985 AND 1989

PRIVATE COMPANY LIMITED BY SHARES

ARTICLES OF ASSOCIATION

of

HERONGREEN LIMITED

PRELIMINARY

1.  (A)  The regulations contained in Table A in the Schedule to the Companies (Table A to
F) Regulations 1985 (as amended) ("**Table A**") apply to the Company except to the
extent that they are excluded or modified by these articles.

    (B)  The regulations of Table A numbered 24, 38, 60, 61, 64, 73, 74, 75, 76, 77, 78, 80,
81, 90, 94, 95, 96, 97, 98, 115 and 118 do not apply. The regulations of Table A
numbered 37, 40, 46, 53, 54, 57, 59, 62, 65, 66, 67, 68, 72, 79, 88, 110, 112 and
116 are modified. Subject to these exclusions and modifications, and in addition to
the remaining regulations of Table A, the following are the articles of association of
the Company.

    (C)  Where an ordinary resolution of the Company is expressed to be required for any
purpose, a special or extraordinary resolution is also effective for that purpose, and
where an extraordinary resolution is expressed to be required for any purpose, a
special resolution is also effective for that purpose.

PRIVATE COMPANY

2.  The Company is a private company limited by shares and accordingly any invitation to the
public to subscribe for any shares or debentures of the Company is prohibited.



- 8 -

## SHARE CAPITAL

3.   The authorised share capital of the Company at the date of incorporation of the Company is £100 divided into 100 shares of £1 each.

4.   (A)   Subject to the provisions of the Act, the directors have general and unconditional authority to allot (with or without conferring rights of renunciation), grant options over, offer or otherwise deal with or dispose of any unissued shares of the Company (whether forming part of the original or any increased share capital) to such persons, at such times and on such terms and conditions as the directors may decide but no share may be issued at a discount.

     (B)   The directors have general and unconditional authority, pursuant to section 80 of the Act, to exercise all powers of the Company to allot relevant securities for a period expiring on the fifth anniversary of the date of incorporation of the Company unless previously renewed, varied or revoked by the Company in general meeting.

     (C)   The maximum amount of relevant securities which may be allotted pursuant to the authority conferred by paragraph (B) is the amount of the authorised but as yet unissued share capital of the Company at the date of incorporation of the Company.

     (D)   By the authority conferred by paragraph (B), the directors may before the authority expires make an offer or agreement which would or might require relevant securities of the Company to be allotted after it expires and may allot relevant securities in pursuance of that offer or agreement.

5.   The pre-emption provisions of section 89(1) of the Act and the provisions of sub-sections (1) to (6) inclusive of section 90 of the Act do not apply to any allotment of the Company's equity securities.

## TRANSFERS

6.   The directors may, in their absolute discretion and without giving any reason, refuse to register the transfer of a share to any person, whether or not it is a fully-paid share or a share on which the Company has a lien.

## GENERAL MEETINGS

7.   Regulation 37 of Table A is modified by the deletion of the words "eight weeks" and the substitution for them of the words "28 days".

## NOTICE OF GENERAL MEETINGS

8.   An annual general meeting and an extraordinary general meeting called for the passing of a special resolution or an elective resolution must be called by at least 21 clear days' notice. All other extraordinary general meetings must be called by at least 14 clear days' notice but a general meeting, other than a meeting called for the passing of an elective resolution, may be called by shorter notice if it is so agreed:

(a) in the case of an annual general meeting, by all the members entitled to attend and vote at that meeting; and

(b) in the case of any other meeting, by a majority in number of the members having a right to attend and vote, being (i) a majority together holding not less than such percentage in nominal value of the shares giving that right as has been determined by elective resolution of the members in accordance with the Act, or (ii) if no such elective resolution is in force, a majority together holding not less than 95 per cent. in nominal value of the shares giving that right.

The notice must specify the time and place of the meeting and the general nature of the business to be transacted and, in the case of an annual general meeting, must specify that the meeting is an annual general meeting.

Subject to the provisions of the articles and to any restrictions imposed on any shares, the notice must be given to all the members, to all persons entitled to a share in consequence of the death or bankruptcy of a member and to the directors and auditors.

## PROCEEDINGS AT GENERAL MEETINGS

9. A poll may be demanded by the chairman or by any member present in person or by proxy and entitled to vote and regulation 46 of Table A is modified accordingly.

10. Regulation 53 of Table A is modified by the addition at the end of the following sentence: "If a resolution in writing is described as a special resolution or as an extraordinary resolution, it has effect accordingly.".

## VOTES OF MEMBERS

11. Regulation 57 of Table A is modified by the inclusion after the word "shall" of the phrase ", unless the directors otherwise determine,".

12. Regulation 59 of Table A is modified by the addition at the end of the following sentence: "Deposit of an instrument of proxy does not preclude a member from attending and voting at the meeting or at any adjournment of it.".

13. An instrument appointing a proxy must be in writing in any usual form or in any other form which the directors may approve and must be executed by or on behalf of the appointor.

14. Regulation 62 of Table A is modified by the deletion in paragraph (a) of the words "deposited at" and by the substitution for them of the words "left at or sent by post or by facsimile transmission to", by the substitution in paragraph (a) of the words "at any time" in place of "not less than 48 hours" and by the substitution in paragraph (b) of the words "at any time" in place of "not less than 24 hours.".

## NUMBER OF DIRECTORS

15. Unless otherwise determined by ordinary resolution, the number of directors (other than alternate directors) is not subject to any maximum and the minimum number is one.

## ALTERNATE DIRECTORS

16. A director may appoint any person willing to act, whether or not he is a director of the Company, to be an alternate director. That person need not be approved by resolution of the directors, and regulation 65 is modified accordingly.

17. An alternate director who is absent from the United Kingdom is entitled to receive notice of all meetings of directors and meetings of committees of directors and regulation 66 of Table A is modified accordingly.

18. Regulation 68 of Table A is modified by the addition at the end of the following sentence: "Any such notice may be left at or sent by post or facsimile transmission to the office or another place designated for the purpose by the directors.".

## DELEGATION OF DIRECTORS' POWERS

19. Regulation 72 is modified by the addition at the end of the regulation of the following sentence: "Where a provision of the articles refers to the exercise of a power, authority or discretion by the directors and that power, authority or discretion has been delegated by the directors to a committee, the provision must be construed as permitting the exercise of the power, authority or discretion by the committee.".

## APPOINTMENT AND REMOVAL OF DIRECTORS

20. The directors are not subject to retirement by rotation. Regulations 73, 74 and 75 of Table A do not apply, and reference in any other regulation to retirement by rotation must be disregarded.

21. The Company may by ordinary resolution appoint a person who is willing to act to be a director either to fill a vacancy or as an additional director.

22. A person appointed by the directors to fill a vacancy or as an additional director is not required to retire from office at the annual general meeting next following his appointment and the last two sentences of regulation 79 of Table A are deleted.

23. No person is incapable of being appointed a director by reason of his having reached the age of 70 or another age. No special notice is required in connection with the appointment or the approval of the appointment of such person. No director is required to vacate his office at any time because he has reached the age of 70 or another age and section 293 of the Act does not apply to the Company.

24. The holder or holders of more than half in nominal value of the shares giving the right to attend and vote at general meetings of the Company may remove a director from office and

appoint a person to be a director, but only if the appointment does not cause the number of directors to exceed a number fixed by or in accordance with the articles as the maximum number of directors. The removal or appointment is effected by notice to the Company signed by or on behalf of the holder or holders. The notice may consist of several documents in similar form each signed by or on behalf of one or more holders and shall be left at or sent by post or facsimile transmission to the office or such other place designated by the directors for the purpose. The removal or appointment takes effect immediately on deposit of the notice in accordance with the articles or on such later date (if any) specified in the notice.

## DISQUALIFICATION AND REMOVAL OF DIRECTORS

25. The office of a director is vacated if:

   (a) he ceases to be a director by virtue of any provision of the Act or he becomes prohibited by law from being a director; or

   (b) he becomes bankrupt or makes any arrangement or composition with his creditors generally; or

   (c) he becomes, in the opinion of all his co-directors, incapable by reason of mental disorder of discharging his duties as director; or

   (d) he resigns his office by notice to the Company; or

   (e) he is for more than six consecutive months absent without permission of the directors from meetings of directors held during that period and his alternate director (if any) has not during that period attended any such meetings instead of him, and the directors resolve that his office be vacated; or

   (f) he is removed from office by notice addressed to him at his last-known address and signed by all his co-directors; or

   (g) he is removed from office by notice given by a member or members under article 24.

## REMUNERATION OF DIRECTORS

26. A director who, at the request of the directors, goes or resides abroad, makes a special journey or performs a special service on behalf of the Company may be paid such reasonable additional remuneration (whether by way of salary, percentage of profits or otherwise) and expenses as the directors may decide.

## PROCEEDINGS OF DIRECTORS

27. Regulation 88 of Table A is modified by the exclusion of the third sentence and the substitution for it of the following sentences: "Every director must receive notice of a meeting, whether or not he is absent from the United Kingdom. A director may waive the

requirement that notice be given to him of a board meeting, either prospectively or retrospectively.".

28. A director or his alternate may validly participate in a meeting of the directors or a committee of directors through the medium of conference telephone or similar form of communication equipment if all persons participating in the meeting are able to hear and speak to each other throughout the meeting. A person participating in this way is deemed to be present in person at the meeting and is counted in a quorum and entitled to vote. Subject to the Act, all business transacted in this way by the directors or a committee of directors is for the purposes of the articles deemed to be validly and effectively transacted at a meeting of the directors or of a committee of directors although fewer than two directors or alternate directors are physically present at the same place. The meeting is deemed to take place where the largest group of those participating is assembled or, if there is no such group, where the chairman of the meeting then is.

29. If and for so long as there is a sole director, he may exercise all the powers conferred on the directors by the articles by resolution in writing signed by him, and regulations 88, 89, 91 and 93 of Table A and article 28 do not apply.

30. Without prejudice to the obligation of any director to disclose his interest in accordance with section 317 of the Act, a director may vote at a meeting of directors or of a committee of directors on any resolution concerning a matter in respect of which he has, directly or indirectly, an interest or duty. The director must be counted in the quorum present at a meeting when any such resolution is under consideration and if he votes his vote must be counted.

## DIVIDENDS

31. The directors may deduct from a dividend or other amounts payable to a person in respect of a share any amounts due from him to the Company on account of a call or otherwise in relation to a share.

## CAPITALISATION OF PROFITS

32. The directors may, with the authority of an ordinary resolution of the Company, resolve that any shares allotted under regulation 110 of Table A to any member in respect of a holding by him of any partly-paid shares rank for dividend, so long as those shares remain partly paid, only to the extent that those partly-paid shares rank for dividend and regulation 110 of Table A is modified accordingly.

## NOTICES

33. Regulation 112 of Table A is modified by the deletion of the last sentence and the substitution for it of the following: "A member whose registered address is not within the United Kingdom is entitled to have notices given to him at that address.".

34. A notice sent to a member (or another person entitled to receive notices under the articles) by post to an address within the United Kingdom is deemed to be given:

(a) 24 hours after posting, if pre-paid as first class, or

(b) 48 hours after posting, if pre-paid as second class.

A notice sent to a member (or other person entitled to receive notices under the articles) by post to an address outside the United Kingdom is deemed to be given 72 hours after posting, if pre-paid as airmail. Proof that an envelope containing the notice was properly addressed, pre-paid and posted is conclusive evidence that the notice was given. A notice not sent by post but left at a member's registered address is deemed to have been given on the day it was left.

35. Regulation 116 of Table A is modified by the deletion of the words "within the United Kingdom".

## INDEMNITY

36. Subject to the provisions of the Act, but without prejudice to an indemnity to which he may otherwise be entitled, every director, alternate director or secretary of the Company must be indemnified out of the assets of the Company against all costs, charges, losses and liabilities incurred by him in the execution of his duties or the exercise of his powers, authorities and discretions including, without limitation, a liability incurred:

    (a) defending proceedings (whether civil or criminal) in which judgment is given in his favour or in which he is acquitted, or which are otherwise disposed of without a finding or admission of material breach of duty on his part, or

    (b) in connection with any application in which relief is granted to him by the court from liability for negligence, default, breach of duty or breach of trust in relation to the affairs of the Company.

37. The directors may exercise all the powers of the Company to purchase and maintain insurance for the benefit of a person who is an officer or employee, or former officer or employee, of the Company or of a company which is a subsidiary undertaking of the Company or in which the Company has an interest (whether direct or indirect), or who is or was trustee of a retirement benefits scheme or another trust in which an officer or employee or former officer or employee is or has been interested, indemnifying him against liability for negligence, default, breach of duty or breach of trust or another liability which may lawfully be insured against by the Company.

## SOLE MEMBER

38. If and for so long as the Company has only one member:

    (a) in relation to a general meeting, the sole member or a proxy for that member or (if the member is a corporation) a duly authorised representative of that member is a quorum and regulation 40 of Table A is modified accordingly;

(b)     a proxy for the sole member may vote on a show of hands and regulation 54 of Table A is modified accordingly;

(c)     the sole member may agree that any general meeting, other than a meeting called for the passing of an elective resolution, be called by shorter notice than that provided for by the articles; and

(d)     all other provisions of the articles apply with any necessary modification (unless the provision expressly provides otherwise).

## NAMES AND ADDRESSES OF SUBSCRIBERS

*Kalpuatta*

KALPNA SHAH
For and on behalf of
Legibus Nominees Limited
200 Aldersgate Street
London EC1A 4JJ

*AOrban*

ANGELA ORBAN
For and on behalf of
Legibus Secretaries Limited
200 Aldersgate Street
London EC1A 4JJ

---

DATED this 12th day of October 1994

WITNESS to the above signatures:

Denise Ward            *Award*
200 Aldersgate Street
London EC1A 4JJ

# EXHIBIT 6



# Find and update company information

Companies House does not verify the accuracy of the information filed (http://resources.companieshouse.gov.uk/serviceInformation.shtml#compInfo)
Advanced company search (/advanced-search)

R&Q CAPITAL NO. 8 LIMITED

Company number **05989679**

Follow this company

File for this company (https://beta.companieshouse.gov.uk/company/05989679/authorise?
return_to=/company/05989679)

— Overview (https://beta.companieshouse.gov.uk/company/05989679)

— Filing history (https://beta.companieshouse.gov.uk/company/05989679/filing-history)

— People (https://beta.companieshouse.gov.uk/company/05989679/officers)

— Charges (https://beta.companieshouse.gov.uk/company/05989679/charges)

— More (https://beta.companieshouse.gov.uk/company/05989679/more)

Registered office address
71 Fenchurch Street, London, England, EC3M 4BS

Company status
Active

Company type
Private limited Company

Incorporated on
6 November 2006

## Accounts

Next accounts made up to **31 December 2022**
due by **30 September 2023**

Last accounts made up to **31 December 2021**

## Confirmation statement

Next statement date **18 June 2023**
due by **2 July 2023**

Last statement dated **18 June 2022**

# Nature of business (SIC)

- 65120 - Non-life insurance

# Previous company names

| Name | Period |
|------|--------|
| VIBE CORPORATE MEMBER LIMITED | 03 Apr 2014 - 06 May 2021 |
| RITC CORPORATE MEMBER LIMITED | 06 Nov 2006 - 03 Apr 2014 |

Tell us what you think of this service (https://www.smartsurvey.co.uk/s/getcompanyinformation/) Is there anything wrong with this page? (/help/feedback?sourceurl=https://find-and-update.company-information.service.gov.uk/company/05989679)

Policies Link opens in new tab

Cookies (https://beta.companieshouse.gov.uk/help/cookies)

Contact us Link opens in new tab

Accessibility statement (https://beta.companieshouse.gov.uk/help/accessibility-statement)

Developers Link opens in new tab

Built by Companies House

© Crown copyright



# CS01 (ef)

## Confirmation Statement

Company Name: **VIBE CORPORATE MEMBER LIMITED**
Company Number: **05989679**

Received for filing in Electronic Format on the: **23/06/2020**

X97UHYQO

---

Company Name: **VIBE CORPORATE MEMBER LIMITED**

Company Number: **05989679**

Confirmation
Statement date: **20/06/2020**

# Full details of Shareholders

The details below relate to individuals/corporate bodies that were shareholders during the review period or that had ceased to be shareholders since the date of the previous confirmation statement.

Shareholder information for a non-traded company as at the confirmation statement date is shown below

Shareholding 1:     **9 ORDINARY shares held as at the date of this confirmation statement**
Name:               **VIBE UK HOLDINGS LTD**

# Confirmation Statement

I confirm that all information required to be delivered by the company to the registrar in relation to the confirmation period concerned either has been delivered or is being delivered at the same time as the confirmation statement

# Authorisation

Authenticated

This form was authorised by one of the following:

Director, Secretary, Person Authorised, Charity Commission Receiver and Manager, CIC Manager, Judicial Factor

**FILE COPY**



# CERTIFICATE OF INCORPORATION

# OF A PRIVATE LIMITED COMPANY

## Company No.   5989679

The Registrar of Companies for England and Wales hereby certifies that

RITC CORPORATE MEMBER LIMITED

is this day incorporated under the Companies Act 1985 as a private
company and that the company is limited.

Given at Companies House, London, the  6th November 2006



*N059896794*



THE OFFICIAL SEAL OF THE
REGISTRAR OF COMPANIES



*Companies House*
—— *for the record* ——



**12**

Please complete in typescript, or in bold black capitals.

CHFP025

### Declaration on application for registration

5989679

**Company Name in full**

RITC Corporate Member Limited

**I,** Christopher John Sage

**of** Kendall Freeman, One Fetter Lane, London EC4A 1JB

† Please delete as appropriate.

*do solemnly and sincerely declare that I am a [Solicitor engaged in the formation of the company]* XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXX† *and that all the requirements of the Companies Act 1985 in respect of the registration of the above company and of matters precedent and incidental to it have been complied with.*

*And I make this solemn Declaration conscientiously believing the same to be true and by virtue of the Statutory Declarations Act 1835.*

**Declarant's signature** *CJSage*

~~Lewis Silkin LLP~~
~~5 Chancery Lane~~
~~Clifford's Inn~~
~~London EC4A 1BL~~

**Declared at**

| | Day | Month | Year |
|---|---|---|---|
| **On** | 0 3 | 1 1 | 2 0 0 6 |

❶ Please print name.

**before me** ❶  MARK LIM

**Signed** *MarkLim*   **Date** 3/11/2006

† ~~A Commissioner for Oaths or Notary Public or Justice of the Peace or~~ <u>Solicitor</u>

Please give the name, address, telephone number and, if available, a DX number and Exchange of the person Companies House should contact if there is any query.

Kendall Freeman
One Fetter Lane
LONDON
EC4A 1JB

Ref: CIS/01143439     Tel 020 7583 4055
DX number 103          DX exchange LONDON

When you have completed and signed the form please send it to the Registrar of Companies at:
**Companies House, Crown Way, Cardiff, CF14 3UZ   DX 33050 Cardiff**
for companies registered in England and Wales
**or**
**Companies House, 37 Castle Terrace, Edinburgh, EH1 2EB**
for companies registered in Scotland          **DX 235 Edinburgh**

*LIRHKKAP*
LD1                    23
COMPANIES HOUSE    06/11/2006

*Laserform International 12/99*

127137



**10**

**First directors and secretary and intended situation of registered office**

*Please complete in typescript, or in bold black capitals.*

CHFP025

Notes on completion appear on final page

5989679

**Company Name in full**

RITC Corporate Member Limited

**Proposed Registered Office**

(PO Box numbers only, are not acceptable)

Two Minster Court

Mincing Lane

Post town: London

County / Region: [blank]   Postcode: EC3R 7YN

If the memorandum is delivered by an agent for the subscriber(s) of the memorandum mark the box opposite and give the agent's name and address.

Agent's Name: [blank]

Address: [blank]

Post town: [blank]

County / Region: [blank]   Postcode: [blank]

Number of continuation sheets attached: 1

You do not have to give any contact information in the box opposite but if you do, it will help Companies House to contact you if there is a query on the form. The contact information that you give will be visible to searchers of the public record.

Kendall Freeman
One Fetter Lane
LONDON
EC4A 1JB

Ref: CIS/01143439    Tel 020 7583 4055
DX number 103    DX exchange LONDON

When you have completed and signed the form please send it to the Registrar of Companies at:

**Companies House, Crown Way, Cardiff, CF14 3UZ  DX 33050 Cardiff**
for companies registered in England and Wales    **or**
**Companies House, 37 Castle Terrace, Edinburgh, EH1 2EB**
for companies registered in Scotland    **DX 235 Edinburgh**

LD1
COMPANIES HOUSE
*LIRHJKAO*
24
06/11/2006

Laserform International 4/03

127137...

## Company Secretary (see notes 1-5)

| | |
|---|---|
| Company name | |

**NAME**  *Style / Title  Ms   *Honours etc

*Voluntary details

Forename(s)  Shirley Lorna Lucy

Surname  Blakelock

Previous forename(s)

Previous surname(s)

†† Tick this box if the address shown is a service address for the beneficiary of a Confidentiality Order granted under section 723B of the Companies Act 1985 otherwise, give your usual residential address. In the case of a corporation or Scottish firm, give the registered or principal office address.

Address ††  26 The Drive

Post town  Westcliff on Sea

County / Region  Essex    Postcode  SS0 8PN

Country  United Kingdom

I consent to act as secretary of the company named on page 1

**Consent signature**  *S Blakelock*   **Date**  2/11/2006

## Directors (see notes 1-5)

*Please list directors in alphabetical order*

**NAME**  *Style / Title  Mr   *Honours etc

Forename(s)  Anthony Gordon

Surname  Hines

Previous forename(s)

Previous surname(s)

†† Tick this box if the address shown is a service address for the beneficiary of a Confidentiality Order granted under section 723B of the Companies Act 1985 otherwise, give your usual residential address. In the case of a corporation or Scottish firm, give the registered or principal office address.

Address ††  Stream House, Tidebrook

Post town  Wadhurst

County / Region  Sussex    Postcode  TN5 6PQ

Country  United Kingdom

| Date of birth | Day | Month | Year |
|---|---|---|---|
| | 2 6 0 5 | 1 9 3 5 | |

Nationality  British

Business occupation  Chairman

Other directorships  The Underwriter Insurance Company Limited

I consent to act as director of the company named on page 1

**Consent signature**  *Anthony. G. Hines*   **Date**  2. 11. 2006

1271377

## Directors (see notes 1-5)
*Please list directors in alphabetical order*

| | | | |
|---|---|---|---|
| **NAME** | *Style / Title | Mr | *Honours etc |

* Voluntary details

| | |
|---|---|
| Forename(s) | Nigel Harold John |
| Surname | Rogers |
| Previous forename(s) | |
| Previous surname(s) | |

†† Tick this box if the address shown is a service address for the beneficiary of a Confidentiality Order granted under section 723B of the Companies Act 1985 otherwise, give your usual residential address. In the case of a corporation or Scottish firm, give the registered or principal office address.

| | |
|---|---|
| **Address** †† | Penthouse 10 |
| | Regents Court, Wrights Lane |
| Post town | |
| County / Region | London |
| Postcode | W8 5SJ |
| Country | UK |

| | Day | Month | Year | |
|---|---|---|---|---|
| **Date of birth** | 1 8 | 0 9 | 1 9 4 9 | **Nationality** British |

| | |
|---|---|
| **Business occupation** | Chief Executive Officer |
| **Other directorships** | RITC Syndicate Management Limited |
| | The Underwriter Group Limited (cont'd) |

I consent to act as director of the company named on page 1

| | | | |
|---|---|---|---|
| **Consent signature** | *[signature]* | **Date** | 2/11/2006 |

---

**This section must be signed by**

*Either*

**an agent on behalf of all subscribers**

| | | | |
|---|---|---|---|
| | **Signed** | | **Date** |

*Or* **the subscribers**

**( *i.e those who signed as members on the memorandum of association).***

| | | | |
|---|---|---|---|
| **Signed** | *[signature]* | **Date** | 2/11/2006 |
| **Signed** | | **Date** | |
| **Signed** | | **Date** | |
| **Signed** | | **Date** | |
| **Signed** | | **Date** | |
| **Signed** | | **Date** | |

1271372

## Notes

1. Show for an individual the full forename(s) NOT INITIALS and surname together with any previous forename(s) or surname(s).

   If the director or secretary is a corporation or Scottish firm - show the corporate or firm name on the surname line.

   Give previous forename(s) or *surname(s)* except that:

   - for a married woman, the name by which she was known before marriage need not be given,

   - names not used since the age of 18 or for at least 20 years need not be given.

   A peer, or an individual known by a title, may state the title instead of or in addition to the forename(s) and surname and need not give the name by which that person was known before he or she adopted the title or succeeded to it.

   Address:

   Give the usual residential address.

   In the case of a corporation or Scottish firm give the registered or principal office.

   *Subscribers:*

   The form must be signed personally either by the subscriber(s) or by a person or persons authorised to sign on behalf of the subscriber(s).

2. Directors known by another description:

   - A director includes any person who occupies that position even if called by a different name, for example, governor, member of council.

3. Directors details:

   - Show for each individual director the director's date of birth, business occupation and nationality.
     **The date of birth must be given for every individual director.**

4. Other directorships:

   - Give the name of every company of which the person concerned is a director or has been a director at any time in the past 5 years. You may exclude a company which either **is** or at **all times during the past 5 years**, when the person was a director, **was** :

   - dormant,

   - a parent company which wholly owned the company making the return,

   - a wholly owned subsidiary of the company making the return, or

   - *another wholly owned* subsidiary of the same parent company.

   If there is insufficient space on the form for other directorships you may use a separate sheet of paper, which should include the company's number and the full name of the director.

5. Use Form 10 continuation sheets or photocopies of page 2 to provide details of joint secretaries or additional directors.

**RITC CORPORATE MEMBER LIMITED**

**CONTINUATION SHEET TO FORM 10**

**NIGEL HAROLD JOHN ROGERS - DIRECTORSHIPS**

| Company name: | Company number: |
|---|---|
| RITC Syndicate Management Limited | 5957729 |
| The Underwriter Group Limited | 3654606 |
| The Underwriter Insurance Company Limited | 3654581 |
| The Underwriter Management Services Company Limited | 3861461 |
| RG Kensington Management Company Limited | 3232518 |



C7043

No. 5989679

THE COMPANIES ACTS 1985 AND 1989
PRIVATE COMPANY LIMITED BY SHARES
MEMORANDUM OF ASSOCIATION
OF

RITC CORPORATE MEMBER LIMITED

1.      The Company's name is " RITC CORPORATE MEMBER LIMITED ".

2.      The Company's registered office is to be situated in England and Wales.

3.1     The Company's objects are:

    (1)     to carry on business as a general commercial company;

    (2)     without prejudice to the generality of the objects and powers of the Company derived from s.3A of the Companies Act 1985 the Company has the following additional objects:

(a)     to carry on the business of underwriting of any type of insurance and reinsurance business as a corporate member of Lloyd's, to observe and carry out all the requirements from time to time of the Council of Lloyd's in relation to such business, to manage the investments comprising its funds at Lloyd's and cash resources, to enter into, perform and enforce agreements with managing agents and licensed Lloyd's advisers and to negotiate remuneration in connection therewith, to hedge its foreign exchange exposures, to take out insurance or reinsurance, to carry out research and analysis in relation to syndicates at Lloyd's and to carry on any other activity which may be incidental to, or necessary or desirable in relation to the underwriting of any kind of insurance and reinsurance business as a corporate member of Lloyd's;

(b)     to carry on at such places in the United Kingdom or elsewhere as may be determined by the Directors of the Company any other trade or business which may seem to the Company capable of being conveniently carried on in connection with the above, or calculated directly or indirectly to enhance the value of or render profitable any of the property or rights of the Company or further any of its objects;

(c)     to purchase or otherwise acquire any patents, brevets d'invention, licences, concessions and the like conferring any exclusive or non-exclusive or limited right to use any invention which may seem capable of being used for any of the purposes of the Company or the acquisition of which may seem calculated directly or indirectly to benefit the Company, and to use, exercise, develop or



LD1                      25
COMPANIES HOUSE         06/11/2006

PCL2/1271641/1

grant licences in respect of or otherwise turn to account the property and rights so acquired;

(d) to enter into any arrangements with any governments or authorities, supreme, municipal, local or otherwise, which may seem conducive to the Company's objects or any of them and to obtain from any such government or authority any rights privileges and concessions which the Company may think it desirable to obtain, and to carry out, exercise and comply with any such arrangements, rights, privileges and concessions;

(e) to purchase or otherwise acquire and undertake all or any part of the business, property and liabilities of any person or company carrying on any business which the Company is authorised to carry on or possessed of property suitable for the purposes of the Company and to pay cash or to issue any shares, stocks, debentures, and debenture stock of the Company as the consideration for such purchase or acquisition and to undertake any liabilities or obligations relating to the business or property so purchased or acquired;

(f) to enter into partnership or into any arrangement for sharing profits or to amalgamate with any person or company carrying on or about to carry on any business which this Company is authorised to carry on, or any business or transaction capable of being conducted so as to benefit the Company; to take or otherwise acquire and hold shares in any other company having objects altogether or in part similar to those of the Company, or carrying on any business capable of being conducted so as directly or indirectly to benefit the Company;

(g) to purchase, subscribe for or otherwise acquire and hold shares, stocks or other interests in or obligations of any other company or corporation;

(h) generally to purchase, take on lease, exchange, hire or otherwise acquire any real or personal property and any rights or privileges which the Company may think necessary or convenient with reference to any of these objects, and capable of being profitably dealt with in connection with any of the Company's property or rights for the time being, and to construct, maintain and alter any buildings or works necessary or convenient for the purposes of the Company;

(i) to sell the undertaking of the Company, or any part thereof, or any agency connected therewith, for such consideration as the Company may think fit, and in particular for shares partly or fully paid up, debentures, debenture stock, or securities of any other company whether actually incorporated and existing or proposed to be formed or promoted by the purchaser or otherwise;

(j) to promote, finance or assist any other company or companies for the purpose of its or their acquiring all or any of the property, rights and liabilities of this

Company, or for any other purpose which may seem directly or indirectly calculated to benefit the Company;

(k) to raise or borrow or secure the payment of money for the purpose of the Company upon such terms and on such security as may seem to the Company expedient, and in particular by the issue of debentures or debenture stock, whether perpetual or not, and charged upon the whole or any part of the property of the Company, both present and future, including its uncalled capital;

(l) to stand surety for or to guarantee, support or secure the performance of all or any of the obligations of any person, firm or company whether by personal covenant or by mortgage, charge or lien upon the whole or any part of the undertaking, property and assets of the Company, both present and future, including its uncalled capital or by a combination of such methods; and in particular (but without limiting the generality of the foregoing) to guarantee, support or secure whether by personal covenant or by any such mortgage, charge or lien or by a combination of such methods the performance of all or any of the obligations (including the repayment or payment of the principal and premium of and interest on any securities) of any company which is for the time being the Company's holding company (as defined by s.736 Companies Act 1985) or another subsidiary (as defined by the said s.736) of any such holding company;

(m) to make and execute any deed, indenture, agreement, appointment or other legal or notarial act or document which may be necessary, expedient or desirable for effecting or carrying out any matter or transaction within the powers of the Company or which may be incidental thereto or connected therewith, and to draw, accept, endorse, discount and execute and issue cheques, bills of exchange, promissory notes, debentures, bills of lading, warrants and other negotiable, commercial or transferable instruments or securities;

(n) to pay all preliminary expenses of the Company and any company formed or promoted by the Company, and to remunerate any person or company for services rendered or to be rendered in placing or assisting to place or guaranteeing the placing of any shares in the Company's capital or any debentures, debenture stock or other securities of the Company or in or about the formation or promotion of the Company or the conduct of its business;

(o) to invest and deal with the moneys of the Company not immediately required in such manner as may be from time to time determined;

(p) to lend money to such person and on such terms as may seem expedient;

(q) to give any guarantee or indemnity as may seem expedient;

(r)     to sell, improve, manage, develop, lease, mortgage, dispose of, turn to account or otherwise deal with all or any part of the property of the Company;

(s)     to distribute by way of dividend or otherwise any of the property of the Company in specie;

(t)     to do all or any of the above things in any part of the world, and as principals, agents, contractors, nominees, trustees, or otherwise, and by or through trustees, agents, or otherwise and either alone or in conjunction with others and either gratuitously or for reward;

(u)     to procure the Company to be registered or recognised and to establish and maintain local registers, agencies and branch places of business in any colony or dependency or in any foreign country or place;

(v)     to adopt such means of making known the business, products and services of the Company as may seem expedient and in particular by advertising in the press, by circulars, by purchase and exhibition of works of art or interest or by the publication of books and periodicals and by granting prizes, rewards and donations;

(w)     to establish and support or aid in the establishment and support of associations, institutions, funds, trusts and conveniences calculated to benefit the employees or ex-employees of the Company (including any Director or other officer of the Company) or the dependants or connections of such persons and to grant pensions and allowances and to make payment towards insurance for any such persons and to subscribe or guarantee money for charitable or benevolent objects or for any exhibition or for any public, general or useful objects;

(x)     to do all such other things as may be deemed incidental or conducive to the attainment of the above objects or any of them.

3.2     The objects set forth in each paragraph of Clause 3.1 shall not be restrictively construed but the widest interpretation shall be given thereto, and they shall not, except where they expressly so require, be in any way limited or restricted by reference to or inference from any other object or objects set forth in such paragraphs or from the terms of any other object or objects or from the name of the Company. None of the objects specified in Clause 3.1 or the powers thereby conferred shall (except where the object expressly so requires) be deemed subsidiary or ancillary to any other objects or powers therein mentioned but the Company shall have as full a power to exercise all or any of the objects conferred by and provided in each paragraph of Clause 3.1 as if each paragraph were the objects of a separate

company. The word **"company"** in Clause 3.1 and 3.2, except where used in reference to the Company, shall be deemed to include any partnership or other body of persons, whether incorporated or unincorporated and whether registered or resident or domiciled in the United Kingdom or elsewhere.

4.      The liability of the members is limited.

5.      The Company's share capital is £100 divided into 100 shares of £1 each.

[I/We], the subscriber[s] to this Memorandum of Association, wish to be formed into a company pursuant to this Memorandum; and [I/we] agree to take the number of shares shown opposite our name.

| NAME AND ADDRESS OF SUBSCRIBER[S] | Number of shares taken by the Subscriber[s] |
|---|---|

Nigel Harold John Rogers
Penthouse 10
Regents Court
Wrights Lane
London
W8 5SJ

1

..............................................

Total shares taken          1

DATED this *2 November* 2006

WITNESS to the above signature(s):

Full Name: *JOANNA STANNELL*

..........................................
Signature

Address: *402 Cheney St. ECIV 8BF*

Occupation: *Trainee Solicitor*

No. .............

THE COMPANIES ACTS 1985 AND 1989

PRIVATE COMPANY LIMITED BY SHARES

ARTICLES OF ASSOCIATION

OF

RITC CORPORATE MEMBER LIMITED

1.    **INTERPRETATION**

1.1.    In these Articles the expression "Table A" means Table A in the Schedule to the Companies (Tables A to F) Regulations 1985 as amended by the Companies (Tables A to F) (Amendment) Regulations 1985.

1.2.    Save as otherwise provided in these Articles, words and expressions which have particular meanings in Table A shall have the same respective meanings in these Articles.

1.3.    Wherever in Table A or in these Articles any notice, resolution or other document is required to be signed by any person the reproduction of the signature of such person by means of telex print-out or facsimile copy shall be fully sufficient, provided that such notice, resolution or document shall within 14 days be confirmed to the recipient by writing signed in manuscript by such person.

1.4.    In Table A and in these Articles, references to writing shall include any method of representing or reproducing words in a legible and non-transitory form.

1.5.    References herein to Articles are to the numbered paragraphs of these Articles and to Regulations are to the regulations of Table A.

2.    **ADOPTION OF TABLE A**

2.1.    The Company is a private company. The Regulations contained in Table A shall (except where they are excluded or modified by these Articles) apply to the Company and, together with these Articles, shall constitute the Articles of the Company.

2.2.    Subject to Article 2.1, no regulations scheduled to any statute concerning companies shall apply to the Company.

3.     **ALLOTMENT AND ISSUE OF SHARES**

3.1.   Subject to the Act and to any direction to the contrary which may be given by ordinary or other resolution of the Company, any unissued shares of the Company (whether forming part of the original or any increased capital) shall be at the disposal of the directors who may offer, allot (with or without conferring a right of renunciation), grant options over or otherwise dispose of the same to such persons, at such times, and generally on such terms and conditions as they may determine.

3.2.   Subject to the provisions of the Act, the directors are generally and unconditionally authorised for the purposes of section 80 of the Act to exercise any power of the Company to allot (as defined for the purposes of such section) all relevant securities (as defined for such purposes) of the Company subsisting at the date of incorporation at any time or times during the period of five years from such date.

3.3.   At the expiry of such period of five years, the authority contained in Article 3.2 shall expire but such authority shall permit the directors to make any offer or agreement before the expiry of such authority which would or might require relevant securities to be allotted, or rights to subscribe for or to convert any security into shares to be granted, after the expiry of such authority.

3.4.   Section 89(1) of the Act shall not apply to the allotment by the Company of equity securities.

4.     **REDEEMABLE SHARES**

       Subject to the provisions of the Act, shares may be issued which are to be redeemed or are to be liable to be redeemed at the option of the Company or the member. Regulation 3 shall not apply.

5.     **PURCHASE OF OWN SHARES**

       Subject to the provisions of the Act, the Company may enter into any contract for the purchase of all or any of its shares of any class (including any redeemable shares) and any contract under which it may, subject to any conditions, become entitled or obliged to purchase all or any such shares and may make payments in respect of the redemption or purchase of such shares otherwise than out of distributable profits or the proceeds of a fresh issue of shares. Every contract entered into pursuant to this Article shall be authorised by such resolution of the Company as may for the time

being be required by law but subject thereto the directors shall have full power to determine or approve the terms of any such contract. Neither the Company nor the directors shall be required to select the shares in question rateably or in any other particular manner as between the holders of shares of the same class or as between them and the holders of shares of any other class or in accordance with the rights as to dividends or capital conferred by any class of shares. Subject to the provisions of the Act, the Company may agree to the variation of any contract entered into pursuant to this Article and to the release of any of its rights or obligations under any such contract. Notwithstanding anything to the contrary contained in the Articles, the rights attaching to any class of shares shall not be deemed to be varied by anything done by the Company pursuant to this Article. Regulation 35 shall not apply.

6. **CALLS**

The liability of any person in default in respect of a call shall be increased by the addition at the end of the first sentence of Regulation 18 of the words "and all expenses that may have been incurred by the Company by reason of such non-payment.".

7. **TRANSFER OF SHARES**

7.1. No share shall be transferred, assigned, charged or otherwise disposed of without the prior written consent of all the members. Regulation 24 shall not apply.

7.2. The directors shall subject to its being properly stamped, forthwith register any transfer to which all the members for the time being of the Company shall have assented in writing and shall not register any transfer which does not comply with the provisions of Article 7.1 whether or not it is of fully-paid shares.

8. **LIMITATION ON SHAREHOLDINGS**

8.1. The purpose of this Article 8 is to prevent any person (other than a Permitted Person as defined below), to the detriment of the Company, having the right, either alone or with any Connected Person (as defined below), to exercise, or to control a specified percentage (a Relevant Percentage as defined below) or more of the voting power at general meetings of the Company or owning a specified percentage (a Relevant Percentage and defined below) or more of the economic interest in the Company.

8.2.    In this Article 8:

(a)    "**Additional Interest**" means any such interest as referred to in paragraph (f)(ii) below;

(b)    "Associates" means:

    (i)    a person's spouse and children (including step-children and adopted children) under the age of 18 years;

    (ii)    any body corporate of which that person or their spouse is a director;

    (iii)    any person who is an employer, employee or partner of the person or of their spouse; and

    (iv)    any body corporate of which the person or their spouse, either alone or with any Connected Person, is controller;

(c)    "**Companies Act**" means the Companies Act 1985 (as amended by the Companies Act 1989 and any subsequent subordinate legislation) as in force at the date of adoption of this Article 8 and notwithstanding any repeal, modification or re-enactment thereof after that date (including, for the avoidance of doubt, any amendment, replacement or repeal by regulations made by the Secretary of State pursuant to s.210A of that Act to the definition of the relevant share capital in s.198(2) or to the provisions as to what is taken to be an interest in shares in s.208 or as to what interests are to be disregarded in s.209) but so that the percentages giving rise to a notifiable interest in s.199(2)(a) and (b) of that Act shall be 3 per cent and 10 per cent respectively or such lesser percentages as may from time to time be prescribed in relation to s.199(2)(a) and (b) respectively for the purposes of s.199(2) of that Act;

(d)    "**Connected Person**" in relation to a person ("A") means:

    (i)    any person who is party to any agreements, arrangement or understanding with A involving mutual obligations, understandings, or expectations with regard to the retention or disposal of any shares in a body corporate or to the exercise of any voting power conferred by such shares or to any other influence arising from such shares;

    (ii)    any person of whom A is the Controller;

    (iii)    where A is a body corporate, any trustee of its pension funds;

    (iv)    where A is a body corporate, its directors and their Associates;

    (v)    where A is an individual, his Associates;

(e)     **"Controller"** in relation to a body corporate means:

    (i)     any person who, either alone or with any Associate or Connected Person, is entitled to exercise, or to control the exercise of a Relevant Percentage or more of the voting power at any general meeting of the body corporate; or

    (ii)    any person who, either alone or with any Associate or Connected Person, holds such part of the share capital of the body corporate as would, if the whole of the income of that body corporate were in fact distributed amongst its shareholders, entitle him to receive a Relevant Percentage or more of the amount so distributed; or

    (iii)   any person who, either alone or with any Associate or Connected Person, has such rights as would, in the event of a winding up of the body corporate or in any other circumstances, entitle him to receive a Relevant Percentage or more of the assets of the body corporate available for distribution amongst its shareholders; or

    (iv)    any person in accordance with whose directions or instructions (either alone or with those of any Associate or Connected Person) the directors of the body corporate are accustomed to act

and **"control"** shall be construed accordingly;

(f)     **"interest"**, in relation to shares, means:

    (i)     any interest which would be taken into account in determining for the purposes of Part VI of the Companies Act whether a person has a notifiable interest (including any interest which he would be taken as having for those purposes); and

    (ii)    any interest (an **"Additional Interest"**) mentioned in s.209(1) of the Companies Act (but only on the basis that such Additional Interest would not be disregarded for the purposes of ss.198 to 202 of the Companies Act by reason of the provisions of ss.209(5) and (6) of that Act) or mentioned in s.208(4)(b) of the Companies Act (but on the basis that the entitlement referred to therein could arise under an agreement within the meaning of ss.204(5) and (6) of that Act);

and **"interested"** shall be construed accordingly;

(g)     **"Lloyd's Act"** means Lloyd's Act 1982;

(h)     **"Permitted Person"** means any person who has the prior written consent of Lloyd's:

(i)     to have the right, either alone or with any Associate or Connected Person, to exercise, or to control the exercise of, a Relevant Percentage or more of the voting power at general meetings of the Company; or

(ii)    to hold, either alone or with any Associate or Connected Person, such part of the share capital of the Company as would, if the whole of the income of the Company were in fact distributed amongst the shareholders, entitle him to receive a Relevant Percentage or more of the amount so distributed; or

(iii)   to have such rights, either alone or with any Associate or Connected Person, as would, in the event of a winding-up of the Company, or in any other circumstances, entitle him to receive a Relevant Percentage or more of the assets of the Company available for distribution amongst the shareholders;

(i)     **"Relevant Percentage"** means such percentage of qualifying interests, rights or entitlements in a corporate managing agency or a corporate member as Lloyd's shall determine from time to time as being the percentage requiring the consent of Lloyd's;

(j)     "Relevant Person" means:

(i)     any person (whether or not identified) who has, or who appears to the Board to have, at any particular time the right, either alone or with any Associate or Connected Person, to exercise or to control the exercise of a Relevant Percentage or more of the total votes attaching to Relevant Share Capital of all classes (taken as a whole) and capable of being cast on a poll at a general meeting of the Company convened at such time, or who is deemed for the purposes of this Article 8 to be a Relevant Person; or

(ii)    any person (whether or not identified) who holds, or who appears to the Board to hold, at any particular time, either alone or with any Associate or Connected Party, such part of the Relevant Share Capital as would, if the whole of the income of the Company were in fact distributed amongst the shareholders, entitle him to receive a Relevant Percentage or more of the amount so distributed; or

(iii)   any person (whether or not identified) who has or who appears to the Board to have, at any particular time, either alone or with any Associate or Connected Person, such rights in respect of the Relevant Share Capital as would, in the event of a winding up of the Company or in any other circumstances, entitle him to receive a Relevant

Percentage or more of the assets of the Company available for distribution amongst the shareholders;

(k)     "**Relevant Share Capital**" means for the purposes of the definition of "Relevant Person" in (j)(i) above the issued share capital of the Company carrying rights to vote in any circumstances at general meetings of the Company and, for the purposes of the definition of Relevant Person in (j)(ii) and (iii) above, means the entire issued share capital of the Company;

(l)     "**Required Disposal**" means a disposal or disposals of such a number of Relevant Shares (or interests therein) as will cause a Relevant Person to cease to be a Relevant Person, not being a disposal to another Relevant Person (other than a Permitted Person) or a disposal which constitutes any other person (other than a Permitted Person) a Relevant Person;

(m)     "**Relevant Shares**" means all shares comprised in the Relevant Share Capital in which a Relevant Person has, or appears to the Board to have, an interest or which are deemed for the purposes of this Article 8 to be Relevant Shares; and, for the purposes of this Article 8, where the Board resolves that it has made reasonable enquiries and that it is unable to determine:

(i)     whether or not a particular person has an interest in any particular shares comprised in Relevant Share Capital; or

(ii)     who is interested in any particular shares so comprised

the shares concerned shall be deemed to be Relevant Shares and all persons interested in them to be Relevant Persons.

8.3.     Subject to Article 8.4, the provisions of Part VI of the Companies Act shall apply in relation to the Company as if those provisions extended to all interests, including but not limited to Additional Interests, and accordingly the rights and obligations arising under that Part shall apply in relation to the Company, its members and all persons interested in Relevant Share Capital; but so that Additional Interests shall, when disclosed to the Company, be entered in a separate register kept by the Company for that purpose. The rights and obligations created by this Article 8.3 in respect of interests in shares (including, but not limited to, Additional Interests) are in addition to and separate from those arising under Part VI of the Act.

8.4.     If:

(a)     to the knowledge of the Board, any person other than a Permitted Person is or becomes a Relevant Person (including, without limitation by virtue of being deemed to be one); and

(b)     following consultation with the Board, Lloyd's notifies the Company to the effect that, by virtue of such person becoming or being a Relevant Person the Company may not be or shall not be fit and proper to be or to remain a corporate member of Lloyd's without satisfaction of certain conditions (as the case may be)

then the Board shall be entitled to give notice to all persons (other than persons referred to in Article 8.9) who appear to the Board to have interests in the Relevant Shares and, if different, to the registered holders of those shares. The notice shall set out the restrictions referred to in Article 8.7 and call for a Required Disposal to be made within twenty-one days of the giving of the notice to the holder or such longer period as the Board considers reasonable. The Board may extend the period in which any such notice is required to be complied with and may withdraw any such notice (whether before or after the expiration of the period referred to) if it appears to it that there is no Relevant Person in relation to the shares concerned. After the giving of such notice, and save for the purpose of a Required Disposal under this Article 8.4 or Article 8.5, no transfer of any of the Relevant Shares may be registered until either the notice is withdrawn or a Required Disposal has been made to the satisfaction of the Board and registered.

8.5.    If a notice given under Article 8.4 has not been complied with in all respects to the satisfaction of the Board and has not been withdrawn, the Board shall, so far as it is able, make a Required Disposal (or procure that a Required Disposal is made) and shall give written notice of the disposal to those persons on whom the notice was served. The Relevant Person(s) and the registered holder(s) of the shares duly disposed of shall be deemed irrevocably and unconditionally to have authorised the Board to make such Required Disposal. The manner, timing and terms of any such Required Disposal made or sought to be made by the Board (including, but not limited to, the price or prices at which the same is made and the extent to which assurance is obtained that no transferee, except a Permitted Person, is or would become a Relevant Person) shall be such as the Board determines, based on advice from bankers, brokers, or other persons as the Board considers it appropriate to consult for the purpose, to be reasonably practicable having regard to all the circumstances, including, but not limited to, the number of shares to be disposed of and the requirement that the disposal be made without delay; and the Board shall not be liable to any person (whether or not a Relevant Person) for any of the consequences of reliance on such advice. If, in relation to a Required Disposal to be made by the Board, Relevant Shares are held by more than one holder (treating joint holders of any Relevant Shares as a single holder) the Board shall cause as nearly as practicable the same proportion of each holding (so far as known to it) of the Relevant Shares to be sold.

8.6.    For the purpose of effecting any Required Disposal, the Board may authorise in writing any officer or employee of the Company to execute any necessary transfer on behalf of any holder and may enter the name of the transferee in the register of

members in respect of the transferred shares notwithstanding the absence of any share certificate and may issue a new certificate to the transferee and an instrument of transfer executed by such person shall be as effective as if it had been executed by the registered holder of the transferred shares and the title of the transferee shall not be affected by any irregularity or invalidity of the proceedings relating thereto. The net proceeds of the disposal shall be received by the Company whose receipt shall be a good discharge for the purchase money, and shall be paid (without any interest being payable in respect of it and after deduction of any expenses incurred by the Board in the sale) to the former holder (or in the case of joint holders, the first of them named in the register) together with, if appropriate, a new certificate in respect of the balance of the Relevant Shares to which he is entitled upon surrender by him or on his behalf of any certificate in respect of the Relevant Shares sold and formerly held by him.

8.7. A holder of a Relevant Share on whom a notice has been given under (and complying with) Article 8.4 shall not in respect of that share be entitled, until such time as the notice has been complied with to the satisfaction of the Board or withdrawn, to attend or vote at any general meeting of the Company or meeting of the holders of Relevant Share Capital or of any class thereof, or to exercise any other rights conferred by the membership in relation to any such meeting; and the rights to attend (whether in person or by representative or proxy), to speak and to demand and vote on a poll which would have attached to the Relevant Share had it not been a Relevant Share shall vest in the Chairman of any such meeting. The manner in which the Chairman exercises or refrains from exercising any such rights shall be entirely at his discretion. The Chairman of any such meeting shall be informed by the Board of any share becoming or being deemed to be a Relevant Share.

8.8. Without prejudice to the provisions of the Act and subject to the provisions of this Article 8, the Board may assume without enquiry that a person is not a Relevant Person unless the information contained in the registers kept by the Company under Part VI of the Companies Act (as applied and extended by this Article), including the separate register to be kept under Article 8.3, appears to the Board to indicate to the contrary or the Board has reason to believe otherwise, in which circumstances the Board shall make reasonable enquiries to discover whether any person is a Relevant Person.

8.9. If the Board does not give any notice pursuant to this Article 8 because it does not know the identity or address of the person on whom it may give such a notice, then the absence of such a notice in such circumstances and any accidental error in or failure to give any notice to any person to whom notice may be given under this Article 8 shall not prevent the implementation of, or invalidate, any procedure under this Article 8.

8.10. Save as otherwise provided in this Article 8.10, the provisions of the Articles applying to the giving of notice of meetings to members shall apply to the giving to a member

of any notice required by this Article 8. Any notice required by this Article 8 to be given to a person who is not a member, or who is a member (or, in the case of joint holders, who is the person first named in the Register) whose registered address is not within the United Kingdom and who has not given to the Company an address within the United Kingdom at which notices may be given to him, shall be deemed validly served if it is sent through the post in a prepaid envelope addressed to that person at the address (or if more than one, at one of the addresses) if any, at which the Board believes him to be resident or carrying on business or to his last known address as shown on the Register. The notice shall in such a case be deemed to have been given on the second day after posting. Proof that the envelope was properly addressed, prepaid and posted shall be conclusive evidence that the notice was given.

8.11. Any resolution or determination of, or decision or exercise of any discretion or power by, the Board or any Director or by the Chairman of any meeting under or pursuant to the provisions of this Article 8 (including, without prejudice to the generality of the foregoing, as to what constitutes reasonable enquiry or as to the manner, timing and terms of any Required Disposal made by the Board under Article 8.5) shall be final and conclusive; and any disposal or transfer made, or other thing done, pursuant to this Article 8 shall be conclusive and binding on all persons concerned and shall not be open to challenge, whether as to its validity or otherwise on any ground whatsoever. The Board shall not be required to give any reasons for any decision, determination or declaration taken or made in accordance with this Article 8.

8.12. Notwithstanding Article 7 the Board may refuse to register the transfer of a share to a Relevant Person (other than a Permitted Person) or to a person (other than a Permitted Person) if the registration of that transfer would constitute that person a Relevant Person.

8.13. If to the knowledge of the Board, any person, or persons, acquires, directly or indirectly, an interest in shares of the Company which, in the view of the Board constitutes or would give rise to a breach of the provisions of the Lloyd's Act, then the Board shall serve notice on all persons who appear to the Board to have interests in such shares and, if different, to the registered holders of those shares informing such persons of a mandatory disposal ("**Lloyd's Act Disposal**") of such shares, which the Board shall effect, to the extent that it is able. The registered holders of the shares duly disposed of shall be deemed irrevocably and unconditionally to have authorised the Board to make such a Lloyd's Act Disposal. The manner, timing and terms of any Lloyd's Act Disposal made or sought to be made by the Board shall be on the same basis applicable to a Required Disposal and the provisions for effecting a Required Disposal shall apply to a Lloyd's Act Disposal mutatis mutandis.

8.14. For the purposes of Article 8.13, the term "interest" shall be interpreted in accordance with the provisions of the Lloyd's Act in addition to the interpretation set out in Article

8.2 (f) save that, in the event of any conflict, the provisions of the Lloyd's Act shall prevail.

8.15. This Article 8 shall apply notwithstanding any provisions in any other of the Articles which is inconsistent with or contrary to either of them.

## 9. GENERAL MEETINGS AND RESOLUTIONS

9.1. The directors may call general meetings and, on the requisition of members pursuant to the provisions of the Act, shall forthwith proceed to convene an extraordinary general meeting for a date not later than four weeks after receipt of the requisition. Regulation 37 shall not apply.

9.2. No business shall be transacted at any general meeting unless a quorum is present when the meeting proceeds to business, but the absence of a quorum shall not preclude the nomination, election or choice of a chairman which shall not be treated for this purpose as part of the business of the meeting. Save as otherwise provided by this Article and Article 9.3, two persons entitled to vote upon the business to be transacted, each being a member or a proxy for a member or a duly authorised representative of a corporation, shall be a quorum. If and for so long as the Company has only one member, then one member present in person or by proxy or (if a corporation) by a duly authorised representative shall be a quorum. Regulation 40 shall not apply.

9.3. If a quorum is not present within fifteen minutes (or such longer time, not exceeding half an hour, as the chairman of the meeting may decide to wait) after the time appointed for the meeting, or if during a meeting a quorum ceases to be present, the meeting shall stand adjourned to such day and at such other time and place as the chairman of the meeting may determine and at such adjourned meeting one member present in person or by proxy (whatever the number of shares held by him) shall be a quorum. It shall not be necessary to give notice of any meeting adjourned through want of a quorum. Regulation 41 shall not apply.

9.4. If at any General Meeting any votes shall be counted which ought not to have been counted or which might have been rejected, the error shall not vitiate the result of the voting unless it be pointed out at the same meeting, and not in that case unless it shall, in the opinion of the chairman of the meeting, be of sufficient magnitude to vitiate the result of the voting. Regulation 58 shall not apply.

## 10. PROXIES

An instrument appointing a proxy shall be in writing, executed by or on behalf of the appointor and in any usual or common form or in such other form as the directors

may approve and shall be deemed to confer authority to vote on any amendment of a *resolution put to the meeting for which it is given as the proxy thinks fit*. The instrument of proxy shall, unless the contrary is stated therein, be valid as well for any adjournment of the meeting as for the meeting to which it relates. The instrument appointing a proxy and any authority under which it is executed shall be deposited at the office of the Company, or immediately prior to the commencement of a general meeting or class meeting, with the Secretary or the chairman of that meeting. Regulations 60, 61 and 62 shall not apply.

## 11. APPOINTMENT AND RETIREMENT OF DIRECTORS

11.1. The number of the directors shall be determined by ordinary resolution of the Company but unless and until so fixed there shall be no maximum number of directors and the minimum number of directors shall be one. In the event of the minimum number of directors fixed by or pursuant to these Articles being one, a sole director shall have authority to exercise all the powers and discretions by Table A or these Articles expressed to be vested in the directors generally. Regulation 89 shall *be modified accordingly, and Regulation 64 shall not apply.*

11.2. Any member who is the only member of the Company, or any member or members holding in aggregate a majority in nominal value of such of the issued share capital for the time being of the Company as carries the right of attending and voting at general meetings of the Company, by memorandum in writing signed by or on behalf *of him or them and delivered to the office or tendered at a meeting of the directors or* at a general meeting of the Company may at any time and from time to time appoint any person to be a director either to fill a vacancy or as an additional director or remove any director from office howsoever appointed. Any such removal from office shall be deemed to be an act of the Company and shall have effect without prejudice to any claim for damages for breach of any contract of service between him and the Company.

11.3. Without prejudice to the powers conferred by Article 11.2, any person may be appointed a director by the directors either to fill a vacancy or as an additional director.

11.4. In any case where as the result of the death of a sole member of the Company the Company has no members and no directors the personal representatives of such deceased member shall have the right by memorandum in writing signed by or on behalf of him or them and delivered to the office to appoint a person to be a director of the Company and such appointment shall be as effective as if made pursuant to Article 11.2.

11.5. Regulations 73 to 80 (inclusive) and the last sentence of Regulation 84 shall not apply.

## 12. DISQUALIFICATION OF DIRECTORS

The office of a director shall be vacated not only upon the happening of any of the events mentioned in Regulation 81 but also if he is removed from office pursuant to these Articles. Regulation 81 shall be modified accordingly.

## 13. ALTERNATE DIRECTORS

13.1. Any director (other than an alternate director) may appoint any other director, or any other person who is willing to act, to be an alternate director and may remove from office an alternate director so appointed by him. Regulation 65 shall not apply.

13.2. A director or any other person may act as alternate director to represent more than one director, and an alternate director shall be entitled at meetings of the directors or any committee of the directors to one vote for every director which he represents in addition to his own vote (if any) as a director, but he shall count as only one for the purpose of determining whether a quorum if present.

13.3. An alternate director shall cease to be an alternate director if his appointor ceases for any reason to be a director. Regulation 67 shall not apply.

## 14. POWERS OF DIRECTORS

The directors may, by power of attorney or otherwise, appoint any person to be the agent of the Company upon such terms (including terms as to remuneration) as they may think fit and may delegate to any person so appointed any of the powers vested in or exercisable by them including power to sub-delegate. The directors may remove any person appointed under this Article and may revoke or vary such delegation but no person dealing in good faith and without notice of any such revocation or variation shall be affected by it. Regulation 71 shall not apply.

## 15. DELEGATION OF DIRECTORS' POWERS

The directors may delegate any of their powers to committees consisting of such person or persons (whether directors or not) as they think fit. Regulation 72 shall be modified accordingly.

## 16. DIRECTORS' GRATUITIES AND PENSIONS

16.1. The directors, on behalf of the Company, may exercise all the powers of the Company to provide benefits, either by the payment of gratuities or pensions or by insurance or in any other manner whether similar to the foregoing or not, for any director or former director or the relations, connections or dependants of any director or former director who holds or has held any executive office or employment with the Company or with any body corporate which is or has been a subsidiary of the Company or with a predecessor in business of the Company or of any such subsidiary and may contribute to any fund and pay premiums for the purchase or provisions of any such benefit. No director or former director shall be accountable to the Company or the members for any benefit provided pursuant to this Article and the receipt of any such benefit shall not disqualify any person from being or becoming a director of the Company. Regulation 87 shall not apply.

16.2. The directors may by resolution exercise any power conferred by the Act to make provision for the benefit of persons employed or formerly employed by the Company or any of its subsidiaries in connection with the cessation or the transfer to any person of the whole or part of the undertaking of the company or that subsidiary.

## 17. PROCEEDINGS OF DIRECTORS

17.1. A director who to his knowledge is in any way, whether directly or indirectly, interested in a contract or proposed contract (within the meaning of section 317 of the Act) with the Company shall declare the nature of his interest at a meeting of the directors in accordance with that section. Subject where applicable to such disclosure, a director shall be entitled to vote in respect of any such contract or proposed contract in which he is interested and if he shall do so his vote shall be counted and he shall be taken into account in ascertaining whether a quorum is present. Regulations 94 to 96 (inclusive) shall not apply.

17.2. Without prejudice to the first sentence of Regulation 88, a meeting of the directors or of a committee of the directors may consist of a conference between directors who are not all in one place, but of whom each is able (directly or by telephonic communication) to speak to each of the others, and to be heard by each of the others simultaneously; and the word "meeting" in these Articles and in Table A shall be construed accordingly.

## 18.   NOTICES

18.1.   Any notice or other document may be served on or delivered to any member by the Company either personally or by sending it by post in a prepaid envelope or wrapper addressed to the member at his registered address, or by leaving it at that address addressed to the member, or by any other means authorised in writing by the member concerned. In the case of joint holders of a share, service or delivery of any notice or other document on or to one of the joint holders shall for all purposes be deemed a sufficient service on or delivery to all the joint holders. Regulation 112 shall be modified accordingly.

18.2.   Any notice or other document, if sent by post, shall be deemed to have been served or delivered on the day following that on which it was put in the post and, in proving such service or delivery, it shall be sufficient to prove that the notice or document was properly addressed, stamped and put in the post. Any notice or other document left at a registered address otherwise than by post shall be deemed to have been served or delivered on the day it was so left. Regulation 115 shall not apply.

18.3.   Any notice or other document may be served on or delivered to any person or persons entitled to a share in consequence of the death or bankruptcy of a member by the Company in any manner which would be permitted by the Articles if the person or persons concerned were a member or were members and either addressed to him or them by name or by the title of representatives of the deceased or trustee of the bankrupt or by any like description at the address (if any) within the United Kingdom supplied by him or them for that purpose. Until such address has been supplied, a notice or other document may be served on or delivered to the person or persons so entitled in any manner in which it might have been served or given if the death or bankruptcy had not occurred. Regulation 116 shall not apply.

## 19.   INDEMNITY

19.1.   Subject to the provisions of the Act, but without prejudice to any indemnity to which the person concerned may otherwise be entitled, every director or other officer or auditor of the Company shall be indemnified out of the assets of the Company against any liability incurred by him as such director or other officer or auditor in defending any proceedings, whether civil or criminal, in which judgment is given in his favour or in which he is acquitted or in connection with any application in which relief is granted to him by the court from liability. Regulation 118 shall not apply.

19.2.   The directors shall have power to purchase and maintain for any director, officer or auditor of the Company, insurance against any such liability as is referred to in section 310(1) of the Act.

## NAME AND ADDRESS OF SUBSCRIBER(S)

Nigel Harold John Rogers
Penthouse 10
Regents Court
Wrights Lane
London
W8 5SJ

DATED this 2 NOVEMBER 2006

WITNESS to the above signature(s):

Address: 102 Lane St

Occupation: Trainee Solicitor

# EXHIBIT 7



# Find and update company information

Companies House does not verify the accuracy of the information filed (http://resources.companieshouse.gov.uk/serviceInformation.shtml#compInfo)
Advanced company search (/advanced-search)

MARKEL CAPITAL LIMITED

Company number **03114572**

Follow this company

File for this company (https://beta.companieshouse.gov.uk/company/03114572/authorise?
return_to=/company/03114572)

— Overview (https://beta.companieshouse.gov.uk/company/03114572)

— Filing history (https://beta.companieshouse.gov.uk/company/03114572/filing-history)

— People (https://beta.companieshouse.gov.uk/company/03114572/officers)

— Charges (https://beta.companieshouse.gov.uk/company/03114572/charges)

— More (https://beta.companieshouse.gov.uk/company/03114572/more)

Registered office address
20 Fenchurch Street, London, EC3M 3AZ

Company status
Active

Company type
Private limited Company

Incorporated on
17 October 1995

## Accounts

Next accounts made up to **31 December 2022**
due by **30 September 2023**

Last accounts made up to **31 December 2021**

## Confirmation statement

Next statement date **13 October 2023**
due by **27 October 2023**

Last statement dated **13 October 2022**

# Nature of business (SIC)

- 65120 - Non-life insurance

# Previous company names

| Name | Period |
|------|--------|
| TERRA NOVA CAPITAL LIMITED | 30 Oct 1995 - 20 Apr 2000 |
| CAVEBERRY LIMITED | 17 Oct 1995 - 30 Oct 1995 |

Tell us what you think of this service (https://www.smartsurvey.co.uk/s/getcompanyinformation/) Is there anything wrong with this page? (/help/feedback?sourceurl=https://find-and-update.company-information.service.gov.uk/company/03114572)

Policies Link opens in new tab

Cookies (https://beta.companieshouse.gov.uk/help/cookies)

Contact us Link opens in new tab

Accessibility statement (https://beta.companieshouse.gov.uk/help/accessibility-statement)

Developers Link opens in new tab

Built by Companies House

© Crown copyright



# CS01 (ef)

Companies House

## Confirmation Statement

Company Name: **MARKEL CAPITAL LIMITED**
Company Number: **03114572**

Received for filing in Electronic Format on the: **17/10/2022**

XBEU5WYY

Company Name: **MARKEL CAPITAL LIMITED**

Company Number: **03114572**

Confirmation Statement date: **13/10/2022**

# Confirmation Statement

I confirm that all information required to be delivered by the company to the registrar in relation to the confirmation period concerned either has been delivered or is being delivered at the same time as the confirmation statement

# Authorisation

Authenticated

This form was authorised by one of the following:

Director, Secretary, Person Authorised, Charity Commission Receiver and Manager, CIC Manager, Judicial Factor

**FILE COPY**



# CERTIFICATE OF INCORPORATION
# OF A PRIVATE LIMITED COMPANY

## Company No.  3114572

The Registrar of Companies for England and Wales hereby certifies that

CAVEBERRY LIMITED

is this day incorporated under the Companies Act 1985 as a private

company and that the company is limited.

Given at Companies House, Cardiff, the  17th October 1995

*N03114572A*

M.LEWIS

For the Registrar of Companies



*C O M P A N I E S   H O U S E*

HC007B

# G

## Statutory Declaration of compliance with requirements on application for registration of a company

**12**

CHA 116

Please do not
write in
this margin

Pursuant to section 12(3) of the Companies Act 1985

Please complete
legibly, preferably
in black type, or
bold block lettering

To the Registrar of Companies

For official use

For official use

Name of company

\* CAVEBERRY LIMITED

* insert full
  name of Company

I, ANGELA ORBAN ON BEHALF OF LEGIBUS SECRETARIES LIMITED

of  200 ALDERSGATE STREET

 LONDON   EC1A 4JJ

† delete as
appropriate

do solemnly and sincerely declare that I am a [Solicitor engaged in the formation of the company] †
[person named as director or secretary of the company in the statement delivered to the registrar
under section 10(2)] † and that all the requirements of the above Act in respect of the registration of the
above company and of matters precedent and incidental to it have been complied with.

And I make this solemn declaration conscientiously believing the same to be true and by virtue of the
provisions of the Statutory Declarations Act 1835

Declared at  150 ALDERSGATE STREET

 LONDON EC1

Declarant to sign below

the  10th  day of October
One thousand nine hundred and ninety-five
before me  M Pharrombe

*For and on behalf of* LEGIBUS SECRETARIES LTD.

*Authorised Signatory*

A Commissioner for Oaths or Notary Public or Justice of
the Peace or Solicitor having the powers conferred on a
Commissioner for Oaths.

Presentor's name address and
reference (if any):
Legibus Secretaries Ltd
200 Aldersgate Street
London   EC1A 4JJ

For official Use
New Companies Section

Post room

KLO  *KNANTFIU*  753
COMPANIES HOUSE 10/10/95

PJC/CAL

| Package: | 'Laserform' by Laserform International Ltd. |
| Companies House Approval No: | CHA 116 |

# 10

## Statement of first directors and secretary and intended situation of registered office

This form should be completed in black.

**CN**      For official use

**Company name** *(in full)*    CAVEBERRY LIMITED

**Registered office** of the company on incorporation.

**RO** 200 Aldersgate Street

Post town    London

County/Region

Postcode    EC1A 4JJ

If the memorandum is delivered by an agent for the subscribers of the memorandum mark 'X' in the box opposite and give the agent's name and address.

[ x ]

Name    LEGIBUS SECRETARIES LIMITED

**RA** 200 Aldersgate Street

Post town    London

County/Region

Postcode    EC1A 4JJ

KLO *KNANSFIT* 752
COMPANIES HOUSE 10/10/95

Number of continuation sheets attached

To whom should Companies House direct any enquiries about the information shown in this form?

LEGIBUS SECRETARIES LIMITED   ATTN: Mrs D Ward

200 Aldersgate Street

London     Postcode    EC1A 4JJ

Telephone    0171-600 1000     Extension    1562

Page 1

## Company Secretary

**Name**

*Style/Title

| CS | |

Forenames

Surname

LEGIBUS SECRETARIES LIMITED

*Honours etc

Previous forenames

Previous surname

**Address**

Usual residential address must be given.

In the case of a corporation, give the registered or principal office address.

| AD | 200 Aldersgate Street |

Post town   London

County/Region

Postcode   EC1A 4JJ    Country   England

I consent to act as secretary of the company named on page 1

*For and on behalf of LEGIBUS SECRETARIES LTD.*

**Consent signature**   Signed _(signature)_    Date 6·10·95

*Authorised Signatory*

## Directors

*Please list directors in alphabetical order.*

**Name**

*Style/Title

| CD | Mr |

Forenames   Peter John

Surname   CHARLTON

*Honours etc

Previous forenames

Previous surname

**Address**

Usual residential address must be given.

In the case of a corporation, give the registered or principal office address.

| AD | 17 Kirkdale Road |

Post town   Harpenden

County/Region   Hertfordshire

Postcode    Country   England

Date of birth   | DO | 1 6 1 2 5 5 |   Nationality | NA | British

Business occupation   | OC | Solicitor |

Other directorships   | OD | Legibus Secretaries Ltd., Legibus Nominees Ltd., |

Clifford Chance Ltd.

I consent to act as director of the company named on page 1

Page 2    **Consent signature**   Signed _(signature)_    Date 4·10·95

* Voluntary details

## Directors (continued)

**Name**

| | | |
|---|---|---|
| *Style/Title | **CD** | Mr |
| Forenames | | Martin Edgar |
| Surname | | RICHARDS |
| *Honours etc | | |
| Previous forenames | | |
| Previous surname | | |

**Address**

Usual residential address must be given.
In the case of a corporation, give the registered or principal office address.

| | | |
|---|---|---|
| | **AD** | 89 Thurleigh Road |
| | | |
| Post town | | London |
| County/Region | | |
| Postcode | SW12 8TY | Country England |
| Date of birth | **DO** 2 7 0 2 4 3 | Nationality **NA** British |
| Business occupation | **OC** Solicitor | |
| Other directorships | **OD** Legibus Secretaries Ltd., Legibus Nominees Ltd. | |

\* Voluntary details

I consent to act as director of the company named on page 1

**Consent signature**

Signed *M.E. Richard* Date 4·10·95

---

Delete if the form is signed by the subscribers.

Signature of agent on behalf of all subscribers    Date

---

Delete if the form is signed by an agent on behalf of all the subscribers.

All the subscribers must sign either personally or by a person or persons authorised to sign for them.

| | |
|---|---|
| Signed *e.e.* | Date 6/10/95 |
| Signed For and on behalf of Legibus Nominees Limited | Date |
| Signed *A.C.Olsen* | Date 6·10·95 |
| Signed For and on behalf of Legibus Secretaries Limited | Date |
| Signed | Date |
| Signed | Date |

Page 3

# Notes

1 Show for an individual the full forenames NOT INITIALS and surname together with any previous forenames or surname(s).

If the director or secretary is a corporation or Scottish firm - show the corporate or firm name on the surname line.

Give previous forenames or surname except that:

- for a married woman, the name by which she was known before marriage need not be given,

- names not used since the age of 18 or for at least 20 years need not be given.

In the case of a peer, or an individual usually known by a British title, you may state the title instead of or in addition to the forenames and surname and you need not give the name by which that person was known before he or she adopted the title or succeeded to it.

Address:

Give the usual residential address.

In the case of a corporation or Scottish firm give the registered or principal office.

2 Directors known by another description:

A director includes any person who occupies that position even if called by a different name, for example, governor, member of council. It also includes a shadow director.

3 Directors details:

Show for each individual director their date of birth, business occupation and nationality. **The date of birth must be given for every individual director.**

4 Other directorships:

Give the name of every company of which the individual concerned is a director or has been a director at any time in the past 5 years. You may exclude a company which either **is or at all times during the past 5 years** when the person was a director **was**

- dormant,

- a parent company which wholly owned the company making the return,

- a wholly owned subsidiary of the company making the return,

- another wholly owned subsidiary of the same parent company.

If there is insufficient space on the form for other directorships you may use a separate sheet of paper.

5 Use photocopies of page 2 to provide details of joint secretaries or additional directors and include the company's name and number.

6 The address for companies registered in England and Wales is:-

The Registrar of Companies
Companies House
Crown Way
Cardiff
CF4 3UZ

or, for companies registered in Scotland:-

The Registrar of Companies
Companies House
100-102 George Street
Edinburgh
EH2 3DJ

THE COMPANIES ACTS 1985 AND 1989



3114572

KLO    *KNANBFIC*    735
COMPANIES HOUSE 10/10/95

---

PRIVATE COMPANY LIMITED BY SHARES

---

MEMORANDUM OF ASSOCIATION

of



NC
1 1 OCT 1995
£20 FEE PAID
COMPANIES
HOUSE

CAVEBERRY LIMITED

1.    The Company's name is "CAVEBERRY LIMITED".

2.    The Company's registered office is to be situated in England and Wales.

3.    The Company's objects are:

(A)    (i)    To carry on business as manufacturers, builders and suppliers of and dealers in goods of all kinds, and as mechanical, general, electrical, marine, radio, electronic, aeronautical, chemical, petroleum, gas civil and constructional engineers, and manufacturers, importers and exporters of, dealers in machinery, plant and equipment of all descriptions and component parts thereof, forgings, castings, tools, implements, apparatus and all other articles and things.

(ii)    To act as an investment holding company and to co-ordinate the business of any companies in which the Company is for the time being interested, and to acquire (whether by original subscription, tender, purchase exchange or otherwise) the whole of or any part of the stock, shares, debentures, debenture stocks, bonds and other securities issued or guaranteed by a body corporate constituted or carrying on business in any part of the world or by any government, sovereign ruler, commissioners, public body or authority and to hold the same as investments, and to sell, exchange, carry and dispose of the same.

(iii)    To carry on the businesses in any part of the world as importers, exporters, buyers, sellers, distributors and dealers and to win, process and work produce of all kinds.

(B)    To carry on the following businesses, namely, contractors, garage proprietors, filling station proprietors, owners and charterers of road vehicles, aircraft and ships and boats of every description, lightermen and carriers of goods and passengers by road, rail, water or air, forwarding, transport and commission agents, customs agents, stevedores, wharfingers, cargo superintendents, packers, warehouse storekeepers, cold store keepers,

290925

hotel proprietors, caterers, publicans, consultants, advisers, financiers, bankers, advertising agents, insurance brokers, travel agents, ticket agents and agency business of all kinds and generally to provide entertainment for and render services of all kinds to others and to carry on any other trade or business which can in the opinion of the directors be advantageously carried on by the Company in connection with or ancillary to any of the businesses of the Company.

(C)     To buy, sell, manufacture, repair, alter, improve, manipulate, prepare for market, let on hire, and generally deal in all kinds of plant, machinery, apparatus, tools, utensils, materials, produce, substances, articles and things for the purpose of any of the businesses specified in clause 3, or which may be required by persons having, or about to have, dealings with the Company.

(D)     To build, construct, maintain, alter, enlarge, pull down, remove and replace any buildings, shops, factories, offices, works, machinery and engines, and to work, manage and control these things.

(E)     To enter into contracts, agreements and arrangements with any person for the carrying out by that person on behalf of the Company of any object for which the Company is formed.

(F)     To acquire, undertake and carry on the whole or any part of the business, property and liabilities of any person carrying on any business which may in the opinion of the directors be capable of being conveniently carried on, or calculated directly or indirectly to enhance the value of or make profitable any of the Company's property or rights, or any property suitable for the purposes of the Company.

(G)     To enter into any arrangement with a government or authority, whether national, international, supreme, municipal, local or otherwise, that may in the opinion of the directors be conducive to any object of the Company, and to obtain from that government or authority any right, privilege or concession which in the opinion of the directors is desirable, and to carry out, exercise and comply with that arrangement, right, privilege or concession.

(H)     To apply for, purchase and by other means acquire, protect, prolong and renew any patent, patent right, brevet d'invention, licence, secret process, invention, trade mark, service mark, copyright, registered design, protection, concession and right of the same or similar effect or nature, and to use, turn to account, manufacture under and grant licences and privileges in respect of those things, and to spend money in experimenting with, testing, researching, improving and seeking to improve any of those things.

(I)     To acquire an interest in, amalgamate with and enter into partnership or any arrangement for the sharing of profits, union of interests, co-operation, joint venture, reciprocal concession or otherwise with any person, or with any employees of the Company. To lend money to, guarantee the contracts of, and otherwise assist that person or those employees, and to take and otherwise acquire an interest in that person's shares or other securities and to sell, hold, re-issue, with or without guarantee, and otherwise deal with those shares or other securities.

(J) To lend money to, subsidise and assist any person, to act as agents for the collection, receipt and payment of money and generally to act as agents and brokers for and perform services for any person, and to undertake and perform sub-contracts.

(K) To enter into any guarantee or contract of indemnity or suretyship, and to provide security, including, without limitation, the guarantee and provision of security for the performance of the obligations of and the payment of any money (including, without limitation, capital, principal, premiums, dividends, interest, commissions, charges, discount and any related costs or expenses whether on shares or other securities) by any person including, without limitation, any body corporate which is for the time being the Company's holding company, the Company's subsidiary, a subsidiary of the Company's holding company or any person which is for the time being a member or otherwise has an interest in the Company or is associated with the Company in any business or venture, with or without the Company receiving any consideration or advantage (whether direct or indirect), and whether by personal covenant or mortgage, charge or lien over all or part of the Company's undertaking, property, assets or uncalled capital (present and future) or by other means. For the purposes of paragraph (K) "guarantee" includes any obligation, however described, to pay, satisfy, provide funds for the payment or satisfaction of (including, without limitation, by advance of money, purchase of or subscription for shares or other securities and purchase of assets or services), indemnify against the consequences of default in the payment of, or otherwise be responsible for, any indebtedness of any other person.

(L) To promote, finance and assist any person for the purpose of acquiring all or any of the property, rights and undertaking or assuming the liabilities of the Company, and for any other purpose which may in the opinion of the directors directly or indirectly benefit the Company, and in that connection to place, guarantee the placing of, underwrite, subscribe for, and otherwise acquire all or any part of the shares or other securities of a body corporate.

(M) To pay out of the funds of the Company all or any expenses which the Company may lawfully pay of or incidental to the formation, registration, promotion and advertising of and raising money for the Company and the issue of its shares or other securities, including, without limitation, those incurred in connection with the advertising and offering of its shares or other securities for sale or subscription, brokerage and commissions for obtaining applications for and taking, placing, underwriting or procuring the underwriting of its shares or other securities.

(N) To remunerate any person for services rendered or to be rendered to the Company, including, without limitation, by cash payment or by the allotment of shares or other securities of the Company, credited as paid up in full or in part.

(O) To purchase, take on lease, exchange, hire and otherwise acquire any real or personal property and any right or privilege over or in respect of it.

(P) To receive money on deposit on any terms the directors think fit.

(Q)     To invest and deal with the Company's money and funds in any way the directors think fit.

(R)     To lend money and give credit with or without security.

(S)     To borrow, raise and secure the payment of money in any way the directors think fit, including, without limitation, by the issue of debentures and other securities, perpetual or otherwise, charged on all or any of the Company's property (present and future) or its uncalled capital, and to purchase, redeem and pay off those securities.

(T)     To remunerate any person for services rendered or to be rendered in placing, assisting and guaranteeing the placing and procuring the underwriting of any share or other security of the Company or of any person in which the Company may be interested or proposes to be interested, or in connection with the conduct of the business of the Company, including, without limitation, by cash payment or by the allotment of shares or other securities of the Company, credited as paid up in full or in part.

(U)     To subscribe for, acquire and hold (in each case absolutely or conditionally) shares, debentures and other securities of any person and to co-ordinate, finance and manage the business and operation of any person in which the Company has an interest.

(V)     To draw, make, accept, endorse, discount, execute and issue promissory notes, bills of exchange, bills of lading, warrants, debentures and other negotiable or transferable instruments.

(W)     To sell, lease, exchange, let on hire and dispose of any real or personal property and the whole or part of the undertaking of the Company, for such consideration as the directors think fit, including, without limitation, for shares, debentures or other securities, whether fully or partly paid up, of any person, whether or not having objects (altogether or in part) similar to those of the Company. To hold any shares, debentures and other securities so acquired, and to improve, manage, develop, sell, exchange, lease, mortgage, dispose of, grant options over, turn to account and otherwise deal with all or any part of the property and rights of the Company.

(X)     To adopt any means of publicising and making known the businesses, services and products of the Company as the directors think fit, including, without limitation, advertisement, publication and distribution of notices, circulars, books and periodicals, purchase and exhibition of works of art and interest and granting and making of prizes, rewards and donations.

(Y)     To support, subscribe to and contribute to any charitable or public object and any institution, society and club which may be for the benefit of the Company or persons who are or were directors, officers or employees of the Company, its predecessor in business, any subsidiary of the Company or any person allied to or associated with the Company, or which may be connected with any town or place where the Company carries on business. To subsidise and assist any association of employers or employees and any trade association. To grant pensions, gratuities, annuities and charitable aid and to provide advantages, facilities and services to any person (including any director or former

director) who may have been employed by or provided services to the Company, its predecessor in business, any subsidiary of the Company or any person allied to or associated with the Company and to the spouses, children, dependants and relatives of those persons and to make advance provision for the payment of those pensions, gratuities and annuities by establishing or acceding to any trust, scheme or arrangement (whether or not capable of approval by the Commissioners of Inland Revenue under any relevant legislation) the directors think fit, to appoint trustees and to act as trustee of any trust, scheme or arrangement, and to make payments towards insurance for the benefit of those persons and their spouses, children, dependants and relatives.

(Z)     To establish and contribute to any scheme for the purchase or subscription by trustees of shares or other securities of the Company to be held for the benefit of the employees of the Company, any subsidiary of the Company or any person allied to or associated with the Company, to lend money to those employees or to trustees on their behalf to enable them to purchase or subscribe for shares or other securities of the Company and to formulate and carry into effect any scheme for sharing the profits of the Company with employees.

(AA)    To apply for, promote and obtain any Act of Parliament and any order or licence of any government department or authority (including, without limitation, the Department of Trade and Industry) to enable the Company to carry any of its objects into effect, to effect any modification of the Company's constitution and for any other purpose which the directors think fit, and to oppose any proceeding or application which may in the opinion of the directors directly or indirectly prejudice the Company's interests.

(BB)    To establish, grant and take up agencies, and to do all other things the directors may deem conducive to the carrying on of the Company's business as principal or agent, and to remunerate any person in connection with the establishment or granting of an agency on the terms and conditions the directors think fit.

(CC)    To distribute among the shareholders in specie any of the Company's property and any proceeds of sale or disposal of any of the Company's property and for that purpose to distinguish and separate capital from profits, but no distribution amounting to a reduction of capital may be made without any sanction required by law.

(DD)    To purchase and maintain insurance for the benefit of any person who is or was an officer or employee of the Company, a subsidiary of the Company or a company in which the Company has or had an interest (whether direct or indirect) or who is or was trustee of any retirement benefits scheme or any other trust in which any officer or employee or former officer or employee is or has been interested, indemnifying that person against liability for negligence, default, breach of duty or breach of trust or any other liability which may lawfully be insured against.

(EE)    To amalgamate with any other person and to procure the Company to be registered or recognised in any part of the world.

(FF)  Subject to the Act, to give (whether directly or indirectly) any kind of financial assistance (as defined in section 152(1)(a) of the Act) for any purpose specified in section 151(1) or section 151(2) of the Act.

(GG)  To do all or any of the things provided in any paragraph of clause 3:

(i)  in any part of the world;

(ii)  as principal, agent, contractor, trustee or otherwise;

(iii)  by or through trustees, agents, subcontractors or otherwise; and

(iv)  alone or with another person or persons.

(HH)  To do all things that are in the opinion of the directors incidental or conducive to the attainment of all or any of the Company's objects, or the exercise of all or any of its powers.

(II)  The objects specified in each paragraph of clause 3 shall, except where otherwise provided in that paragraph, be regarded as independent objects, and are not limited or restricted by reference to or inference from the terms of any other paragraph or the name of the Company.  None of the paragraphs of clause 3 or the objects or powers specified or conferred in or by them is deemed subsidiary or ancillary to the objects or powers mentioned in any other paragraph.  The Company has as full a power to exercise all or any of the objects and powers provided in each paragraph as if each paragraph contained the objects of a separate company.

(JJ)  In clause 3, a reference to:

(i)  a "person" includes a reference to a body corporate, association or partnership whether domiciled in the United Kingdom or elsewhere and whether incorporated or unincorporated;

(ii)  the "Act" is, unless the context otherwise requires, a reference to the Companies Act 1985, as modified or re-enacted or both from time to time; and

(iii)  a "subsidiary" or "holding company" is to be construed in accordance with section 736 of the Act.

4.  The liability of the members is limited.

5.  The Company's share capital is US$100 (Sterling equivalent £64.40) divided into 100 shares of $1 each.

WE, the subscribers to this memorandum of association, wish to be formed into a company pursuant to this memorandum; and we agree to take the number of shares in the capital of the company shown opposite our respective names.

| NAMES AND ADDRESSES OF SUBSCRIBERS | Number of shares taken by each Subscriber |
|---|---|
| *e.E. B* | *One* |
| CHANTAL ELIZABETH BRACKENBURY<br>For and on behalf of<br>Legibus Nominees Limited<br>200 Aldersgate Street<br>London  EC1A 4JJ | ONE |
| *[signature]* | *o-e* |
| ANGELA ORBAN<br>For and on behalf of<br>Legibus Secretaries Limited<br>200 Aldersgate Street<br>London  EC1A 4JJ | ONE |

DATED the  *9th*  day of  *October* , 1995.

WITNESS to all the above Signatures:-

DENISE WARD    *[signature]*
200 Aldersgate Street
London  EC1A 4JJ

THE COMPANIES ACTS 1985 AND 1989

PRIVATE COMPANY LIMITED BY SHARES

ARTICLES OF ASSOCIATION

of

CAVEBERRY LIMITED

PRELIMINARY

1.    (A)    The regulations contained in Table A in the Schedule to the Companies (Table A to F) Regulations 1985 (as amended) ("**Table A**") apply to the Company except to the extent that they are excluded or modified by these articles.

      (B)    The regulations of Table A numbered 24, 38, 60, 61, 64, 73, 74, 75, 76, 77, 78, 80, 81, 90, 94, 95, 96, 97, 98, 115 and 118 do not apply. The regulations of Table A numbered 37, 40, 46, 53, 54, 57, 59, 62, 65, 66, 67, 68, 72, 79, 88, 110, 112 and 116 are modified. Subject to these exclusions and modifications, and in addition to the remaining regulations of Table A, the following are the articles of association of the Company.

      (C)    Where an ordinary resolution of the Company is expressed to be required for any purpose, a special or extraordinary resolution is also effective for that purpose, and where an extraordinary resolution is expressed to be required for any purpose, a special resolution is also effective for that purpose.

PRIVATE COMPANY

2.    The Company is a private company limited by shares and accordingly any invitation to the public to subscribe for any shares or debentures of the Company is prohibited.

## SHARE CAPITAL

3. The authorised share capital of the Company at the date of incorporation of the Company is US$100 (Sterling equivalent £64.40) divided into 100 shares of $1 each.

4. (A) Subject to the provisions of the Act, the directors have general and unconditional authority to allot (with or without conferring rights of renunciation), grant options over, offer or otherwise deal with or dispose of any unissued shares of the Company (whether forming part of the original or any increased share capital) to such persons, at such times and on such terms and conditions as the directors may decide but no share may be issued at a discount.

   (B) The directors have general and unconditional authority, pursuant to section 80 of the Act, to exercise all powers of the Company to allot relevant securities for a period expiring on the fifth anniversary of the date of incorporation of the Company unless previously renewed, varied or revoked by the Company in general meeting.

   (C) The maximum amount of relevant securities which may be allotted pursuant to the authority conferred by paragraph (B) is the amount of the authorised but as yet unissued share capital of the Company at the date of incorporation of the Company.

   (D) By the authority conferred by paragraph (B), the directors may before the authority expires make an offer or agreement which would or might require relevant securities of the Company to be allotted after it expires and may allot relevant securities in pursuance of that offer or agreement.

5. The pre-emption provisions of section 89(1) of the Act and the provisions of sub-sections (1) to (6) inclusive of section 90 of the Act do not apply to any allotment of the Company's equity securities.

## TRANSFERS

6. The directors may, in their absolute discretion and without giving any reason, refuse to register the transfer of a share to any person, whether or not it is a fully-paid share or a share on which the Company has a lien.

## GENERAL MEETINGS

7. Regulation 37 of Table A is modified by the deletion of the words "eight weeks" and the substitution for them of the words "28 days".

## NOTICE OF GENERAL MEETINGS

8. An annual general meeting and an extraordinary general meeting called for the passing of a special resolution or an elective resolution must be called by at least 21 clear days' notice. All other extraordinary general meetings must be called by at least 14 clear days' notice but a general meeting, other than a meeting called for the passing of an elective resolution, may be called by shorter notice if it is so agreed:

(a)     in the case of an annual general meeting, by all the members entitled to attend and vote at that meeting; and

(b)     in the case of any other meeting, by a majority in number of the members having a right to attend and vote, being (i) a majority together holding not less than such percentage in nominal value of the shares giving that right as has been determined by elective resolution of the members in accordance with the Act, or (ii) if no such elective resolution is in force, a majority together holding not less than 95 per cent. in nominal value of the shares giving that right.

The notice must specify the time and place of the meeting and the general nature of the business to be transacted and, in the case of an annual general meeting, must specify that the meeting is an annual general meeting.

Subject to the provisions of the articles and to any restrictions imposed on any shares, the notice must be given to all the members, to all persons entitled to a share in consequence of the death or bankruptcy of a member and to the directors and auditors.

## PROCEEDINGS AT GENERAL MEETINGS

9.     A poll may be demanded by the chairman or by any member present in person or by proxy and entitled to vote and regulation 46 of Table A is modified accordingly.

10.     Regulation 53 of Table A is modified by the addition at the end of the following sentence: "If a resolution in writing is described as a special resolution or as an extraordinary resolution, it has effect accordingly.".

## VOTES OF MEMBERS

11.     Regulation 57 of Table A is modified by the inclusion after the word "shall" of the phrase ", unless the directors otherwise determine,".

12.     Regulation 59 of Table A is modified by the addition at the end of the following sentence: "Deposit of an instrument of proxy does not preclude a member from attending and voting at the meeting or at any adjournment of it.".

13.     An instrument appointing a proxy must be in writing in any usual form or in any other form which the directors may approve and must be executed by or on behalf of the appointor.

14.     Regulation 62 of Table A is modified by the deletion in paragraph (a) of the words "deposited at" and by the substitution for them of the words "left at or sent by post or by facsimile transmission to", by the substitution in paragraph (a) of the words "at any time" in place of "not less than 48 hours" and by the substitution in paragraph (b) of the words "at any time" in place of "not less than 24 hours.".

## NUMBER OF DIRECTORS

15.    Unless otherwise determined by ordinary resolution, the number of directors (other than alternate directors) is not subject to any maximum and the minimum number is one.

## ALTERNATE DIRECTORS

16.    A director may appoint any person willing to act, whether or not he is a director of the Company, to be an alternate director. That person need not be approved by resolution of the directors, and regulation 65 is modified accordingly.

17.    An alternate director who is absent from the United Kingdom is entitled to receive notice of all meetings of directors and meetings of committees of directors and regulation 66 of Table A is modified accordingly.

18.    Regulation 68 of Table A is modified by the addition at the end of the following sentence: "Any such notice may be left at or sent by post or facsimile transmission to the office or another place designated for the purpose by the directors.".

## DELEGATION OF DIRECTORS' POWERS

19.    Regulation 72 is modified by the addition at the end of the regulation of the following sentence: "Where a provision of the articles refers to the exercise of a power, authority or discretion by the directors and that power, authority or discretion has been delegated by the directors to a committee, the provision must be construed as permitting the exercise of the power, authority or discretion by the committee.".

## APPOINTMENT AND REMOVAL OF DIRECTORS

20.    The directors are not subject to retirement by rotation. Regulations 73, 74 and 75 of Table A do not apply, and reference in any other regulation to retirement by rotation must be disregarded.

21.    The Company may by ordinary resolution appoint a person who is willing to act to be a director either to fill a vacancy or as an additional director.

22.    A person appointed by the directors to fill a vacancy or as an additional director is not required to retire from office at the annual general meeting next following his appointment and the last two sentences of regulation 79 of Table A are deleted.

23.    No person is incapable of being appointed a director by reason of his having reached the age of 70 or another age. No special notice is required in connection with the appointment or the approval of the appointment of such person. No director is required to vacate his office at any time because he has reached the age of 70 or another age and section 293 of the Act does not apply to the Company.

24.    The holder or holders of more than half in nominal value of the shares giving the right to attend and vote at general meetings of the Company may remove a director from office and

appoint a person to be a director, but only if the appointment does not cause the number of directors to exceed a number fixed by or in accordance with the articles as the maximum number of directors. The removal or appointment is effected by notice to the Company signed by or on behalf of the holder or holders. The notice may consist of several documents in similar form each signed by or on behalf of one or more holders and shall be left at or sent by post or facsimile transmission to the office or such other place designated by the directors for the purpose. The removal or appointment takes effect immediately on deposit of the notice in accordance with the articles or on such later date (if any) specified in the notice.

## DISQUALIFICATION AND REMOVAL OF DIRECTORS

25. The office of a director is vacated if:

   (a) he ceases to be a director by virtue of any provision of the Act or he becomes prohibited by law from being a director; or

   (b) he becomes bankrupt or makes any arrangement or composition with his creditors generally; or

   (c) he becomes, in the opinion of all his co-directors, incapable by reason of mental disorder of discharging his duties as director; or

   (d) he resigns his office by notice to the Company; or

   (e) he is for more than six consecutive months absent without permission of the directors from meetings of directors held during that period and his alternate director (if any) has not during that period attended any such meetings instead of him, and the directors resolve that his office be vacated; or

   (f) he is removed from office by notice addressed to him at his last-known address and signed by all his co-directors; or

   (g) he is removed from office by notice given by a member or members under article 24.

## REMUNERATION OF DIRECTORS

26. A director who, at the request of the directors, goes or resides abroad, makes a special journey or performs a special service on behalf of the Company may be paid such reasonable additional remuneration (whether by way of salary, percentage of profits or otherwise) and expenses as the directors may decide.

## PROCEEDINGS OF DIRECTORS

27. Regulation 88 of Table A is modified by the exclusion of the third sentence and the substitution for it of the following sentences: "Every director must receive notice of a meeting, whether or not he is absent from the United Kingdom. A director may waive the

requirement that notice be given to him of a board meeting, either prospectively or retrospectively.".

28. A director or his alternate may validly participate in a meeting of the directors or a committee of directors through the medium of conference telephone or similar form of communication equipment if all persons participating in the meeting are able to hear and speak to each other throughout the meeting. A person participating in this way is deemed to be present in person at the meeting and is counted in a quorum and entitled to vote. Subject to the Act, all business transacted in this way by the directors or a committee of directors is for the purposes of the articles deemed to be validly and effectively transacted at a meeting of the directors or of a committee of directors although fewer than two directors or alternate directors are physically present at the same place. The meeting is deemed to take place where the largest group of those participating is assembled or, if there is no such group, where the chairman of the meeting then is.

29. If and for so long as there is a sole director, he may exercise all the powers conferred on the directors by the articles by resolution in writing signed by him, and regulations 88, 89, 91 and 93 of Table A and article 28 do not apply.

30. Without prejudice to the obligation of any director to disclose his interest in accordance with section 317 of the Act, a director may vote at a meeting of directors or of a committee of directors on any resolution concerning a matter in respect of which he has, directly or indirectly, an interest or duty. The director must be counted in the quorum present at a meeting when any such resolution is under consideration and if he votes his vote must be counted.

## DIVIDENDS

31. The directors may deduct from a dividend or other amounts payable to a person in respect of a share any amounts due from him to the Company on account of a call or otherwise in relation to a share.

## CAPITALISATION OF PROFITS

32. The directors may, with the authority of an ordinary resolution of the Company, resolve that any shares allotted under regulation 110 of Table A to any member in respect of a holding by him of any partly-paid shares rank for dividend, so long as those shares remain partly paid, only to the extent that those partly-paid shares rank for dividend and regulation 110 of Table A is modified accordingly.

## NOTICES

33. Regulation 112 of Table A is modified by the deletion of the last sentence and the substitution for it of the following: "A member whose registered address is not within the United Kingdom is entitled to have notices given to him at that address.".

34. A notice sent to a member (or another person entitled to receive notices under the articles) by post to an address within the United Kingdom is deemed to be given:

(a)     24 hours after posting, if pre-paid as first class, or

(b)     48 hours after posting, if pre-paid as second class.

A notice sent to a member (or other person entitled to receive notices under the articles) by post to an address outside the United Kingdom is deemed to be given 72 hours after posting, if pre-paid as airmail. Proof that an envelope containing the notice was properly addressed, pre-paid and posted is conclusive evidence that the notice was given. A notice not sent by post but left at a member's registered address is deemed to have been given on the day it was left.

35.     Regulation 116 of Table A is modified by the deletion of the words "within the United Kingdom".

## INDEMNITY

36.     Subject to the provisions of the Act, but without prejudice to an indemnity to which he may otherwise be entitled, every director, alternate director or secretary of the Company must be indemnified out of the assets of the Company against all costs, charges, losses and liabilities incurred by him in the execution of his duties or the exercise of his powers, authorities and discretions including, without limitation, a liability incurred:

(a)     defending proceedings (whether civil or criminal) in which judgment is given in his favour or in which he is acquitted, or which are otherwise disposed of without a finding or admission of material breach of duty on his part, or

(b)     in connection with any application in which relief is granted to him by the court from liability for negligence, default, breach of duty or breach of trust in relation to the affairs of the Company.

37.     The directors may exercise all the powers of the Company to purchase and maintain insurance for the benefit of a person who is an officer or employee, or former officer or employee, of the Company or of a company which is a subsidiary undertaking of the Company or in which the Company has an interest (whether direct or indirect), or who is or was trustee of a retirement benefits scheme or another trust in which an officer or employee or former officer or employee is or has been interested, indemnifying him against liability for negligence, default, breach of duty or breach of trust or another liability which may lawfully be insured against by the Company.

## SOLE MEMBER

38.     If and for so long as the Company has only one member:

(a)     in relation to a general meeting, the sole member or a proxy for that member or (if the member is a corporation) a duly authorised representative of that member is a quorum and regulation 40 of Table A is modified accordingly;

(b)    a proxy for the sole member may vote on a show of hands and regulation 54 of Table A is modified accordingly;

(c)    the sole member may agree that any general meeting, other than a meeting called for the passing of an elective resolution, be called by shorter notice than that provided for by the articles; and

(d)    all other provisions of the articles apply with any necessary modification (unless the provision expressly provides otherwise).

## NAMES AND ADDRESSES OF SUBSCRIBERS

*e. E.*

CHANTAL ELIZABETH BRACKENBURY
For and on behalf of
Legibus Nominees Limited
200 Aldersgate Street
London  EC1A 4JJ


ANGELA ORBAN
For and on behalf of
Legibus Secretaries Limited
200 Aldersgate Street
London  EC1A 4JJ


DATED this 9th day of October 1995

WITNESS to the above signatures:

Denise Ward
200 Aldersgate Street
London EC1A 4JJ


CAL556A1.39

- 16 -